IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PRACTICEWORKS, INC., ET AL.    *

                              *

v.                    *    Civil No. JFM-02-1205

                              *

PROFESSIONAL SOFTWARE    *
SOLUTIONS OF ILLINOIS, INC.    *

                        *****

PRACTICEWORKS, INC., ET AL.    *

                              *

v.                    *    Civil No. JFM-02-1206

                              *

DENTAL MEDICAL    *
AUTOMATION, INC.    *

                        *****

MEMORANDUM

Plaintiffs have filed a motion for partial summary judgment to which defendants have

responded. For the reasons stated briefly in this memorandum, the motion will be granted.[1]

A. Applicability of the Copyright Act of 1976

The Copyright Act defines "transfer of copyright ownership" as "an assignment,

mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright

or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or

place of effect but not including a nonexclusive license." 17 U.S.C. §101. One of the exclusive

rights possessed by the owner of a copyright is the right "to distribute copies . . . of the

copyrighted work to the public by sale or other transfer of ownership . . . ." 17 U.S.C. §106(3).

On its face this language may seem broad enough to encompass within the Copyright Act

any sales distribution agreement with respect to a product in which a copyright inheres (such as

---

[1]Unfortunately, I am in the midst of three to four months of trials in multi-defendant
criminal cases and this fact prevents me from writing a more formal opinion.



the software programs which are the subject of the Dealer/Resellers Agreements ("Agreements") in issue in this case). I doubt, however, that this was Congress' intent. Likewise, I am not persuaded that the sporadic use of the term "re-licensing," "license fees," and "royalties" in the Agreements converts what otherwise are clearly dealership sales agreements into copyright licenses.

In any event, even if the Copyright Act does apply, I do not believe that §203 sets a minimum term of thirty-five years in which the license agreement cannot be terminated. Rather, the thirty-five year period is a maximum term. Suffice it to say in this regard that I accept and adopt the reasoning of the courts in *Walthal v. Rusk*, 172 F.3d 481 (7th Cir. 1999) and *Korman v. HBC Florida, Inc.*, 182 F.3d 1291 (11th Cir. 1999), that criticized and declined to follow *Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir. 1993), upon which defendants here rely. Therefore, I find that if the Dealer/Resellers Agreements are terminable at will under Maryland law, they are terminable under the Copyright Act as well. *Korman*, 182 F.3d at 1296-97.[2]

B. Revocability Under Maryland Law

The agreements in issue provide for the sale of software to the defendants and resale of that same software by the defendants to the public. There is no dispute that the software

---

[2]Defendants rely upon the general proposition that "when . . . consideration is paid for a license, it is irrevocable." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 772 (7th Cir. 1996) (*quoting* the district court that cited Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright*,§§ 10.01[C][5], 10.02[B][5] (1995). This proposition merely stands in contrast with another blackletter rule that absent consideration, a nonexclusive license is revocable. *See, e.g.*, *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir. 1994); *Johnson v. Jones*, 885 F. Supp. 1008, 10012 n.6 (E.D. Mich. 1995). It does not mean that once consideration has been paid, a license is perpetually non-revocable. Rather, it is revocable only as permitted by the Copyright Act (which implicitly incorporates state law that is not inconsistent with it). *See Korman v. HBC Florida, Inc.*, 182 F.3d at 1296-97.

constitutes goods. Therefore, the UCC applies. *See* Md. Code Ann., Com. Law, §2-102.[3]

Section 2-309(2) of the UCC provides: "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." Md. Code Ann., Com. Law I § 2-309(2). In *Universal Lite Distribs., Inc. v. Northwest Indus., Inc.*, 602 F.2d 1173 (4th Cir. 1979), the Fourth Circuit addressed the termination of an oral agreement regarding ballasts. The party opposing termination argued that the parties intended that the agreement continue as long as they remained in the ballast business. The Fourth Circuit, however, citing § 2-309(2), affirmed the district court which had determined that the oral agreement was so "indefinite in duration" as to be terminable on reasonable notice. *Id.* at 1175; *see also Best Way Distrib. Co.*, 1989 WL 37395, at *1 (4th Cir. 1989) (unpublished) (holding that a contract was so "indefinite in duration" as to be terminable on reasonable notice where the contract was to remain effective as long as the distributor promoted the products and timely paid its bills).

