**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                )
PRACTICEWORKS, INC., et al.,                    )
                                                )
                            Plaintiffs,         )    Civil No.:  JFM 02 CV 1205
                                                )
            - against -                         )
                                                )
PROFESSIONAL SOFTWARE SOLUTIONS                 )
OF ILLINOIS, INC.,                              )
                                                )
                            Defendant.          )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                )
PRACTICEWORKS, INC., et al.,                    )
                                                )
                            Plaintiffs,         )    Civil No.:  JFM 02 CV 1206
                                                )
            - against -                         )
                                                )
DENTAL MEDICAL AUTOMATION, INC.,                )
                                                )
                            Defendant.          )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO ENFORCE THE COURT'S DECISION AND JUDGMENT**
**AGAINST DEFENDANTS FOR ATTORNEYS' FEES AND COSTS**

**KATTEN MUCHIN ZAVIS ROSENMAN**
575 Madison Avenue
New York, New York 10022

Counsel for Plaintiffs
PracticeWorks, Inc. and SoftDent LLC

**Of Counsel**:

Howard E. Cotton
Michael S. Gordon

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 2

I. CASE HISTORY.................................................................................................... 5

  A.  Nature of the Case................................................................................................ 5

  B.  Claims as to Which Plaintiffs Prevailed ............................................................. 6

  C.  Remaining Claims............................................................................................... 8

II. REASONABLE ATTORNEYS' FEES AND COSTS INCURRED BY PLAINTIFFS........... 8

  A.  The KMZ Rosenman Firm................................................................................... 8

  B.  Overview of Compensation Sought for Legal Services Rendered
     and Disbursements Incurred by KMZ Rosenman................................................. 9

    1.  Legal Services Rendered .............................................................................. 10

    2.  Disbursements Incurred ............................................................................... 11

    3.  Principal Attorneys ...................................................................................... 12

       a.  New York Office.................................................................................... 12
       b.  Washington, D.C. Office ....................................................................... 14

    4.  Attorneys Consulted on Discrete Issues ....................................................... 14

       a.  Intellectual Property.............................................................................. 15
       b.  Antitrust ............................................................................................... 15
       c.  Federal Practice and Procedure.............................................................. 16

  C.  Summary of Legal Services Rendered and Disbursements Incurred................................ 16

    1.  Pre-Filing of Complaint – January through March 2002................................. 17

       a.  January and February 2002..................................................................... 17
       b.  March 2002 ........................................................................................... 19

    2.  April 2002 – Service of Termination Notices/Filing of Complaint.............................. 21

    3.  May 2002 – Review of Defendants' Answer and Counterclaims................................ 22

    4.  June 2002 – Reply to Counterclaims; Scheduling Conference;
       Drafting of Summary Judgment Motion ....................................................... 24

    5.  July and August 2002 – Drafting of Summary Judgment Motion
       and Reviewing Defendants' Opposition Papers ............................................. 25

    6.  September 2002 – Drafting of Reply Brief in Further Support of
       Summary Judgment Motion; Preparation of Discovery Demands............................. 27

i

22183694.01

7.  October through December 2002 – Discovery Regarding Claims
    and Counterclaims at Issue in Plaintiffs' Motions...................................... 29

    a.  October 2002............................................................................... 29
    b.  November 2002........................................................................... 30
    c.  December 2002 ........................................................................... 31

8.  January 2003 – Enforcing the Court's Decision and Judgment
    and Opposing Defendants' Motion for Reconsideration............................... 32

9.  February 2003 ........................................................................................ 34

III.  KMZ ROSENMAN'S CUSTOMARY FEE AND
      THE CUSTOMARY FEE FOR LIKE WORK ................................................. 34

IV.   ADDITIONAL FACTORS TO CONSIDER UNDER MARYLAND LAW ..................... 36

CONCLUSION..................................................................................................... 40

ii

Pursuant to Rule 109.2 of the Local Rules of the United States District Court for the District of Maryland, Plaintiffs PracticeWorks, Inc. ("PracticeWorks") and SoftDent LLC ("SoftDent") (collectively "Plaintiffs"), respectfully submit this Memorandum in support of their Motion to Enforce the Court's Memorandum Decision entered as of January 7, 2003 (the "January 7 Decision"), and its Order and Judgment entered as of January 7, 2003 (the January 7 Judgment") against Defendants Professional Software Solutions of Illinois, Inc. ("PSS Illinois") and Dental Medical Automation, Inc. ("DMA") (collectively "Defendants"), entering judgment in favor of Plaintiffs "for reasonable attorney's fees and costs associated with bringing this action and litigating . . . [their] motion [for partial summary judgment and partial judgment on the pleadings]."  January 7 Judgment at ¶ 4; see also January 7 Decision at p. 9.  As set forth herein, Plaintiffs seek an order adjudging Defendants to reimburse Plaintiffs for reasonable attorneys' fees and costs incurred by Plaintiffs in the amount of $620,684.28 in bringing this action and litigating their motion for partial summary judgment and partial judgment on the pleadings, plus additional reasonable attorneys' fees and costs in the amount of $91,559.70 incurred by Plaintiffs in defeating Defendants' motion for reconsideration, for a total of $712,243.98.[1]

As required under Local Rule 109.2.a, the foregoing Memorandum sets forth:  (i) the nature of the above-captioned actions; (ii) the claims as to which Plaintiffs prevailed; (iii) the claims remaining in the case; (iv) a detailed description of the legal services rendered by Plaintiffs' national counsel, Katten Muchin Zavis Rosenman ("KMZ Rosenman"), broken down by the hours expended and the value of the time incurred by each professional and

---

[1]    This amount does not include unbilled but incurred time charges and disbursements for the month of February 2003 in  connection with Plaintiffs' counsel's successful defense of Defendants' motion for reconsideration.  KMZ Rosenman's February 2003 bill will be furnished to Defendants for reimbursement at the time said bill is rendered.

paraprofessional rendering services to Plaintiffs; (v) a listing of actual, necessary and reasonable out-of-pocket costs incurred by KMZ Rosenman on Plaintiffs' behalf for which reimbursement is sought; (vi) KMZ Rosenman's customary fee for like work and the customary fee for like work prevailing in the New York, Washington, D.C. and Baltimore, Maryland legal markets; and (vii) additional factors required by case law and which KMZ Rosenman wishes to bring to the Court's attention.

**PRELIMINARY STATEMENT**

The prosecution of this Motion to Enforce is a direct result of Defendants' intransigent refusal to afford any value to the legal services rendered to Plaintiffs and expenses incurred on Plaintiffs' behalf by their national counsel, KMZ Rosenman, in bringing the above-captioned actions, successfully litigating a summary judgment motion against Defendants and defeating Defendants' motion to reconsider the same. Indeed, nine months after commencing the instant actions seeking a declaration that Plaintiffs' dealership agreements with Defendants (the "Agreements") were so unambiguously indefinite in duration as to be terminable at will on reasonable notice, KMZ Rosenman achieved the remarkable result of obtaining summary judgment in Plaintiffs' favor on all three of their claims, including their claim for attorneys' fees and costs, and dismissing all seven of Defendants' counterclaims that were the subject of Plaintiffs' motion, including Defendants' reciprocal claim for attorneys' fees and costs.

As the Court noted in its January 7 Decision, the Agreements unambiguously provide that "'[i]n the event that any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all of the sums that the unsuccessful party may be called on to pay, a reasonable sum for the successful party's reasonable attorneys' fees.'" (January 7 Decision at p. 9, *quoting* Agreements § 17). The Court further noted that "[t]he validity of this section is undisputed, as demonstrated by both parties' requests for fees under it,"

2

and thus "grant[ed] summary judgment in favor of plaintiffs for reasonable attorney's fees." (Id.)

As amplified below, Plaintiffs have incurred $582,553.00 in attorneys' fees and $38,131.28 in actual, necessary and reasonable out-of-pocket expenses or costs for a total of $620,684.28 in bringing this action and litigating their motion for partial summary judgment and partial judgment on the pleadings, and thereafter incurred $91,559.70 in January 2003—comprised of $88,629.50 in attorneys' fees and $2,930.20 in costs, not including February time charges and costs (see supra note 1)—in connection with their successful opposition of Defendants' motion to reconsider the January 7 Decision and Judgment. Hence, Plaintiffs seek a money judgment against Defendants in the amount of $712,243.98—comprised of $671,182.50 in attorneys' fees and $41,061.48 in actual, necessary and reasonable out-of-pocket expenses incurred to date and recoverable in accord with the Court's January 7 Decision and Judgment. Plaintiffs' Motion to Enforce is amply supported by the instant Memorandum summarizing the services rendered to Plaintiffs by KMZ Rosenman's professionals and paraprofessionals and actual, necessary out-of-pocket expenses incurred by KMZ Rosenman on Plaintiffs' behalf, which amounts are wholly reasonable in light of the complexity of the case, the experience and expertise of KMZ Rosenman as Plaintiffs' national counsel, the relevant market place, and the successful result obtained by KMZ Rosenman.

