

*KATTEN MUCHIN ZAVIS ROSENMAN*

575 Madison Avenue
New York, NY 10022-2585
212.940.8800 office   212.940.8776 fax

April 14, 2003

MICHAEL S. GORDON
michael.gordon@kmzr.com
212.940.6666   212.894.5966 fax

**By Facsimile**

Mark E. Wiemelt, Esq.
Law Offices of Mark E. Wiemelt, P.C.
10 S. LaSalle St., Suite 3500
Chicago, IL  60603

Re:    (1)    PracticeWorks, Inc., et al. v. Professional Software
              Solutions of Illinois, Inc., Civil No. JFM 02-CV-1205

       (2)    PracticeWorks, Inc., et al. v. Dental Medical
              Automation, Inc., Civil No. JFM 02-CV-1206

Dear Mark:

        As you know, during the hearing on February 21, 2003 in the above-referenced matters,
in addition to denying Defendants' motion for reconsideration, the Court held that Defendants
could provide technical support and service pertaining to the SoftDent software at issue
"provided, of course, . . . that relevant materials were returned and not used." (Trans. at p. 11).
The Court's holding was consistent with its finding in its January 7 Decision that Defendants
were required "'to immediately return [to the plaintiffs] any and all materials regarding the
Products in any form whatsoever,'" as required in the Agreements.  (Decision at p. 9, *quoting*
Section 13.3 of the Agreements).  It further was agreed during the February 21 hearing that
Defendants would deliver all such materials to you and that you would confirm to Plaintiffs'
counsel your receipt and sole custody of these materials. (Trans. at p. 14)

        Accordingly, pursuant to the Court's ruling and the parties' agreement during the
February 21 hearing, Plaintiffs demand that Defendants deliver to you any and all materials
regarding the Products in any form whatsoever, including, without limitation, the following
materials received from Plaintiffs and/or their predecessors:

        1.    All SoftDent Products (as that term is defined in the Agreements) and any copies
              thereof, in any form whatsoever, being used by Defendants for any purpose,
              including, without limitation, to service and/or support the SoftDent Products;

        2.    All manuals, guides, product descriptions, specifications, updates, upgrades,
              revisions, new versions and supplements;

*New York    Charlotte    Chicago    Los Angeles    Newark    Palo Alto    Washington, DC    www.kmzr.com*
A Law Partnership Including Professional Corporations

22184666.01

Mark E. Wiemelt, Esq.
April 14, 2003
Page 2



3. All charts, documents, drawings, memoranda, notes, computer printouts, reports, studies, specifications, charts, graphs, descriptions, instructions, recordings, spreadsheets, and/or other materials contained in any stored data retrieval system;

4. All sales and marketing materials;

5. All monthly reports;

6. All sentinels, including, without limitation, sentinels with the following serial numbers:

    a. from Dental Medical Automation, Inc. - 14606;

    b. from Professional Software Solutions of Illinois, Inc. - 1032, 1113, 1147, 3722, 3729, 5908, 7455, 7457, 14281, 14835, 15030.

Finally, the Court stated that "if there are issues that . . . materials are being used improperly, that they should be returned or that software is being used improperly," then Plaintiffs could seek enforcement remedies. (Id. at p. 12).

In order to obviate the necessity for motion practice on these issues, please confirm in writing to the undersigned that your clients have delivered to you all of the foregoing materials and that you are in sole custody of the same.

Very truly yours,

Michael S. Gordon

MSG/jpb

Cc:  Dennis Stockwell, Esq. (via facsimile)
     Howard E. Cotton, Esq.

22184666.01

# LAW OFFICES OF MARK E. WIEMELT, P.C.

TEN SOUTH LASALLE STREET
SUITE 3300
CHICAGO, IL 60603
(312) 372-7664
FAX: (312) 372-6568
E-MAIL: **mark@wiemeltlaw.com**
INTERNET: **www.wiemeltlaw.com**

MARK E. WIEMELT*

PATENT, TRADEMARK, COPYRIGHT,
TRADE SECRETS, UNFAIR COMPETITION,
INTERNET/E-COMMERCE LAW AND
RELATED CONTRACT, LICENSING
AND LITIGATION MATTERS

* REGISTERED PATENT ATTORNEY

### PRIVILEGED AND CONFIDENTIAL

*The following is a privileged attorney-client communication made in response to a request by the addressee for legal advice. It includes and reflects confidential communications from the addressee, and is intended solely for the use of the addressee and the addressee's duly authorized agents concerned with the decisions in the matter*

Thursday, May 08, 2003

## FOR PURPOSES OF SETTLEMENT
## UNDER FED. R. EVID. 408

VIA FACSIMILE

Howard E. Cotton, Esq.
Katten, Muchin, Zavis, Rosenman
575 Madison Avenue
New York, NY 10022

Re: PracticeWorks, Inc. and SoftDent, LLC - Cases Nos. 02CV1206 & 02CV1205

Dear Mr. Cotton:

This letter follows our telephone conversation yesterday and responds to the letter of Michael Gordon dated April 14, 2003.

Please be advised that I received all of the relevant materials from PSSI and DMA on February 27, 2003 and February 28, 2003, respectively, with the exception of the one sentinel in the possession of DMA which it recently located and is forwarding to my office. Please also be advised that the "relevant materials" which were in my clients' possessions and forwarded to me did not include all of the documents and things demanded in Mr. Gordon's letter. It was made clear during the February 21, 2003 hearing that "relevant materials" included only the "advertising collateral used to sell the Product" and that PSSI and DMA would forward all the relevant materials to my office

pending this litigation, but they would also continue to use software "that they have lawfully purchased and for which title had passed to them … to provide technical support and service." (Trans. at p. 10.) Indeed, the parties agreed on the record that DMA and PSSI would "drop all the materials that have ever been given them by the plaintiffs, **with the exception of the software that they've purchased**, drop all that material off to my office pending this litigation." (Trans. at p. 14.)(emphasis added). Accordingly, DMA and PSSI have not forwarded to my office software that they have lawfully purchased from Plaintiffs.

For the sake of clarity, all of the advertising and marketing collateral (sales supplies) which was provided to DMA and PSSI by Plaintiffs, and their predecessors, during the terms of the Agreements and which was still in my clients' possessions, was forwarded to my office. As part of the relevant materials (sales supplies), PSSI forwarded 11 sentinels to my office and DMA is forwarding the one sentinel in its possession which it recently located.

The forwarding of all of the advertising and marketing collateral (sales supplies), including sentinels, ends the dispute regarding whether DMA and PSSI may continue to provide technical support and service of the Products. Please recall that in granting Defendants' Motion for Clarification, the Court agreed with both Plaintiffs and Defendants that "the defendants may continue to provide technical support and service to their former and existing customers even after the Agreements have been terminated…, provided…, that relevant materials were returned and not used." (Trans., at p. 11). Accordingly, since all of the relevant material (sales supplies) have been forwarded to my office and are not being used by my clients in connection with the provision of support or services, my clients shall continue to provide technical support and services of the Products.