Thus, I must next determine whether the Agreements are so "indefinite in duration" that they fall within the reasoning of *Universal Lite* and section 2-309(2) of the UCC. Each agreement provides that it "will come into force on January 1, 1993, for an initial period of one

---

[3]Even if the UCC did not apply, I would find that under Maryland common law the Agreements did not establish a perpetual relationship. *See Kiley v. First Nat'l Bank of Maryland*, 649 A.2d 1145, 1153 (Md. Ct. Spec. App. 1994), *cert. denied*, 656 A.2d 772 (Md. 1995), *cert. denied*, 516 U.S. 866 (1995) ("Absent a contrary intention being shown by the circumstances, courts will interpret a promise which does not in term state the time of performance as intending performance in or for a reasonable time."); *see also Giannaris v. Cheng*, 219 F. Supp. 2d 687, 694 (D. Md. 2002); *Pumphrey v. Pelton*, 245 A.2d 301, 303 (Md. 1968) (stating in dicta that there is a "rule that a contract may not exist in perpetuity in the absence of an express provision").

(1) year and shall automatically renew thereafter for successive one (1) year periods and is

subject to earlier termination only as hereinabove provided." (*See* Pl.'s Exs. B and C,

Agreements § 22.)[4]  The Agreements provide five "default" grounds for termination: (1) the

insolvency of either party; (2) a bankruptcy filing with respect to either party; (3) revocation of a

license needed by either party to perform under the Agreements; (4) failure by a defendant to

make required payments under the Agreements; or (5) a judgment that the defendants have

violated the plaintiffs' copyright in the software. (*Id.* § 11.)[5]

 The five default terms do not establish a definite duration for the Agreements.  In *Trient*

*Partners I Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704 (5th Cir. 1996), the court addressed the

question of whether the plaintiff could unilaterally terminate an agreement absent breach or

default by the defendant.  Similar to this case, the state law applicable in *Trient* (Texas's)

provided that "when a contract contemplates continuing performance (or successive

---

 [4]The parties have not argued the point but it appears to me that an implicit premise of this provision may be that the agreement is "automatically renew[ed]" every year unless one of the parties cancels it.  Otherwise, why should any provision for annual renewal be included at all?  Moreover, to what does the word "earlier" in the last clause of the provision refer other than the one year anniversary date?  If the agreement were terminable only in the event of the occurrence of a default, the word "earlier" would be unnecessary.

 [5]The defendants argue that there is a sixth ground for termination: if they fail to meet the purchase quotas established in section 3.1 of the Agreements.  Section 3.1 provides that exclusivity throughout Illinois and Ohio "shall continue during the term of th[ese] Agreement[s] and all renewals thereof for so long as Dealer's purchases from PSS[M] average fifty (50) programs per year."  Section 3.2, however, provides that "PSS[M] reserves the right to revoke this exclusivity in the event that the Dealer does not maintain the purchase quota outlined hereinabove."  The unambiguous terms of the Agreements make clear that if the defendants fail to meet the purchase quota, the plaintiffs have the right to revoke exclusivity, not the entire Agreements.  Thus, the purchase quota provisions of the Agreements do not constitute a sixth grounds for termination.

performances) and is indefinite in duration, it may be terminated at the will of either party." *Id.*

at 708 (citations omitted). The contract in *Trient* provided that it was to "continue indefinitely . .

. until terminated in accordance with the provisions hereof." The referenced provisions expressly

allowed for the termination of the contract upon "(1) defaults by either party that are not or

cannot be cured within a specified number of days; (2) the death or incapacity of a natural person

who is one of [the plaintiff's] partners, if [the defendant] does not consent to the transfer of the

deceased partner's interest; (3) the transfer or change of control of [the plaintiff's] partnership

without [the defendant's] prior approval; and (4) the insolvency of either party." Id. at 709.

The *Trient* court held that these termination conditions did not make the duration of the

contract determinable.