Indeed, Plaintiffs retained KMZ Rosenman as their national counsel in seven matters, including the above-captioned matters, involving dealership agreements (like those at issue here) assumed by Plaintiffs from their corporate predecessors, which agreements were unspecified or indefinite as to duration.[2] As alleged in Plaintiffs' Complaints, at the time it

---

[2]    The other five matters, however, involved a 1997 form agreement different in many respects from the two 1993 Agreements at issue here, which differences are not relevant to this Memorandum.

3

assumed the Agreements, Plaintiff PracticeWorks already had a national, direct sales force in place to sell its own line of dental management software. (Compl. ¶ 3). PracticeWorks determined that it was inefficient and costly to maintain in the same national market both a direct sales force for its own line of software as well as a dealer network for the SoftDent line of software. (Id.). Thus, in the interests of conforming the marketing of the software to an already existing direct sales method, Plaintiffs decided not to renew and to terminate dealerships like that at issue here (id.) and sought out a national law firm to represent it in any litigation(s) arising out of its termination of these dealership relationships.

Here, KMZ Rosenman succeeded in effectuating the proper termination and non-renewal of a very substantial ten-year dealership relationship with Defendants. And KMZ Rosenman achieved these results in only nine months, which nine-month time frame was coextensive with the amount of notice of termination and non-renewal afforded by Plaintiffs to Defendants (and which time frame the Court has found to be reasonable as a matter of law). The chronology of these proceedings—Plaintiffs' tendering of written termination notices to Defendants in April 2002, immediately followed by the commencement of the above-captioned actions, followed shortly thereafter by Plaintiffs' motions for dispositive relief, which were fully submitted by September 2002—resulted in an expeditious result and obviated the necessity for emergent motion practice on the eve of (or following) the effective termination date of the Agreements.

Moreover, the amount of total reimbursement sought by KMZ Rosenman, $712,243.98, should be looked at in the context of the results obtained and the overall potential liability involved. Indeed, prior to Plaintiffs' termination and non-renewal of the Agreements, Defendants—laboring under the erroneous belief that the Agreements could not be terminated at will, but rather continued indefinitely (unless one of certain enumerated events of default took place, if ever)—each were seeking substantial seven-figure sums for the "buy-out" of the Agreements. KMZ Rosenman effectuated the termination of said Agreements for Plaintiffs

4

without any "buy-out" being necessary, and in fact, succeeded in obtaining a judgment against Defendants for Plaintiffs' attorneys' fees and costs.

Moreover, as set forth more fully herein, KMZ Rosenman's billing range for partners, associates and paraprofessionals falls entirely within the range of and is consistent with the billing rates of comparable national law firms in New York, Washington, D.C. and, even, Baltimore, Maryland.

For all of these reasons and those set forth herein, it is respectfully requested that Defendants be adjudged to reimburse Plaintiffs in the amount of $712,243.98, which amount constitutes the reasonable attorneys' fees and costs incurred by Plaintiffs in bringing the above-captioned actions, successfully litigating a summary judgment motion against Defendants and defeating Defendants' motion to reconsider the same.

## I.

## CASE HISTORY

### A.    <u>Nature of the Case</u>

Pursuant to the Agreements entered into on or about January 1, 1993 between Plaintiffs' predecessor and Defendants, Defendants were afforded the exclusive right, during the term of the Agreements, to re-sell Plaintiffs' software products within specified geographic regions.  The Agreements had no specified term, but rather provided for "automatic" renewal for "successive" one-year periods.  As such, under well-settled Maryland law, the Agreements were so unambiguously indefinite in duration as to be terminable at will on reasonable notice.

On April 8, 2002, Plaintiffs transmitted to each Defendant a written notice that the Agreements were being terminated in nine months, effective as of December 31, 2002, and would not be renewed for the term commencing January 1, 2003.  On or about April 10, 2002, Plaintiffs commenced the instant actions seeking a declaration in their First and Second Counts that the Agreements properly were terminated and non-renewed effective as of December 31,

5

2002, and that the nine-months' notice of termination and non-renewal afforded to Defendants was reasonable. In their Third Count, Plaintiffs sought to recover attorneys' fees and costs under the Agreements' express provision at Section 17 requiring the unsuccessful party in any action filed concerning the Agreements to reimburse the successful party for any reasonable attorneys' fees and costs incurred by said successful party. (Agreements § 17).

In May 2003, Defendants interposed nine counterclaims basically seeking the inverse relief, *i.e.*, a declaration that the Agreements were ***not*** properly terminated and non-renewed on reasonable notice. In their Ninth Counterclaim, Defendants also sought to recover attorneys' fees in the event that they prevailed in these actions (which they did not).

Thereafter, Plaintiffs made a motion for partial summary judgment and partial judgment on the pleadings as to their three claims and seeking to dismiss seven of Defendants' nine counterclaims (the First through Fifth, Eighth and Ninth), which motion was fully submitted on September 27, 2002. As set forth below, on January 7, 2003, the Court issued its Decision and Judgment affording Plaintiffs all of the relief they sought, including their request for attorneys' fees.

**B.** **Claims as to Which Plaintiffs Prevailed**

In its January 7 Decision and Judgment, the Court held as a matter of law, that the Agreements properly had been terminated and non-renewed on reasonable notice in April 2002, which termination and non-renewal became effective as of December 31, 2002. In doing so, the Court entered judgment in Plaintiffs' favor on all three of their causes of action. As previously stated, the Court entered judgment in Plaintiffs' favor "for reasonable attorney's fees and costs associated with bringing this action and litigating . . . [their] motion [for partial summary judgment and partial judgment on the pleadings]." January 7 Judgment at ¶ 4; <u>see also</u> January 7 Decision at p. 9.

6

22183694.01

The Court also entered judgment in Plaintiffs' favor, dismissing all seven of Defendants' nine counterclaims which were the subject of Plaintiffs' motions, including Defendants': (i) First Counterclaim for a declaration that the Agreements had not been terminated as of December 31, 2002; (ii) Second Counterclaim for a declaration that nine months' notice did not constitute reasonable notice of termination of the Agreements; (iii) Third Counterclaim for a declaration that Plaintiffs' April 8, 2002 notice terminating and non-renewing the Agreements as of December 31, 2002 operated to anticipatorily breach the Agreements; (iv) Fourth Counterclaim for a declaration that, under federal copyright law, the Agreements are terminable only at the will of the author during the five year period beginning at the end of 35 years from the date of execution of the Agreements; (v) Fifth Counterclaim for a declaration that the Agreements are "perpetual in duration" under the Maryland Uniform Computer Information Transactions Act (the "MD UCITA"); (vi) Eighth Counterclaim for a declaration that Defendants have certain "continuing rights" under the Agreements even after termination and non-renewal thereof; and (vii) Ninth Counterclaim for attorneys fees, disbursements and other costs incurred by Defendants in the above-referenced actions.

On or about January 21, 2003, Defendants moved for reconsideration of the Court's January 7 Decision and Judgment under the guise of Federal Rules of Civil Procedure 59(e), 60(b) and 52(b), asking the Court to reconsider matters which it had unequivocally decided in Plaintiffs' favor including:   (i) whether a genuine issue of material fact existed as to the reasonableness of the nine-months notice of termination and non-renewal afforded by Plaintiffs to Defendants; (ii) whether the Agreements' termination provisions were ambiguous; and (iii) whether the Court properly had refused to consider Defendants' extrinsic evidence in aid of interpretation of what the Court had deemed to be unambiguous Agreements.  Plaintiffs further asked the Court to stay enforcement of its January 7 Judgment, pursuant to Rule 62(b).  On February 21, the Court conducted a hearing and denied Defendants' application for

7

reconsideration in its entirety and further declined to stay enforcement of its January 7 Judgment.[3]

### C.    Remaining Claims

Presently, all that remains in the above-referenced actions are Defendants' two counterclaims (not included in Plaintiffs' motions) for breach of contract (the Sixth Counterclaim) and breach of the implied duty of good faith and fair dealing (the Seventh Counterclaim) -- the latter of which is not even recognized as an independent cause of action under Maryland law.  See Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc., 190 F. Supp. 2d 785, 793-94 (D. Md. 2002).