To the extent that your clients wish to maintain their contention that "material regarding the Products," as provided under the Agreements, which are to be returned or forwarded to my office, includes every scrap of paper and tangible item ever given to DMA and PSSI by Plaintiffs or generated by PSSI and DMA during the term of the Agreements, whether proprietary or not and whether related to the sales of the Products or not, please review the following Agreement provisions in the context of the entire Agreements. The Agreements expressly define "Products" as "computer software and related products now or hereafter, during the term of this Agreement, manufactured by InfoSoft® and distributed by PSS." (Agreements ¶ 2.1). The Agreements provide that "[t]he restrictions and controls on the Dealer's operation and acquisition of **sales supplies** established herein are intended **solely** to protect PSS's rights to its trademark and to discharge **PSS's obligation** to the Dealer to maintain a high level of quality products and services." (Agreements ¶ 1.5). Sections 4 of the Agreements address PSS' obligations to provide sales supplies or sales materials to Dealers in order to facilitate sales of the Products by Dealers. The Agreements expressly provide that PSS shall provide "mailing lists, demographic studies, brochures, demonstration disks and other **sales materials** to licensed Dealers at cost." (Agreements ¶ 4.4). Sections 6 of the Agreements define the parties' indemnity obligations arising from the sale of the Products. Sections 7.4 of the

Agreements address PSS' provision of promotional items and promotional materials (sales materials) to Dealers. Sections 11.6 of the Agreements confirm that Dealers may provide support and service to their customers. Furthermore, Addendum A to the Agreements (PSSI/DMA 212), a copy of which is enclosed herewith, lists specific advertising collateral, sales supplies or sales materials under the heading SALES TOOLS, separate and apart from the heading MANAGEMENT SYSTEMS, which includes only software Products. Consequently, when the Agreements are read as a whole and in the proper context, they clearly provide only that "sales supplies", "sales materials", and the like, which are related to the sale of Products, are to be returned to Plaintiffs after termination of the Agreements.

Consistent therewith, Plaintiffs stated in their Memorandum in Support of Motion for Partial Summary Judgment that

> Because the **Agreements apply only to the sale of the Software** and related products, and **not to any incidental services, such as technical support** that Defendants may opt to provide in connection therewith, **Plaintiffs do not dispute that Defendants may continue to provide 'technical support' and 'service' to their former and existing customers even after the Agreements have been terminated.**"

(Plaintiff's Motion p. 30) (emphasis added).

To clarify, PSSI and DMA do not retain possession of any of the advertising collateral, sales supplies or sales materials listed under the heading SALES TOOLS.

Moreover, both PSSI and DMA were providing technical support and service for the Products prior to entering into the Agreements. Need I remind you that a termination of the Agreement which is not for cause fails to trigger a non-compete with respect to the Products, much less with respect to technical support and service. In addition, we note that non-Dealers have provided technical support and service related to the Products over the years by using the Products. Therefore, PSSI and DMA may clearly retain the software which they purchased for the purpose of providing technical support and service.

Turning now to the subject of a potential settlement of all of the disputes between Plaintiffs and Defendants, DMA and PSSI are willing to discuss and even offer settlement of all of the remaining disputes, but not on the terms you outlined for discussion purposes yesterday. While I acknowledge that you indicated that your client in no way approved or authorized any type of settlement offer on their behalf, I did as you requested and asked my clients to consider settlement under the following principle terms:

1. the payment of a combined net sum by Defendants to Plaintiffs of an amount considerably in excess of Defendants previous offer of settlement of $50,000.00 (inclusive of attorneys fees and costs);
2. a waiver of Defendants' appellate rights;
3. dismissal with prejudice of Defendants' pending Counterclaims, including Defendants' claims for compensatory damages, attorneys fees and costs;

4. mutual releases between Plaintiffs and each of the Defendants; and
5. an agreement and acknowledgement by Plaintiffs that Defendants can continue to provide worldwide technical support and services of the Products, including but not limited to an agreement and acknowledgement that Plaintiffs will not impede, block, obstruct, inhibit, or restrict DMA or PSSI's ability to provide technical support and services of the Products, including but not limited to an agreement and acknowledgement that Plaintiffs will sell all versions of Products in any form whatsoever to Defendants for the limited purpose of providing said technical support and services related to the Products.

For the reasons set forth herein, my clients are not offering settlement under the terms outlined above.

First, DMA and PSSI believe that Plaintiffs grossly overestimate the value of their Motion for Attorneys' Fees. As stated in our Response to Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Attorneys Fees, Plaintiffs failed to meet their burden to establish reasonable attorneys fees and the Court should deny their Motion for failing to meet their burden or at the very least use its discretion to significantly reduce any award of attorneys fees and costs to a reasonable amount.

Second, Plaintiffs apparently underestimate the merits and value of Defendants' Counterclaims by labelling them "spurious" and "pretextual" counterclaims which are raised in the litigation for the first time. In sharp contrast, as detailed in enclosed documents labeled PSSI/DMA 1691-1710 which were previously provided in discovery, please recall that in the fall of 2000, well before Plaintiffs' purported notices of termination and non-renewal dated April 8, 2002, I exchanged correspondence with Attorney Richard M. Barnes regarding, in part, some of the same breaches of contract under the Agreements which form a part of Defendants' Sixth Counterclaim. Thus, the Counterclaims are clearly not "spurious" and "pretextual" counterclaims which were raised in the litigation for the first time.

To review, DMA and PSSI's Sixth Counterclaims provide that SoftDent's "Platinum", "Advantage", and "Subscription" products and services contain Plaintiffs' SoftDent Software and related products, which, by definition, are subject to the terms of the Agreements and that Plaintiffs, in violation of Sections 3.1, 4.1, 4.4, 10.1 and 10.7 of the Agreement, have: i) offered to sell Software and related products to customers within DMA and PSSI's exclusive geographical territories; ii) sold Software and related products to customers within DMA and PSSI's exclusive geographical territories; iii) directly advertised its SoftDent Software and related products and services to customers and potential customers within DMA and PSSI's exclusive geographical territories; iv) failed to provide mailing lists, demographic studies, brochures, demonstration disks and other sales materials to DMA and PSSI, as provided in Sections 4.4; v) failed to compensate DMA and PSSI as provided in the Agreement; vi) failed to provide regular reports as required in Sections 4.1; and vii) otherwise interfered with the Fair Trade Practices of DMA and PSSI. Similarly, DMA and PSSI's Seventh Counterclaims currently provide that Plaintiffs have: i) failed to forward sales "leads" within DMA and

PSSI's exclusive geographical territories to DMA and PSSI; ii) failed to cooperate with DMA and PSSI regarding issues pertaining to the distribution of Software upgrades, pricing, and participation in trade shows; and iii) failed to allow PSSI and DMA to offer products and services DMA and PSSI's territory when the products and services were offered in other territories. If forced to proceed on the Counterclaims, DMA and PSSI will likely re-evaluate Counterclaims 6 & 7 and amend Counterclaims 6 & 7 to specify that the conduct detailed in Counterclaim 7 amounts to breaches of the Agreements.

As set forth in the current Counterclaim 7, Plaintiffs failed to continue to forward all sales leads for the Products to DMA and PSSI, in their respective Territories, and instead diverted and converted these leads into direct sales for Plaintiffs. Plaintiffs also failed to continue providing adequate advertising collateral. As a result, PSSI experienced a drop-off of sales from Plaintiffs' forwarded leads from an average of approximately 98 new customer sales per year from the date of execution of the Agreements through 1999, to only 50 new sales in 2000, 17 new sales in 2001, and 6 new sales in 2002, during a time in which Plaintiffs boasted of record sales and record leads. The dramatic decrease in forwarded leads from Plaintiffs and resulting new sales cost PSSI lost profits in an amount well in excess of $400,000.00 on the sale of the software alone, plus the lost profits from the provision of related technical support and service which exceeds $400,000.00, plus the lost profits from related updates and upgrades which exceeds $200,000.00, for a total loss by PSSI well in excess of $1,000,000.00, not to mention the lost profits related to the ancillary sales of hardware and related services to new customers. DMA had a similar lost profits experience due to the failure of Plaintiffs to continue to provide leads and adequate advertising collateral in years 2001 and 2002.