> With regard to the first condition, the License Agreement merely provides that it
> will "continue indefinitely" *until*--meaning "unless"--it is breached by means of an
> incurable or uncured default. Under foundational principles of contract law, the
> term of any contract is terminable by one party upon a total or material breach by
> another party. Accordingly, an agreement which is otherwise indefinite in
> duration and terminable at will cannot be converted into an agreement of definite
> duration by the mere transcription of such universals within the text of the
> contract.

*Id.* (emphasis in original); *see also Profile Prods, LLC v. Soil Mgmt. Techs., Inc.*, 155 F. Supp.

2d 880, 883 (N.D. Ill. 2001) ("[I]t adds nothing to 'specify' that the contract is terminable for

material breach, because 'any contract is terminable for material breach. [A]n agreement which is

otherwise indefinite in duration and terminable at will cannot be converted into an agreement of

definite duration by the mere transcription of such universals within the text of the contract.'")

(*quoting Jespersen v. Minnesota Mining and Mfg. Co.*, 700 N.E.2d 1014, 1016-17 (Ill. 1998)); *cf.*

*Foster-Porter Enter. v. De Mare*, 81 A.2d 325, 333 (Md. 1951) ("If plaintiff had committed a

material breach of his contract, Foster-Porter could have terminated the contract without regard to the provisions of section 10 [the section regarding termination].").

With regard to the remaining three conditions, the *Trient* court held that they did not limit the duration of the contract in any real or concrete way because the contract stated it would "continue indefinitely" and the conditions were likely to never transpire. Accordingly, the court concluded that the contract was terminable at will in accordance with Texas law.

Here, like in *Trient*, the "default" provisions do not make the Agreements definite in duration. The fourth and fifth provisions of the default clause, which respectively provide for termination upon the failure by a defendant to make required payments under the Agreements or a judgment that the defendants have violated the plaintiffs' copyright in the software, are material breaches that do not make the Agreements definite because any contract is terminable for material breach regardless of the termination clause. *Cf. Foster-Porter*, 82 A.2d at 333. The other provisions, like those in *Trient*, also do not establish a definite duration because the Agreements "automatically renew" and the conditions are never likely to transpire, i.e., the insolvency of either party, a bankruptcy filing with respect to either party, or a revocation of a license needed by either party to perform under the Agreements. *See Trient*, 83 F.3d at 709; *see also Universal Lite*, 602 F.3d at 1175 (holding that an agreement was "so 'indefinite in duration' as to be terminable on reasonable notice where the parties intended for the agreement to last as long as the parties remained in their relevant business); *Best Way*, 1989 WL 37395, at *1.

Thus, the Agreements in this case are contracts that fall within the meaning of Md. Code Ann., Com. Law I § 2-309(2). They provide for successive performances and are indefinite in duration because the "default" provisions are essentially rendered meaningless under Maryland

6

law. The two provisions that constitute a material breach are meaningless because any contract

is terminable for material breach regardless of the termination clause. *Cf. Foster-Porter*, 82 A.2d

at 333. The remaining provisions do not render the Agreements definite in duration. *Universal*

*Lite*, 602 F.3d at 1175. Accordingly, the Agreements were terminable upon reasonable notice.[6]

C. Reasonableness of Notice

The issue remains whether the plaintiffs provided reasonable notice of termination to the

defendants. "In determining what constitutes a reasonable duration, reference should be made to

the subject matter of the agreement." *Lerner v. Lerner Corp.*, 750 A.2d 709, 716 (Md. Ct. Spec.

---

[6]Defendants attempt to introduce a plethora of extrinsic evidence which allegedly establishes that the parties intended for the Agreements to last as long as the defendants met the average quota provided in the Agreements. I will not consider this evidence for two reasons. First, extrinsic evidence is only admissible under Maryland law to aid in interpreting an ambiguity in the contract language. *See Eaglehead Corp. v. Cambridge Capital Group, Inc.*, 170 F. Supp. 2d 552, 557 (D. Md. 2001). There is, however, no ambiguity here. In fact, the defendants do not even point to any ambiguous language, instead, arguing that the Agreements are ambiguous because the parties disagree as to their meaning. This argument is illogical. See *Musick v. Musick*, 798 A.2d 1213, 1217 (Md. Ct. Spec. App. 2002) (citation omitted). Defendants also try to create an ambiguity by pointing to extrinsic evidence in which the plaintiffs' predecessor's attorney allegedly stated there was an ambiguity. This attempt to create an ambiguity is also invalid because the ambiguity must exist on the face of the contractual language. *See Eaglehead*, 170 F. Supp. 2d at 557.