## II.

## REASONABLE ATTORNEYS' FEES AND COSTS INCURRED BY PLAINTIFFS

### A.    The KMZ Rosenman Firm

In late December 2001, Plaintiffs retained the law firm of KMZ Rosenman as national counsel to advise Plaintiffs as to how to effectuate the proper termination and non-renewal of dealership agreements like those at issue here, which agreements were unspecified or indefinite as to duration.  KMZ Rosenman, the product of a March 27, 2002 merger between Rosenman &

---

[3]    In addition to denying Defendants' motions, the Court clarified its dismissal of Defendants' Eighth Counterclaim to the limited extent of holding that Defendants could provide technical support and service pertaining to the software at issue "provided, of course, . . . that relevant materials were returned and not used."  (Trans. at p. 11).  The Court's holding was consistent with its finding in its January 7 Decision that Defendants were required "'to immediately return [to the plaintiffs] any and all materials regarding the Products in any form whatsoever,'" as required in the Agreements.  (Decision at p. 9, *quoting* Section 13.3 of the Agreements).  As discussed during the hearing, further to said requirement, Plaintiffs shortly will be transmitting to Defendants' counsel a list of any and all materials regarding the Products which were furnished to Defendants during the term of the Agreements.  It was agreed during the hearing that Defendants would deliver all such materials to their counsel, who then would confirm to Plaintiffs' counsel his receipt and sole custody of these materials. (Trans. at p. 14).  Finally, the Court stated that "if there are issues that . . . materials are being used improperly, that they should be returned or that software is being used improperly," then Plaintiffs could seek enforcement remedies.  (Id. at p. 12)

8

Colin LLP and Katten Muchin Zavis, maintains offices in, among other cities, New York, Chicago, Los Angeles, Washington, D.C. and Charlotte. The law firm has approximately 600 partners, counsel and associates, in addition to a substantial professional staff of non-lawyers, including financial and paralegal personnel. KMZ Rosenman is a full service law firm with a widely diversified practice.

KMZ Rosenman enjoys a national reputation for its expertise in the field of commercial litigation and has been actively involved on behalf of its clients in many of the nation's major litigations. To maximize efficiency and reduce costs to Plaintiffs, every effort was made to use the same attorneys to provide services to Plaintiffs. During the relevant period, January 1, 2002 through February 28, 2003 (the "Relevant Period"), the vast majority of the legal services on Plaintiffs' behalf were performed by three attorneys in the Litigation Department of KMZ Rosenman's New York office: Howard E. Cotton, a litigation partner at KMZ Rosenman; Michael S. Gordon, a senior associate of KMZ Rosenman who became a partner of the Firm as of February 1, 2003; and Jason Halper, a second-year associate at KMZ Rosenman.

**B.      Overview of Compensation Sought for Legal Services
           Rendered and Disbursements Incurred by KMZ Rosenman**

Plaintiffs seek reimbursement from Defendants for reasonable attorneys' fees and costs in the amount of $620,684.28 incurred through December 31, 2002 (comprised of $582,553.00 in attorneys' fees and $38,131.28 in disbursements), in addition to $91,559.70 (comprised of $88,629.50 in attorneys' fees and $2,930.20 in costs), incurred by Plaintiffs in defeating Defendants' motion to reconsider the January 7 Decision and Judgment, for a total of $712,243.98—comprised of $671,182.50 in attorneys' fees and $41,061.48 in actual, necessary and reasonable out-of-pocket expenses incurred through January 31, 2003. Annexed to the Cotton Affidavit as Exhibits A through K are copies of the computer-generated time entries reflecting the hours expended and the value of the time incurred by each professional and

9

paraprofessional rendering services to Plaintiffs on a monthly basis during the Relevant Period (except for Exhibits A and F, covering the two-month periods, January-February 2002 and July-August 2002, respectively), as well as statements of the actual, necessary and reasonable out-of-pocket expenses incurred by KMZ Rosenman on Plaintiffs' behalf during said Period.

Plaintiffs do not wish to burden the Court with an overly detailed or lengthy recitation of the conferences, telephone conversations, memoranda, factual investigations, research projects, document accumulation and review, drafting of research memoranda, pleadings, affidavits and legal memoranda that occupied KMZ Rosenman's time and attention during the Relevant Period. Moreover, while KMZ Rosenman's attorneys, law clerks and paraprofessionals maintain daily detailed records of their time concurrent with the rendition of professional services, Plaintiffs do not wish to waive the attorney-client and work-product privileges by disclosing such detailed information to Defendants. Therefore, the description of services rendered on the time records annexed to the Cotton Affidavit as Exhibits A through K has been redacted and the instant Memorandum contains a summary description of the services that KMZ Rosenman rendered on Plaintiffs' behalf.  Of course, should the Court wish to review unredacted versions of Plaintiffs' legal bills *in camera*, Plaintiffs will furnish said bills to the Court.

**1.    Legal Services Rendered**

Most of the services that KMZ Rosenman performed on Plaintiffs' behalf during the Relevant Period can be divided into the following basic categories:    (i) the day-to-day administration of the above-captioned actions, including, without limitation, telephone conferences with Dennis Stockwell, Plaintiffs' General Counsel, and Al Fiore, Plaintiffs' Vice President of Corporate Development as well as inter-office conferences between and among KMZ Rosenman professionals handling said matters; (ii) review of client files, including, without limitation, the Agreements; all communications between the parties concerning the Agreements; all materials concerning the SoftDent software and other products distributed by

10

Defendants under the Agreements; documents concerning Defendants' re-sale of products under the Agreements, including, *inter alia*, the pricing thereof, invoices, advertising and promotional materials; (iii) legal research concerning, *inter alia*, Plaintiffs' right to terminate and non-renew the Agreements; reasonable notice of said termination; Defendants' ability to obtain interim relief following said termination; the inadmissibility of extrinsic evidence in aid of interpretation of the Agreements; the myriad potential and actual defenses to said termination interposed by Defendants including, *inter alia*, under federal copyright law and MD UCITA; and issues of jurisdiction and venue pertinent to the commencement of the above-captioned actions; (iv) the preparation of pleadings, including the Complaints and Plaintiffs' Repl(ies) to Defendants' Counterclaims; (v) the preparation and prosecution of a Motion for Partial Summary Judgment and Partial Judgment on the Pleadings directed to all of Plaintiffs' claims and seven of Defendants' counterclaims; (vi) the conduct of pre-trial discovery concerning the claims and counterclaims that were the subject of Plaintiffs' dispositive motions, including preparation of document requests and interrogatories; responding to Defendants' document requests and interrogatories; interviewing potential witnesses; Plaintiffs' accumulation, review and production of 14,811 pages of responsive documents; Plaintiffs' review of roughly 9,000 pages of documents produced by Defendants; the exchange of detailed correspondence concerning discovery disputes, including the taking of pre-trial depositions; and (vii) the opposition of Defendants' unsuccessful motion to reconsider the Court's January 7 Decision and Judgment.

## 2.    **Disbursements Incurred**

At the end of each bill is a summary of all disbursements itemized by type (*e.g.*, postage, photocopies, long distance telephone charges) that KMZ Rosenman incurred on Plaintiffs' behalf

11

during the Relevant Period.[4]  It is KMZ Rosenman's practice to charge clients the normal cost charged to KMZ Rosenman by third-party vendors, with no added premium, for all disbursements for which reimbursement is sought, including, <u>inter</u> <u>alia</u>, long distance telephone charges, computer-assisted legal research charges and overnight delivery services.  KMZ Rosenman does not charge for incoming facsimiles.

    **3.**    <u>**Principal Attorneys**</u>

        **a.**    <u>**New York Office**</u>

<u>**Howard Cotton**</u>:  Mr. Cotton is a partner in KMZ Rosenman's Litigation Department who is admitted *pro hac vice* in this action, was admitted to the bar of the State of New York in 1983, and has been a commercial litigator since such admission.  Mr. Cotton was the lead attorney on the above-captioned actions, having been involved in all aspects thereof from pre-filing of the complaints in January 2002 through opposing Defendants' unsuccessful motion for reconsideration of the Court's January 7 Decision and Judgment in February 2003.  Mr. Cotton's billing rate during January 2002 was $500 per hour, increasing to $525 per hour in February 2002, and then to $550 in January 2003, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Cotton's level and breadth of experience.

<u>**Michael Gordon**</u>: Mr. Gordon is a recently-made partner in KMZ Rosenman's Litigation Department, who also is admitted *pro hac vice* in this action, and was admitted to the bars of the States of New Jersey and New York in 1992 and 1993, respectively.  Mr. Gordon worked closely with Mr. Cotton on all aspects of the litigation and was the principal drafter of all pleadings and

---

[4]    Due to delays in billing by third party vendors and the normal delays in posting certain disbursements to the firm's computerized billing system, out-of-pocket expenses incurred during a particular month may not be posted until the next billing cycle.

12

legal memoranda.  Mr. Gordon's billing rate during January 2002 was $380 per hour, increasing to $400 per hour in February 2002, and then to $415 in January 2003, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Gordon's level and breadth of experience.

**Jason Halper**:  Mr. Halper was admitted to the bars of the States of New Jersey and New York in 2001 and 2002, respectively and has worked on litigation matters since that time. Commencing in March 2002, Mr. Halper became the principal junior attorney involved in the actions, undertaking all material research, drafting memoranda regarding the same, preparing initial drafts of sections of legal memoranda and pleadings, and reviewing tens of thousands of pages documents produced by the parties. Mr. Halper's billing rate during the Relevant Period was $185 per hour from February through December 2002, increasing to $235 per hour in January 2003, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Halper's level and breadth of experience.