Additionally, the reports produced by Plaintiffs during discovery confirm the breaches of the Agreements by Plaintiffs with respect to the SoftDent Advantage Product.

Based on the foregoing, the damages recoverable by PSSI and DMA for breaches of the Agreements alone, including attorneys fees and costs, should easily exceed $2,000,000.00.

Third, if your clients do not agree that the dispute regarding whether DMA and PSSI may continue to provide technical support and service of the Products has been removed and the parties do not otherwise agree to a settlement of all disputes between Plaintiffs and Defendants, my clients will be compelled to move the Court for leave to file amended Counterclaims as set forth above and adding new Counterclaims for tortious interference with contract and tortious interference with prospective economic advantage under Illinois, Ohio and possibly other applicable state law. The new Counterclaims will be based in part on your clients' statements to customers and prospective customers of DMA and PSSI that PSSI, DMA and other former Dealers cannot purchase the Products, cannot continue to provide technical support and services, and other similar statements and conduct to that effect. The lost profits caused by Plaintiffs' statements and conduct has caused and will continue to cause DMA and PSSI lost profits in an ever-increasing amount. In addition to these compensatory damages, the new Counterclaims will seek punitive damages for this tortious conduct.

issues and shall not be construed as a wavier of any of DMA and PSSI's rights, whether express or implied.

This offer will expire if not accepted on or before noon on Tuesday, May 13, 2003.

Sincerely,

Mark E. Wiemelt

MW
Enclosures

# LAW OFFICES OF MARK E. WIEMELT, P.C.

TEN SOUTH LASALLE STREET
SUITE 3500
CHICAGO, IL 60603
(312) 372-7664
FAX: (312) 372-6568
E-MAIL: mwiemelt@poweruser.com

MARK E. WIEMELT*
JOSEPH C. WANG*

PATENT, TRADEMARK, COPYRIGHT,
TRADE SECRETS, UNFAIR COMPETITION,
INTERNET/E-COMMERCE LAW AND
RELATED CONTRACT, LICENSING
AND LITIGATION MATTERS

* REGISTERED PATENT ATTORNEYS

Friday, August 18, 2000

**VIA FACSIMILE: 410/783-4040**

Mr. Richard M. Barnes
Goodell, DeVries, Leech & Gray, LLP
One South Street, 20th Floor
Baltimore, MD 21202

Re: Professional Software Solutions of Illinois, Inc. – 1/1/93 Dealer/Resellers Agreement

Dear Mr. Barnes:

This letter is in response to your letter dated August 8, 2000, responding to my July 7, 2000 letter to Justin H. McCarthy II.

In summary, it remains PSSI's firm belief, and they have been so advised, that they have not engaged in any conduct which constitutes a breach of the Agreement. Indeed, it is DENTSPLY who continues to breach the Agreement.

## 1-800-SOFTDENT

Your position appears to be that Paragraph 8.2 of the Agreement does not apply to my client's use of 1-800-SOFTDENT because my client's long distance telephone number and webpage are not "locally designed, printed materials." If so, would you then agree that my client is not required to submit any of the content on its website or radio advertisements to your client for review? Regardless, your position ignores the fact that my client's webpages are locally designed and become printed materials when they are downloaded and printed. Your position also ignores the fact that 1-800-SOFTDENT has been used by my client in numerous locally designed, printed materials, i.e., sales proposals, banners and booth displays at tradeshows (Chicago Dental Society Midwinter Meeting) and business cards, for years. The use of the locally designed, printed materials containing 1-800-SOFTDENT has been with full knowledge of your client. Indeed, printed materials containing 1-800-SOFTDENT have been submitted to your client for years. Moreover, your client assisted with the display and distribution of the printed materials at one or more of the tradeshows. Because each use of 1-800-SOFTDENT has

PSSI/DMA 1691
Confidential

been consistent with prior uses, future approval is unnecessary under Paragraph 8.2 of the Agreement.

In addition, the legal and equitable doctrines of waiver, laches, estoppel and acquiescence allow my client to continue its use of 1-800-SOFTDENT. Your client has known of and allowed such use for years without objection.

I am unpersuaded by your reference to "The New York Times", "Microsoft" and "Bell Atlantic" in support of your position that my client cannot use 1-800-SOFTDENT. Your "exercise" of researching three tradenames falls woefully short of being a comprehensive survey or even a representative sampling. Although I have not conducted a search, I would not be surprised to find that at least three exclusive licensees of marks promoting the licensed goods and services using vanity numbers such as 1-800-SOFTDENT where the SOFTDENT portion of the number is a trademark or service mark. Indeed, it is common for exclusive licensees to have wide latitude in their use of the licensed marks to promote the licensed products or services.

Even if no exclusive licensees of marks use vanity numbers, a logical assumption upon encountering a mark such as 1-800-SOFTDENT is that by calling the number one would be contacting a provider of SOFTDENT products, i.e., the manufacturer or an authorized dealer, licensee or supplier of SOFTDENT products. SOFTDENT is a trademark used in connection with a product which my client has the exclusive right to sell in its Territory. Consumers would not be dialing 1-800-SOFTDENT unless they encountered my client's use of same and were interested in the SOFTDENT product. Therefore, I cannot agree that "one's logical assumption would be that one is contacting 'SoftDent' by dialing a number containing that mark, or by locating a web site identified by that mark." Consumers dialing 1-800-SOFTDENT are seeking information regarding a product not a company. In fact, there is no SoftDent company. SOFTDENT identifies a product, not a company. In sharp contrast, the three trademarks you reference double as all company names and tradenames. The New York Times is a tradename of The New York Times Company, Microsoft is a tradename of Microsoft Corporation and Bell Atlantic is a tradename of Bell Atlantic Corporation.

Even the plain language of the Agreement grants my client the right to use 1-800-SOFTDENT. Paragraph 1.4 of the Agreement "gives each dealer the right to exploit the trademark...." Paragraph 1.5 similarly refers to "the exploitation of the Products and trademarks" by my client. Thus, it remains clear that as an exclusive Dealer/Reseller, PSSI has the right to use/exploit the SoftDent® trademark, including use of 1-800-SOFTDENT.

Again, 1-800-SOFTDENT is being used only in connection with Products which are being distributed under the terms of the Agreement. DENTSPLY and its predecessors have known of PSSI's use of the 1-800-SOFTDENT phone number for many years and has only recently objected to same. All current uses of the 1-800-SOFTDENT phone number are consistent with past uses of the trademark and are part of PSSI's best personal efforts to promote the Products and its devotion to the success of the Products

PSSI/DMA 1692
Confidential

consistent with the spirit of the Agreement. The use of the 1-800-SOFTDENT phone number is also consistent with PSSI's efforts to fully exploit the sales potential of the Products in the Territory.

Your client's insistence that my client not use 1-800-SOFTDENT is inconsistent with its suggestions that my client may not be using its best personal efforts to promote the Products and its devotion to the success of the Products. In essence, your client is attempting to clip my client's wings and then claim that my client cannot fly.

As stated in my July 7, 2000 letter, none of PSSI's uses of the 1-800-SOFTDENT phone number "might mislead or deceive the public regarding InfoSoft, its products and services," particularly since PSSI's use of the 1-800-SOFTDENT phone number is generally accompanied by a prominent indication that PSSI is a Dealer of SoftDent® products. Not surprisingly, I note that your client still fails to submit any evidence that the public has been misled or deceived. Simply announcing that the use is a misleading association, as you do in your August 8 letter, is not a persuasive argument.

Although my client voluntarily, temporarily ceased use of 1-800-SOFTDENT pending a review of the matter, it reserves the right to use 1-800-SOFTDENT consistent with past uses.