Second, the evidence which the defendants seek to introduce directly contradicts the terms of the Agreements. As discussed above, the Agreements provide for the right of plaintiffs to revoke exclusivity if the quota terms are not met. The Agreements do not provide that they may be terminated if the quota provisions are not met. Thus, evidence that the Agreements were to last as long as the defendants met the average quota is contradictory to the plain language of the contracts. Maryland law provides that "[t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreements or of a contemporaneous oral agreement . . . ." Md. Code Ann., Com. Law I § 2-202. Here, there is a final merger clause in the Agreements barring such contradictory evidence. (*See* Pl.'s Exs. B and C, Agreements § 21).

App. 2000) (citations omitted).  Reasonable notification under the UCC is "such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement."  Md. Code Ann., Com. Law I, § 2-309, Official Comment 8.

Although the defendants argue otherwise, determination of the reasonableness of notice is appropriate at the summary judgment stage of the litigation.  *See, e.g., Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 14 (1st Cir. 1999).  Courts have held that time periods much shorter than nine months constitutes reasonable notice.  *See, e.g., id.* (granting summary judgment on one month's notice); *Best Way*, 1989 WL 37395, at *1 (affirming grant of summary judgment where it was undisputed that 90 days constituted reasonable notice).  Furthermore, the defendants have come forward with no evidence that nine months is unreasonable other than the bald assertions of the two sole shareholders of the defendants that nine months is unreasonable and that they have not arranged substitute agreements.  (See Eyer Aff. ¶¶ 13-14; Suglio Aff. ¶¶ 13-14.)  These self-serving statements are insufficient to create a genuine dispute of fact.  *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (*citing Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988)).  Accordingly, I find that nine months constitutes reasonable notice under the UCC.

D.  Defendants' Alleged Right To Continuing Technical Support

In defendants' eighth counterclaim, they seek a declaration that notwithstanding termination and non-renewal of the Agreements, they have certain "continuing rights" under the Agreements.  Specifically, defendants seek a declaration that they are entitled to continue "technical support, services, updates, upgrades and certain electronic services to their former and existing customers of the Software and related products."  Defendants have not opposed

8

plaintiffs' motion for summary judgment on this counterclaim. They point to no language in the Agreements, and there is none, that allows them to continue to sell updates, upgrades, and provide certain electronic services following termination of the Agreements. Defendants are also required to "immediately return [to the plaintiffs] any and all materials regarding the Products in any form whatsoever." (Pl.'s Exs. B and C, Agreements § 13.3.) Thus, they are not entitled to continue technical support and services anticipated in the Agreements.[7]

E. Attorneys' Fees

Section 17 of the Agreement provides that "[i]n the event that any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all of the sums that the unsuccessful party may be called on to pay, a reasonable sum for the successful party's reasonable attorneys' fees." The validity of this section is undisputed, as demonstrated by both parties' requests for fees under it. Accordingly, I will grant summary judgment in favor of plaintiffs for reasonable attorneys' fees. *See B&T Enter. v. Overland Equip. Co.*, 758 A.2d 1026, 1046 (Md. Cts. Spec. App. 2000) ("Attorneys' fees may be awarded . . . if authorized by contract or statute.").

---

[7]Defendants have also not opposed plaintiff's motion as to the fifth counterclaim in which defendants assert that the Agreements are subject to the Maryland Uniform Computer Transactions Act. As defendants thus implicitly concede, defendants' motion on this counterclaim is meritorious as well.

A separate order effecting the rulings made in this memorandum is being entered herewith.

Date: _January 7, 2003_    _____
J. Frederick Motz
United States District Judge