**Richard Julie**:  Mr. Julie was admitted to the Bar of the State of New York in 2000 and has worked on litigation matters since that time.  Prior to Mr. Halper's extensive involvement in these actions in March 2002, Mr. Julie was the principal junior attorney involved in researching various issues in January and February 2002.  Mr. Julie's billing rate during January 2002 was $225 per hour, increasing to $230 per hour in February, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Julie's level and breadth of experience. [5]

---

[5]    In addition to Messrs. Halper and Julie, Matthew Parrott, a seventh-year litigation associate in KMZ Rosenman's New York office assisted Messrs. Cotton and Gordon with various research issues during the months of September and October 2002.  Mr. Parrott's billing rate was $350 per hour, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Parrott's level and breadth of experience.

13

###### b. <u>Washington, D.C. Office</u>

As explained more fully herein, the following attorneys in KMZ Rosenman's Washington, D.C. office are admitted to the District of Maryland and acted as local counsel to Plaintiffs' New York counsel, advising them on local matters of policy and procedure:

**<u>S. Scott Morrison</u>**: Mr. Morrison was admitted to the bar of the District of Columbia in 1979 and then admitted in 1987 to the bars of the State of Maryland and the District of Maryland. Mr. Morrison's billing rate during the Relevant Period was $385 per hour, which, as explained in Point III, *infra*, is reasonable and customary in the Washington, D.C. and Maryland legal markets for attorneys possessing Mr. Morrison's level and breadth of experience

**<u>Nicole Kobrine</u>**: Ms. Kobrine was admitted to the bars of the State of Maryland and the District of Maryland in 1996, and then admitted to the bar of the District of Columbia in 1997. Ms. Kobrine's billing rate during the Relevant Period was $265 per hour, which, as explained in Point III, *infra*, is reasonable and customary in the Washington, D.C. and Maryland legal markets for attorneys possessing Ms. Kobrine's level and breadth of experience.[6]

###### 4. <u>Attorneys Consulted on Discrete Issues</u>

As set forth more fully herein, KMZ Rosenman attorneys with expertise in particular areas also were involved in discrete issues arising during the course of the Firm's representation of Plaintiffs.

---

[6]   In addition to Mr. Morrison and Ms. Kobrine, Richard Kelley, a junior associate KMZ Rosenman's Washington, D.C. office, and Brian Corcoran, a senior associate in that office, assisted Plaintiffs' New York counsel during the months of April and September 2002, respectively, with service and filing issues. Mr. Kelley's billing rate was $215 per hour and Mr. Corcoran's billing rate was $315 per hour. As explained in Point III, *infra*, the billing rates for Messrs. Corcoran and Kelley are reasonable and customary in the Washington, D.C. legal market for attorneys possessing their level and breadth of experience.

### a.    Intellectual Property

The following attorneys assisted Messrs. Cotton and Gordon in analyzing various intellectual property issues implicated by the actions, including, *inter alia*, whether a "license" was conveyed under the Agreements, as well as analysis of Defendants' Fourth and Fifth Counterclaims asserted under federal copyright law and MD UCITA, respectively:

**Karen Artz Ash**:  Ms. Ash was admitted to the bar of the State of New York in 1980, and has practiced intellectual property law since 1984.  Ms. Ash's billing rate during January 2002 was $500 per hour, increasing to $525 in January 2003, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Ms. Ash's level and breadth of experience.[7]

**Roger Furey**:  Mr. Furey was admitted to the bars of the District of Columbia and the State of Virginia in 1983 and 1984, respectively, and has practiced intellectual property law since that time.  Mr. Furey's billing rate during the Relevant Period was $360 per hour, which, as explained in Point III, *infra*, is reasonable and customary in the Washington D.C. legal market for attorneys possessing Mr. Furey's level and breadth of experience.[8]

### b.    Antitrust

The following attorney assisted Messrs. Cotton and Gordon in analyzing various antitrust issues implicated by the Agreements:

---

[7]    Brett Danow, a second-year attorney in KMZ Rosenman's New York office, assisted Ms. Ash in researching various intellectual property issues implicated by the Agreements during the months of January and February 2002.  Mr. Danow's billing rate during January 2002 was $225 per hour, increasing to $230 in January 2003, which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Danow's level and breadth of experience.

[8]    Sylvia Davis, a fifth-year attorney in KMZ Rosenman's Washington D.C. office, assisted Mr. Furey with copyright and UCITA research during the month of May 2002. Ms. Davis' billing rate was $245 per hour, which, as explained in Point III, *infra*, is reasonable and customary in the Washington D.C. legal market for attorneys possessing Ms. Davis' level and breadth of experience.

15

**James Calder**:  Mr. Calder was admitted to the bar of the State of New York in 1978, and has practiced antitrust law since 1984.  Mr. Calder's billing rate during the Relevant Period was $500 per hour which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Calder's level and breadth of experience.[9]

### c.    Federal Practice and Procedure

The following attorneys assisted Messrs. Cotton and Gordon in analyzing various federal practice and procedural issues implicated by the commencement and prosecution of the above-captioned actions:

**Martin Karlinsky**:  Mr. Karlinsky was admitted to the bars of the State of New York and State of California in 1977 and has been a commercial litigator since that time. Mr. Karlinsky's billing rate during the Relevant Period was $550 per hour which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Karlinky's level and breadth of experience.

**Joseph Zuckerman**: Mr. Zuckerman was admitted to the bar of the State of New York in 1962, and has been a commercial litigator since admission. Mr. Zuckerman's billing rate during the Relevant Period was $525 per hour which, as explained in Point III, *infra*, is reasonable and customary in the New York legal market for attorneys possessing Mr. Zuckerman's level and breadth of experience.

### C.    Summary of Legal Services Rendered and Disbursements Incurred

The following constitutes a summary of services rendered and disbursements incurred by KMZ Rosenman professionals and paraprofessionals on Plaintiffs' behalf during the Relevant

---

[9]    Under the direction of Mr. Calder, Mr. Julie, *see supra* subpart II(B)(3)(a), also undertook discrete research regarding antitrust issues implicated by the Agreements.

16

Period in connection with which Defendants should be adjudged to reimburse Plaintiffs in the amount of $712,243.98, as follows:

    1.    **Pre-Filing of Complaint – January through March 2002**

**[Total Fees: $127,800.50; Total Hours: 339.7; Total Disbursements: $10,566.23]**[10]

    a.    **January and February 2002**

**[Fees:  $85,290.50; Hours:  234.6; Disbursements:  $2,498.05]**

Exhibit A to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the months of January and February 2002 in connection with the commencement of the above-captioned actions.   During these months, KMZ Rosenman undertook a comprehensive review of the Agreements, including the terminability thereof, and the scope of Products covered thereunder.   KMZ Rosenman also analyzed various procedural issues attendant to the commencement of the above-captioned actions, including forum selection and jurisdictional issues.   Mr. Cotton oversaw all of these activities spending 15.7 hours in January and 46 hours in  February, totaling 61.7 hours, conferring extensively with Dennis Stockwell, Plaintiffs' General Counsel, and Al Fiore, Plaintiffs' Vice President of Corporate Development regarding the history of the Agreements, Plaintiffs' (and Plaintiffs' predecessors) course of dealing with Defendants, communications with Defendants regarding the scope of Products covered thereunder and the duration and terminability thereof.   Mr. Cotton also conferred with Mr. Gordon regarding procedural and case management issues, who, in turn, directed Messrs. Julie and Halper in their various research assignments, as described below, and reviewed and edited memoranda  drafted by them.

---

[10]   These figures represent the total fees, hours and disbursements incurred by Plaintiffs at KMZ Rosenman for the period January through March 2002, as broken out in subparts II(C)(1)(a) and (b).

Mr. Gordon spent 25 hours in January and 48.7 hours in February, totaling 73.7 hours conferring with Messrs. Stockwell and Fiore regarding the Agreements and Defendants' performance thereunder, supervising legal research, reviewing case law and drafting comprehensive memoranda addressing, *inter alia*,  (i) the terms of the Agreements; (ii) the "Products" distributed or re-sold by Defendants thereunder; (iii) all advertising and promotional materials regarding the "Products;" (iv) the duration and terminability of the Agreements under the Uniform Commercial Code and Maryland law; (v) forum selection and other procedural issues pertinent to the commencement of declaratory actions against Defendants; and (vi) any and all potential counterclaims and defenses that might be asserted by Defendants in opposition to Plaintiffs' declaratory actions.

Richard Julie spent 39.4 hours in January and 24.8 hours in February, totaling 64.2 hours researching, *inter alia*, the duration and terminability of the Agreements under the UCC and the common law, the inadmissibility of extrinsic and parol evidence in connection therewith, various antitrust issues implicated by the Agreements and various potential counterclaims and/or defenses that Defendants might assert in opposition to Plaintiffs' declaratory claims.  Mr. Julie drafted research memoranda containing his findings, which memoranda were modified and incorporated into Mr. Gordon's memoranda described hereinabove, and then transmitted to Plaintiffs as attorney work-product.