## DENTSPLY'S VIOLATION OF PSSI'S EXCLUSIVE RIGHT TO DISTRIBUTE PRODUCT IN THE TERRITORY

While your letter states that effective immediately your client will not include updates as part of its service and software support, it does not indicate whether your client will continue to offer SoftDent® Platinum. Apparently, it continues to do so. Again, DENTSPLY must immediately cease and desist from offering SoftDent® Platinum in the Territory because it was marketed as containing and contains Product.

In addition, under Paragraph 10.3 of the Agreement, DENTSPLY should immediately pay PSSI commissions (40%) on the entire purchase price of all prior sales of SoftDent® Platinum in the Territory, particularly since DENTSPLY is paying other Dealers commissions on the full SoftDent® Platinum purchase price. Your letter fails to address this compensation issue.

With respect to my client's obligations under the Agreement, your letter misconstrues the provisions of Paragraph 10.5 (which you erroneously cite as Paragraph 10.3). You state that my client "is required to refrain from any actions which would 'impede, block, obstruct, inhibit, or restrict' DENTSPLY'S offering of services to the end users." In comparison, Paragraph 10.5 provides that my client will not "impede, block, obstruct, inhibit, or restrict InfoSoft's or PSS's access to the End-User with regards to these services..."(emphasis added). The language does not provide that DENTSPLY may directly offer services to End-Users. My client is doing nothing to impede, block, obstruct, inhibit, or restrict your client's access to End-Users with regards to the services which your client may properly provide. Instead, my client is merely insisting that your

PSSI/DMA 1693
Confidential

client abide by the terms of the Agreement and not directly offer Product in the Territory. Paragraph 10.5 specifically provides that "PSS warrants, however, that PSS and InfoSoft will not sell any Product to the End-User except as specifically permitted herein." Your client breached this warranty and continued promotion and sales of SoftDent® Platinum in the Territory is a willful and intentional continuing breach of the express warranty.

Again, the following Paragraphs of the Agreement clearly provide that DENTSPLY cannot offer Products within the Territory:

Paragraph 2.1 as amended in the May 9, 1994 Addendum To Dealer/Resellers Agreement provides that "[t]he term 'Products' shall mean the SoftDent® Dental Management System software program and related products now or hereafter, during the term of this Agreement, developed, manufactured or distributed by PSS. This includes all programs and related products now or hereafter, except an update to the current DOS version which can be sold directly by InfoSoft, Inc. For example a SoftDent® Dental Management System software Windows® version, if developed, would be 'Products' as defined here, and would not be an update. Another example of 'Products' would be a SoftDent® Dental Management System software program with only some of the features that exist, now or hereafter, and sold at a lower retail price than the complete SoftDent® Dental Management System software."

Paragraph 3.3 as added in the May 9, 1994 Addendum To Dealer/Resellers Agreement provides that "PSS grants to Dealer the right of first refusal on all new PSS products with respect to the Territory."

Paragraph 3.1 provides, in relevant part, that "PSS hereby grants to Dealer the exclusive right to sell the Products" in the Territory and that "PSS acknowledges that Dealer, in executing this Agreement, is relying on the exclusive right to distribute the Products in the Territory and is expending significant funds (and foregoing other opportunities) to fully develop and maximize the economic viability of the Territory for the benefit of Dealer and PSS."

Paragraph 3.2 provides that "PSS reserves the right to revoke this exclusivity in the event that the Dealer does not maintain the purchase quota outlined hereinabove."

Paragraph 10.2 provides that "[t]he Dealer offers value-added services that affect the overall 'system' pricing of the Products in the marketplace such as hardware, training, installation and support. However, it is suggested that the Dealer offer the Products for the then-advertised Suggested Retail Price (SRP) stated separately from any adjunctive services. In the event the Dealer does not offer the Products at the then-advertised SRP, PSS reserves the right, upon five (5) days prior written notice to Dealer, to circumvent the Dealer and sell directly to the costumer for the then-advertised SRP of the Product. PSS will not discount these Products to the End-user."

10.3 provides that "In the event that a Product is sold to End-User by any person or entity other than the Dealer in the Dealer's Territory, PSS will compensate the Dealer by the

PSSI/DMA 1694
Confidential

payment of forty (40) percent of the Suggested Retail Price (SRP) of the Product provided Dealer is not in Default of this Agreement."

10.5 provides, in relevant part, that "PSS warrants, however, that PSS and InfoSoft will not sell any Product to the End-User except as specifically permitted herein."

Paragraph 25.1 provides that "Dealer agrees to purchase an average of fifty (50) Products per year in exchange for Dealer Exclusivity in the Territory...."

Again, the Agreement clearly provides that DENTSPLY cannot offer Products within the Territory, unless specifically authorized in writing by my client.

REVIEW OF PSSI'S METHOD OF SELLING

With respect to your request to my client for a "detailed marketing plan, with specific goals and timetables", "a detailed summary of its marketing efforts over the past year, with specific examples and results" and "the specific means by which [my] client intends to carry out the sales activities and demonstrations which would otherwise have been the responsibility of [my] client's] recently departed salesperson" and your insistence that my client's efforts "be monitored very closely", it remains our opinion that your client is not entitled to such under the letter or spirit of the Agreement.

Paragraph 1.5 of the Agreement provides, in relevant part, that "[t]he restrictions and controls on the Dealer's operation and acquisition of sales supplies established herein are intended solely to protect PSS's rights to its trademark...." Paragraph 5.2 provides, in relevant part, that "PSS reserves the right to review the Dealer's method of selling and to offer suggestions designed to assist the Dealer to achieve the highest level of success within the industry...." Please note that PSS has the right only to <u>review</u> PSSI's methods of selling and offer suggestions. Again, DENTSPLY has been reviewing PSSI's methods of selling. Upon review of PSSI's selling methods, DENTSPLY's contractual rights are specifically limited to offering suggestions.

The Random House Webster's College Dictionary definition of "method" is "1. a procedure, technique, or planned way of doing something. 2. order or system of doing anything. 3. orderly or systematic arrangement, sequence or the like." Similarly, my computer thesaurus gives "method" the following meanings: technique, approach or system. These definitions do not support your client's theory of micromanagement.

As stated in my July 7 letter, DENTSPLY is attempting to place restrictions and controls on PSSI and its methods of sales far beyond that authorized by the Agreement. Such attempted restrictions and controls are contrary to the letter and spirit of the Agreement. Paragraph 14.1 of the Agreement provides, in relevant part, that "Dealer is and shall be considered an independent contractor with entire control and discretion of its business and operations, subject only to the conditions and obligations established by this Agreement." As you may know, excessive restraints and controls by DENTSPLY may jeopardize this independent contractor relationship. Furthermore, restraints on a licensee

PSSI/DMA 1695
Confidential

unrelated to the licensed mark and the quality of the products may constitute an antitrust violation.

Continued demands for a "detailed marketing plan, with specific goals and timetables", "a detailed summary of its marketing efforts over the past year, with specific examples and results" and "the specific means by which [my] client intends to carry out the sales activities and demonstrations which would otherwise have been the responsibility of [my] client's] recently departed salesperson" and your insistence that my client's efforts "be monitored very closely", will be considered continuing breaches of the covenant of good faith and fair dealing implied in every contract. Instead of making burdensome, oppressive and unwarranted demands on my client in an attempt to create the appearance of a breach of contract, your client should begin to offer constructive suggestions. Perhaps these suggestions could be in the form of a detailed summary of the suggestions you give other licensees.