Like Mr. Julie, Jason Halper spent 23 hours in February 2002 researching various procedural and jurisdictional issues attendant to the commencement of the above-captioned actions, including, *inter alia*, whether Defendants were subject to Maryland's "long-arm" jurisdiction and whether a declaratory claim satisfies the amount-in-controversy requirement for federal jurisdiction.

Other attorneys who participated to a lesser extent in the analysis of potential claims and counterclaims arising out of the termination of the Agreements include Mr. Calder who billed 7.1

18

hours during January 2002 addressing the viability of various potential claims from an antitrust perspective.  As previously stated, Mr. Julie also undertook discrete research at Mr. Calder's direction with respect to certain antitrust issues.

Similarly, Karen Ash addressed licensing, copyright and other intellectual property issues concerning the Agreements and the termination thereof, in connection with which Ms. Ash recorded 3 billable hours in January 2002.  Brett Danow, a third-year associate, assisted Ms. Ash with the research of  the aforementioned intellectual property issues, recording 1.9 hours.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $85,290.50.  Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $2,498.05, which included telephone and facsimile charges, photocopying charges, legal research and local travel, all of which are itemized on Exhibit A. Total time charges and disbursements incurred by Plaintiffs in January and February 2002 amounted to $87,788.55.

**b.     March 2002**

**[Fees:  $42,510.00; Hours:  105.1; Disbursements:  $8,068.18]**

Exhibit B to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of March 2002, in which KMZ Rosenman attorneys finalized their research and analysis in connection with Plaintiffs' tender to Defendants of written notices of termination and Plaintiffs' commencement of the above-captioned actions—which occurred during the first week in April 2002.

Mr. Cotton oversaw all of these activities, spending 40.5 hours in March 2002 conferring with Messrs. Stockwell and Fiore regarding litigation strategy, conferring with Mr. Gordon regarding case management issues, and overseeing the drafting of the aforementioned termination notices and complaints.  Mr. Cotton also reviewed and analyzed relevant case law regarding the terminability of agreements of indefinite duration on reasonable notice, and

19

addressed procedural issues, including venue and forum selection. In addition, Mr. Cotton directed Messrs. Julie and Halper in their various research assignments, as described below, and reviewed memoranda drafted by them.

Mr. Gordon spent 31.8 hours in March reviewing client documents reflecting the history of the parties' dealership relationship, drafting research memoranda analyzing UCC and common law cases regarding the terminability of agreements of indefinite duration, drafting the complaint and termination notices and conferring with Mr. Cotton, as well as Messrs. Stockwell and Fiore, regarding the overall case strategy.

Messrs. Halper and Julie assisted Mr. Gordon in his preparation of research memoranda concerning the aforementioned issues, as well as in drafting the complaint. Mr. Halper spent 13.6 hours researching and drafting memoranda further delving into the availability of preliminary injunctive relief to terminated dealers, and the applicability of MD UCITA to the Agreements, while Mr. Julie spent 10.3 hours researching and drafting memoranda further delving into the inadmissibility of parol evidence under the UCC, as well as what constitutes reasonable notice of termination under the UCC and common law.

Ms. Ash spent 3 hours analyzing intellectual property issues implicated by termination of the Agreements while Mr. Danow spent 2.4 hours assisting Ms. Ash with research and drafting a termination notice consistent with the Agreements.

Plaintiffs' local counsel, Mr. Morrison, spent 2.3 hours conferring with Mr. Cotton regarding local procedural and other issues, while Mr. Zuckerman spent 1.2 hours conferring with Messrs. Cotton and Gordon regarding procedural matters as well.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $42,510.00. Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of $8,068.18, which included charges for telephone and facsimile communications, photocopying charges, legal research on Westlaw and local travel, all of which

20

22183694.01

are itemized on Exhibit B.  Total time charges and disbursements incurred by Plaintiffs in March 2002 amounted to $50,578.18.

   2.    **April 2002 – Service of Termination Notices/Filing of Complaint**

          **[Fees:  $36,482.00; Hours:  90.2; Disbursements:  $682.43]**

       Exhibit C to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of April 2002, when Plaintiffs tendered to Defendants written notices of termination and non-renewal and commenced the above-captioned actions. During April, attorneys at KMZ Rosenman finalized their analysis of procedural and jurisdictional concerns implicated by the commencement of the above-captioned actions, finalized their  research under the UCC and common law with respect to the terminability and non-renewal of the Agreements, prepared complaints in the above-captioned actions, assisted Plaintiffs in finalizing the termination notices and developed an overall litigation gameplan.

       Mr. Cotton oversaw all of these activities, spending 28.2 hours in April 2002 conferring with Mr. Gordon regarding litigation strategy and case management issues, directing additional research on the terminability of the Agreements, reviewing and modifying drafts of the complaints, as well as the notices of termination and non-renewal to each of Defendants.  Mr. Cotton also conferred with local counsel Scott Morrison of KMZ Rosenman's Washington, D.C. office in connection with issues pertinent to the service and filing of the complaint, as well as the judges drawn for each of the above-captioned actions (originally the second-captioned action against Defendant Dental Medical Automation, Inc. was assigned to Judge Catherine C. Blake, but shortly thereafter was transferred to Judge Motz).

       Mr. Gordon spent 43.2 hours in April drafting the complaints and termination notices, further distilling the relevant case law applicable to Plaintiffs' claims and Defendants' potential counterclaims, and conferring with Mr. Cotton, as well as Messrs. Stockwell and Fiore, regarding overall litigation strategy.

21

In addition to Scott Morrison, certain attorneys in KMZ Rosenman's Washington, D.C. office assisted with the service and filing of the complaints, including associates Nicole Kobrine, who spent 4 hours, and Richard Kelley, who spent 9.9 hours, reviewing the pleadings and ensuring their compliance with local rules and procedure.  In addition, paralegal Marcus Bell in KMZ Rosenman's Chicago office spent 1.8 hours liaising with process servers and facilitating the service of the complaint upon Defendants in Illinois and Ohio.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $36,482.00.  Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $682.43, which included filing fees in the amount of $300.00 for filing each of the above-captioned actions ($150.00 per action), charges for telephone and facsimile communications, photocopying charges and legal research on Westlaw, all of which are itemized on Exhibit C.  Total time charges and disbursements incurred by Plaintiffs in April 2002 amounted to $37,164.43.

3.    **May 2002 – Review of Defendants' Answer and Counterclaims**

**[Fees:  $60,041.00; Hours:  175.9; Disbursements:  $4,025.58]**

Exhibit D to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of May 2002, when Defendants served and filed their Answer and interposed nine counterclaims against Plaintiffs as follows: (i) First Counterclaim for a declaration that the Agreements had not been terminated as of December 31, 2002; (ii) Second Counterclaim for a declaration that nine months' notice did not constitute reasonable notice of termination of the Agreements; (iii) Third Counterclaim for a declaration that Plaintiffs' April 8, 2002 notice terminating and non-renewing the Agreements as of December 31, 2002 operated to anticipatorily breach the Agreements; (iv) Fourth Counterclaim for a declaration that, under federal copyright law, the Agreements are terminable only at the will of the author during the five year period beginning at the end of 35 years from the date of execution

22

of the Agreements; (v) Fifth Counterclaim for a declaration that the Agreements are "perpetual in duration" under MD UCITA; (vi) Sixth Counterclaim for breach of contract; (vii) Seventh Counterclaim for breach of the implied duty of good faith and fair dealing; (viii) Eighth Counterclaim for a declaration that Defendants have certain "continuing rights" under the Agreements even after termination and non-renewal thereof; and (vii) Ninth Counterclaim for attorneys fees, disbursements and other costs incurred by Defendants in the above-referenced actions.

During May, attorneys at KMZ Rosenman reviewed and analyzed these counterclaims with an eye toward dispositive motion practice directed to all but the sixth and seventh contract-based counterclaims. Mr. Cotton oversaw these activities spending 41.6 hours in May 2002 reviewing Defendants' Answer and Counterclaims and conferring with Mr. Gordon regarding litigation strategy and case management issues, and directing additional research on said counterclaims. Mr. Gordon spent 46.2 hours in May 2002 directing research, reviewing relevant case law and drafting research memoranda pertinent to Plaintiffs' dispositive motion practice directed to the First through Fifth, Eighth and Ninth Counterclaims. Mr. Halper spent 53.9 hours researching whether summary judgment was obtainable with respect to Plaintiffs' claims and ascertaining which of Defendants' counterclaims were vulnerable to summary adjudication and/or judgment on the pleadings.

Roger Furey and Sylvia Davis—both in the Intellectual Property Group in KMZ Rosenman's Washington, D.C. office—spent 15.7 and 15.5 hours, respectively, researching and analyzing whether the Agreements were governed by federal copyright law or MD UCITA, as alleged by Defendants in their Fourth and Fifth Counterclaims. Finally, paraprofessional Anthony Burgalassi spent 1.5 hours tracking down various legislative histories pertinent to Plaintiffs' intended motions.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $60,041.00.  Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $4,025.28, which included charges for telephone and facsimile communications, photocopying and legal research on Westlaw, all of which are itemized on Exhibit D.  Total time charges and disbursements incurred by Plaintiffs in May 2002 amounted to $64,066.58.