## JOHN WEGNER AND SALES EFFORTS

With respect to your suggestions that my client cannot continue to use John Wegner and that it must also replace him, Mr. Wegner is not referenced in or required by the Agreement. Employee turnover is not unusual and the loss of an employee is not inconsistent with my client's "best personal efforts." As you know, my client's sales numbers continue to greatly exceed the purchase quota specified in the Agreement. Consequently, your suggestion that my client is not adequately performing under the Agreement is unfounded.

Again, neither PSSI nor John Wegner, by virtue of their continued relationship, are breaching any of the terms of the Agreement. Neither PSSI nor Mr. Wegner are selling a dental product that directly competes with a software product that is manufactured by InfoSoft and distributed by PSS and Dealer. Mr. Wegner does not offer, sell, represent, install, train or support a practice management system other than the SoftDent® product. Please clarify your statement that my client "has admitted that the salesperson is free to sell competing products." In particular, please identify the particular competing products which you believe Mr. Wegner is selling, if any.

Again, PSSI has not granted Mr. Wegner access to protectable trade secrets of DENTSPLY. He may simply continue to market a product which is in the public domain. Please identify with particularity the DENTSPLY trade secrets which you believe are being disclosed to Mr. Wegner and the steps your client has taken to maintain their alleged trade secret status.

Finally, your client's suggestion that my client is not adequately performing under the Agreement and its oppressive and unwarranted demands on my client appear to be in an attempt to create the appearance of a breach of the Agreement by my client and to force my client out of its exclusive license. If your client feels that it cannot live up to its obligations under the Agreement, it should make an offer to purchase my client's rights at fair market value.

PSSI/DMA 1696
Confidential

Please respond within ten (10) days of your receipt of this communication.  I look forward to hearing your response.

Sincerely,


Mark E. Wiemelt

MW
Cc: John T. Doyle, Esq.
    Larry Eyer, PSSI

PSSI/DMA 1697
Confidential

# GOODELL, DeVRIES, LEECH & GRAY, LLP

ATTORNEYS AT LAW
ONE SOUTH STREET, 20TH FLOOR
BALTIMORE, MARYLAND 21202

TELEPHONE (410) 783-4000

FACSIMILE (410) 783-4040

RICHARD M. BARNES
RMB@GDLGLAW.COM
WRITER'S DIRECT NUMBER
410-783-4004

WASHINGTON, D. C.
301-470-7244

August 8, 2000

Mark E. Wiemelt, Esquire
Ten South LaSalle Street
Suite 3500
Chicago, Illinois 60603

Re:    <u>Professional Software Solutions of Illinois, Inc.</u>

Dear Mr. Wiemelt:

This office represents DENTSPLY International Inc. and its InfoSoft Division. I wish to respond to your letter dated July 7, 2000 to Justin H. McCarthy II, Corporate Counsel.

In your letter, you assert that your client's incorporation of the SoftDent trade mark into its long distance telephone number (1-800-SOFTDENT) and similar uses on its web site are "grandfathered" by Paragraph 8.2 of the Dealer/Resellers Agreement between the parties. Presumably, although your letter does not expressly mention the matter, you would apply the same analysis to the issue which seems to have given rise to the current controversy, i.e., whether DENTSPLY is required to incorporate that 1-800 number into its own web site as referring to your client.

Please be advised that DENTSPLY and its counsel do not share this view. In particular, we do not see how, if one gives ordinary English words their common English meaning (as one must in construing a contract), the phrase "locally designed, printed materials" can be read as referring to a long-distance telephone number or to a web site. If you know of any authority on this point, please advise me of same. Simply announcing that Paragraph 8.2 covers web sites or a 1-800 number, as you appear to do in your July 7 letter, is not a persuasive argument.

PSSI/DMA 1698
Confidential

Mark E. Wiemelt, Esquire
August 8, 2000
Page 2

We are equally unpersuaded by your blanket assertion that no one could be misled by the appearance of DENTSPLY's protected trade mark as part of your client's telephone number. To the contrary, the use of a trade mark in the body of a 1-800 number or a web site locator is common practice, but only when the owner of the number or the web site is also the owner of the mark. As an exercise, I have researched several common trade marks known to me ("The New York Times", "Microsoft", "Bell Atlantic"). In each instance, the 1-800 number or web site was maintained by the owner of the mark; in no instance would one reach a dealer or distributor by dialing the 1-800 number or searching the InterNet for a site incorporating the trade mark. The plain fact is that one's logical assumption would be that one is contacting "SoftDent" by dialing a number containing that mark, or by locating a web site identified by that mark. Such a misleading association is a violation of Paragraph 14.2 of the Agreement. Your client must immediately cease such violations. Please confirm to me in writing that this will be done.

Furthermore, we cannot agree that any of DENTSPLY's activities to date have violated your client's rights of exclusivity under the Agreement. However, in a spirit of cooperation, and in the hope of getting our clients' relationship back on track as quickly as possible, we would propose the following:

Effective immediately, DENTSPLY will not include updates as part of its service and software support offered to end users in your client's territory. At the same time, DENTSPLY does intend to market vigorously the other components of service and support to all end users in the territory. Under paragraph 10.3 of the Agreement, your client is obligated to assist DENTSPLY in offering such services to the end users, and your client is required to refrain from any actions which would "impede, block, obstruct, inhibit, or restrict" DENTSPLY's offering of services to the end users.

Furthermore, DENTSPLY expects a vigorous sales effort on the part of your client, to market all Products (as defined in the Agreement) to end users. DENTSPLY plans to continue monitoring your client's sales practices under Paragraph 5.2 of the Agreement, and DENTSPLY will hold your client to all of its contractual obligations of "personal attention," "best personal efforts," and "personal management," as defined in paragraphs 5.1 through 5.3. Your client has ignored DENTSPLY's repeated requests for a detailed marketing plan, with specific goals and timetables, which would define your client's efforts to market the updates and DENTSPLY products. Such a plan should be provided to Jeff Lyon's attention within ten (10) days of your receipt of this letter Within thirty (30) days of your receipt of this letter, your client also should forward to Mr. Lyon's attention a detailed summary of its marketing efforts over the past year, with specific examples and results, for all DENTSPLY products and updates. The

PSSI/DMA 1699
Confidential

Mark E. Wiemelt, Esquire
August 8, 2000
Page 3

marketing of these updates is a major national initiative for DENTSPLY, and, if your client is going to insist upon being the only seller of the updates in its territory, DENTSPLY will insist that your client's sales efforts be effective and that they be monitored very closely. Your client's sales penetration of the update subscription product is at only 75% of the national average. Your client's territories in Southern Illinois have historically shown poor sales penetration, and in the year 2000 sales are merely at 20% of the present national penetration rate. Your client's marketing plan must address these serious issues. The marketing plan should also include the specific means by which your client intends to carry out the sales activities and demonstrations which would otherwise have been the responsibility of your client's recently departed salesperson. If your client plans to continue to rely upon this salesperson, the plan should explain the relationship in detail and address how trade secrets will be protected (since your client has admitted that the salesperson is free to sell competing products).

Finally, we do appreciate the commitment in your letter, to the effect that your client will forward future sales materials to DENTSPLY for advance approval. Kindly have such materials forwarded to the attention of Jeff Lyon, Bob Chaisson, and Amie Maas.

So far as the legal issues in your letter are concerned, please direct any future communications to the undersigned.