### 4.    June 2002 – Reply to Counterclaims; Scheduling Conference; Drafting of Summary Judgment Motion

**[Fees:  $45,776.50; Hours:  130.8; Disbursements:  $5,808.11]**

Exhibit E to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of June 2002, when Plaintiffs prepared their Reply to Defendants' Counterclaims, continued their research and analysis of the pleadings with an eye toward dispositive motion practice and devised an overall litigation strategy concerning pre-trial discovery and the briefing of said dispositive motion.

Mr. Cotton oversaw these activities, spending 62.2 hours in June 2002 conferring with Messrs. Stockwell and Fiore regarding litigation strategy, and directing Mr. Halper in researching the myriad issues attendant to Plaintiffs' anticipated dispositive motions directed to Plaintiffs' three causes of action and the First through Fifth, Eighth and Ninth Counterclaims. Additionally, Mr. Cotton devised a case scheduling gameplan in preparation for a Scheduling Conference on June 13 before the Court in Baltimore, Maryland, at which Conference Plaintiffs announced their intention to make a motion for partial summary judgment and partial judgment on the pleadings, and the Court set a four-month discovery schedule.  Further to said scheduling, Mr. Cotton met with and interviewed potential witnesses with knowledge of the history of each the dealership relationships at issue.

Mr. Halper spent 65.0 hours involved in various tasks, including, *inter alia*, preparing a first draft of Plaintiffs' motion for partial summary judgment and partial judgment on the pleadings, researching various issues attendant thereto and drafting Plaintiffs' Reply to Defendants' Counterclaims. Mr. Furey spent 1.5 hours reviewing Mr. Halper's copyright and UCITA analysis and supplementing the same.

Finally, Ms. Kobrine spent 2.1 hours reviewing Plaintiffs' Reply, ensuring its conformity to the District of Maryland's local rules and facilitating the service and filing of the same.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $45,776.50. Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $5,808.11, which included charges for process serving, telephone and facsimile communications, photocopying and legal research including Westlaw, New York Law Institute and Maryland's Department of Legislative Services, all of which are itemized on Exhibit E. Total time charges and disbursements incurred by Plaintiffs in June 2002 amounted to $51,584.61.

**5.     July and August 2002 – Drafting of Summary Judgment Motion and Reviewing Defendants' Opposition Papers**

**[Fees:  $111,983.00; Hours:  300.4; Disbursements:  $6,021.22]**

Exhibit F to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the months of July and August 2002, when Plaintiffs prepared their 42-page moving brief and affidavits in support thereof seeking summary adjudication of their three claims and seven of Defendants' nine counterclaims, reviewed and analyzed Defendants' 50-page opposition brief and affidavits in support thereof and commenced preparation of their reply brief and affidavits in support thereof.

Mr. Cotton oversaw these activities, spending 80.8 hours in July and August  2002 conferring with Messrs. Stockwell and Fiore regarding the drafting of the summary judgment

papers, conferring with Mr. Gordon regarding litigation strategy and case management issues, reviewing and revising drafts of the summary judgment papers, analyzing Defendants' opposition papers and directing research in connection with the same.  Mr. Gordon spent 129.3 hours in July and August conferring with Messrs. Cotton, Stockwell and Fiore regarding overall case strategy and as the principal drafter of Plaintiffs' 42-page moving and 25-page reply briefs, reviewing and analyzing all cited caselaw and directing additional research, undertaken by Mr. Halper.

Under the direction of Messrs. Cotton and Gordon, Mr. Halper spent 83.8 hours researching myriad issues implicated by Plaintiffs' moving and reply briefs, prepared first drafts of sections thereof and reviewed and summarized caselaw cited in Defendants' opposition papers.

Finally, Mr. Furey spent 6.5 hours reviewing and analyzing Defendants' 20-page copyright-based argument in their opposition papers and the case law and legislative history cited therein, as well as reviewing Plaintiffs' arguments in their moving and reply papers regarding the same.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $111,983.00.  Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $6,021.22, which included travel charges for Messrs. Cotton and Gordon (*see supra* note 4), telephone and facsimile communications, photocopying and legal research including Westlaw, New York Law Institute and Maryland's Department of Legislative Services, all of which are itemized on Exhibit F.  Total time charges and disbursements incurred by Plaintiffs in July and August 2002 amounted to $118,004.22.

6.    **September 2002 – Drafting of Reply Brief in Further Support of Summary Judgment Motion; Preparation of Discovery Demands**

**[Fees:  $84,591.00; Hours:  223.6; Disbursements:  $4,919.20]**

Exhibit G to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of September 2002, when Plaintiffs prepared their 25-page reply brief and supporting affidavits in further support of their motion for summary judgment, reviewed Defendants' discovery demands directed to the claims and counterclaims at issue in Plaintiffs' motions and prepared responses to the same, as well as prepared document requests and interrogatories to be propounded upon Defendants regarding the claims and counterclaims at issue in Plaintiffs' motions.

Mr. Cotton supervised these activities, spending 50 hours in September 2002 conferring with Messrs. Stockwell and Fiore regarding the reply brief and discovery issues, conferring with Mr. Gordon regarding litigation strategy, case management issues, discovery issues,  reviewing and revising drafts of Plaintiffs' reply papers and directing research in connection therewith. Mr. Gordon spent 76.3 hours in September 2002 conferring with Messrs. Cotton, Stockwell and Fiore regarding overall case strategy and was the principal drafter of  Plaintiffs' 25-page reply brief, reviewing and analyzing all cited caselaw in Defendants' opposition brief, liaising with affiants and directing additional research, undertaken by Mr. Halper.  In addition, Mr. Gordon supervised the accumulation of documents in response to Defendants' discovery demands the vast majority of which pertained to the claims and counterclaims at issue in Plaintiffs' motion, the drafting of written objections and responses thereto and the preparation of discovery demands to be propounded upon Defendants (the vast majority of which pertained to the claims and counterclaims at issue in Plaintiffs' motion).

Having significant expertise in federal practice, Mr. Karlinsky spent 20.9 hours in analyzing Defendants' opposition brief and assisting in the preparation of Plaintiffs' reply brief

and supporting affidavits, as well as consulting with Messrs. Cotton and Gordon regarding overall case strategy.

Under the direction of Messrs. Cotton and Gordon, Mr. Halper spent 60.4 hours researching issues to be addressed in Plaintiffs' reply brief, preparing first drafts of sections of said reply brief and preparing first drafts of discovery demands to be propounded upon Defendants.

Mr. Parrott spent 10.1 hours preparing first drafts of sections of Plaintiffs' reply brief regarding the propriety of determining reasonable notice on a motion for summary judgment and replying to Defendants' arguments concerning the same.

Mr. Furey spent 2.8 hours analyzing Defendants' copyright-based arguments and assisted in the preparation of a reply to the same.

Finally, Mr. Corcoran of KMZ Rosenman's Washington, D.C. office spent 1 hour facilitating the service and filing of Plaintiffs' reply papers and paraprofessional John A. Carpenter spent 2.1 hours facilitating the execution of reply affidavits.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $84,591.00. Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $4,919.20, which included telephone and facsimile communications, photocopying and legal research including Westlaw, all of which are itemized on Exhibit G. Total time charges and disbursements incurred by Plaintiffs in September 2002 amounted to $51,584.61.

7.    **October through December 2002 – Discovery Regarding
        Claims and Counterclaims At Issue in Plaintiffs' Motions**

**[Total Fees: $115,879.00; Total Hours: 370.5; Total Disbursements: $6,108.51]** [11]

a.    **October 2002**

**[Fees:  $46,592.00; Hours:  137.4; Disbursements:  $1,453.58]**

Exhibit H to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of October 2002, when Plaintiffs responded to Defendants' discovery demands, including the accumulation, review and production of 14,811 pages of responsive documents, and the exchange of detailed correspondence concerning discovery disputes, including Defendants' eleventh-hour request to take ten pre-trial depositions during the two weeks immediately preceding to the discovery cut-off.

Mr. Cotton supervised these activities spending 26.3 hours in October 2002 conferring with Messrs. Stockwell and Fiore regarding discovery issues and case strategy, conferring with Mr. Gordon regarding litigation strategy and case management issues, and reviewing and revising drafts of discovery responses and correspondence.   Mr. Gordon spent 46.7 hours in October 2002 conferring with Mr. Cotton regarding litigation strategy and case management issues, conferring with Messrs. Stockwell and Fiore regarding day-to-day issues pertinent to Defendants' dealership operations, overseeing Plaintiffs' 14,811-page document production and the preparation of written objections and responses thereto, execution of a confidentiality stipulation with Defendants in connection therewith, and drafting correspondence to Defendants' counsel regarding various discovery disputes, including, *inter alia*, Defendants' refusal to respond to alleged supernumerary interrogatories, Defendants' last-minute improper attempt to

_____

[11]    These figures represent the total fees, hours and disbursements incurred by Plaintiffs at KMZ Rosenman for the period October through December 2002, as broken out in subparts II(C)(7)(a)-(c).

schedule ten deposition in the final days preceding the agreed-upon discovery cutoff date of October 31 and negotiating a resolution of these issues with Defendants' counsel.