Sincerely,

Richard M. Barnes

RMB/usm

PSSI/DMA 1700
Confidential

# LAW OFFICES OF MARK E. WIEMELT, P.C.

TEN SOUTH LASALLE STREET
SUITE 3500
CHICAGO, IL 60603
(312) 372-7664
FAX: (312) 372-6568
E-MAIL: mwiemelt@poweruser.com

MARK E. WIEMELT*
JOSEPH C. WANG*

PATENT, TRADEMARK, COPYRIGHT,
TRADE SECRETS, UNFAIR COMPETITION,
INTERNET/E-COMMERCE LAW AND
RELATED CONTRACT, LICENSING
AND LITIGATION MATTERS

\* REGISTERED PATENT ATTORNEYS

Monday, July 10, 2000

## VIA FACSIMILE (717-849-4753), E-MAIL AND REGULAR MAIL

Mr. Justin H. McCarthy II
Corporate Counsel
DENTSPLY International
570 West College Avenue
P.O. Box 872
York, PA 17405-0872

Professional Software Solutions, Inc.
2113 Emmorton Park Road
Edgewood, MD 21040.

Re: Professional Software Solutions of Illinois, Inc. – 1/1/93 Dealer/Resellers Agreement

Dear Mr. McCarthy:

I represent Professional Software Solutions of Illinois, Inc. ("PSSI") in the above-referenced matter.

This letter is in response to your letter dated February 17, 2000, addressed to Mssrs. John Wegner and Larry Eyer, alleging service mark infringement and related correspondence between PSSI and DENTSPLY and their representatives (hereinafter "DENTSPLY" refers to DENTSPLY and their predecessors). This letter also addresses DENTSPLY's breach of the Agreement by offering Products and products in PSSI's Territory in violation of the exclusive distribution rights granted to PSSI. This letter also addresses the issues DENTSPLY has raised with respect to the relationship between PSSI and Mr. John Wegner. Finally, this letter responds to the recent e-mail communication from DENTSPLY to PSSI regarding DENTSPLY® InfoSoft Marketing Materials Legal Guidelines

In summary, with respect to the matters raised in your letter and the various communications between PSSI and DENTSPLY representatives, upon review of the Agreement and PSSI's business, it is PSSI's firm belief, and they have been so advised, that they have not engaged in any conduct which constitutes a breach of the Agreement.

PSSI/DMA 1701
Confidential

On the contrary, it is DENTSPLY who is breaching PSSI's exclusive right under the Agreement to distribute the Products in the Territory by offering SoftDent® Platinum software support which includes free updates.

## TRADEMARKS

Your February 17 letter alleges that PSSI has "been improperly using [your] SoftDent and other InfoSoft related trademarks, and [has] not been sending a sample of [PSSI's] printed materials containing those InfoSoft related trademarks (including [PSSI's] SoftDent training manuals) to InfoSoft for approval prior to their distribution, in violation of the terms of [PSSI's] Dealer/Resellers Agreement (the 'Agreement')."

As an initial matter, please be assured that PSSI does not dispute that DENTSPLY is the sole owner of the SoftDent® trademark. Furthermore, PSSI has not and does not intend to take any action which would infringe upon, dilute or otherwise harm DENTSPLY's trademark rights. Indeed, PSSI wishes to benefit from the goodwill associated with the SoftDent® trademark consistent with the rights granted in the Agreement.

The following Agreement provisions are considered most relevant to the use of trademarks issue:

Paragraph 1.4 "gives each dealer the right to exploit the trademark...."

Paragraph 1.5 refers to "the exploitation of the Products and trademarks" by PSSI.

Paragraph 3.1 provides, in relevant part, that "PSS hereby grants to Dealer the exclusive right to sell the Products" in the Territory and that "PSS acknowledges that Dealer, in executing this Agreement, is relying on the exclusive right to distribute the Products in the Territory and is expending significant funds (and foregoing other opportunities) to fully develop and maximize the economic viability of the Territory for the benefit of Dealer and PSS."

Paragraph 5.1 provides, in relevant part, that "Dealer shall use its best personal efforts to promote the Products...."

Paragraph 5.2 provides, in relevant part, that "[t]he requirements of personal management established herein are understood and agreed by all parties to include the Dealer's best personal efforts and a devotion to the success of the Products consistent with the spirit of this Agreement...."

Paragraph 5.2 further provides, in relevant part, that "Personal management shall include, but not be limited to, ... an effective local marketing effort that will fully exploit the sales potential of the Products in the Territory."

Paragraph 8.1 provides, in relevant part, that "Dealer acknowledges that InfoSoft®, SoftDent®, MedAssist®, and SoftVet® are registered trademarks of InfoSoft, Inc."

PSSI/DMA 1702
Confidential

Paragraph 8.2 provides that "[t]he Dealer agrees to send a sample of any locally-designed, printed materials containing these registered trademarks to both PSS and InfoSoft, Inc., prior to the distribution of same, provided, however, that all of Dealer's existing uses of the trademarks as of the date of this Agreement are deemed approved and no future approvals will be necessary for future uses of such trademarks which are consistent with such past uses."

Paragraph 9.2 provides, in relevant part, that "[p]ublic advertisements offering Dealer's interest for sale shall not include any reference to PSS, InfoSoft® or to the SoftDent® trademarks...."

Paragraph 14.2 provides that "Dealer (and its representatives and agents) shall properly identify their status as a dealer (and agents of the Dealer....") in relation to InfoSoft and at anytime during or after the term of this Agreement shall not engage in any advertising, contracts, or practices that might mislead or deceive the public regarding InfoSoft, its products and services."

The foregoing provisions make it clear that as an exclusive Dealer/Reseller, PSSI has the right to use/exploit the SoftDent® trademark.

As stated previously by Mr. Larry Eyer in communications with DENTSPLY representatives, samples of printed materials containing the trademarks have been sent by PSSI to DENTSPLY prior to their distribution to consumers. DENTSPLY's reply that materials were forwarded to DENTSPLY by PSSI, but not for the purpose of review, is disingenuous at best. If you know of any printed material which was distributed by PSSI to consumers prior to the material being provided to DENTSPLY, please specifically identify same. In addition, if you wish for the materials to be forwarded to a particular individual in the future, please provide the individual's name and address.

Under Paragraph 8.2 of the Agreement, please recall that "no future approvals will be necessary for future uses of such trademarks which are consistent with such past uses." Therefore, PSSI is under no contractual obligation to provide copies of all printed materials to DENTSPLY prior to distribution. In other words, to the extent printed materials incorporate the use of trademarks consistent with past uses, PSSI is under no obligation to provide same to DENTSPLY prior to distribution, although it will continue in good faith to attempt to do so.

With respect to the 1-800-SOFTDENT phone number, it is being used only in connection with Products which are being distributed under the terms of the Agreement. In addition, DENTSPLY and its predecessors have known of PSSI's use of the 1-800-SOFTDENT phone number for many years and has only recently objected to same. Moreover, all current uses of the 1-800-SOFTDENT phone number are consistent with past uses of the trademark and are part of PSSI's best personal efforts to promote the Products and its devotion to the success of the Products consistent with the spirit of the Agreement. The

PSSI/DMA 1703
Confidential

use of the 1-800-SOFTDENT phone number is also consistent with PSSI's efforts to fully exploit the sales potential of the Products in the Territory.

The use of PSSI's training manual, SOFTDENT support and SOFTDENT training are also consistent with PSSI's efforts to fully exploit the sales potential of the Products in the Territory. Additionally, PSSI's training manual, SOFTDENT support and SOFTDENT training were in use at the time of execution of the Agreement. Moreover, PSSI's training manual and all current uses of SOFTDENT support and SOFTDENT training are consistent with past uses of the trademark and are part of PSSI's best personal efforts to promote the Products and its devotion to the success of the Products consistent with the spirit of the Agreement.