Mr. Halper spent 19.7 hours undertaking research implicated by the parties' discovery disputes, drafting objections and responses to Defendants' discovery requests and commencing review of documents responsive thereto.

Mr. Parrott spent 17.6 hours researching various issues, including parol evidence and principles of contract interpretation under Maryland law, as well as the measurement and recoverability of damages under Maryland law.

Mr. Karlinsky spent 1.6 hours conferring with Messrs. Cotton and Gordon regarding litigation strategy and discovery issues.

Finally, paraprofessionals Rodney Ellis, Natalie Gondre and Ishmael Taylor-Kamara spent 11.5 hours, 6.5 hours and 4.5 hours, respectively, assisting in various aspects of Plaintiffs' 14,811-page document production, including, *inter alia*, document management and redaction of privileged information from Plaintiffs' production.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $46,592.00. Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of $1,453.58, which included local travel, telephone and facsimile communications, photocopying and legal research including Westlaw, all of which are itemized on Exhibit H. Total time charges and disbursements incurred by Plaintiffs in October 2002 amounted to $48,045.58.

        **b.**      **November 2002**

        **[Fees: $18,979.50; Hours: 63.2; Disbursements: $625.65]**

Exhibit I to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of November 2002, when Plaintiffs continued to address pre-trial discovery issues.

Mr. Cotton supervised these activities spending 14.1 hours in November 2002 conferring with Messrs. Stockwell and Fiore regarding discovery issues and case strategy, and conferring with Mr. Gordon regarding litigation strategy and case management issues, including addressing the impending December 31, 2002 date of termination and non-renewal and avoiding unnecessary motion practice in connection therewith.    Mr. Gordon spent 11.5 hours in November 2002 supervising Mr. Halper in preparing an inventory of documents produced by both parties, and exchanging correspondence with Mr. Wiemelt regarding various discovery disputes.

Mr. Halper spent 35.2 hours reviewing thousands of pages of documents produced by Defendants, undertaking research implicated by the parties' discovery disputes and drafted a memorandum concerning issues implicated by the remaining two counterclaims.

Ms. Kobrine spent 0.5 hours conferring with Mr. Gordon regarding local procedure, including the filing of the parties' confidentiality stipulation and paraprofessional Tabatha Adams spent 1.9 hours overseeing various clerical and filing matters pertaining to these actions.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $18,979.50.  Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $625.65, which included local meals for late nights worked in September and October, *see supra* note 2, telephone and facsimile communications, photocopying and legal research including Westlaw, all of which are itemized on Exhibit I. Total time charges and disbursements incurred by Plaintiffs in November 2002 amounted to $19,605.15.

c.    **December 2002**

**[Fees:  $50,307.50; Hours:  169.9; Disbursements:  $4,029.28]**

Exhibit J to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of December 2002, when Plaintiffs continued to address

31

pre-trial discovery issues, including the review of Defendants' 9,000-page document production, and the negotiation of a standstill agreement with Defendants pending the Court's adjudication of Plaintiffs' motions.

Mr. Cotton supervised these activities spending 28.2 hours in December 2002 conferring with Messrs. Stockwell and Fiore regarding the parties' respective document productions and other discovery issues, and conferring with Mr. Gordon regarding litigation strategy and case management issues.  Mr. Gordon spent 43.2 hours exchanging correspondence with Defendants concerning various discovery disputes, negotiating a discovery standstill and drafting a stipulation memorializing the same and reviewing key documents produced by Defendants.

Mr. Halper spent 98.5 hours reviewing Defendants' 9,000-page document production, undertaking research implicated by the parties' discovery disputes and drafting a memorandum identifying the issues in the case and the corresponding documents pertaining thereto and deposition outlines for various witnesses.

For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $50,307.50.  Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of   $4,029.28, which included Bates-stamping and outside duplicating charges incurred in connection with the previous month's document production (*see supra* note 4), telephone and facsimile communications, photocopying and legal research including Westlaw, all of which are itemized on Exhibit J.  Total time charges and disbursements incurred by Plaintiffs in December 2002 amounted to $54,336.78.

**8.      January 2003 – Enforcing the Court's Decision and Judgment
         and Opposing Defendants' Motion for Reconsideration**

**[Fees:  $88,629.50; Hours:  225.5; Disbursements:  $2,930.20]**

Exhibit K to the Cotton Affidavit reflects reasonable time charges and disbursements incurred by Plaintiffs during the month of January 2003, when the Court issued its January 7

32

Decision and Judgment and Defendants patently refused to abide by the Court's rulings, resulting in an exchange of correspondence between counsel and ultimately opposing Defendants' unsuccessful motion for reconsideration of said Decision and Judgment.

Mr. Cotton supervised these activities spending 60.4 hours in January 2003 conferring with Messrs. Stockwell and Fiore regarding the Court's January 7 Decision and Judgment, Defendants' refusal to abide by the same, and conferring with Mr. Gordon regarding litigation strategy and case management issues.    Mr. Gordon spent 83.9 hours drafting lengthy correspondence to Defendants' counsel and the Court regarding Defendants' flouting of the Court's January 7 Decision and Judgment, as well as reviewing Defendants' motion for reconsideration and drafting Plaintiffs' opposition thereto.

Three junior attorneys assisted Mr. Gordon in researching various issues implicated by Defendants' erroneous interpretation of the January 7 Decision and Judgment, and ultimately Defendants' motion for reconsideration.  Kerri Folb, a third-year attorney whose billing rate is $285 per hour, spent 38.8 hours researching issues raised by Defendants in their reconsideration papers including, *inter alia*, the standards for reconsideration under Rules 59(e), 60(b) and 52(b), the "single document" requirement under Rule 58, and preparing an initial draft of sections of Plaintiffs' brief in opposition to Defendants' motion.  Additionally, Geoffrey Cahen and Michael Tiffany, first-year attorneys each of whose billing rate is $190 per hour, spent 2.1 hours and 7.2 hours, respectively, researching issues pertaining to the enforceability of the January 7 Decision and Judgment and the remedies available for Defendants' failure to abide by the same. For all of the above-referenced services, Plaintiffs incurred reasonable time charges in the amount of $88,629.50.   Additionally, Plaintiffs incurred actual, necessary and reasonable out-of-pocket expenses in the amount of  $2,930.20, which included charges for overnight mail, telephone and facsimile communications, photocopying and legal research including Westlaw, all of which are

itemized on Exhibit K.  Total time charges and disbursements incurred by Plaintiffs in January 2003 amounted to $91,559.70.

     **9.**     **February 2003**

As stated in note 1, *supra*, Plaintiffs will furnish Defendants with KMZ Rosenman's bill for reasonable time charges and disbursements incurred during the  month of February 2003 in connection with KMZ Rosenman's successful defense of Defendants' motion for reconsideration at the time said bill is rendered.

### III.

### KMZ ROSENMAN'S CUSTOMARY FEE AND
### THE CUSTOMARY FEE FOR LIKE WORK

The rates charged by KMZ Rosenman in the above-captioned actions do not differ from the rates generally charged to and collected from KMZ Rosenman's other clients.  As borne out by Point II(B)(3), *supra*, the range of rates for New York partners at KMZ Rosenman is $415 to $550, with junior partners like Mr. Gordon being billed at the lower end of the spectrum ($415) and Mr. Karlinsky, who has been practicing for 26 years, being billed out at the upper end of the spectrum ($550).  The range of rates for Washington, D.C. partners is $360 for Mr. Furey, who has been practicing law for 20 years, to $385 for Mr. Morrison, who has been practicing law for 24 years.  The range of rates for New York associates at KMZ Rosenman is $185 to $400, with Mr. Halper, a second-year attorney being billed out at $185 per hour; Mr. Parrott, a sixth-year attorney being billed out at $350 per hour; and Mr. Gordon, an eleventh-year attorney, being billed out at $400 per hour (prior to his becoming a partner in February 2003).  The range of rates for Washington, D.C. associates at KMZ Rosenman is $215 to $315, with Mr. Kelley, a third-year attorney being billed out at $215 per hour; Ms. Kobrine, a seventh-year attorney being billed out at $265 per hour; and Mr. Corcoran, an eleventh-year attorney, being billed out at $315 per hour.

The range of rates for New York and Washington, D.C. paraprofessionals at KMZ Rosenman is $100 to $175, with Mr. Burgalassi, a research librarian in KMZ Rosenman's New York office at the lower end of the spectrum ($100) and Mr. Bell and Ms. Adams, senior litigation paralegals in the firm's Chicago and Washington D.C. offices, respectively, at the upper end of the spectrum ($175).