With respect to Paragraph 14.2 of the Agreement, none of PSSI's uses of the 1-800-SOFTDENT phone number "might mislead or deceive the public regarding InfoSoft, its products and services," particularly since PSSI's use of the 1-800-SOFTDENT phone number is generally accompanied by a prominent indication that PSSI is a Dealer of SoftDent® products.

Significantly, we note that your letter alleges "confusion of origin and ownership of both the mark and the products," yet you provided no evidence of actual customer confusion. Please share such evidence in the event actual customer confusion begins.

## REVIEW OF PRINTED MATERIAL

Again, under Paragraph 8.2 of the Agreement, PSSI is under no contractual obligation to provide copies of all printed materials to DENTSPLY prior to distribution, although it will continue in good faith to attempt to do so.

With respect to the restrictions and controls which DENTSPLY attempts to impose upon PSSI, please be advised that Paragraph 1.5 of the Agreement provides, in relevant part, that "[t]he restrictions and controls on the Dealer's operation and acquisition of sales supplies established herein are intended solely to protect PSS's rights to its trademark...." Since DENTSPLY controls the quality of the products, the use of the mark should be the only concern of DENTSPLY. As set forth above, PSSI's trademark use has been proper.

Paragraph 5.2 provides, in relevant part, that "PSS reserves the right to review the Dealer's methods of selling and to offer suggestions designed to assist the Dealer to achieve the highest level of success within the industry...." Please note that PSS has the right only to review PSSI's methods of selling and offer suggestions. DENTSPLY has been reviewing PSSI's methods of selling. Upon review of PSSI's selling methods, DENTSPLY's contractual rights are specifically limited to offering suggestions. DENTSPLY is attempting to place restrictions and controls on PSSI and its methods of sales far beyond that authorized by the Agreement.

Additionally, such attempted restrictions and controls are contrary to the letter and spirit of the Agreement. Paragraph 14.1 of the Agreement provides, in relevant part, that

PSSI/DMA 1704
Confidential

"Dealer is and shall be considered an independent contractor with entire control and discretion of its business and operations, subject only to the conditions and obligations established by this Agreement." As you may know, excessive restraints and controls by DENTSPLY may jeopardize this independent contractor relationship. Furthermore, restraints on a licensee unrelated to the licensed mark and the quality of the products may constitute an antitrust violation.

## EXCLUSIVE RIGHT TO DISTRIBUTE PRODUCT IN THE TERRITORY

By offering SoftDent® Platinum software support which includes free updates, DENTSPLY is breaching PSSI's exclusive right under the Agreement to distribute the Products in the Territory. Therefore, DENTSPLY must immediately cease and desist from offering SoftDent® Platinum software in the Territory. In addition, DENTSPLY should immediately pay PSSI commissions on the entire purchase price of all prior sales of the SoftDent® Platinum software support in the Territory, particularly since DENTSPLY is paying other Dealers commissions on the full SoftDent® Platinum software support purchase price.

The following Paragraphs of the Agreement clearly provide that DENTSPLY cannot offer the updates within the Territory:

Paragraph 2.1 as amended in the May 9, 1994 Addendum To Dealer/Resellers Agreement provides that "[t]he term 'Products' shall mean the SoftDent® Dental Management System software program and related products now or hereafter, during the term of this Agreement, developed, manufactured or distributed by PSS. This includes all programs and related products now or hereafter, except an update to the current DOS version which can be sold directly by InfoSoft, Inc. For example a SoftDent® Dental Management System software Windows® version, if developed, would be 'Products' as defined here, and would not be an update. Another example of 'Products' would be a SoftDent® Dental Management System software program with only some of the features that exist, now or hereafter, and sold at a lower retail price than the complete SoftDent® Dental Management System software."

Paragraph 3.3 as added in the May 9, 1994 Addendum To Dealer/Resellers Agreement provides that "PSS grants to Dealer the right of first refusal on all new PSS products with respect to the Territory."

Paragraph 3.1 provides, in relevant part, that "PSS hereby grants to Dealer the exclusive right to sell the Products" in the Territory and that "PSS acknowledges that Dealer, in executing this Agreement, is relying on the exclusive right to distribute the Products in the Territory and is expending significant funds (and foregoing other opportunities) to fully develop and maximize the economic viability of the Territory for the benefit of Dealer and PSS."

PSSI/DMA 1705
Confidential

Paragraph 3.2 provides that "PSS reserves the right to revoke this exclusivity in the event that the Dealer does not maintain the purchase quota outlined hereinabove."

Paragraph 10.2 provides that "[t]he Dealer offers value-added services that affect the overall 'system' pricing of the Products in the marketplace such as hardware, training, installation and support. However, it is suggested that the Dealer offer the Products for the then-advertised Suggested Retail Price (SRP) stated separately from any adjunctive services. In the event the Dealer does not offer the Products at the then-advertised SRP, PSS reserves the right, upon five (5) days prior written notice to Dealer, to circumvent the Dealer and sell directly to the costumer for the then-advertised SRP of the Product. PSS will not discount these Products to the End-user."

10.3 provides that "In the event that a Product is sold to End-User by any person or entity other than the Dealer in the Dealer's Territory, PSS will compensate the Dealer by the payment of forty (40) percent of the Suggested Retail Price (SRP) of the Product provided Dealer is not in Default of this Agreement."

10.5 provides, in relevant part, that "PSS warrants, however, that PSS and InfoSoft will not sell any Product to the End-User except as specifically permitted herein."

Paragraph 16 provides, in relevant part, that [a]ll remedies, either under this Agreement or by law, or otherwise afforded to either party or InfoSoft, shall be cumulative and not alternative."

Paragraph 17 provides that [I]n the event any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all of the sums that the unsuccessful party may be called upon to pay, a reasonable sum for the successful party's reasonable attorneys' fees."

Paragraph 25.1 provides that "Dealer agrees to purchase an average of fifty (50) Products per year in exchange for Dealer Exclusivity in the Territory...."

DENTSPLY's continued offering of SoftDent® Platinum software support including free updates is an intentional and willful breach of the Agreement and the warranty provided in Paragraph 10.5. PSSI's remedy for the breach is not limited to commissions on a portion of SoftDent® Platinum software support sales in the Territory. In the event of a lawsuit to resolve the controversy, PSSI would be entitled to an injunction to prevent the unauthorized sales and breach of contract, as well as commissions on the entire purchase price of the SoftDent® Platinum software support sales in the Territory.

DENTSLPY's continuing conduct is considered a breach of the Agreement and a breach of the covenant of good faith and fair dealing implied in every contract. In particular, any mailings to PSSI's customers regarding SoftDent® Platinum software support will be considered an intentional, willful and flagrant breach.

PSSI/DMA 1706
Confidential

### JOHN WEGNER

Neither PSSI nor John Wegner, by virtue of their continued relationship, are breaching any of the terms of the Agreement.

Neither PSSI nor Mr. Wegner are selling a dental product that directly competes with a software product that is manufactured by InfoSoft and distributed by PSS and Dealer. Mr. Wegner does not offer, sell, represent, install, train or support a practice management system other than the SoftDent® product.

PSSI has not granted Mr. Wegner access to protectable trade secrets of DENTSPLY.

## DENTSPLY INFOSOFT® MARKETING MATERIALS LEGAL GUIDELINES

We have received a copy of an e-mail communication from DENTSPLY to PSSI entitled DENTSPLY InfoSoft® Marketing Materials Legal Guidelines. We note that these are merely guidelines and although we do not agree that PSSI is contractually obligated to follow these guidelines, PSSI will attempt in future written materials to incorporate these or similar statements to comply with the spirit and purpose of the Guidelines and the Agreement. In particular, PSSI will continue to use the following or a similar statement on its materials:

> An exclusive dealer of SoftDent® software and related products.