As borne out by *The National Law Journal's* 2002 survey of billing rates at law firms nationwide, which is annexed to the Cotton Affidavit as Exhibit L, KMZ Rosenman's billing range for partners—from $415 to $550 per hour—and for associates—from $185 to $400 per hour—is entirely commensurate with the billing rates of comparable national law firms in New York, Washington, D.C. and, even, Baltimore, Maryland.  For example, the New York law firm Hughes Hubbard & Reed, with 282 attorneys, has an hourly billing range for partners from $375 to $625, and an hourly billing range for associates of $175 to $415; the New York law firm Kramer Levin Naftalis & Frankel with 285 attorneys, has an hourly billing range for partners from $440 to $625, and an hourly billing range for associates of $210 to $440; and the New York law firm Thelen Reid & Priest with 440 attorneys, has an hourly billing range for partners from $315 to $575, and an hourly billing range for associates of $165 to $390.  See Cotton Aff., Ex. L, "A Firm By Firm Sampling of Billing Rates Nationwide, *The National Law Journal*, December 2002.

In the same vein, the Washington, D.C. firm of Akin, Gump, Strauss, Hauer & Feld, with 1,017 attorneys, has an hourly billing range for partners from $350 to $600, and an hourly billing range for associates of $170 to $330; the Washington, D.C. firm of Covington & Burling, with 522 attorneys, has an hourly billing range for partners from $325 to $600, and an hourly billing range for associates of $175 to $415; and the Washington, D.C. firm of Hogan & Hartson with 937 attorneys, has an hourly billing range for partners from $230 to $750, and an hourly billing range for associates of $95 to $405.  See Cotton Aff., Ex. L.

35

Finally, one of Maryland's premiere law firms, the Venable Firm, with 448 attorneys, has billing ranges entirely comparable to that of KMZ Rosenman, with an hourly billing range for partners from $250 to $670, and an hourly billing range for associates of $165 to $310.  Id.

Thus, there can be no doubt that KMZ Rosenman's billing rates are reasonable and customary in the New York, Washington D.C. and/or Baltimore legal markets for attorneys possessing the level and breadth of experience possessed by those attorneys working on the above-captioned matters.

## IV.

## ADDITIONAL FACTORS TO CONSIDER UNDER MARYLAND LAW

Under Maryland law, the reasonableness of attorneys' fees is governed by consideration of various factors including:

> . . . the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

> \* \* \*

> . . . the fee customarily charged in the locality for similar legal services;

> . . . the amount involved and the results obtained;

> . . . the time limitations imposed by the client or by the circumstances;

> \* \* \*

> . . . the experience, reputation, and ability of the lawyer or lawyers performing the services; and

> . . . whether the fee is fixed or contingent.

See Reisterstown Plaza Associates v. General Nutrition Center, Inc., 89 Md. App. 232, 247, 597 A.2d 1049, 1056-1057 (Md. Ct. Spec. App. 1991) (affirming award of attorneys' fees); see also Contract Materials Processing, Inc. v. Kataleuna GMBH Catalysts, 222 F. Supp. 2d 733, 751 (D. Md. 2002) (granting motion for award of attorneys' fees).

36

Here, Plaintiffs engaged KMZ Rosenman as their national counsel to assist them in conflicts arising out of the termination of dealership relationships that they had inherited from their corporate predecessors, but which relationships were not suited to Plaintiffs' business model.  In fact, KMZ Rosenman has represented Plaintiffs in five other dealership disputes, albeit, involving different agreements (*see supra* note 2), but governed by Maryland law and implicating the same legal principles at issue in this action.  The skill of Plaintiffs' national counsel in achieving remarkable results within a short time frame cannot be understated.  KMZ Rosenman succeeded in effectuating the termination of two very substantial, ten-year dealership agreements in nine months' time—which time frame was coextensive with the amount of notice of termination and non-renewal afforded by Plaintiffs to Defendants (and which time frame the Court has found to be reasonable as a matter of law).  The chronology of these proceedings— Plaintiffs' tendering of notices of termination and non-renewal to Defendants in April 2002, immediately followed by the commencement of the above-captioned actions, followed shortly thereafter in July 2003 by Plaintiffs' motions for dispositive relief—resulted in an expeditious result and obviated the necessity for emergent motion practice on the eve of (or post) termination.

The amount involved, $712,243.98—comprised of $671,182.50 in attorneys' fees and $41,061.48 in actual, necessary and reasonable out-of-pocket expenses incurred to date and recoverable in accord with the Court's January 7 Decision and Judgment—should be looked at in the context of the results obtained and the overall potential liability involved.  Indeed, prior to Plaintiffs' termination and non-renewal of the Agreements, Defendants—laboring under the erroneous belief that the Agreements could not be terminated at will, but rather continued indefinitely (unless one of certain enumerated events of default took place, if ever)—each were seeking substantial seven-figure sums for the "buy-out" of the Agreements.  KMZ Rosenman effectuated the termination of said Agreements for Plaintiffs without any "buy-out" being

37

necessary, and in fact, succeeded in obtaining a judgment for Plaintiffs' attorneys' fees and costs. This is relevant because the Maryland Court of Special Appeals has held that a court should consider the relationship between the fee and costs amount—here, approximately $712,000—and the potential liability involved—here, exponentially greater than $712,000— in ascertaining the reasonableness of attorneys' fees and costs.

For example, in <u>Reisterstown Plaza Associates</u>, although the actual damage award was only $79,337.91, the court found that attorneys' fees and costs in the amount of $141,784.42 bore "a reasonable relationship to the liability involved" because had defendant lessee been unsuccessful in the action, it would have been required to pay 6½ years of rent to plaintiff, and it would have been exposed to adverse publicity and possible claims by clients and employees.  89 Md. App. at 247-48, 597 A.2d at 1056-57.  Here, similarly, had Plaintiffs been unsuccessful in the instant action, in addition to having to pay Defendants' reasonable attorneys' fees and costs and having to pay a substantial premium to buy out the Agreements, Plaintiffs likely would have faced additional claims asserted by other dealers under similar agreements, contending, *inter alia*, that their agreements were not terminable at will and/or had not been terminated on reasonable notice.

Separate and apart from the reasonable relationship between the fees/costs at issue and the potential liability involved, the Fourth Circuit has recognized that in complex litigations like the case at bar, a court should consider the rates charged by attorneys in the community where the attorneys at issue practice—here, New York and Washington, D.C.  <u>See</u> <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 31 F.3d 169, 179 (4th Cir. 1994).  In <u>Rum Creek</u>, the Fourth Circuit reversed the lower court's downward adjustment of billing rates charged by Hunton & Williams ("Hunton")—a national law firm like KMZ Rosenman here—to comport with those charged in the city where the litigation was pending (Charleston, WV).  The court reasoned that Hunton, like KMZ Rosenman here, was plaintiff's regular outside counsel, was very experienced in

38

matters of the type involved, that the case was expected to be difficult and protracted, and thus tailored to Hunton's expertise.  See id.  See also National Wildlife Federation v. Hanson, 859 F.2d 313, 317-318 (4th Cir. 1988) (affirming district court's award of fees based on Washington D.C. rate rather than Raleigh, N.C. rate where court sat because local counsel were unable to take the case and nearest counsel with requisite expertise was in D.C.).

Here, even though the above-captioned actions are pending in Baltimore, Maryland, the rates charged by attorneys in KMZ Rosenman's New York and Washington, D.C. offices should govern.  KMZ Rosenman is Plaintiffs' national counsel and specifically was retained to represent Plaintiffs in any litigation(s) arising out of their termination of dealership relationships involving agreements (like that at issue here) of unspecified or indefinite duration.  KMZ Rosenman carefully analyzed the relationships at issue, and developed and implemented a strategy for terminating these relationships that would be in full compliance with the UCC and the common law applicable to the contracts at issue.

Notwithstanding the foregoing, as set forth in Point III, *supra*, even if the Court were consider rates charged by Maryland law firms, comparable firms, such as the Venable Firm, have billing rates entirely commensurate with that of KMZ Rosenman. *Compare* KMZ Rosenman rates: partners [$415-$550] and associates [$185-$400] with Venable rates:  partners [$260-$670] and associates [$165-$310].  See Cotton Aff., Ex. L.

39

## CONCLUSION

For all of the foregoing reasons and those set forth in the accompanying Cotton Affidavit, it is respectfully requested that Defendants be adjudged to reimburse Plaintiffs in the amount of $620,684.28 in bringing this action and litigating their motion for partial summary judgment and partial judgment on the pleadings, plus additional attorneys' fees and costs in the amount of $91,559.70 incurred by Plaintiffs in successfully defending against Defendants' motion for reconsideration, for a total of $712,243.98.

Dated: March 25, 2003

Respectfully submitted,

KATTEN MUCHIN ZAVIS ROSENMAN

By: _____/s/  Howard E. Cotton _____
Howard E. Cotton (admitted *pro hac vice*)
Michael S. Gordon (admitted *pro hac vice*)
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8855
Facsimile: (212) 894-5966

Counsel for Plaintiffs
PracticeWorks, Inc. and SoftDent LLC

40

22183694.01