Please indicate whether DENTSPLY has a particular objection to PSSI's use of this language.

## CONCLUSION

We strongly urge DENTSPLY to reconsider its conduct and assertions and take no further action with respect to my client in this matter.

In addition, we again hereby demand that DENTSPLY immediately cease and desist from offering SoftDent® Platinum software in the Territory.

If you know of other specific instances of conduct which you believe constitute a breach of the Agreement, please call them to my attention so that I may investigate the matter with my client and respond accordingly. In the event that any conduct is identified and we agree with its impropriety, my client would be more than happy to cease or alter such conduct.

I look forward to hearing your response.

PSSI/DMA 1707
Confidential

Sincerely,


Mark E. Wiemelt

MW
Cc: John T. Doyle, Esq.
    Larry Eyer, PSSI
    Tom Whiting, via e-mail
    Jeff E. Lyon, via e-mail
    Robert J. Chaisson, via e-mail
    Kathy F. McGrath, via e-mail
    Mark Dilatush, via e-mail

PSSI/DMA 1708
Confidential

**DENTSPLY**

**DENTSPLY International**
570 West College Avenue
P.O. Box 872
York, PA 17405-0872
(717) 845-7511
Fax (717) 849-4753

**Via Overnight Mail**

February 17, 2000

Professional Software Solutions of Illinois, Inc.
5155 West 111th Street
Alsip, IL  60803

<u>Attn</u> :  John Wegner
        Larry Eyer

Re: Use of Trademark

Gentlemen:

On behalf of DENTSPLY International Inc. and its InfoSoft division, I am writing with respect to your repeated requests that we approve certain very broad uses by you of our SoftDent trademark, on the Internet and even as a component part of your general long-distance phone number as reflected on the SoftDent web site.  In addition, I wish to bring to your attention that you have been improperly using our SoftDent and other InfoSoft related trademarks, and have not been sending a sample of your printed materials containing those InfoSoft related trademarks (including your SoftDent training manuals) to InfoSoft for approval prior to their distribution, in violation of the terms of your Dealer/Resellers Agreement (the "Agreement").

Please be advised that under Paragraph 8.1 of the Agreement, DENTSPLY International Inc. is the sole owner of the SoftDent trademark with full legal rights to restrict and monitor the use of it.  Paragraph 8.2 of the Agreement expressly covers only "locally-designed, printed materials", a description which scarcely includes a web site, especially when the main bone of contention seems to be the way that <u>your</u> telephone number is listed on <u>our</u> web site.  Under no stretch of the imagination could your web site or ours be considered "printed materials", and the SoftDent web site is scarcely "locally designed."  Further, even under the most generous interpretation of the language of that paragraph or any other paragraph of the Agreement, InfoSoft does not have an obligation to include the SoftDent trademark as a component part of your long-distance phone number when InfoSoft displays your number on the SoftDent web site.

*A Century of Firsts in Dentistry*

PSSI/DMA 1709
Confidential

**DENTSPLY 100**
1899 • 1999

# DENTSPLY

Professional Software Solutions of Illinois, Inc.
February 17, 2000
Page Two

One serious problem with your broad, unrestricted use of the SoftDent mark is that it misleads the public into believing that all products marketed by you are protected by the mark. What else would a customer think when a sales telephone number, through which a variety of non-SoftDent products are sold, is dialed by spelling the SoftDent trademark? Such an association of our trademark with other manufacturers' products is a clear violation of Paragraph 14.2 of the Agreement. In this regard, kindly note that Paragraph 2.1 of the Agreement carefully limits the definition of "products" covered by the Agreement, to those products "developed, manufactured or distributed" by InfoSoft, not by some other manufacturer.

Another serious problem with your actions is your failure to submit your printed materials containing InfoSoft related trademarks to InfoSoft prior to their distribution, and the resultant improper use of the SoftDent trademark and the confusion of origin and ownership of both the mark and the products. A prime example of this is the "SoftDent Training Manual" that your company distributes. The design and contents of the cover of the notebook binder, together with the materials inside, create confusion as to ownership and origin, fail to give proper attribution to InfoSoft and therefore damages its goodwill, and fail to properly designate Dentsply's trademarks, among other problems, all in violation of Paragraph 14.2 of the Agreement. You could have avoided these problems if you had abided by the terms of Paragraph 8.2 of the Agreement and sent a sample of this printed material containing these trademarks to InfoSoft prior to their distribution.

For these reasons, we insist on our right, as owner of the SoftDent trademark, to prohibit uses of that mark which we have not approved, including without limitation the incorporation of the trademark into your telephone number. We also insist on our right that you send a sample of all printed material containing any of our trademarks to InfoSoft for review prior to your distribution of them. We hope that in the future you will abide by the terms of the Agreement so that we do not have to take further action with respect to these matters.

If you have any questions, please direct them to me. All further communications about this matter shall be with me.

Sincerely,

Justin N. McCarthy II
Corporate Counsel

PSSI/DMA 1710
Confidential

THE FOLLOWING WILL REPRESENT A CURRENT PRICE LIST FOR THE PRODUCTS DISTRIBUTED BY PROFESSIONAL SOFTWARE SOLUTIONS, INC. AND WILL BE IN EFFECT FOR A PERIOD OF 30 DAYS FROM THE DATE SHOWN AT THE BOTTOM OF THIS DOCUMENT.  THIS LIST IS REFERRED TO IN THE "DEALER/RESELLERS AGREEMENT" AND IS INCORPORATED HEREIN WITH SAME. PROCEDURES FOR CHANGE IN THE PRICE STRUCTURE ARE ALSO DESCRIBED IN THE AFOREMENTIONED "AGREEMENT".

## MANAGEMENT SYSTEMS

| | |
|---|---|
| S o f t D e n t® (Ver. 7.XX) SINGLE USER | $ 3 0 0 0 . 0 0 |
| S o f t D e n t® (Ver. 7.XX) MULTI USER | $ 4 0 0 0 . 0 0 |
| M e d A s s i s t® (Ver. 2.XX) SINGLE USER | $ 3 0 0 0 . 0 0 |
| M e d A s s i s t® (Ver. 2.XX) MULTI USER | $ 4 0 0 0 . 0 0 |
| Annual Update Fee (single user)  - InfoSoft® | $  3 5 0 . 0 0 |
| Annual Update Fee (multi-user) - InfoSoft® | $  4 0 0 . 0 0 |

(Updates will be priced according to content)

**ALL DEALER DISCOUNTS ARE DESCRIBED IN ATTACHED AGREEMENT**

## SALES TOOLS

| | | |
|---|---|---|
| SELF RUNNING DEMO/SoftDent® or MedAssist® | $ | 1 . 0 0 |
| LIVE DEMO for SoftDent® or MedAssist® | $ | 1 5 . 0 0 |
| SoftDent® MANUALS | $ | 1 0 . 0 0 |
| MedAssist® MANUALS | $ | 3 5 . 0 0 |
| SoftDent® DISK MAILERS | $ | . 5 0 |
| SoftDent®/MedAssist® REPORT PACKS | $ | 2 . 0 0 |
| SoftDent®/MedAssist® LARGE BROCHURES /100 | $ | 4 6 . 0 0 |
| SoftDent® AUDIO TAPES | $ | 1 . 0 0 |
| SoftDent® Dealer Manual | $ | 2 5 . 0 0 |

Signed: _____    Date: 1/15/93
       Professional Software Solutions, Inc.

Signed: _____    Dated: _____
       Dealer

PSSI/DMA 212
Confidential