**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        )
PRACTICEWORKS, INC., et al.,                            )
                                                        )
                              Plaintiffs                )     Civil No.: JFM 02 CV 1205
                                                        )
           - against -                                  )
                                                        )
PROFESSIONAL SOFTWARE SOLUTIONS                         )
OF ILLINOIS, INC.,                                      )
                                                        )
                              Defendant.                )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        )
PRACTICEWORKS, INC., et al.,                            )
                                                        )
                              Plaintiffs                )     Civil No.: JFM 02 CV 1206
                                                        )
           - against -                                  )
                                                        )
DENTAL MEDICAL AUTOMATION, INC.,                        )
                                                        )
                              Defendant.                )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT GRANTING THEIR AMENDED
THIRD, FOURTH, FIFTH AND SIXTH COUNTS AND FOR PARTIAL SUMMARY
JUDGMENT, TO DISMISS, OR, IN THE ALTERNATIVE, FOR JUDGMENT ON
THE PLEADINGS AS TO DEFENDANTS' FIFTH, SEVENTH, EIGHTH, NINTH,
TENTH, ELEVENTH, TWELFTH, THIRTEENTH AND PSSI'S FOURTEENTH
<u>AMENDED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES</u>**

**KATTEN MUCHIN ZAVIS ROSENMAN**
575 Madison Avenue
New York, New York 10022

Counsel for Plaintiffs
PracticeWorks, Inc. and SoftDent LLC

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE ..................4

    A.    The Parties ...................................................................................................4

    B.    The Agreements ...........................................................................................4

    C.    The Software ................................................................................................4

         1.    Provisions of the Agreement Precluding the Continued Use of the
             Software Upon Termination to Provide Technical Services and Support................5

    D.    The Court's Grant of Summary Judgment in  Plaintiffs'
        Favor Terminating the Agreements ..............................................................6

    E.    The Dismissal of Defendants' Eighth Counterclaim Seeking a
        Declaration as to Defendants' "Continuing Right" to Provide
        Technical Support and Services ....................................................................7

    F.    Defendants' Improper Copying and Use of the  Software to
        Provide Technical Support and Services.........................................................7

    G.    Defendants' Unavailing Attempt to Broaden the Scope of
        these Proceedings ........................................................................................8

SUMMARY OF PLEADINGS...............................................................................................9

The Amended Complaint .....................................................................................................9

The Affirmative Defenses .................................................................................................10

The Amended Counterclaims..............................................................................................10

         1.    Declaration Regarding Right to Use SoftDent Software to
             Provide Technical Support (Seventh Amended Counterclaim) .............................10

         2.    Unfair Competition, including Antitrust, and Deceptive Trade
             Practices (the Fifth, Eighth and Thirteenth Amended Counterclaims) ..................10

         3    Tortious Interference with Contract and with Prospective Economic
             Advantage (Tenth and Eleventh Amended Counterclaims)...................................11

         4.    Accounting (Twelfth Amended Counterclaim).....................................................11

         5.    Breach of Contract (PSSI) (Fourteenth Amended Counterclaim)..........................12

         6.    Attorneys' Fees and Costs (Ninth Amended Counterclaim)..................................12

ARGUMENT .....................................................................................................................12

22193511.04

I.    PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT
GRANTING THEIR FOURTH, FIFTH AND SIXTH AMENDED COUNTS
AS WELL AS DISMISSING DEFENDANTS' SEVENTH AMENDED
COUNTERCLAIM AND PSSI'S FOURTEENTH AMENDED COUNTER-
CLAIM BECAUSE DEFENDANTS' ADMITTED USE OF SOFTDENT'S
SOFTWARE TO PROVIDE TECHNICAL SUPPORT AND SERVICES
CONSTITUTES A BREACH OF THE AGREEMENTS AND INFRINGEMENT
OF SOFTDENT'S COPYRIGHT ................................................................................ 12

    A.    Plaintiffs Are Entitled to Summary Judgment on
          Their Fourth Amended Count for Breach of Contract ........................................ 13

    B.    SoftDent is Entitled to Summary Judgment on its
          Fifth Amended Count for Copyright Infringement .............................................. 14

    C.    SoftDent Owns Valid Copyrights on the Software .............................................. 15

          1.    Defendants Do Not Dispute That They Have Copied SoftDent's
                Software and are Using it to Provide Technical Support and Services .................. 15

          2.    Defendants Do Not "Own" the Copies of SoftDent's Software
                That They Took into Their Possession .................................................................. 17

          3.    Defendants' Use and Copying of the Software to Provide
                Technical Support to Third Parties Exceeds the Scope of
                Permissible Copying Under Section 117 of the Copyright Act .............................. 18

    D.    None of Defendants' Affirmative Defenses
          Preclude Summary Judgment in Favor of SoftDent ........................................... 19

          1.    Defendants' Use of SoftDent's Software for the
                Commercial Purpose of Providing Technical Support and
                Service Does Not Constitute Fair Use, Thus Requiring
                Dismissal of Their Twelfth Affirmative Defense .................................................. 20

          2.    Defendants' Misuse of the Software is Not Protected By
                Ownership or a License and Thus Defendants' Thirteenth
                Affirmative Defense Must Be Dismissed .............................................................. 21

          3.    The First Sale Doctrine Does Not Apply to Defendants' Misuse
                of the Software Thus Warranting Dismissal of Their Fourteenth
                Affirmative Defense .............................................................................................. 21

          4.    Defendants' Misrepresentation Defenses Must Be Dismissed .............................. 21

                a.    Fraud on the Copyright Office .................................................................... 22

                b.    Innocent Misrepresentations ...................................................................... 22

          5.    Because Defendants Have Failed to State an Antitrust
                Counterclaim their Nineteenth Affirmative Defense
                for Copyright Misuse Must be Dismissed .............................................................. 23

6.    Because Defendants Have Failed to Allege Any Improper Conduct by SoftDent in Enforcing its Rights Under the Copyright Act, Defendants' Sixteenth, Eighteenth and Twentieth Affirmative Defenses of Unclean Hands Should Be Dismissed ................................................. 23

7.    Because Defendants Have Failed to Allege Any Facts Demonstrating a Lack of Originality in the Software, Their Fifteenth Affirmative Defense Must Be Dismissed ................................................. 24

E.    Plaintiffs Are Entitled to a Permanent Injunction, Statutory Damages and Attorneys' Fees in Connection with Defendants' Infringement of SoftDent's Copyrights ................................................. 25

1.    SoftDent is Entitled to a Permanent Injunction Enjoining Defendants From Any Further Copying or Distribution of the Software ................................................. 25

2.    SoftDent is Entitled to an Award of Attorneys' Fees Under 17 U.S.C. § 505 ................................................. 25

3.    SoftDent is Entitled to an Award of Damages for Defendants' Willful Infringement ................................................. 26

F.    Plaintiffs Are Entitled to Summary Judgment on their Sixth Count and Dismissing Defendants' Seventh Counterclaim Because Defendants May Not Continue to Use SoftDent's Software to Provide Technical Support and Service ................................................. 27

G.    Because PSSI's Use of the Software to Provide Technical Support and Service Constitutes a Breach of the Agreement and Infringes SoftDent's Copyright, Plaintiffs are Entitled to Summary Judgment Dismissing PSSI's Amended Fourteenth Counterclaim for Breach of Contract ................................................. 27

II.    DEFENDANTS' FIFTH AND EIGHTH AMENDED COUNTERCLAIMS SHOULD BE DISMISSED AND/OR PLAINTIFFS SHOULD RECEIVE JUDGMENT ON THE PLEADINGS BECAUSE DEFENDANTS HAVE FAILED TO STATE UNFAIR COMPETITION CLAIMS UNDER STATE OR FEDERAL LAW ................................................. 29

A.    The Fifth Amended Counterclaim Must Be Dismissed and/or Judgment Must Be Granted in Favor of Plaintiffs Because Defendants Have Failed to State Claims for Unfair Competition Under Maryland, Illinois and/or Ohio Law ................................................. 30

1.    Defendants Have Failed to State a Claim for Deceptive Trade Practices, Trade Disparagement and/or Unfair Competition Under Maryland Law ................................................. 30

2.    PSSI Has Failed to State a Claim for Deceptive Trade Practices, Consumer Fraud, Trade Disparagement and/or Unfair Competition Under Maryland Law ................................................. 31

          a.       The Illinois Uniform Deceptive Trade Practices Act ................................. 31

          b.       Trade Disparagement (Illinois Common Law) ........................................... 32

          c.       Unfair Competition (Illinois Common Law) .............................................. 33

      3.      PSSI Has Failed to State a Claim Under the Illinois  Consumer
             Fraud and Deceptive Business Practices Act ............................................ 33

      4.      DMA Has Failed to State a Claim for Deceptive Trade Practices
             Unfair Competition and Defamation Under Ohio Law ............................ 35

          a.       The Ohio Uniform Deceptive Trade Practices Act .................................... 36

          b.       Unfair Competition (Ohio Common Law) ................................................ 36

          c.       Defamation (Ohio Common Law) .............................................................. 37

  B.      The Eighth Amended Counterclaim Must Be Dismissed and/or Judgment
        Must Be Granted in Favor of  Plaintiffs Because Defendants Have Failed
        to State a Claim Under Section 43(a) of the Lanham Act ..................................... 37

III.  THE THIRTEENTH AMENDED COUNTERCLAIM MUST BE DISMISSED
     AND/OR JUDGMENT MUST BE GRANTED IN FAVOR OF PLAINTIFFS
     BECAUSE DEFENDANTS HAVE FAILED TO PLEAD A TYING
     ARRANGEMENT UNDER THE SHERMAN ACT ...................................................... 39

  A.      Defendants Have Failed to Plead the Requisite
        Elements of a Tying Arrangement ...................................................................... 40

  B.      Defendants Have Failed to Allege Antitrust Injury .......................................... 43

IV.  DEFENDANTS' TENTH AND ELEVENTH AMENDED COUNTERCLAIMS
     MUST BE DISMISSED BECAUSE THEY ARE CONTRACT CLAIMS
     MASQUERADING AS TORT CLAIMS, AND IN ANY EVENT, THEY
     FAIL TO STATE CLAIMS AS A MATTER OF LAW ................................................ 44

  A.      Defendants' Tenth and Eleventh Amended Counterclaims Are
        Nothing More than Contract Claims Disguised as Tort Claims ........................... 44

  B.      Defendants' Tenth and Eleventh Amended Counterclaims
        Must Be Dismissed  Because They Fail to State Claims for
        Which Relief May Be Granted ........................................................................... 45

      1.      Defendants' Tenth Amended Counterclaim for Tortious Interference
             With Contract Must Fail Because Defendants Do Not Plead the
             Essential Elements that Plaintiffs Actually Succeeded in Inducing
             Third Parties to Breach Their Contract with Defendants ...................................... 45

          a.       Defendants Fail to Allege Plaintiffs' Intentional  Interference
                with Defendants' Third-Party Contracts .................................................... 47

2. Plaintiffs' Eleventh Amended Counterclaim for Tortious
Interference With Prospective Economic Advantage Must
Fail Because Defendants Have Failed to Plead the Requisite
Element of Malice, *i.e.*, Violation of Federal Antitrust Law ...................................48

V. THE TWELFTH COUNTERCLAIM FOR AN ACCOUNTING MUST BE
DISMISSED  AND/OR JUDGMENT MUST BE GRANTED IN FAVOR
OF PLAINTIFFS ...........................................................................................................49

VI. AS WITH THEIR PRIOR DISPOSITIVE MOTION, PLAINTIFFS ARE
ENTITLED TO PARTIAL SUMMARY JUDGMENT GRANTING
THEIR THIRD AMENDED COUNT FOR AN AWARD OF ATTORNEYS'
FEES UNDER THE AGREEMENTS AND DISMISSING DEFENDANTS'
 NINTH AMENDED COUNTERCLAIM FOR THE RECIPROCAL RELIEF............................49

CONCLUSION............................................................................................................................50

Plaintiffs, PracticeWorks, Inc. and SoftDent LLC ("Plaintiffs") respectfully submit this memorandum of law in support of their motion (i) pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, for partial summary judgment granting their Third, Fourth, Fifth and Sixth Amended Counts; and dismissing Defendants Professional Software Solutions of Illinois, Inc.'s ("PSSI") and Dental Medical Automation, Inc.'s ("DMA") (collectively "Defendants") Seventh, Ninth and PSSI's Fourteenth Amended Counterclaims; (ii) pursuant to Rule 12(b)(6) or, in the alternative, pursuant to Rule 12(c), dismissing Defendants' Fifth, Eighth, Tenth, Eleventh, Twelfth and Thirteenth Amended Counterclaims; and (iii) pursuant to Rule 12(b)(6) dismissing Defendants' Twelfth through Twenty-Second Affirmative Defenses to the Fifth Amended Count, SoftDent's copyright infringement claim.

## PRELIMINARY STATEMENT

When these actions were commenced in April 2002, Plaintiffs sought a declaration as to whether they properly had terminated and declined to renew their dealership agreements with Defendants on reasonable notice. Despite Defendants' attempt to evade the core issue of terminability by interposing nine counterclaims, the Court saw past these counterclaims and held, as a matter of law, that the Agreements properly had been terminated on nine months' reasonable notice, effective as of December 31, 2002. (See Decision and Judgment, dated January 7, 2003 ("1/7/03 Decision and Judgment") which is submitted herewith as Exhibit A). In doing so, the Court granted judgment in Plaintiffs' favor on all three of their causes of action, including their Third Count for attorneys' fees, and dismissed all of the counterclaims against which Plaintiffs moved (*i.e.*, Counterclaims One through Five, Eight and Nine).

Following the issuance of the 1/7/03 Decision and Judgment, all that remained of the above-captioned actions were Defendants' two precatory counterclaims sounding in breach of contract—now merged into the Sixth Amended Counterclaim. Moreover, these actions appeared to be on the cusp of resolution, with the parties engaged in settlement discussions as to Defendants' adjudged obligation to pay Plaintiffs' attorneys' fees and costs, as well as the lingering issue of whether Defendants could use SoftDent's Software to provide technical support and service thereof, notwithstanding the termination of the Agreements. As the Court may recall, it entered judgment in Plaintiffs' favor on Defendants' Eighth Counterclaim, holding that Defendants "[were] ***not*** entitled to continue technical support and services anticipated in the Agreements" (emphasis added) and were required "to immediately return [to the plaintiffs] any and all materials regarding the Products in any form whatsoever," as required in the Agreements. (Ex. A

1

at p. 9, *quoting* Agreements § 13.3). Later, the Court clarified its dismissal of the Eighth Counterclaim to the limited extent of holding that Defendants could provide technical support and service of the Software "provided, of course, . . . that relevant materials were returned [to Plaintiffs] and not used" as required under the Agreements. " (See, e.g., Feb. 21, 2003 Transcript ("2/21/03 Tr.") annexed hereto as Exhibit B, at p. 11).

However, the relevant materials—the Software and related products—never were returned to Plaintiffs. In fact, the Software has been, and continues to be, used by Defendants, for the commercial purpose of providing technical support and service to third parties—a use that breaches the Agreements and infringes SoftDent's copyrights. Defendants maintain that they have the unfettered right to continue to use SoftDent Software "that they have lawfully purchased and for which title has passed to them . . . to provide technical support and service." (See, e.g., Ex. B, 2/21/03 Tr. at p. 10; Am. Countercl. ¶¶ 58, 113 and Ex. C thereto at p. 2). Defendants take this position even though they have admitted that, in order to use the Software, it "must be loaded into a computer's Random Access Memory ('RAM')," which loading "*requires copying of the Software from a disk or other storage media into RAM, and that copying, when done without SoftDent's authorization, is a direct infringement of SoftDent's Copyrights*." (See Am. Compl. ¶ 100 (emphasis added) and Am. Ans. ¶ 100, admitting the allegations contained in paragraph 100).

Unable to reach an accord on the remaining technical support issue, the parties stipulated to each other's filing an amended pleading, reserving all rights to challenge the other's amended pleading and further reserving all rights to make any dispositive motion as to these amended pleadings (the parties also agreed to stay discovery pending the Court's disposition of these dispositive motions). While the purpose of this amendment exercise was to frame the remaining technical support issue for the Court in the form of a dispositive motion, history has repeated itself in the form of yet another blunderbuss responsive pleading interposed by Defendants in an attempt to complicate a simple issue and avoid summary disposition thereof. As they did in their original responsive pleading, Defendants once again attempt to distract the Court with an abundance of counterclaims, when the simple issue to be resolved is whether Defendants' continued commercial use of the Software constitutes a breach of the Agreements and an infringement of SoftDent's copyrights. Remarkably, this technical support question first was posed *by Defendants in their original Eighth Counterclaim*. Now, Defendants have dressed up this old counterclaim in new clothes, seeking relief under a host of theories sounding, *inter alia*, in business tort, unfair competition, deceptive trade practices and even antitrust—the well-worn defense of last resort for copyright infringers—under federal, Illinois and Ohio statutory and common law. However, Plaintiffs respectfully ask the Court to resolve, once and for all,

the core technical support issue, which will cause all of Defendants' other "amended counterclaims" to fall like a house of cards.

Accordingly, as amplified more fully herein, it is respectfully submitted that Defendants' continued use, copying and exploitation of the Software for their own commercial purposes constitutes a breach of the Agreements and infringement of SoftDent's copyrights.  As such, judgment should be entered in Plaintiffs' favor on their Fourth, Fifth and Sixth Amended Counts for, respectively, breach of contract, copyright infringement and a declaration that Defendants do not have the continuing right to use the Software in providing technical support to third parties.  Additionally, judgment should be entered in favor of Plaintiffs on their Third Amended Count, awarding them attorneys' fees and costs incurred in commencing this action, defending against Defendants' Amended Counterclaims, and enforcing their rights under the Agreements.

Similarly, a review of Defendants' eight "new" counterclaims reveal that all are spun off the parties' dispute over the dismissal of Defendants' old Eighth Counterclaim.  These Amended Counterclaims turn upon the single conclusory allegation that Plaintiffs have made "disparaging, false, inaccurate and/or misleading representations" to third parties regarding Defendants' inability to use the Software to provide technical support and service. (See, e.g., Am Countercl. ¶¶ 9, 12, 41-43, 95, 119, 129-30, 138 and 150).  Moreover, these "new" counterclaims rest on legal conclusions that are insufficient to sustain them as a matter of law.  Because the galvanizing force behind these allegations is Defendants' ill-conceived notion that their copying and use of SoftDent's Software for their own pecuniary benefit is proper, dismissal and/or judgment in Plaintiffs' favor seems all the more appropriate.

Finally, consistent with their "kitchen sink" approach to pleading counterclaims, Defendants have purported to assert every conceivable Affirmative Defense to SoftDent's Fifth Amended Count for copyright infringement.  Defendants' Affirmative Defenses should be considered precisely in the spirit in which they were launched, i.e., as a desperate attempt to raise the spectre of factual issues where none exist so as to avoid summary disposition and compel costly and time-consuming discovery on specious issues such as the originality of the Software.

For all of these reasons, and those set forth herein, it is respectfully requested that the Court grant Plaintiffs' motion: (i) for partial summary judgment on Plaintiffs' Amended Third, Fourth, Fifth and Sixth Counts and partial summary judgment dismissing Defendants' Seventh, Ninth and PSSI's Fourteenth Amended Counterclaims; (ii) to dismiss under Rule 12(b)(6) or grant partial judgment on the pleadings under

Rule 12(c) with respect to Defendants' Fifth, Eighth, Tenth, Eleventh, Twelfth and Thirteenth Counterclaims, and (iii) to dismiss Defendants' Twelfth through Twenty-Second Affirmative Defenses.

<div align="center">

**STATEMENT OF FACTS AS TO**
**<u>WHICH THERE IS NO GENUINE DISPUTE</u>**

</div>

Plaintiffs submit that there is no genuine issue to be tried as to the following facts, which are set forth in the Amended Complaints filed in both actions ("Am. Compl.") as well as the accompanying Affidavit of Al Fiore ("Fiore Aff."), Vice President, Marketing and Corporate Development of Plaintiffs, sworn to February 13, 2004, which affidavit is submitted herewith as Exhibit C and summarized here for the Court's convenience:

**A.     <u>The Parties</u>**

Plaintiffs PracticeWorks and SoftDent are information management technology providers for dentists, oral surgeons and orthodontists throughout the United States (Am. Compl. ¶ 1; Ex. C, Fiore Aff. ¶ 6).  Plaintiff PracticeWorks is a corporation organized and existing under the laws of the State of Delaware, and has its principal place of business in the State of Georgia (Am. Compl. ¶ 11; Ex. C ¶ 6).  Plaintiff SoftDent, a wholly owned subsidiary of PracticeWorks, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Maryland (Am. Compl. ¶ 12; Ex. C ¶ 6).

Defendants PSS Illinois and DMA are dealers of dental management products throughout Illinois and Ohio, respectively (<u>see</u> Defendants' Answer, Affirmative Defenses and First Amended Counterclaims ("Am. Countercl.") ¶ 2).

**B.     <u>The Agreements</u>**

When they were in effect, the Agreements granted Defendants an exclusive dealership to re-sell or distribute a dental management software program known as the SoftDent® Dental Management System (the "Software") within specified zip code ranges located throughout Illinois and Ohio, respectively (Am. Compl. ¶ 2; <u>see also</u>, Agreements, submitted herewith as Exhibits D and E, at § 3.1).  At the time of the formation of these contracts, PSS Md. was the sole distributor of the Software, pursuant to exclusive distribution rights conveyed to it by InfoSoft, Inc. ("InfoSoft"), the then-developer and copyright holder of the Software (Am. Compl. ¶ 20; Ex. C, Fiore Aff. ¶ 8).

**C.     <u>The Software</u>**

Beginning in March 1990, Plaintiffs' predecessor-in-interest, InfoSoft, applied for copyrights for the computer source code and documentation for the Software with the United States Copyright Office, and five

Certificates of Registration were issued. (See Am. Compl. Exs. D through H thereto; Ex. C, Fiore Aff. ¶ 9). Thereafter, SoftDent applied for copyrights for the computer source code and documentation for the Software with the United States Copyright Office, and two Certificates of Registration were issued (See id. Exs. I and J thereto; Ex. C ¶ 9).

Plaintiff SoftDent is the sole owner of the copyrights associated with the Software, having assumed ownership of the copyrights registered from 1990 through 1998 and owning those registered in 2003 (Ex. C, Fiore Aff. ¶ 10).

The original works associated with the Software were developed by InfoSoft and/or SoftDent and possess the requisite originality under the Copyright Laws and, as such, InfoSoft and/or SoftDent were properly granted an authentic and valid copyright  (Ex. C, Fiore Aff. ¶ 11).

    **1.**    **Provisions of the Agreement Precluding the Continued Use of the Software Upon Termination to Provide Technical Services and Support**

The purpose of the Agreements was to facilitate the sale of copies of the Software to end-users—dental or orthodontic practices in Defendants' territory ("End-Users"). (Ex. C, Fiore Aff. ¶12; Exs. D and E, Agreements § 3.1). Plaintiffs tightly control the dissemination of copies of the Software, making sure that each one is specifically ordered on behalf of a registered End-User. The Agreements provide that "orders may only be filled when a completed Purchase Registration Form . . . has been executed by the End-User and received by [Plaintiffs]." (Ex. C ¶ 12; Exs. D and E § 23).

The Agreements clearly do not contemplate Defendants themselves being End Users, as borne out by the Agreements' express definitions of Defendants as "Dealers" and "End-User" as "a customer or purchaser of the Products." (Exs. D and E, Agreements § 2.5). Rather, the Agreements expressly provide for Defendants to act as a conduit for shipment of the Software to the End-User (id., § 23). Further distinguishing between End-Users on the one hand, and Defendants, as Dealers, on the other, the Agreements afford Defendants the option of offering "local support" to End-Users during the term of the Agreements, but require Defendants to make End-Users aware of the "national support" being afforded by Plaintiffs "and allow the customer to decide based on the merits and prices of these support options" whether to purchase Defendants' local support or Plaintiffs' national support (id. § 10.5). Finally, Section 10.5 of the Agreements expressly precludes Defendants from taking any steps to "impede, block, obstruct, inhibit, or restrict . . . [Plaintiffs'] access to the End User with regards to these services or any other adjunctive services that might be offered by [Plaintiffs]" (Id.) These provisions unequivocally confirm that the Software was not intended to be purchased and/or used by Defendants as End-Users. (Ex. C, Fiore Aff. ¶ 13).

With respect to Plaintiffs' intellectual property, in the Agreements, Defendants "acknowledge[d] the proprietary rights of [SoftDent]" to the Software and agreed "[t]hroughout the term of this Agreement *and at all times thereafter* . . . not to disclose, or cause to be disclosed, any confidential or proprietary information relating to the [Software] or [SoftDent], other than in the faithful performance of the duties hereunder." (Ex. C, Fiore Aff. ¶ 14; Exs. D and E, Agreements § 13.1)(emphasis added).

Additionally, Defendants acknowledged that the works were copyrighted and that "unauthorized duplicat[ion]" thereof constituted a copyright violation that could lead to termination of the Agreements. (Ex. C, Fiore Aff. ¶ 15; Exs. D and E, Agreements § 11.5, providing that an Event of Default occurs entitling Plaintiffs to immediately terminate the Agreement "[i]f [either Defendant] is adjudged to have violated the copyright of the Software or accompanied documentation by making unauthorized duplicates of same"). Further Defendants agreed to "be subject to *any and all applicable fines and penalties under the provisions of the Federal Copyright Laws*." (Exs. D and E § 11.5, emphasis added)

In the same vein, the Agreement provides that upon termination, Defendant must "immediately return" to Plaintiffs "any and all materials regarding the Products in any form whatsoever," including any and all Software. (Ex. C, Fiore Aff. ¶ 16; Exs. D and E, Agreements s 13.3). "Products" are broadly defined in the Agreement as "SoftDent computer software and related products now or hereafter, during the term of this Agreement, developed, manufactured or distributed by [Plaintiffs]." (Ex. C ¶ 16; Exs. D and E  § 2.1).

**D.**    **The Court's Grant of Summary Judgment in
Plaintiffs' Favor Terminating the Agreements**

In the 1/7/03 Decision and Judgment, the Court held, as a matter of law, that the Agreements properly were terminated and non-renewed on reasonable notice by letter dated April 8, 2002, which termination and non-renewal became effective as of December 31, 2002. (Ex. A; Ex. C, Fiore Aff. ¶ 18). In doing so, the Court granted judgment in Plaintiffs' favor on all three of their causes of action, including entry of judgment in Plaintiffs' favor for reasonable attorneys' fees and costs associated with bringing this action and litigating   the prior dispositive motion (Ex. A, 1/7/03 Judgment at ¶ 4; see also 1/7/03 Decision at p. 9), and dismissed all of the counterclaims against which Plaintiffs moved (*i.e.*, Counterclaims One through Five, Eight and Nine) seeking the inverse relief of that sought by Plaintiffs.[1]  (Ex. C ¶ 18).

---

[1]    Five of Defendants' dismissed Counterclaims are included in their Amended Counterclaims, *i.e.*, Defendants' (i) First Counterclaim for a declaration that the Agreements had not been terminated as of December 31, 2002; (ii) Second Counterclaim for a declaration that nine months' notice did not constitute reasonable notice of termination of the

(continued)

**E.      The Dismissal of Defendants' Eighth Counterclaim Seeking a Declaration as to Defendants' "Continuing Right" to Provide Technical Support and Services**

As previously mentioned, the Court dismissed Defendants' Eighth Counterclaim for a declaration that Defendants had the "continuing right" to provide, *inter alia*, technical support and service of the Software following termination of the Agreements.  The Court, in fact, held that Defendants were "***not entitled to continue technical support and services anticipated in the Agreements***" and were required "to immediately return [to the plaintiffs] any and all materials regarding the Products in any form whatsoever," as required in the Agreements.  (Ex. A, 1/7/03 Decision at 9, *quoting* Agreements (Exs. D and E) § 13.3). Although the Court denied Defendants' application to reconsider, alter, amend and/or stay enforcement of the 1/7/03 Decision and Judgment, the Court clarified its dismissal of Defendants' Eighth Counterclaim to the limited extent of holding that Defendants could provide technical support and service of the Software "provided, of course, . . . that relevant materials were returned [to Plaintiffs] and not used" as required under Section 13.3 of the Agreements (Ex. B, 2/21/03 Trans. at p. 11).

**F.      Defendants' Improper Copying and Use of the Software to Provide Technical Support and Services**

By letter dated April 14, 2003, Plaintiffs demanded that Defendants immediately return to them any and all materials regarding the Products in any form whatsoever, including the Software, as required in the Agreement.  (Ex. C, Fiore Aff. ¶ 19; Am. Countercl. Ex. B thereto)

To date, Defendants have refused to return their copies of the Software and in fact, have admitted on more than one occasion that they have copied, are copying and are using the Software currently in their possession to provide "technical support and service" to third parties. (Ex. C, Fiore Aff. ¶ 20).

Indeed, in their Amended Answer to Plaintiffs' Amended Complaint, Defendants allege that they have delivered to their counsel all materials regarding the Products  "with the exception of the software that they've purchased . . ." (Am. Answer ¶ 57) and further have admitted that "[they] [are] entitled to use copies

_____

(continued from previous page . . .)

Agreements; (iii) Third Counterclaim for a declaration that Plaintiffs' termination notice operated to anticipatorily breach the Agreements; (iv) Fourth Counterclaim for a declaration that, under federal copyright law, the Agreements are terminable only at the will of the author during the five year period beginning at the end of 35 years from the date of execution of the Agreements; and (v) Ninth Counterclaim for attorneys fees, disbursements and other costs incurred by Defendants in the above-referenced actions. Additionally, although not repleaded in the Amended Counterclaims, the Court granted summary judgment in Plaintiffs' favor dismissing (vi) Defendants' Fifth Counterclaim for a declaration that the Agreements are "perpetual in duration" under the Maryland Uniform Computer Information Transactions Act and (vii) Eighth Counterclaim for a declaration that Defendants have the "continuing right" to provide, *inter alia*, technical support and service under the Agreements even after termination and non-renewal thereof.

of all software which [they] lawfully own and/or for which [they have] a license to provide 'technical support and service' to third parties." (id. ¶¶ 58 and 113). In the same vein, Defendants' counsel has judicially admitted that Defendants would ***not*** return Plaintiffs' Software to Plaintiffs and would continue to use this Software to provide technical support and service. (Ex. B, 2/21/03 Tr. at p. 10; <u>see also</u> Am. Countercl. Ex. C thereto at p. 2; Ex. C, Fiore Aff. ¶ 21).

**G.     Defendants' Unavailing Attempt to
        <u>Broaden the Scope of these Proceedings</u>**

Following the 1/7/03 Decision and Judgment affording judgment in Plaintiffs' favor on all three of their counts and seven of Defendants' nine counterclaims, all that remained for resolution in these actions were: (i) Defendants' breach of contract counterclaim; (ii) Defendants' adjudged obligation to reimburse Plaintiffs for their attorneys' fees and costs; and (iii) whether Defendants could use SoftDent's Software to provide technical support and service—the third issue being the most important and arguably forestalling resolution of the first two.

So as to obviate unnecessary motion practice and to hone in on the core technical support issue remaining in the case, during the summer of 2003 the parties consented to each other's filing an amended pleading, while reserving all rights to challenge the other's amended pleading and further reserving all rights to make any dispositive motion as to these amended pleadings. Additionally the parties agreed to stay discovery pending the Court's disposition of these dispositive motions.

In the spirit of framing the technical support issue for summary disposition by the Court, Plaintiffs stated an intention to assert three amended claims for: (i) breach of contract; (ii) copyright infringement; and (iii) declaratory relief on the technical support issue while Defendants stated an intention to assert three additional counterclaims for (i) declaratory relief on the technical support issue, (ii) tortious interference with contract, and (iii) tortious interference with prospective economic advantage. However, in addition to the aforementioned counterclaims, Defendants also purported to interpose five new counterclaims sounding in unfair competition, deceptive trade practices and antitrust under federal, Illinois and Ohio statutory and common law (Fifth, Eighth and Thirteenth Amended Counterclaims); as well as a counterclaim for an accounting (Twelfth Amended Counterclaim); and Defendant PSSI's newly-minted breach of contract counterclaim (Fourteenth Amended Counterclaim). Rather than narrowing issues for purposes of expeditious dispute resolution, Defendants' new counterclaims broadened the scope of this litigation unnecessarily, solely to delay the inevitable summary disposition thereof.

## SUMMARY OF AMENDED PLEADINGS

The following is a summary of the pleadings at issue on Plaintiffs' dispositive motion under Rules 56(c), 12(b)(6) and/or 12(c):

### The Amended Complaint

Having obtained summary judgment on their first three counts regarding their proper termination and non-renewal of the Agreement on reasonable notice, and their entitlement to attorneys' fees and costs in connection therewith, Plaintiffs now seek summary judgment on the following Amended Counts:

In their Fourth Amended Count for breach of contract, Plaintiffs allege that while they have fully complied with their contractual obligations (id. ¶ 88), Defendants have breached the Agreements, by, *inter alia*, (i) failing to return to Plaintiffs all materials regarding in the Products as required under the Agreements (Exs. D and E § 13.3); (ii) disclosing confidential or proprietary information relating to the Software  (id. § 13.1); and (iii) continuing to use, copy, or otherwise exploit the Software to provide technical support and service to third parties (id. § 11.5) (Am. Compl. ¶ 89).  Defendants' actions have caused Plaintiffs to incur damages in excess of $1 million including, without limitation, lost technical support opportunities. (Id. ¶ 90). (Ex. C, Fiore Aff. ¶ 24).

In the Fifth Amended Count for copyright infringement, Plaintiff SoftDent alleges that it is the sole owner of the copyrights associated with the Software, which have been registered with the Copyright Office and that the works associated with the Software possess the requisite originality under the Copyright Act (Am. Compl. ¶¶ 95-97 and Exs. D through J thereto).  In using the Software to continue to provide technical support and service after the Agreements were terminated, Defendants have infringed, and continue to willfully infringe SoftDent's copyrights. (Am. Compl. ¶¶ 101-02; Ex. C, Fiore Aff. ¶ 25).

In their Sixth Amended Count, Plaintiffs seek a declaration that Defendants do not have the continuing right, following termination of the Agreements, to use the Software to provide "technical support and service" to third parties because the provision thereof constitutes a breach of the Agreements and infringement of SoftDent's copyrights (Am. Compl. ¶¶ 109-18; Ex. C, Fiore Aff. ¶ 26).

In their Third Amended Count, Plaintiffs seek to recoup attorneys' fees and costs, recoverable under Section 17 of the Agreements, incurred by Plaintiffs in litigating these actions and prosecuting the instant motion (Am. Compl. ¶¶ 81-84; Ex. C, Fiore Aff. ¶ 27).

## The Affirmative Defenses

Plaintiffs seek to dismiss Defendants' Affirmative Defenses that SoftDent's copyright infringement claim is barred by the doctrines of (i) fair use (Twelfth Aff. Def.) (ii) first sale (Fourteenth Aff. Def.); (iii) unclean hands due to unspecified omissions and misrepresentations to the Copyright Office (the Sixteenth through Eighteenth Aff. Defs.); and (iv) copyright misuse (Nineteenth Aff. Def.), including "bad faith enforcement of intellectual property rights" (Twentieth Aff. Def.) and is barred on the purported grounds that (v) Defendants "lawfully own" and/or have a "license" to use the software (Thirteenth Aff. Def.); (vi) SoftDent's software "lacks originality" (Fifteenth Aff. Def.); (vii) Plaintiffs "fail[ed] to comply with the requirements of the Copyright Laws," precluding entitlement "to statutory damages or attorneys' fees" (Twenty-First Aff. Def.) and rendering "invalid" their copyright registrations (Twenty-Second Aff. Def.).

## The Amended Counterclaims

As demonstrated herein, the majority of Defendants' Amended Counterclaims turn on the unspecified allegation that Plaintiffs have told third parties that Defendants no longer are permitted to provide technical support and service of the Software. Even if this is so, the following Amended Counterclaims do not state cognizable claims for which relief may be granted:

### 1. Declaration Regarding Right to Use SoftDent Software to Provide Technical Support (Seventh Amended Counterclaim)

In their Seventh Amended Counterclaim, Defendants seek a declaration that they may continue to provide technical support and service of SoftDent's products to customers pending this litigation or after termination of the Agreements (Am. Countercl. ¶ 116), *i.e.*, the inverse of Plaintiffs' Sixth Amended Count (Am. Compl. ¶ 118). Because Defendants' use and copying of the Software to provide technical support breaches the Agreements and infringes SoftDent's copyrights, judgment should be granted dismissing the Seventh Amended Counterclaim (Ex. C, Fiore Aff. ¶ 28).

### 2. Unfair Competition, including Antitrust, and Deceptive Trade Practices (the Fifth, Eighth and Thirteenth Amended Counterclaims)

In their Fifth and Eighth Amended Counterclaims, Defendants purport to assert unfair competition claims under Illinois and Ohio statutory and common law (Fifth Am. Countercl.) as well as under federal law, i.e., Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Eighth Am. Countercl.). These Amended Counterclaims turn on the single vague and conclusory allegation that Plaintiffs have made "disparaging, false, inaccurate and/or misleading representations" to third parties regarding Defendants' inability to use the

Software to provide technical support and services. (See, e.g., Am Countercl. ¶¶ 9, 12, 41-43, 95, 119, 129-30, 138 and 150).

In their Thirteenth Amended Counterclaim, Defendants attempt to ratchet up their unfair competition allegations, contending that Plaintiffs "recently" have "tied" the sale of SoftDent Software to the purchase of technical support in violation of the Sherman Act, 15 U.S.C. § 1 (Am. Countercl. ¶¶ 144-155). Defendants do not allege when such tying was implemented nor do they allege any evidentiary facts in support thereof.  As with their Fifth and Eighth Amended Counterclaims sounding in unfair competition and commercial disparagement, the sole basis of the Thirteenth Amended Counterclaim is Plaintiffs' alleged statements to unidentified "end-user customers" regarding Defendants' inability to provide technical support (id. ¶¶ 150-51). In addition to their failure to plead the requisite elements of a tying arrangement, Defendants also have failed to plead, as they must, antitrust injury, i.e., that Defendants' injury flows from Plaintiffs' alleged tying of the sale of the software to the sale of technical support.  Rather, Defendants' purported injury arises from Plaintiffs' "expressly alleg[ing]" to potential and actual end-users "that [Defendants] [are] no longer able to provide technical support and services for [Plaintiffs'] software."  (Am. Countercl. ¶ 150).  As amplified herein, for all of these reasons, Defendants have failed to state a tying claim under the Sherman Act.

### 3. Tortious Interference with Contract and with Prospective Economic Advantage (Tenth and Eleventh Amended Counterclaims)

As with Defendants' purported unfair competition and antitrust counterclaims, the gravamen of Defendants' Tenth and Eleventh Amended Counterclaims is that Plaintiffs have told third parties that Defendants "cannot continue to provide technical support and service of [Plaintiffs'] Products to customers." (Am. Countercl. ¶¶ 128, 136).  Separate and apart from these purported business tort counterclaims sounding in contract (see infra), Defendants have not alleged—as they must—that Plaintiffs actually induced Defendants' customers to breach their contracts with Defendants nor have Defendants alleged the requisite element of an unlawful purpose as a predicate to these business torts (see, e.g., Am. Countercl. ¶¶ 130, 138). In fact, as explained herein, under Maryland law, the alleged unlawful purpose underlying tortious interference with prospective economic must be a violation of federal antitrust laws, which as demonstrated above and below, Defendants also have failed to establish.

### 4. Accounting (Twelfth Amended Counterclaim)

In their Twelfth Amended Counterclaim, Defendants purport to seek a "complete accounting of the gross revenues and profits of the business of [Plaintiffs]" (Am. Countercl. ¶ 143), but have failed to allege any factual basis that would entitle them to the equitable remedy of an accounting, such as the existence of a

fiduciary or confidential relationship and/or that facts and records pertaining to their sales and support revenue are in their exclusive possession.

     **5.**      **Breach of Contract (PSSI) (Fourteenth Amended Counterclaim)**

     In its Amended Fourteenth Counterclaim, PSSI alleges that in November 2002, it purchased the Software and an Update Subscription, the latter of which, it alleges, entitled it to receive "all updated versions of the SoftDent software which are released and distributed by [Plaintiffs] for one year following the purchase date of the Update Subscription." (PSSI Am. Countercl. ¶ 162). PSSI further alleges that during the relevant time period (*i.e.*, from November 2002 through November 2003), SoftDent released three versions of the Software, but "[d]espite [PSSI's] repeated demands" SoftDent declined to furnish PSSI with these updated versions. (Id. ¶¶ 163-65). Essentially, PSSI alleges that Plaintiffs are in breach of a purported sales contract with PSSI because Plaintiffs have declined to facilitate PSSI's continued infringement of SoftDent's Software. However, as amplified herein, any obligation by SoftDent to furnish PSSI with updates to the Software was discharged when PSSI disclosed that it was using the Software improperly for its own commercial benefit, in violation of SoftDent's copyright, to provide technical support and service to third parties. (Ex. C, Fiore Aff. ¶ 29).

     **6.**      **Attorneys' Fees and Costs (Ninth Amended Counterclaim)**

     In their Ninth Amended Counterclaim, Defendants seek attorneys fees and costs—the inverse of the relief sought by Plaintiffs in their Third Count (and upon which Plaintiffs already have prevailed, in part)—purportedly incurred by Defendants in commencing the instant counter-suit and enforcing their rights under the Agreements. However, because Plaintiffs are entitled to dispositive relief on virtually all of Defendants' Amended Counterclaims, Plaintiffs' Third Amended Count should be granted and Defendants Ninth Amended Counterclaim should be dismissed. (Ex. C, Fiore Aff. ¶ 30).

<div align="center">

**ARGUMENT**

**I.**

**PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT GRANTING THEIR FOURTH, FIFTH AND SIXTH AMENDED COUNTS AS WELL AS DISMISSING DEFENDANTS' SEVENTH AMENDED COUNTERCLAIM AND PSSI'S FOURTEENTH AMENDED COUNTERCLAIM BECAUSE DEFENDANTS' ADMITTED USE OF SOFTDENT'S SOFTWARE TO PROVIDE TECHNICAL SUPPORT AND SERVICES CONSTITUTES A BREACH OF THE AGREEMENTS AND INFRINGEMENT OF SOFTDENT'S COPYRIGHT**

</div>

     Following the Court's dismissal of Defendants' original Eighth Counterclaim seeking a declaration as to Defendants' "continuing right" to provide technical support and services under the Agreements, the

only remaining issue in these actions was whether Defendants had extracontractual rights (under federal copyright law or otherwise) to copy and otherwise exploit the SoftDent Software in providing technical support and service to third parties. Indeed, even though they have contractually acknowledged SoftDent's proprietary rights to the Software, agreed not to infringe the same and are required to return all materials, including Software, upon termination of the Agreements (Exs. D and E, Agreements §§ 11.5, 13.1 and 13.3), Defendants have admitted that they are using the Software to provide technical support and service to their customers (see, e.g., Am. Ans. ¶¶ 57, 58 and 113). To deflect attention from and/or justify their contractual breach and copyright infringement, Defendants have asserted a host of purported counterclaims sounding in business tort and unfair competition. However, as set forth herein, because there are no issues of fact regarding their infringing use of SoftDent's Software, judgment may be entered in Plaintiffs' favor on their Fourth and Fifth Amended Counts as a matter of law.[2]

### A. Plaintiffs Are Entitled to Summary Judgment on Their Fourth Amended Count for Breach of Contract

Ordinarily, the issue of whether a contract has been breached is factual. However, where, as here, "the facts presented are not in dispute, . . . the issue of whether a contract has been performed or breached in a material way is a question of law for the court to decide" and appropriate for summary adjudication. See, e.g., Farmers' Loan & Trust Co. v. Southern Engineering Co., 284 F. 557, 559 (4th Cir. 1922); Milner Hotels, Inc. v. Norfolk & Western Railway Company, 822 F. Supp. 341, 345 (S.D.W.Va. 1993), aff'd, 19 F.3d 1429 (4th Cir. 1994); 23 WILLISTON ON CONTRACTS § 63:15 at p. 483 (4th ed. 2002) (holding that "where there is no controversy over the facts, the issue of whether a party to a contract has breached a contractual provision is also a question of law ").

Indeed, the following facts are not disputed:

- Defendants agreed to re-sell copies of the Software to end-users, which are dental or orthodontic practices in Defendants' territory ("End-Users"). (Exs. D and E, Agreements § 3.1).

- In the Agreements, Defendants "acknowledge[d] the proprietary rights of [SoftDent]" to the Software and agreed "[t]hroughout the term of this Agreement

---

[2]    Summary judgment is appropriate, where, as here, the pleadings and affidavits demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although the court must draw all reasonable factual inferences in favor of the non-movant, the task of the Court is to decide whether there is a genuine issue of fact for trial. Parker v. Davis, 900 F. Supp. 788, 791 (D. Md. 1995). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).

*and at all times thereafter* . . . not to disclose, or cause to be disclosed, any confidential or proprietary information relating to the [Software] or [SoftDent], other than in the faithful performance of the duties hereunder." (<u>Id.</u> § 13.1) (emphasis added).

- In the Agreements, Defendants acknowledged that the Software was copyrighted and that "unauthorized duplicat[ion]" thereof constituted a copyright violation that could lead to termination of the Agreements. (<u>Id.</u> § 11.5). Further Defendants agreed to "be subject to *any and all applicable fines and penalties under the provisions of the Federal Copyright Laws*." (<u>Id.</u>, emphasis added).

- The Agreements require that upon termination thereof, Defendants must "immediately return" to Plaintiffs "any and all materials regarding the Products in any form whatsoever," including any and all Software. (<u>Id.</u> § 13.3). "Products" are broadly defined in the Agreement as "SoftDent computer software and related products now or hereafter, during the term of this Agreement, developed, manufactured or distributed by [Plaintiffs]." (<u>Id.</u> § 2.1).

- The Court determined in its 1/7/03 Decision and Judgment that Plaintiffs properly had terminated and non-renewed the Agreements, effective as of December 31, 2002 (Ex. A).

- The Court dismissed Defendants' Eighth Counterclaim for a declaration that Defendants had the "continuing right" to provide, *inter alia*, technical support and service of the Software and later clarified this dismissal to the limited extent of holding that Defendants could provide technical support and service of the Software "provided, of course, . . . that relevant materials were returned [to Plaintiffs] and not used" as required under paragraph 13.3 of the Agreements (Ex. B, 2/21/03 Trans. at p. 11)

- By letter dated April 14, 2003, Plaintiffs demanded that Defendants immediately return to them any and all materials regarding the Products in any form whatsoever, including the Software, as required in the Agreement. (Am. Countercl. Ex. B thereto)

- Defendants have judicially admitted that they will *not* return Plaintiffs' Software to Plaintiffs and that Defendants have been using, and will continue to use, the same to provide technical support and service. (Ex. B, 2/21/03 Trans. at p. 10; Am. Ans. ¶ 57; Am. Countercl. ¶¶ 58 and 113 and Ex. C thereto at p. 2).

By failing to return all materials to Plaintiffs including the Software, and continuing to use, copy and exploit the Software for their own commercial purposes, including the disclosure of Plaintiffs' confidential and proprietary information, Defendants have breached, and continue to breach the Agreements. Thus, summary judgment should be entered in Plaintiffs' favor on their Fourth Amended Count for breach of contract.

**B.    SoftDent is Entitled to Summary Judgment on**
**<u>its Fifth Amended Count for Copyright Infringement</u>**

For much the same reason that summary adjudication is appropriate for Plaintiffs' Fourth Amended Count for breach of contract, summary judgment clearly is appropriate for SoftDent's Fifth Amended Count for copyright infringement.

As this Court has held, "to establish a claim for copyright infringement [in violation of 17 U.S.C. § 501 *et seq*.], a plaintiff must show that: (1) it owned a valid copyright, and (2) the defendant encroached upon the rights conferred by copyright ownership." Microsoft Corp. v. Maryland Micro.com, Inc., No. Civ. JFM-01-3797, 2003 WL 21805213 at * 2 (D. Md. Jul. 15, 2003) (Motz, J.) (*citing* 17 U.S.C. § 501(a) and Avtec Sys., Inc. v. Peiffer, 21 F.3d 568, 571 (4th Cir. 1994)). The Court further has held that "[t]he owner of a copyright has the exclusive right to: (1) reproduce the copyrighted works, (2) prepare derivative works based on the copyrighted work, and (3) distribute copies of the copyrighted work." Id. (*citing* 17 U.S.C. § 106(1)-(3)). None of these elements are in dispute and thus summary judgment in favor of SoftDent should be granted.

### C.    Softdent Owns Valid Copyrights on the Software

Copyright registrations are *prima facie* evidence of the validity of a copyright and the facts stated therein. 17 U.S.C. § 401 (c); Service & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 688 (4th Cir. 1992); and Microsoft, 2003 WL 21805213 at * 2. As confirmed by Exhibits D through J annexed to the Amended Complaint, SoftDent is in possession of valid copyright registrations for the Software. As such, the burden shifts to Defendants to rebut the statutory presumption of the validity thereof, which they attempt, but fail, to do through the assertion of insufficiently vague and conclusory counterclaims and affirmative defenses. However, as set forth herein, a grant of summary judgment is appropriate with respect to SoftDent's copyright infringement claim.

### 1.    Defendants Do Not Dispute That They Have Copied SoftDent's Software and are Using it to Provide Technical Support and Services

Unlike many copyright infringement claims, here, there are no factual issues as to whether Defendants had access to copy SoftDent's Software and/or whether such copying, in fact, took place. Indeed, Defendants have judicially admitted that they have been copying, and will continue to copy, the Software in providing technical support and service to third party customers. (See Am. Answer ¶¶ 58 and 113; Am. Countercl. Ex. C thereto at p. 2; and Feb. 21, 2003 Tr. at p. 10).

It is undisputed that the act of using software for its intended purpose, including the SoftDent Software, can often require the making of a "copy," since all or part of that software must be reproduced in a computer's RAM for the software to operate. Indeed, Defendants have admitted that "[i]n order to use SoftDent's Software, or a portion of it, the Software must be loaded into a computer's [RAM]. This loading into a computer's RAM requires copying of the Software from a disk or other storage media into RAM, and that copying, when done without SoftDent's authorization, is a direct infringement of SoftDent's

Copyrights." (See Am. Compl. ¶ 100 and Defendants' admission thereof at Am. Ans. ¶ 100).  See Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp., 845 F. Supp. 356, 363-64 (E.D. Va. 1994) (holding that merely loading software from a computer's hard drive on to RAM constituted "copying" under Copyright Act to sustain a claim of copyright infringement) ("MAI Sys. Corp.").  See also MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 519 (9th Cir. 1993) (holding that "it is generally accepted that the loading of software into a computer constitutes the creation of a copy under the Copyright Act" because software would necessarily be copied onto computer's RAM); ISC – Bunker Ramo Corp. v. Altech, Inc., 765 F. Supp. 1310, 1332 (N.D. Ill. 1990) (holding that "in order to use [the plaintiff's] software program, the program must be 'loaded' into a computer's memory.  Loading a computer's memory requires 'copying' of the program from a disk into memory, and that copy is a direct infringement of the copyright"); and Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 260 (5th Cir. 1988) ("the act of loading a program from a medium of storage into a computer's memory creates a copy of the program").

Notably, in MAI Sys. Corp., a sister court of this one—the Eastern District of Virginia—granted summary judgment on the issue of copyright infringement to a software manufacturer, holding that merely loading software from a computer's hard drive onto RAM constituted "copying" under Copyright Act to sustain a claim for infringement.  845 F. Supp. at 363-64 (citing 17 U.S.C. § 101).  Because, as in MAI Sys. Corp., Defendants do not have a license to use the software to provide technical support, the copying of Software onto RAM constitutes copyright infringement.[3]  Id. at 364.

The Copyright Act provides a narrow exception to the exclusivity of the copyright owner's reproduction right to accommodate a software purchaser's practical need to "copy" proprietary software for its intended use. Indeed, as the Eastern District of Virginia held in MAI Sys. Corp., "[s]ection 117 only permits 'the owner . . . of a computer program to make or otherwise authorize the making of another copy' without infringing the copyright if it is 'an essential step in the utilization of the computer program.'" MAI Sys. Corp., 845 F. Supp. at 367 (emphasis in original) (quoting 17 U.S.C. § 117).  As set forth more fully herein, however, Section 117 does **not** provide a basis for Defendants to "use" (and thereby copy) the

---

[3]    Indeed, in the 1/7/03 Decision and Judgment, the Court expressly rejected the notion that the Agreements conveyed any type of "license" to Defendants and deemed the Agreements to be "clearly dealership sales agreements."  (Ex. A, 1/7/03 Decision at 2.  The Court further rejected the argument advanced by Defendants previously that purchase of the Software imparted an irrevocable license and stated that even with the payment of consideration, a license "is revocable only as permitted by the Copyright Act." See Slip op at 2 n.2 (citing Korman v. HBC Florida, Inc., 182 F.3d 1291, 1296-97 (11th Cir. 1999)).

Software to provide technical support to third parties because Defendants are not "owners" of the copies of the Software that they possess and even if they were, provision of technical support is not a permissible use under Section 117 of the Copyright Act.

### 2. Defendants Do Not "Own" the Copies of SoftDent's Software That They Took into Their Possession

To allocate the risk of loss for copies of the Software ordered by Defendants for re-sale to End-Users, the Agreements provide that "[t]itle and risk of loss or damage with respect to any of the products to be delivered hereunder shall pass from [Plaintiffs] to [Defendants] after delivery of such Products."[4] (Exs. D and E § 23). However, the Agreements confirm that orders for copies of the Software would be filled only after a completed End-User Registration form was furnished by Defendants to Plaintiffs. Id. Thus, Defendants took possession of copies of the Software under the Agreements after such copies were designated for sale to a particular End-User—or, in the case of PSSI, took possession of a copy of the Software (and anticipated updates thereto) for an improper commercial purpose and, concomitantly, a violation of SoftDent's copyrights, see infra Point I(G). In addition, the Agreements require the return of any undistributed Software upon termination thereof and reimbursement for the same. (Id. § 13.3)

Moreover, the Agreements clearly do not contemplate Defendants themselves being End Users, as borne out by the Agreements' express definitions of Defendants as "Dealers" and "End-User" as "a customer or purchaser of the Products." (Exs. D and E, Agreements § 2.5). Rather, the Agreements expressly provide for Defendants to act as a conduit for shipment of the Software to the End-User (id., § 23). Further distinguishing between End-Users on the one hand, and Defendants, as Dealers, on the other, the Agreements afford Defendants the option of offering "local support" to End-Users during the term of the Agreements, but require Defendants to make End-Users aware of the "national support" being afforded by Plaintiffs "and allow the customer to decide based on the merits and prices of these support options" whether to purchase Defendants' local support or Plaintiffs' national support (Id. § 10.5). Finally, Section 10.5 of the Agreements expressly precludes Defendants from taking any steps to "impede, block, obstruct, inhibit, or restrict . . . [Plaintiffs'] access to the End User with regards to these services or any other adjunctive services that might

---

[4]    The issues discussed in this section relate only to "ownership" of the physical copies of the SoftDent Software. There is no dispute that Plaintiffs never conveyed to Defendants, or for that matter, any other party, ownership of the copyrights.  See, e.g., 2 Nimmer on Copyright § 8.08[B][1] at 8-122.8 (stating that "ownership of a tangible copy [of software] is wholly distinct from copyright ownership of the work embodied therein").

be offered by [Plaintiffs]" (Id.)    Thus, the plain language of the Agreements confirms that, under no circumstances were Defendants to be End-Users, no less "owners" of copies of the Software, for purposes of Section 117 of the Copyright Act.

The question of whether a copy of a software product is "owned" for purposes of the Section 117 exception depends on whether, as here, restrictions are placed on the use of the software.  See DSC Comm. Corp. v. Pulse Comm., Inc., 170 F.3d 1354 (Fed. Cir. 1999) (purchaser of a copy of a copyrighted software was not an "owner" when the ownership was restricted as to use).  Here, the right to possess the Software was limited, at most, to the term of the Agreements for any undeliverable or returned copies, but more often to the time between receipt from Plaintiffs and delivery to the End-User on whose behalf the Software was ordered.  Indeed, the Defendants were not even at liberty to "repurpose" unsold copies of the Software they acquired; rather, each such copy was be registered and sold to an End-User (Exs. D and E, Agreements § 23); or returned upon termination of the Agreement (id. § 13.3).[5]    Accordingly, Defendants are not "owners" within Section 117 and, therefore, should not even be accorded the limited reproduction, adaptation and archival rights granted under Section 117 of the Copyright Act, much less the right to copy the Software and use it for their pecuniary benefit to render technical support the third parties.

> **3.    Defendants' Use and Copying of the Software to Provide Technical Support to Third Parties Exceeds the Scope of Permissible Copying Under Section 117 of the Copyright Act**

Even if Defendants were deemed "owners" of a copy or copies of the Software as they allege (Am. Countercl. ¶¶ 58 and 113)—particularly as PSSI alleges with respect to the Software it purchased in November 2002 (PSSI Am. Countercl. ¶ 158)—their use of such copies for the purpose of providing technical support and service lies far outside the purview of permitted copying under Section 117 and, therefore, constitutes copyright infringement.    Section 117 provides an exception to the exclusive reproduction right of the copyright owner, by allowing owners of software copies to make reproductions for their "internal use" in connection with their own computers.    DSC Comm., 170 F.3d at 1361.  However, Section 117 does not exempt software use involving third parties or their equipment. See, e.g., MAI Sys Corp., 845 F. Supp. at 364.

---

[5]    As Nimmer states: "The proper focus to evaluate ownership of . . .[software] is to examine . . . such matters as whether the buyer could legitimately repurpose the physical media in which the software was delivered as 'door jambs, landfill, or (absent blank floppies in a pinch) deleting the software and re-using the disks to store vital company documents.'"  2 Nimmer on Copyright § 8.08[B][1] fn 39.10f at 8-125 (citation omitted)

For example, in <u>Apple Computer Inc. v. Formula Int'l Inc.</u>, 594 F. Supp. 617 (C.D. Cal. 1984), the court held that Section 117 did not protect a computer distributor who resold copies of copyrighted software to third parties even though it lawfully owned a copy of software. <u>Id.</u> The court explained that:

> 1) Only an owner-user of a computer who rightfully owns a copy of a copyrighted program is authorized to make another copy of that program, and this copying must be necessary for him to be able to use the copyrighted program in his computer; 2) The copy authorized by Section 117 must be made only for the owner-user's internal use and must be destroyed when the original copyrighted work is resold; 3) The copy thus made by the owner-user cannot be made accessible to others.

594 F. Supp. at 621-22. <u>See</u> <u>also</u> <u>Expediters Int'l of Washington, Inc. v. Direct Line Cargo Mgmt. Servs., Inc.</u>, 995 F. Supp. 468, 478 (D.N.J. 1998) (holding that the use of copy of copyrighted software to generate information for third party customers not within internal use exception); <u>ISC – Bunker Ramo Corp.</u>, 765 F. Supp. at 1332 (holding that defendant's use of copyrighted software on other people's machines "to diagnose and repair customer equipment, refurbish used equipment or otherwise" not within internal use exception); and <u>Micro-Sparc, Inc. v. Amtype Corp.</u>, 592 F. Supp. 33, 35 (D. Mass. 1984) (holding that typing computer programs transcribed in magazine and subsequently selling these programs to third parties does not fall within Section 117's internal use exception).

It is undisputed that Defendants are "copying" the Software, as that term is used in the Copyright Act, to provide technical support and service to End-Users. (<u>See</u> Am. Answer ¶¶ 58 and 113; Ex. B, 2/21/03 Tr. at p. 10; Am. Countercl., Ex. C thereto at p. 2). Consistent with the foregoing case law, copying the Software for the purpose of providing technical support is not an "internal use," since it clearly involves the use of the Software on their customers' computers. Accordingly, Defendants' use of the Software does not fall within any exception to the copyright owner's exclusive reproduction right, and thus constitutes copyright infringement as a matter of law.

### D. None of Defendants' Affirmative Defenses Preclude Summary Judgment in Favor of SoftDent and They Should Be Dismissed

Confronted with a *prima facie* case of copyright infringement ripe for disposition, Defendants attempt to defer the inevitable judgment in SoftDent's favor by asserting every conceivable affirmative defense to SoftDent's copyright infringement claim. However, as demonstrated below, none of these Affirmative Defenses bar summary judgment in SoftDent's favor on its Fifth Amended Count and they should be dismissed.

Indeed, in circumstances such as these, the Court can and should strike unspecified and vague Affirmative Defenses, bereft of evidentiary facts and unsupported by the pleading, "to avoid unnecessary

time and money in litigating invalid, spurious issues." <u>Clark v. Milam</u>, 152 F.R.D. 66, 70 (S.D. W.Va. 1993) (*quoting* <u>Spell v. McDaniel</u>, 591 F. Supp. 1090, 1112 (E.D.N.C. 1984)); <u>Resolution Trust Corp. v. Hecht</u>, 818 F. Supp. 894 (D. Md. 1992) (motion to strike affirmative defenses granted where no factual issue could prevail); <u>Microsoft Corp. v. Computer Support Serv. of Car., Inc.</u>, 123 F. Supp.2d 945, 949 (W.D.N.C. 2000) (holding that a "court may order stricken from any pleading any insufficient defense or any redundant [or], immaterial . . . matter"). Where, as here, defenses are not properly supported by the facts alleged in the pleading, they should be stricken and matters outside the pleading should not to be considered. <u>Microsoft</u>, 123 F. Supp.2d at 950.

      **1.**      **Defendants' Use of SoftDent's Software for the Commercial Purpose of Providing Technical Support and Service Does Not Constitute Fair <u>Use, Thus Requiring Dismissal of Their Twelfth Affirmative Defense</u>**

     The Supreme Court has held that, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417, 451 (1984). However, under limited circumstances—not present here—a party may use a copyrighted work without violating the Copyright Act. In considering whether use of copyrighted material is "fair use," a court must consider the "(1) the purpose and character of the use, ***including whether such use is of a commercial nature*** . . .; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107 (emphasis added).

     In <u>MAI Sys. Corp.</u>, the Eastern District of Virginia examined these four factors under circumstances virtually identical to that at issue here—plaintiffs' use of defendants' copyrighted software to provide technical support and service—and held that such use was not "fair use." First, like here, plaintiffs' use was commercial in nature, which the <u>MAI</u> court (and the U.S. Supreme Court in <u>Sony Corp.</u>) found "weighs substantially against a finding of fair use." 845 F. Supp. at 365. Second, like here, the software at issue was "a specially designed and crafted work" which "represents a substantial investment of time and labor." <u>Id.</u> Third, because, like here, the software at issue was loaded in its entirety onto the computer's RAM, the court held that "the extent and substantiality of [alleged infringer's] use weigh[ed] against a finding of fair use." <u>Id.</u> at 366. Finally, with respect to the fourth factor, the court held that "because plaintiffs' copying of the MAI software was commercial in nature . . . the likelihood of future harm to the potential market for or to the

value of the software may be presumed." Id. All of these factors in MAI weighed heavily against a finding of fair use—as they do here—and thus the Twelfth Affirmative Defense should be dismissed.

**2.    Defendants' Misuse of the Software is Not Protected By Ownership or a License and Thus Defendants' Thirteenth Affirmative Defense Must Be Dismissed**

In their Thirteenth Affirmative Defense, Defendants allege that they "lawfully own" or have a "license to the software." (Thirteenth Aff. Def.). As previously stated, even if Defendants purchased a copy of the Software for their personal use (as PSSI alleges it did) and/or possessed a valid license in the Software—which the Court already has found they do not, see supra note 3— as previously explained, their use is outside Section 117's internal use exception. See supra Point I(C)(2) and (3); see also Apple Computer, 594 F. Supp. at 621-22; Expediters Int'l, 995 F. Supp. at 478; and ISC – Bunker Ramo, 765 F. at 1332. As such, Defendants' Thirteenth Affirmative Defense must be dismissed.

**3.    The First Sale Doctrine Does Not Apply to Defendants' Misuse of the Software Thus Warranting Dismissal of Their Fourteenth Affirmative Defense**

In their Fourteenth Affirmative Defense, Defendants purport that SoftDent's copyright infringement claim is barred under the "first sale" doctrine. However, the "first sale" doctrine merely permits the owner of a particular copy of a copyrighted work, without authority of copyright owner, to sell or otherwise dispose of possession of that copy. 17 U.S.C. § 109(a); see, e.g., Quality King Distributors, Inc., v. L'anza Research Int'l, Inc., 523 U.S. 135, 141-42 (1998); Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 203 (4th Cir. 1997). Here SoftDent's copyright infringement claim arises not out of the "first sale" of the Software, but rather out of Defendants' use of the Software to provide technical support and service. Indeed, even if a copy is sold without the owner's permission, such first sale in no way opens the floodgates for the copy and use of the Software undertaken by Defendants here in violation of SoftDent's exclusive rights.[6] See 17 U.S.C. 109(a). As such, Defendants' Fourteenth Affirmative Defense must be dismissed.

**4.    Defendants' Misrepresentation Defenses Must Be Dismissed**

Defendants have asserted no less than six affirmative defenses (Sixteenth through Nineteenth, Twenty-First and Twenty-Second) premised upon some form of misrepresentation to the Copyright Office

---

[6]    Moreover, if as Defendants allege, they have a "license" to use the Software, the "first sale" doctrine is inapplicable. See Adobe Sys., Inc. v. Stargate Software, Inc., 216 F. Supp. 2d 1051, 1054 (N.D. Cal. 2002) (holding that if a transaction is classified as a license rather than a sale, the "first sale" doctrine is inapplicable).

and/or failure to comply with the filing requirements of the Copyright Laws (collectively referred to as the "Misrepresentation Defenses"). As previously stated, Defendants have failed to provide any factual predicate for these (and other) Affirmative Defenses, or even to allege if such misrepresentations were intentional or not. Clearly these Misrepresentation Defenses are asserted to raise the specter of possible factual issues militating against summary judgment on SoftDent's copyright infringement claim. It is respectfully submitted that the Court should not accept Defendants' invitation to commence a fishing expedition on alleged misrepresentations when they have presented no factual basis whatsoever for these Affirmative Defenses.

### a.    Fraud on the Copyright Office

Defendants' allegations of SoftDent's intentional misrepresentations as to "the nature and extent of their protectable authorship" in copyright applications (Sixteenth Aff. Def.), failure to identify pre-existing works and an accurate statement of added material (Seventeenth Aff. Def.) and non-compliance with the Copyright Laws (Twenty-first and Twenty-Second Aff. Defs.), all sound in fraud on the Copyright Office. See, e.g., Fonar Corp. v. Domenick, 105 F.3d 99, 105 (2nd Cir.), cert. denied, 522 U.S. 908 (1997) (presumption of copyright registration validity cannot be overcome absent showing of fraud or deliberate misrepresentation). However, any affirmative defense grounded in fraud must be pleaded with particularity as required under Rule 9(b) of the Federal Rule of Civil Procedure. Yurman Design Inc. v. Chaindom Enterprises, Inc., 99 Civ. 9307, 2002 WL 31358991 (S.D.N.Y. Sept. 30, 2002) (fraud on the Copyright Office affirmative defense stricken for failure to plead with particularity).

Indeed, to state a fraud claim with the required particularity, a "heavy burden," an affirmative defense must: 1) specify the statements that the plaintiff contends were fraudulent, 2) identify the speaker, 3) state where and when the statements were made, and 4) explain why the statements were fraudulent. Id. at * 2. Here, Defendants do not state any facts buttressing their allegations of misrepresentation, no less facts pleaded with particularity and thus utterly have failed to meet the requirements attendant to pleading fraud on the Copyright Office. As such, the Misrepresentation Defenses must be dismissed.

### b.    Innocent misrepresentations

To the extent that the Misrepresentation Defenses are grounded on unintentional misrepresentation(s) to the Copyright Office, these Defenses still must fail. Indeed, misstatements or inadvertent errors in a copyright registration, unaccompanied by fraud, will not invalidate the registration or invalidate an infringement claim. Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1162 (1st Cir.

1994).  Therefore, bereft of any supporting allegations that would satisfy even a notice pleading requirement, the Misrepresentation Defenses must be dismissed.

### 5. Because Defendants Have Failed to State an Antitrust Counterclaim their Nineteenth Affirmative Defense for Copyright Misuse Must be Dismissed

Defendants invoke "copyright misuse" as their Nineteenth Affirmative Defense, which, as the District of Maryland recently noted, "the Fourth Circuit has been hesitant to find." CoStar Group, Inc. v. LoopNet, 164 F. Supp. 2d 688,  708 (D. Md. 2001). In Lasercomb America, Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990), the Fourth Circuit held that the affirmative defense of copyright misuse involves the misuse of a copyright to violate antitrust laws and/or "in a manner violative of the public policy embodied in the grant of a copyright." Id. at 978; see also CoStar, 164 F. Supp. at 708-09 (holding that "the establishment of [a copyright misuse] defense depends on a determination that the holder of a copyright is using that copyright in an anticompetitive manner against the public policy behind copyright").  Preliminarily, in order to sustain a defense of "copyright misuse," Defendants must show a nexus between Plaintiffs' purported misconduct and Defendants' infringing use of the software.  Microsoft, 123 F. Supp.2d at 955-56 (dismissing copyright misuse defense where, like here, defendants made "vague allegations" of misuse and failed to allege facts showing that plaintiff had "used its copyrights to prohibit directly the independent development or use of a competing product").  Here, Defendants have failed to plead *any* facts, no less a  nexus, between Plaintiffs' alleged misuse of SoftDent's copyright and Defendants' alleged infringement.

Moreover, courts repeatedly have dismissed the copyright misuse defense, where, like here, a party failed to establish violation of antitrust laws (discussed *infra* at Point III).  See Service & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 690 (4th Cir. 1992) (software manufacturer not guilty of copyright misuse for restricting the use of its software with regard to third-party provider of technical support and services); Grumman, 36 F.3d at 1170 (copyright misuse defense of a third-party provider of technical support and services dismissed where anti-trust claim dismissed); Microsoft, 123 F. Supp. 2d at 955.    As such, Defendants' Nineteenth Affirmative Defense fails as a matter of law.

### 6. Because Defendants Have Failed to Allege Any Improper Conduct by SoftDent in Enforcing its Rights Under the Copyright Act, Defendants' Sixteenth, Eighteenth and Twentieth Affirmative Defenses of Unclean Hands Should Be Dismissed

Defendants purport to rely on the doctrine of "unclean hands" in their Sixteenth, Eighteenth and Twentieth Affirmative Defenses,  arising out of Plaintiffs' "misrepresent[ations] [of] the nature and extent"

of their "protectable authorship" in copyright applications (Sixteenth Aff. Def.) and their "rights" under the Copyright Laws (Eighteenth Aff. Def.) as well as general "bad faith enforcement of intellectual property rights" (Twentieth Aff. Def.)  All of these allegations are so hopelessly vague as to cry out for dismissal.

Indeed, the equitable defense of unclean hands is "a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent defendant's tortious conduct." Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., 96 Civ. 4126, 2000 WL 1028634, at * 19 (S.D.N.Y. July 25, 2000).  For example, copyright misuse, which Defendants have failed to allege in their Nineteenth Affirmative Defense, "is a species of the equitable defense of unclean hands." MicroSoft, 123 F. Supp. 2d at 955.  As Defendants have failed to rebut the validity of Plaintiffs' copyrights borne out by the valid registrations annexed to the Amended Complaint, and have failed to allege *any* facts supporting their allegations of Plaintiffs' misrepresentations of "the nature and extent" of their rights under copyright law and/or any bad faith enforcement thereof, their Sixteenth, Eighteenth and Twentieth Affirmative Defenses alleging "unclean hands" must be dismissed.  See Coleman v. ESPN, Inc., 764 F. Supp. 290, 296 (S.D.N.Y. 1991) (unclean hands defense dismissed where defendant failed to show any improper conduct by plaintiff).

> **7.     Because Defendants Have Failed to Allege Any Facts Demonstrating a Lack of Originality in the Software, Their Fifteenth Affirmative Defense Must Be Dismissed**

Defendants' Fifteenth Affirmative Defense rests on the vague and unsupported allegation that Plaintiffs' copyrighted works "lack originality."  Notwithstanding Defendants failure to point to any derivative and/or similar works, the standard of originality required for copyrightability is minimal. See, e.g., Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., 74 F.3d 488, 492 (4th Cir.), *cert. denied*, 519 U.S. 809 (1996).  To fulfill the originality requirement a work need only be an independent creation and embody a "modicum of creativity."  Id.  The copyright registrations confirm, as a matter of law, that the Software meets this criteria.  Moreover, Defendants have failed to plead any facts demonstrating a lack of originality other than the unspecified allegation that such is the case.

Remarkably, moreover, this affirmative defense is belied by Defendants' denial in their Amended Answer of "sufficient knowledge or information to form a belief as to the truth of" Plaintiffs' allegation that "[t]he works associated with the Software possess the requisite originality  as demanded by 17 U.S.C. § 101 et seq. and, as such, SoftDent was properly granted an authentic and valid copyright."  (Am. Complaint ¶ 97

and Defs. Am. Answer ¶ 97). Indeed, if Defendants were in possession of evidentiary facts—which they clearly are not—that the works lacked originality, they would have denied the allegation, rather than denying "sufficient knowledge or information to form a belief as to the truth of" the aforementioned allegations. Furthermore, Defendants acknowledged in the Agreements that the Software was protected by the Copyright Laws and that a violation thereof constituted grounds for termination. (Exs. D and E, Agreements § 11.5). Defendants should not be permitted to leverage off the baseless defense of lack of originality to avoid summary judgment and thus, their Fifteenth Affirmative Defense should be dismissed.

### E.     Plaintiffs Are Entitled to a Permanent Injunction, Statutory Damages and Attorneys' Fees in Connection with Defendants' Infringement of SoftDent's Copyrights

In its First Amended Complaint, SoftDent seeks a permanent injunction pursuant to 17 U.S.C. § 502 enjoining Defendants, *inter alia*, "from any further copying or distribution of the Software without SoftDent's consent" (Am. Compl. ¶ 105). SoftDent also seeks recovery of its full costs, including attorneys' fees incurred in connection with this matter, as provided by 17 U.S.C. § 505 (Id. ¶ 107). Additionally, SoftDent seeks (i) damages and/or all profits made by Defendants from their wrongful infringement pursuant to 17 U.S.C. § 504. (id. ¶ 106); or in the alternative, (ii) statutory damages pursuant to 17 U.S.C. § 504(c), in an enhanced amount as provided by 17 U.S.C. § 504(c)(2) due to Defendants' willful infringement (id.).

### 1.     SoftDent is Entitled to a Permanent Injunction Enjoining Defendants From Any Further Copying or Distribution of the Software

Where, like here, a claim of copyright infringement has been established, it is respectfully submitted that a permanent injunction prohibiting further infringement is appropriate and should be entered against Defendants. See 17 U.S.C. § 502; Graduate Mgmt. Admission Council v. Raju, 267 F. Supp. 2d 505, 512 (E.D. Va. 2003); Maryland Mirco.com, 2003 WL 21805213 at * 6 (entering a permanent injunction following a finding of copyright infringement). Indeed, this Court has recognized that a permanent injunction is an appropriate remedy in the face of copyright infringement like that at issue here. Id. (*citing* M.L.E. Music v. Kimble, Inc., 109 F.Supp.2d 469, 472-73 (S.D. W.Va. 2000)).

### 2.     SoftDent is Entitled to an Award of Attorneys' Fees Under 17 U.S.C. § 505

Separate and apart from Plaintiffs' entitlement to an award of attorneys' fees under the Agreements (Exs. D and E, Agreements § 19), for which this Court already has entered judgment in Plaintiffs' favor on a prior dispositive motion, it is respectfully submitted that here, Plaintiffs are entitled to attorneys' fees under 17 U.S.C. § 505 due to Defendants' willful infringement of their copyright. See, e.g., Maryland Micro.com,

2003 WL 21805213 at * 6 (*citing* <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517, 534 (1994)) (holding that a court may, in its discretion, award attorneys' fees under 17 U.S.C. § 505 particularly where, like here, infringement is willful). As this Court found in <u>Maryland Micro.com</u>, "[f]actors that a court should consider when determining whether to award attorneys' fees include: frivolousness, motivation, objective unreasonableness, and considerations of compensation and deterrence." <u>Id.</u> As the record reflects, despite repeated requests from Plaintiffs that Defendants cease and desist in their infringing use of the Software, Defendants have used, and continue to use, SoftDent's Software to provide technical support and service which use constitutes intentional, knowing and willful infringement (<u>see</u>, <u>e.g.</u>, Febr. 21, 2003 Tr. at p. 10; Am. Countercl. ¶¶ 58, 113 and Ex. C thereto at p. 2), and warrants an award of attorneys' fees under 17 U.S.C. § 505.

### 3. SoftDent is Entitled to an Award of Damages for Defendants' Willful Infringement

Under the Copyright Act, a copyright owner may elect, at any time, before final judgment is rendered, the remedy of: (i) statutory damages or (ii) actual damages and profits arising from copyright infringement. 17 U.S.C. § 504 (b) and (c); <u>Xoom, Inc. v. Imageline, Inc.</u>, 323 F.3d 279, 285 (4th Cir.), *cert. denied*, 124 S. Ct. 303 (2003). At this time, Plaintiffs do not have enough information to elect the appropriate remedy and thus reserve the right to select a remedy at a later time, before the entry of final judgment, pending limited discovery on the issue of damages. <u>See</u> <u>Twin Peaks Prod., Inc. v. Publications Int'l., Ltd.</u>, 996 F.2d 1366, 1371, 1380 (2d Cir. 1993) (affirming statutory damages award where election of statutory damages made after disposition of summary judgment motion).

In the event that Defendants elect statutory damages, the Court has broad discretion in setting the amount of statutory damages under the Copyright Act. <u>Microsoft Corp. v. Grey Computer</u>, 910 F. Supp. 1077, 1091 (D. Md. 1995). As previously stated, there is no dispute that Defendants' infringement of SoftDent's copyrights was willful. Infringement is willful if a defendant: "(1) has either actual or constructive knowledge that its actions constitute infringement, or (2) recklessly disregards a copyright . . . holder's rights." <u>Maryland Micro.com</u>, 2003 WL 21805213 at * 5 (*citing* <u>Lyons Partnership L.P. v. Morris Costumes, Inc.</u>, 243 F.3d 789, 799 (4th Cir. 2001) and <u>Microsoft Corp. v. Logical Choice Computers, Inc.</u>, No. 99 C 1300, 2001 WL 58950 at * 11 (N.D. Ill. Jan 22, 2001). Accordingly, in light of Defendants' willful infringement and the myriad lost support opportunities arising therefrom, Plaintiffs submit that, in the event that they elect statutory damages, they are entitled to maximum statutory damages under 17 U.S.C. § 504(c)(2). <u>See</u>, <u>e.g.</u>, <u>Grey Computer</u>, 910 F. Supp. at 1091-92 (imposing the maximum penalty authorized by statute for defendant's willful copyright infringement). In the alternative, in the event that the Court deems

Defendants' actions to constitute non-willful infringement, Plaintiffs respectfully reserve the right to request the statutory maximum under 17 U.S.C. § 504(c)(1).  See, e.g., Maryland Micro.com, 2003 WL 21805213 at * 5.

**F.**    **Plaintiffs Are Entitled to Summary Judgment on their Sixth Count and Dismissing Defendants' Seventh Counterclaim Because Defendants May Not Continue to Use SoftDent's Software to Provide Technical Support and Service**

In their Sixth Count, Plaintiffs seek a declaration "that following termination of the Agreement[s], which occurred on December 31, 2002, Defendant[s] do[] not have the continuing right to use the Software in providing 'technical support and service' to third parties."  (Am. Compl. ¶ 118).  Conversely, in their Seventh Amended Counterclaim, Defendants seek a declaration that they "can continue to provide technical support and service of [Plaintiffs'] Products to customers pending this litigation or after termination of the Agreement[s] by [Plaintiffs]"  (Am Countercl. ¶ 116).  As previously stated, the Court dismissed Defendants' original Eighth Counterclaim for a declaration that Defendants had the "continuing right" to provide, *inter alia*, technical support and service, finding that "Defendants are . . . required to 'immediately return [to the plaintiffs] any and all materials regarding the Products in any form whatsoever' [citing Agreement § 13.3]. ***Thus, they are not entitled to continue technical support and services anticipated in the Agreements***." (Ex. A, 1/7/03 Decision at 8-9) (emphasis added). On February 21, 2003, the Court clarified its dismissal of Defendant's Eighth Counterclaim to the limited extent of holding that Defendants could provide technical support and service pertaining to the Software "provided, of course, . . . that relevant materials were returned [to Plaintiffs] and not used."  (Ex. B, Feb. 21, 2003 Trans. at p. 11).

Here, there is no dispute that Defendants have failed to return the Software to Plaintiffs and have continued to copy or otherwise exploit the Software to provide technical support to third parties. (See Am. Answer ¶¶ 58 and 113).  Additionally, Plaintiffs have demonstrated that Defendants' conduct constitutes a breach of the Agreements and an infringement upon SoftDent's copyrights.  As such, Plaintiffs are entitled to summary judgment granting their Sixth Count and dismissing Defendants Amended Seventh Counterclaim.

**G.**    **Because PSSI's Use of the Software to Provide Technical Support and Service Constitutes a Breach of the Agreement and Infringes SoftDent's Copyright, Plaintiffs are Entitled to Summary Judgment Dismissing PSSI's Amended Fourteenth Counterclaim for Breach of Contract**

In its Amended Fourteenth Counterclaim, PSSI alleges that in November 2002, it purchased the Software and an Update Subscription, the latter of which, it alleges, entitled it to receive "all updated versions of the SoftDent software which are released and distributed by [Plaintiffs] for one year following

the purchase date of the Update Subscription." (PSSI Am. Countercl. ¶ 162). PSSI further alleges that during the relevant time period (*i.e.*, from November 2002 through November 2003), SoftDent released three versions of the Software, but "[d]espite [PSSI's] repeated demands" SoftDent declined to furnish PSSI with these updated versions. (Id. ¶¶ 163-65). Essentially, PSSI has alleged that Plaintiffs are in breach of a purported sales contract with PSSI because Plaintiffs have declined facilitate PSSI's continued infringement of SoftDent's Software and breach of the Agreement.

Under the Agreement, PSSI contractually agreed to distribute or re-sell the Software to its end-user customers (see, e.g., Ex. D, PSSI Agreement §§ 1.3 and 3.1), acknowledged that making "unauthorized duplicates" of the Software infringed SoftDent's copyright and further acknowledged that it would be "subject to all applicable fines and penalties under the provisions of the Federal Copyright Laws" (id., § 11.5). As amplified in the accompanying Fiore Affidavit, SoftDent declined to continue to furnish PSSI with updates to the Software when PSSI confirmed, through its counsel, that it was using SofDent's Software improperly for its own commercial purposes in breach of the Agreement and in violation of SoftDent's copyright. Even accepting all pleaded facts as true, under no circumstances can SoftDent's withholding of updates from PSSI, given the latter's improper use thereof to provide technical support and services—in breach of the Agreement and in violation of SoftDent's copyright—constitute a breach of any sales contract.

Indeed, implicit in the sales agreement between PSSI and SoftDent was a duty of good faith and fair and fair dealing, which duty "simply prohibits one party . . . from acting in such a manner as to prevent the other party from performing his obligations under the contract." Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc., 190 F. Supp. 2d 785, 794 (D. Md. 2002) (*quoting* Parker v. The Columbia Bank, 91 Md. App. 346, 366, 604 A.2d 521 (1992)). As a result of PSSI's material breach of its sales agreement with SoftDent, *i.e.*, its infringement of the Software, SoftDent was relieved of any further duty to perform thereunder, including any purported duty to furnish PSSI with updates to the Software. See, e.g., Bollech v. Charles County, Maryland, 166 F. Supp. 2d 443, 458-59 (D. Md. 2001), *aff'd*, No. 01-2385, 2003 WL 21546001 (4th Cir. July 10, 2003) (holding that material breach or failure of performance by one party to a contract suspends or discharges the other party's remaining duties under the contract)(*citing* Restatement (Second) of Contracts § 237). Any contrary result would be counterintuitive as it would require SoftDent to continue to perform by furnishing PSSI with the very tools it needs to infringe SoftDent's copyright. Therefore, it thus follows, that any obligation by SoftDent to furnish PSSI with updates to the Software was discharged when PSSI disclosed that it was using the Software improperly in violation of SoftDent's

copyright.    Accordingly, summary judgment should be granted in Plaintiffs' favor dismissing PSSI's Fourteenth Amended Counterclaim.

<p style="text-align:center">*  *  *</p>

In sum, it is respectfully submitted that summary judgment should be granted in favor of Plaintiffs granting their Fourth, Fifth and Sixth Counts for breach of contract, copyright infringement, and a declaration that Defendants do not have the continuing right to use the Software to provide technical support and service to third parties; dismissing Defendants' Seventh Amended Counterclaim for a declaration on the technical support issue; dismissing PSSI's Fourteenth Amended Counterclaim for breach of contract; and dismissing Defendants' Thirteenth through Twenty-Second Affirmative Defenses.

<p style="text-align:center">**II.**</p>

### DEFENDANTS' FIFTH AND EIGHTH AMENDED COUNTERCLAIMS SHOULD BE DISMISSED AND/OR PLAINTIFFS SHOULD BE AWARDED JUDGMENT ON THE PLEADINGS BECAUSE DEFENDANTS HAVE FAILED TO STATE UNFAIR COMPETITION CLAIMS  UNDER STATE OR FEDERAL LAW

Defendants purport to assert a host of counterclaims under federal, Illinois and Ohio law—all essentially predicated on the same threadbare conclusory allegation—that Plaintiffs have made "disparaging, false, inaccurate and/or misleading representations" regarding Defendants' services.  (See, e.g., Am Countercl. ¶¶ 9, 12, 41-43, 95, 119, 129-30, 138 and 150).  Peeling back the layers of subterfuge, the disparaging representation at the heart of Defendants' unfair competition claims is Defendants' inability to use the Software to provide technical support and service.  As amplified herein, Defendants' allegation are vague and unspecified and wholly insufficient to sustain the myriad unfair competition claims Defendants purport to assert. [7]

---

[7]    A motion to dismiss under Rule 12(b)(6) should be granted "if, after accepting all well-pleaded allegations in the [counter-]plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the [counter-]plaintiff's favor, it appears certain that the [counter-]plaintiff cannot prove any set of facts in support of his claim entitling him to relief."  Fischer v. Viacom Int'l, Inc., 115 F. Supp. 2d 535, 537 (D. Md. 2000) (Motz, J.) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 233-34 (4th Cir. 1999)). In the same vein, the legal standard which governs a motion for judgment on the pleadings under Rule 12(c) is substantially the same as the legal standard which governs a motion to dismiss under Rule 12(b)(6). See Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002).

A.    **The Fifth Amended Counterclaim Must Be Dismissed and/or Judgment Must Be Granted in Favor of Plaintiffs Because Defendants Have Failed to State Claims for Unfair Competition Under Maryland, Illinois and/or Ohio Law**

1.    **Defendants Have Failed to State a Claim for Deceptive Trade Practices, Trade Disparagement and/or Unfair Competition Under Maryland Law**

Notwithstanding Defendants' reliance on Illinois and Ohio law, Maryland law governs all claims arising under the Agreements (Exs. D and E, Agreements ¶ 19), including Defendants' vague and conclusory Fifth Counterclaim sounding in deceptive trade practices, trade disparagement and/or unfair competition. See, e.g., Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999) (holding that "[w]here a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims . . . courts have honored the intent of the parties to choose the applicable law").[8] Defendants' avoidance of Maryland law is not surprising. Indeed, as a threshold matter, although the Maryland Consumer Protection Act, Md. Code. Com. Law § 13-301(4) precludes "[d]isparagement of the goods, realty, services or business of another by a false or misleading representation of material fact," Defendants have failed to state a claim thereunder because, as this Court has held, corporate competitors are not "consumers" as that term is defined in the Maryland CPA and thus cannot seek relief thereunder.[9] Maryland Micro.Com, Inc., 2003 WL 21805213 at * 3 n. 7. See also Penn-Plax, Inc. v. L. Schultz, Inc., 988 F. Supp. 906, 909-11 (D. Md. 1997) (holding that corporate competitors are not "consumers" and therefore lack standing to assert claims under the Maryland CPA); and Fare Deals, Ltd. v. World Choice Travel.com, Inc., 180 F.Supp.2d 678, 692 (D. Md. 2001) (holding that corporate commercial entity is not a "consumer" under the Maryland CPA and therefore has no standing to assert claims thereunder).

As such, Defendants' purported unfair competition and trade disparagement counterclaims  must be analyzed under Maryland common law.  Microsoft, 2003 WL 21805213 at * 3 n. 7 (claims for  unfair competition and trade disparagement must be analyzed under Maryland common law where, like here, claimant lacks standing to assert claims under Maryland CPA).   It is well settled that the Maryland common law governing claims of unfair competition and trade disparagement nearly always tracks federally statutory

---

[8]    Mindful that their claims fail under Maryland law, Defendants have sought refuge under Illinois and Ohio law; their efforts, however, are unavailing because as demonstrated at Points II(A)(2)-(4) herein, they have failed to state claims under Illinois and Ohio law as well.

[9]    Under the Maryland CPA, "'[c]onsumer' means an actual or prospective purchaser, lessee or recipient of consumer goods . . ." Md. Code, Com. Law § 13-101(c)(1).

law under the Lanham Act, 15 U.S.C. § 1125(a).  <u>Fare Deals</u>, 180 F.Supp.2d at 691.  Because, as demonstrated in Point II(B) herein, Defendants have failed to state a claim for "federal unfair competition" under the Lanham Act, their common law claims for unfair competition and trade disparagement under Maryland law must fail as well. <u>See</u>, <u>e.g.</u>, <u>HQM, Ltd. v. Hatfield</u>, 71 F.Supp.2d 500, 504-05 and n. 17 (D. Md. 1999) (dismissing Lanham Act and Maryland common law claims together and finding that the same analysis applies to both).

Recognizing the inevitable fate of unfair competition claims thereunder, Defendants have assiduously avoided Maryland law.  However, their avoidance is unavailing since, as demonstrated in subpoints II(A)(2)-(4), these purported counterclaims equally are doomed under Illinois and/or Ohio law.

> ### 2. PSSI Has Failed to State a Claim for Deceptive Trade Practices, Consumer Fraud, Trade Disparagement and/or Unfair Competition Under Maryland Law
>
> #### a. The Illinois Uniform Deceptive Trade Practices Act

In its Fifth Amended Counterclaim, PSSI purports to assert a claim under the Illinois Uniform Deceptive Trade Practices Act.  As a preliminary matter, such a claim is barred because the Illinois UDTPA does not permit a private cause of action for damages, as sought by PSSI here, but only permits suits for injunctive relief (not sought by PSSI here).  <u>See</u> Illinois UDTPA § 3(b), 815 ILCS 510/3(b); <u>see also</u> <u>Glazewski v. Coronet Insurance Co.</u>, 483 N.E.2d 1263, 1267 (Ill. 1985); <u>Fedders Corp. v. Elite Classics</u>, 268 F.Supp.2d 1051, 1063-64 (S.D. Ill. 2003).   Notwithstanding the foregoing, under Illinois law, the Illinois UDTPA applies *only* to statements disparaging the *quality* of a business's products or services.  <u>Republic Tobacco, L.P. v. North Atlantic Trading Co.</u>, 254 F.Supp.2d 985, 998 (N.D. Ill. 2002); <u>see also</u> <u>Roper Whitney of Rockford, Inc. v. TAAG Machinery Co.</u>, No. 99 C 50032, 2003 WL 57029 at * 2 (N.D. Ill. 2003) (holding that "[s]o long as the statements at issue do not disparage the quality of the plaintiff's goods or services, no cause of action will lie under the [Illinois UDTPA]").  And Illinois courts set a high threshold for disparagement under the UDTPA, requiring a specific statement as to the quality of a competitor's service which the threadbare allegations of the Amended Counterclaims do not even remotely allege.  <u>See</u>, <u>e.g.</u>, <u>Doherty v. Kahn</u>, 682 N.E.2d 163, 178 (Ill. App. Ct. 1997) (holding that defendants' alleged statements that plaintiff was "lazy, incompetent, dishonest, unable to run his business, and unable to perform . . . services" did not constitute trade disparagement within the UDTPA); <u>Allcare, Inc. v. Bork</u>, 531 N.E.2d 1033, 1037-38 (Ill. App. Ct.), *appeal denied*, 541 N.E.2d 1104 (1989) (holding that statements by defendant that president of plaintiff competitor was paying out bribes to a customer, and that competitor was undergoing a Medicare

fraud investigation did not fall within the Illinois UDTPA as they did not pertain to the quality of goods and services).

Here, by contrast, the challenged statements are completely unrelated to the quality of PSSI's technical support and services. Indeed, the only statement in the Amended Counterclaim that even addresses PSSI's services, *i.e.*, that "PSS is no longer able to provide technical support and services for [Plaintiffs'] software (Am. Countercl. ¶ 48, 136), does not constitute disparagement under the Illinois UDTPA (nor for that matter under the Consumer Fraud Act or common law, see *infra*).

Nor are these representations, if made, misleading or inaccurate. Indeed, there is no dispute that in the 1/7/03 Decision and Judgment, the Court dismissed Defendants Eighth Counterclaim as to their "continuing right" to provide technical support and service, and required Defendants to return all materials to Defendants (Ex. A at p. 9), clarifying this ruling to the limited extent of holding that Defendants could provide technical support and service pertaining to the Software "provided, of course, . . . that relevant materials were returned [to Plaintiffs] and not used." (Ex. B, Feb. 21, 2003 Trans. at p. 11). These relevant materials were not returned and Defendants continue to infringe SoftDent's copyrights in providing technical support and service. Hence, to the extent that any statements were made, they arose out of Plaintiffs' belief that the Court's ruling prohibited PSSI from using the Software improperly and not, as PSSI alleges, an intent to disparage. Under Illinois law, "there must be a claim seated in deceptive acts rather than a reasonable difference of opinion as to the meaning of [the law]." Stern v. Norwest Mortgage, Inc., 672 N.E.2d 296, 302 (Ill. App. Ct. 1996), aff'd 688 N.E.2d 99 (Ill. 1997). See also Stern v. Great Western Bank, 959 F. Supp. 478, 485-86 (N.D. Ill. 1997).

Because PSSI seeks damages, and not injunctive relief, and, in any event, has failed to allege that Plaintiffs disparaged the quality of its services, its allegations are wholly insufficient to state a claim under the Illinois UDTPA.

**b.    Trade Disparagement  (Illinois Common Law)**

The Illinois UDTPA incorporates the common law tort of commercial or trade disparagement. Olin Hunt Specialty Prods., Inc. v. Advanced Delivery & Chemical Systems, No. 88 C 20364, 1991 WL 294970 at * 2 (N.D. Ill. May 9, 1991); see also  Crinkley v. Dow Jones & Co., 385 N.E.2d 714, 719 (Ill. App. Ct. 1978).  As with the DTPA, the common law tort applies "to statements which disparage the *quality* of one's goods or services." Crinkley, 385 N.E.2d at 719 (emphasis added); see also Lexmark Int'l, Inc. v. Transportation Ins. Co., 761 N.E.2d 1214, 1225 (Ill. App. Ct. 2001) (defining trade disparagement as

"criticiz[ing] the *quality* of one's goods or services") (emphasis added).  Since PSSI has failed to state a claim under the UDTPA, it also has failed to state a claim for trade disparagement under Illinois common law.

### c.      Unfair Competition (Illinois Common Law)

Hedging against the inescapable fact that it has failed to state a claim under the Illinois DTPA, PSSI also deems its Fifth Counterclaim to sound in "unfair competition."  The Seventh Circuit has noted that the common law of unfair competition is "elusive," its elements "escap[ing] definition."  Wilson v. Electro Marine Sys., Inc., 915 F.2d 1110, 1118 (7th Cir. 1990).  Originally limited to trademark violations, such as "passing off" or "palming off" the product of another as one's own, unfair competition now applies to activity which "so 'shocks judicial sensibilities'" and "violates 'standards of commercial morality' that it cannot be tolerated."  Id. (citations omitted). "Generally speaking, an unfair competition claim requires a misappropriation of the labors and expenditures of another, *i.e.*, one party reaps where the other has sown." Lynch Ford, Inc. v. Ford Motor Co., Inc., 957 F. Supp. 142, 146 (N.D. Ill. 1997).  Here, the Amended Counterclaims are totally void of any allegations of "shocking" or "morally unconscionable" conduct on the part of Plaintiffs and/or and that Plaintiffs have misappropriated PSSI's labors and expenditures.  Indeed, PSSI is hard pressed to concoct such allegations, where, like here, it has failed to allege that Plaintiffs have even disparaged the quality of its services.  See, e.g., Lynch, 957 F. Supp. at 145-46 (dismissing common law unfair competition claim); Fedders Corp., 268 F.Supp.2d at 1063 (same); and Olin Hunt Specialty Prods., Inc. v. Advanced Delivery and Chemical Systems, No. 88 C 20364, 1991 WL 294970 at * 5 (N.D. Ill. 1991).  For all these reasons, PSSI has failed to state a claim for unfair competition under the common law of Illinois.

### 3.      PSSI Has Failed to State a Claim Under the Illinois Consumer Fraud and Deceptive Business Practices Act

Equally doomed is PSSI's purported claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1.  To state a viable claim thereunder, a party must allege "(1) a deceptive or unfair practice; (2) an intent by [counter-defendant] that [counter-plaintiff] rely on that deception; and (3) that the deception occurred during trade or commerce."  State Farm Fire & Cas. Co. v. Trousdale, 673 N.E.2d 1132 (Ill. App. Ct. 1996) (dismissing Consumer Fraud claim); Robinson v. Toyota Motor Credit Corp., 735 N.E.2d 724, 732-33 (Ill. App. Ct. 2000) (dismissing Consumer Fraud Claim where, like here, plaintiff failed to plead sufficiently an unfair or deceptive practice).  As set forth herein, PSSI has

failed to allege sufficient facts to establish any of these elements and thus its Fifth Counterclaim must be dismissed.

Preliminarily, PSSI itself is not a "consumer" within the meaning of the Act and thus cannot allege that it "relied" upon any alleged deception perpetrated by Plaintiffs.[10]  Although courts have held that claims under the Consumer Fraud Act may be asserted by commercial entities in a representative capacity (*i.e.*, on behalf of consumers), a high threshold must be met in order to assert such a claim.  Where, like here, a corporate competitor attempts to contort a contract claim into a purported violation under the Consumer Fraud Act, Illinois courts have held that the party "must meet the consumer nexus test by alleging that the conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns."[11]  Athey Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 437 (7th Cir. 1996).  See also Industrial Specialty Chemicals, Inc. v. Cummins Engine Co., Inc., 902 F. Supp. 805, 812 (N.D. Ill. 1995); Gadson v. Newman, 807 F. Supp. 1412, 1421 (C.D. Ill. 1992); and Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc., 546 N.E.2d 33, 41 (Ill. App. Ct. 1989).

Here, notwithstanding a fatal lack of specificity as to the wrongful conduct engaged in by Plaintiffs, see infra, PSSI's self-serving vague allegations of statements made to unspecified "third parties,  including customers of [Defendants]" (see, e.g., Am. Countercl. ¶¶42, 43, 128, 136) falls far short of satisfying the consumer nexus requirement of alleging conduct directed to the market generally.  Moreover, PSSI nowhere alleges—as it must—how the complained-of conduct implicates consumer protection concerns generally, or otherwise even relates to such concerns.  See, e.g., Stepan Co., 948 F. Supp. at 806-07 (dismissing claim under Consumer Fraud Act for failing to allege a consumer nexus); Central Diversey M.R.I. Center, Inc., 952 F. Supp. at 577-78; and Doherty v. Kahn, 682 N.E.2d 163, 177 (Ill. App. Ct. 1997) (dismissing Consumer

---

[10]    The statute defines a "consumer" as one "who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."  815 ILCS 505/1(e). Here, under the Agreements, Defendants acted as distributors or re-sellers of the Software at issue.

[11]    Indeed, "[c]ourts have consistently resisted attempts by litigants to portray otherwise ordinary breach of contract claims as causes of action under the [Consumer Fraud] Act."  Lake County Grading Co. v. Advance Mechanical Contractors, Inc., 654 N.E.2d 1109, 1116 (Ill. App. Ct. 1995).  As the United States District Court, Northern District of Illinois aptly noted, ". . .without such a requirement, contract law would be subsumed by causes of action brought under the Act." Stepan Company v. Winter Panel Corp., 948 F. Supp. 802, 806 (N.D. Ill. 1996). See also Central Diversey M.R.I. Center, Inc. v. Medical Management Sciences, Inc., 952 F. Supp. 575, 578 (holding that the very purpose of the consumer nexus requirement is "to prevent plaintiffs from 'supplement[ing] or replac[ing] every breach of contract claim with an additional and redundant remedy under the [Consumer Fraud] Act.'") (quoting Lake County Grading Co., 654 N.E.2d at 1116).

Fraud claim for failure to plead that alleged conduct implicates consumer protection concerns). Accordingly, PSSI's Fifth Counterclaim under the Consumer Fraud Act must fail.

Further, even if PSSI had complied with the consumer nexus requirement—which it has not—its claim under the Consumer Fraud Act is barred because PSSI has failed to plead this claim with the requisite particularity and specificity. See, e.g., Neff v. Capital Acquisitions & Management Co., 238 F.Supp.2d 986 (N.D. Ill. 2002) (holding that claims under the Consumer Fraud Act must be pleaded with the same specificity as that required under Rule 9(b) for common law fraud, aff'd, 352 F.3d 1118 (7th Cir. 2003); Anast v. Commonwealth Apartments, 956 F. Supp. 792 (N.D. Ill. 1997); Elson v. State Farm Fire & Cas. Co., 691 N.E.2d 807 (Ill. App. Ct. 1998). Specifically, PSSI is required to allege the identity of the person making the misrepresentation or deceptive statement, the time place and content of such statement, and method by which such statement was communicated. Olympic Chevrolet, Inc. v. General Motors Corp., 959 F. Supp. 918 (N.D. Ill. 1997); Gallagher Corp. v. Massachusetts Mut. Life Ins. Co., 940 F. Supp. 176 (N.D. Ill. 1996).

Here, PSSI's threadbare Consumer Fraud Act claim—pleaded no less "upon information and belief"—rests entirely upon the unspecified allegations that Plaintiffs "have expressly asserted to third parties, including customers of [Defendants]" that: (i) "a Judgment was entered against [Defendants] in favor of [Plaintiffs] in this action, requiring [Defendants] to pay [Plaintiffs] at least $500,000.00" (Am. Countercl. ¶ 42); (ii) [Defendants] [are] going out of business and/or bankrupt" (id. ¶ 43); and (iii) "[Defendants] [are] no longer able to provide technical support and services for [Plaintiffs'] software (id. ¶¶ 48, 136). Even if these alleged statements were false and misleading, PSSI utterly has failed to identify the person making these alleged statements, the time, place and specific content of these alleged statements, and the method by which these statements were communicated (i.e., verbally or in writing). Moreover, PSSI's conclusory characterization of these statements as "false, disparaging, inaccurate and/or misleading" is wholly insufficient to sustain a claim under the Consumer Fraud Act. See, e.g., Kennedy v. First Nat. Bank of Mattoon, 551 N.E.2d 1002 (Ill. App. Ct. 1990) (holding that complaint alleging violation of Consumer Fraud Act should set out specific factual allegations and that merely characterizing actions or unlawful or wrongful is insufficient). As such, PSSI's Fifth Counterclaim must be dismissed.

### 4. DMA Has Failed to State a Claim for Deceptive Trade Practices Unfair Competition and Defamation Under Ohio Law

For many of the same reasons sounding the death knell for PSSI's Fifth Counterclaim, DMA has failed to state claims for deceptive trade practices, unfair competition and defamation under Ohio law.

**a.**    <u>The Ohio Uniform Deceptive Trade Practices Act</u>

DMA purports to assert a claim for trade disparagement under the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(10).  Like the Illinois DTPA, to sustain a claim under subparagraph 10 of the Ohio DTPA, it must be pleaded that a party disparaged the *quality* of a business's goods or services—which as explained above has not been pleaded here.  <u>See</u> <u>e.g.</u> <u>Fairfield Machine Co., Inc. v. Aetna Casualty & Surety Co.</u>, No. 2000 CO 14, 2001 WL 1665624 (Ohio App. Ct. Dec. 28, 2001) (holding that disparagement claim under the Ohio DTPA requires disparagement of the quality of goods and/or services); <u>Blue Cross & Blue Shield of Ohio v. Schmidt</u>, No. L-94-291, 1996 WL 71006 at *3 (Ohio App. Ct. 1996) (same).  Moreover, DMA's claim is fatally flawed because DMA has failed to allege "the time, place and circumstances of [Plaintiffs'] alleged [disparaging] conduct which could lead to a cause of action." <u>Innovative Digitial Equipment, Inc. v. Quantum Technology, Inc.</u>, 597 F. Supp. 983, 988 (N.D. Ohio 1984) (holding that, at a minimum, a claim for trade disparagement under the Ohio DTPA must plead the alleged disparaging conduct with specificity in order to withstand a motion to dismiss).  Additionally, like PSSI, DMA has failed to identify the person making these alleged statements and the method by which these alleged statements were communicated (*i.e.*, verbally or in writing). Accordingly, for the same reasons that PSSI's claim must fail under the Illinois DTPA, DMA's claim must fail under the Ohio DTPA.

**b.**    <u>Unfair Competition (Ohio Common Law)</u>

Merely lumping common law "unfair competition" into its claim under the Ohio DTPA does not save the former claim from dismissal.  Indeed, as the United States District Court, Northern District of Ohio has held that "[u]nder Ohio law, a claim of unfair competition is merely a common law counterpart to a statutory claim under the Deceptive Trade Practices Act.  Consequently, a common law unfair competition claim is evaluated using the same analytical framework as  a claim under the Deceptive Trade Practices Act." <u>Re/Max International, Inc. v. Realty One, Inc.</u>, 924 F. Supp. 1474, 1503 (N.D. Ohio 1996) (dismissing common law claim for unfair competition because, like here, party had failed to state a claim under the Ohio Deceptive Trade Practices Act).  <u>See</u> <u>also</u> <u>Cesare v. Work</u>, 520 N.E.2d 586, 590 (Ohio App. Ct. 1987). <u>Accord</u>, <u>Jewel Companies, Inc. v. Westhall Co.</u>, 413 F. Supp. 994, 999 (N.D. Ohio 1976), *aff'd*, 575 F.2d 1176 (6th Cir. 1978).  The tort of unfair competition "is grounded on 'preventing fraud upon the public' by preventing deceptive trade practices." <u>Cannon Group, Inc. v. Better Bags, Inc.</u>, 250 F.Supp.2d 893, 904 (S.D. Ohio 2003).  As previously stated, DMA utterly fails to allege fraud with specificity, no less a fraud

being perpetrated upon the consumer public.  Accordingly, for all these reasons, DMA's claim for unfair competition under the common law of Ohio must fail as well.

### c.      Defamation (Ohio Common Law)

Thrown in for good measure perhaps, under the correct assumption that none of the other unfair competition claims were viable, DMA purports to seek relief for "defamation" in its Fifth Counterclaim as well.  However, the myriad pleading defects rendering DMA's Ohio DTPA and unfair competition claims invalid similarly plague DMA's purported defamation claim.  In order to state a cause of action for defamation under Ohio, it must be alleged "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the [counter-]plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the required degree of fault."  Havens-Tobias v. Eagle, No. 19562, 2003 WL 1601461 at * 6 (Ohio App. Ct. Mar. 28, 2003).  Here, other than simply injecting the term "defamation" into the Fifth Counterclaim, DMA has failed to satisfy any of the requirements for stating a defamation claim under Ohio law.  Indeed, apart from failing to identify who made the alleged defamatory statements, and the time, place and circumstances thereof, nowhere does DMA allege the falsity of Plaintiffs' alleged statements and/or that Plaintiffs acted with any degree of fault, no less the requisite degree of fault  attendant to stating a defamation claim under Ohio law.   Ohio courts further have held that a *prima facie* case for defamation is made when the claimant "has established a publication to a third person for which [counter-] defendant is responsible, ***the recipient's understanding of the defamatory meaning and its actionable character***."   Hahn v. Kotten, 331 N.E.2d 713, 718 (Ohio 1975) (emphasis added).  Here, DMA does not allege that any of the unspecified "third parties" to whom defamatory statements were made actually understood the defamatory meaning thereof and/or their actionable character.

In sum, Defendants should not be rewarded for shoehorning every conceivable theory of recovery into what are essentially insupportable unfair competition claims.  As such, DMA's claim for defamation must fail.

### B.      The Eighth Amended Counterclaim Must Be Dismissed and/or Judgment Must Be Granted in Favor of Plaintiffs Because Defendants Have Failed to State a Claim Under Section 43(a) of the Lanham Act

In their Eighth Counterclaim for "federal unfair competition," Defendants improperly attempt to shoehorn their ill-fated commercial disparagement claim into Section 43(a) of the Lanham Act, 15 U.S.C. §

1125(a) which pertains to "false advertising." Defendants' Eighth Counterclaim purportedly arises out of "false, inaccurate and/or misleading representations related to the services of [Defendants] and their publication to third parties" (Am. Countercl. ¶ 118) and turns on the vague and conclusory allegations that Plaintiffs' statements have been "willful and malicious" (id. ¶ 120) and that as a "direct and proximate result of their publication to third parties," Defendants have suffered damages (id. ¶ 121).  These allegations do not state a claim under Section 43(a) of the Lanham Act.

In Scotts Co. v. United Industries Corp., 315 F.3d 264, 272 (4th Cir. 2002), the Fourth Circuit held that in order to state a claim under Section 43(a) of the Lanham Act for "false or misleading" statements "in commercial advertising or promotion," 15 U.S.C. § 1125(a)(1)(B)—as Defendants attempt to do here—the claimant must establish a number of elements, none of which Defendants have established.  These include that:

> (1) the [counter-]defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the [counter-] defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

315 F.3d at 272 (quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue, 284 F.2d 302, 310-11 (1st Cir.), cert. denied, 537 U.S. 1001 (2002).  Defendants' threadbare allegations—insufficient to state a claim for commercial disparagement—do not come even remotely close to meeting the stringent pleading requirements under the Lanham Act.   Indeed, Defendants fail to allege that Plaintiffs' statements were material or likely to influence the purchasing decisions of third parties, that these statements deceive or have a tendency to deceive a substantial segment of their audience, that these misleading statements were placed in interstate commerce and/or that Defendants have been injured either by a direct diversion of sales or a lessening of goodwill associated with their services.

Perhaps, most importantly, Defendants have failed to allege that Plaintiffs' statements were made in the context of a "commercial advertisement."   Notably, in Neurotron, Inc. v. American Assoc. of Electrodiagnostic Medicine, 189 F.Supp.2d 271 (D. Md. 2001), aff'd No. 01-2115, 2002 WL 31207199 (4th Cir. Oct 4, 2002), this Court has recognized that in order for an alleged "false or misleading" statement to constitute "commercial advertising or promotion" so as to be actionable under Section 43(a) of the Lanham Act, as a threshold matter, the statement must be:

. . . (1) *commercial speech*; (2) by a [counter-]defendant who is in commercial competition with [counter-]plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

189 F. Supp.2d at 275 (emphasis added) (*quoting* Gordon & Breach Science Publishers, S.A. v. American Institute of Physics, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994)); see also Podiatrist Assoc., Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003).

Failing to meet even the threshold requirement of alleging Plaintiffs' statements to be "commercial speech," Defendants' Eighth Counterclaim is further doomed by Defendants' failure to allege the particular advertising or promotional medium used to disseminate these purported false or misleading statements. Indeed, "to pass the pleading threshold in a Lanham Act [Section 43(a)] case, a plaintiff at the very least must identify some medium or means through which the defendant disseminated information to a particular class of consumers." Podiatrist Assoc., 332 F.3d at 19-20 (dismissing Lanham Act claim for failure to plead the use of a particular advertising or promotional medium). In the same vein, it has been held that "the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are *part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the industry is a normal concomitant of meeting this requirement*." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002) (emphasis added).

Here, Defendants utterly have failed to allege any of the elements of a Lanham Act claim, including, *inter alia*, the key elements of commercial speech, the widespread dissemination thereof and the promotional medium through which the speech has been disseminated. As such, Defendants' Eighth Counterclaim must be dismissed.

## III.

### THE THIRTEENTH AMENDED COUNTERCLAIM MUST BE DISMISSED AND/OR JUDGMENT MUST BE GRANTED IN FAVOR OF PLAINTIFFS BECAUSE DEFENDANTS HAVE FAILED TO PLEAD A TYING ARRANGEMENT UNDER THE SHERMAN ACT

Resorting to a well-worn defense of last resort, see *infra*, Defendants attempt to justify their infringing conduct by spinning out of whole cloth an "antitrust" counterclaim, under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Thirteenth Amended Counterclaim is predicated upon an illegal "tying arrangement," *i.e.*, the conditioning of the sale of one product or service upon the purchase of another product or service. However, consideration of the pleading requirements attendant to tying claims—none of

which have been met here—confirms that Defendants' Thirteenth Counterclaim is nothing more than a red herring.

     **A.**     **Defendants Have Failed to Plead the Requisite Elements of a Tying Arrangement**

     An examination of the vague, conclusory allegations underlying the Thirteenth Amended Counterclaim confirm that Defendants have failed to plead the requisite elements of a tying arrangement. Indeed, the Thirteenth Counterclaim alleges that "until recently," Plaintiffs sold their software "separately from and without requiring" an end-user to purchase technical support and service (id. ¶ 146), but "have recently begun to sell their software to end-users only if they agree to accept technical support and service from [Plaintiffs]" (id. ¶ 149).  Defendants further allege "upon information and belief" that Plaintiffs' "contract for sales of software assumes the purchase of technical support and services from [Plaintiffs]." (id.) Confirming that their Thirteenth Amended Counterclaim is nothing more than a defective commercial disparagement claim in antitrust garb—i.e., that the basis of both claims is Plaintiffs' statements regarding Defendants' inability to provide technical support, Defendants allege that:  (i) a number of their customers "have inquired" of Defendants about whether software could be purchased from Plaintiffs and technical support and services from Defendants (Am. Countercl. ¶ 151); and (ii) that Plaintiffs have told these customers "that [Defendants] [are] no longer able to provide technical support and services for [Plaintiffs'] software" (id. ¶ 150). Confirming that their Thirteenth Amended Counterclaim is nothing more than a defective commercial disparagement claim in antitrust garb—i.e., that the basis of both claims is Plaintiffs' statements regarding Defendants' inability to provide technical support, Defendants allege that:  (i) a number of their customers "have inquired" of Defendants about whether software could be purchased from Plaintiffs and technical support and services from Defendants (Am. Countercl. ¶ 151); and (ii) that Plaintiffs have told these customers "that [Defendants] [are] no longer able to provide technical support and services for [Plaintiffs'] software" (id. ¶ 150).

     Further devoid of allegations as to antitrust injury resulting from the alleged tying, Defendants assert legal conclusions: that "[c]oercing an end-user to purchase technical support and services from [Plaintiffs] in order to receive the software" is an unlawful restraint of trade and that "[i]nforming end-users . . . that [Defendants] [are] unable to provide technical support and services . . . infers that the only viable economic option for the end-user is to buy technical support and services from [Plaintiffs]."  (Am. Countercl. ¶¶ 153-54). Notably, Defendants do not expressly allege that Plaintiffs have, in fact, "coerced" end-users to purchase technical support and service from them in order to receive the software; rather Defendants allege, in the

passive voice, that such coercion would restrict the end-user from buying the software from Plaintiffs and the

support from another vendor..

As the Fourth Circuit articulated in <u>Service & Training, Inc. v. Data General Corp.</u>, 963 F.2d 680 (4th

Cir. 1992), to establish a tying claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must

establish:

> "(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in  the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce."

963 F.2d at 683 (footnotes omitted).  Here, Defendants fail even to identify a distinct tying and tied product

and fail to allege separate market demands for each.  In fact, Defendants allege that "[u]sing [Plaintiffs']

software without technical support and service renders the software useless to most end-users" (Am.

Countercl. ¶ 148), ***thus belying the conclusion of separate market demands for software and support***

***services***.  Additionally, Defendants' threadbare allegations that Plaintiffs' software is:  (i) sold on a "national

scale;" (ii) "superior" to other similar software and thus (iii) "highly desirable by end-users" falls far short of

establishing the requisite element of  Plaintiffs' possession of sufficient economic power in the tying product

market to restrain competition in the tied market, and any concomitant impact of the alleged tying on

interstate commerce.

In <u>Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp.</u>, 905 F.2d 769 (4th Cir. 1990), *rev'd on*

*rehearing*, 945 F.2d 694 (4th Cir. 1991), the Fourth Circuit, after a rehearing *en banc*, dismissed a tying claim

pertaining to a product (automobiles) and related services (advertising services) where, like here, the plaintiff

had alleged "self-serving, inaccurate legal conclusions [that could not] rescue a factually deficient

complaint."  945 F.2d at 695. The Fourth Circuit held that "[t]he identification of two distinct products or

services is often the greatest stumbling block for antitrust plaintiffs who have alleged a tying violation."  905

F.2d at 773.  Notably, unlike here, the complaint at issue in <u>Faulkner</u> did, in fact, identify the tying and tied

product, expressly alleged an agreement conditioning the purchase of the tying product upon purchase of the

tied product (not alleged here) and expressly alleged defendant's possession of sufficient economic power in

the tying product market to restrain competition in the tied product market (also not alleged here).<sup>12</sup>  <u>Id.</u> at

---

12    Similar to the unspecified conclusions asserted here, in <u>Faulkner</u>, the plaintiff, a provider of advertising services, alleged that defendant Nissan, an automobile provider "ha[d] linked the sale of its vehicles with a comprehensive

(continued)

774 n.8.  Thus, if the conclusory allegations in Faulkner were insufficient to state a tying claim, there can be no doubt that the Thirteenth Counterclaim—which does not even plead the threshold elements, is undoubtedly "insufficient to state a 'tying' claim under the Sherman Act."  945 F.2d at 695.

Eliminating any further doubt as to the insufficiency of Defendants' Thirteenth Counterclaim, in a case almost directly on point, this Court rejected a tying claim involving software and technical support and service.  In Service & Training, Inc. v. Data General Corp., 737 F. Supp. 334 (D. Md. 1990)(Motz, J.), the Court correctly determined that the plaintiff had failed to "meet its first burden of proving the existence of two separate and distinct products or services."  737 F. Supp. at 342.  Considering the "nature of the consumer demand" for the software at issue, the Court concluded that the "[software] and maintenance and repair service are inextricably bound together and cannot be considered to be separate and distinct from one another," thus defeating plaintiff's tying claim.[13]  Id. at 343.  Such conclusion easily could be reached here particularly in light of Defendants' allegation that "[u]sing [Plaintiffs'] software without technical support and service renders the software useless to most end-users" (Am. Countercl. ¶ 148).  As is the case here, the Court also recognized the plaintiff's transparent attempt to leverage off an antitrust claim as a  defense to a copyright infringement claim and noted "that numerous courts have held that an alleged violation of the antitrust laws, while perhaps affording a ground for affirmative relief, generally does not provide a defense to copyright infringement."[14]  Id. at 342.  See also MAI Systems Corp., 845 F. Supp. at 369 (granting summary judgment dismissing tying claim, like here, asserted as a defense to copyright infringement because plaintiffs

_____

(continued from previous page . . .)

package of advertising services, that prior to the implementation of this new marketing program, Nissan dealers obtained their  advertising services from independent agencies such as [plaintiff], that under Nissan's new plan, Nissan dealers [were] effectively compelled to buy local advertising from Nissan and [its national advertising agency], that many Nissan dealers would prefer to purchase their advertising services from [plaintiff] rather than from Nissan and [its national advertising agency], that this program is therefore an unreasonable constraint upon the market for advertising services, and that Nissan's new program constitutes an unlawful tying arrangement."  905 F.2d at 773.

[13]    The Fourth Circuit also rejected plaintiff's tying claim, but on different grounds:  failure of the plaintiff to proffer evidence of a tying arrangement pursuant to which defendant would sell the software only on the condition that the buyer also purchase a different (or tied) product—defendant's support services—or evidence of an agreement under which the buyer at least agrees that he will not purchase support services from any other supplier.  Service & Training, Inc., 963 F.2d at 685.  While the Fourth Circuit reached this conclusion in the context of a summary judgment motion based on evidence presented to the district court at an evidentiary hearing, here, the matter can be resolved on the pleadings because Defendants have failed to state the requisite elements of a tying claim to withstand a motion to dismiss.

[14]    As such, the Court rejected, as it should here, plaintiff's conclusory allegations of the software's lack of "originality," derivative nature, and unclean hands with respect to registrations filed with the Copyright Office.  Id. at 342 n.10.

failed to proffer any evidence of agreement conditioning the purchase of software to the purchase of technical support). For all of these reasons, Defendants have failed to allege a tying arrangement and thus, their Thirteenth Amended Counterclaim must be dismissed.

### B.  Defendants Have Failed to Allege Antitrust Injury

In addition to failing to plead a tying arrangement, Defendants do not and cannot allege antitrust injury. Every antitrust plaintiff must allege "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." In re Microsoft Corporation Antitrust Litigation, 237 F. Supp. 2d 639, 658 (D. Md. 2002) (Motz, J.) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

Here, the Thirteenth Counterclaim does not allege that Defendants' injury flows from Plaintiffs' alleged tying of the sale of the software to the sale of technical support but rather from Plaintiffs' "expressly alleg[ing]" to potential and actual end-users "that [Defendants] [are] no longer able to provide technical support and services for [Plaintiffs'] software." (Am. Countercl. ¶ 150). This allegation does not allege the requisite injury to sustain an antitrust claim.

The Supreme Court itself has warned in the antitrust context against "stretching the [liberal pleading] rule of Conley v. Gibson, 355 U.S. 41, 47-48 (1957), too far . . . [A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." Associated General Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 528 n.17 (1983). "The heavy costs of modern federal litigation, especially antitrust litigation, and the mounting caseload pressures on the federal courts, counsel against launching the parties into pretrial discovery if there is no reasonable prospect that the plaintiff can make out a cause of action from the events narrated in the complaint." Sutliff, Inc. v. Donovan Cos., Inc., 727 F.2d 648, 654 (7th Cir. 1984). Here, Defendants' Thirteenth Amended Counterclaim rests on the same unstable foundation underlying all of Defendants' business tort and unfair competition claims, i.e., Plaintiffs' alleged statements to third parties that Defendants no longer may support the software. Because Plaintiffs have demonstrated that they are entitled to judgment on their contract and copyright infringement claims, their Thirteenth Counterclaim, as well as all of their other unfair competition claims, must fail.

<div style="text-align:center">

**IV.**

**DEFENDANTS' TENTH AND ELEVENTH AMENDED COUNTERCLAIMS
MUST BE DISMISSED BECAUSE THEY ARE CONTRACT
CLAIMS MASQUERADING AS TORT CLAIMS, AND IN ANY EVENT,
THEY FAIL TO STATE CLAIMS AS A MATTER OF LAW**

</div>

    **A.**    **Defendants' Tenth and Eleventh Amended Counterclaims Are
Nothing More than Contract Claims Disguised as Tort Claims**

In their Tenth Counterclaim for "tortious interference with contract" and their Eleventh Counterclaim for "tortious interference with prospective economic advantage," Defendants have not alleged a breach of any duty collateral to or independent from the Agreements, but rather are attempting to re-cast their breach of contract claims into tort claims.

Indeed the gravamen of Plaintiffs' tortious interference counterclaims—as well as Plaintiff's purported unfair competition claims—is that Plaintiffs "have expressly asserted to third parties, including customers of [Defendants], that [Defendants] cannot continue to provide technical support and service of [Plaintiffs'] Products to customers."  (Am. Countercl. ¶¶ 128, 136).  Not coincidentally, the gravamen of Defendants' Sixth Counterclaim for breach of contract—indeed, the prime basis for damages being sought by Defendants—is "lost technical support and service opportunities in [Defendants'] Territory[ies] under the Agreement[s] and lost access to customers for other services."  (Am. Countercl. ¶ 107).  So as to obviate any doubt that lost technical support opportunities arising from Plaintiffs' alleged conduct underlies both Defendants' breach of contract and tortious interference claims, Defendants expressly allege as a basis for their breach of contract claim: Plaintiffs "interfer[ence] with [Defendants'] Fair Trade Practices . . ." (id. ¶ 103(vii)).

It is well settled under Maryland law that a contractual obligation by itself does not give rise to a separate tort duty, and that a tort claim must have a basis independent of any alleged breach of contract claim.  See Mitchell, Best & Visnic, Inc. v. Travelers Property Casualty Corp., 121 F.Supp.2d 848, 853 (D. Md. 2000), aff'd, No. 01-1911, 2002 WL 1018562 (4th Cir. May 16, 2002).  Indeed, as the Court of Appeals of Maryland recently held in Berry & Gould, P.A. v. Berry, 360 Md. 142, 155, 757 A.2d 108, 115 (2000) "breach of a contract between the plaintiff and defendant is ***not*** a basis for [an] interference tort, if the interference is simply incidental to the breach."  (emphasis added).  Thus, in the unlikely event that Defendants were to prevail on their contract counterclaim, they should not be permitted to seek damages based on duplicative "interference" theories which are nothing more than contract claims garbed in the cloak of tort.

**B.  Defendants' Tenth and Eleventh Amended Counterclaims Must Be Dismissed Because They Fail to State Claims for Which Relief May Be Granted**

**1.  Defendants' Tenth Amended Counterclaim for Tortious Interference With Contract Must Fail Because Defendants Do Not Plead the Essential Elements that Plaintiffs Actually Succeeded in Inducing Third Parties to Breach Their Contract with Defendants**

Separate and apart from the duplicative nature of these tort counterclaims, the Tenth Counterclaim must be dismissed because Defendants have failed to state a claim for tortious interference with contract, be it under Maryland, Illinois or Ohio law.[15]  In order to establish a claim for tortious interference with contract, Defendants must allege: (1) the existence of a contract between the claimant and a third party; (2) the other party's knowledge of that contract; (3) the other party's intentional interference with that contract; (4) *breach of that contract by the third party*; and (5) resulting damages.  (emphasis added)  See, e.g., havePOWER, LLC v. General Electric Co., 183 F.Supp.2d 779, 784 (D. Md. 2002); Turner v. Fletcher, 706 N.E.2d 514, 519 (Ill. App. Ct. 1999) (elements under Illinois law); Matikas v. Univ. of Dayton, 788 N.E.2d 1108, 1115 (Ohio App. Ct. 2003) (elements under Ohio law).

Defendants' allegations, on their face, do not meet the requisite pleading requirements to sustain a claim for tortious interference with contract.  Indeed, even accepting all of Defendants' allegations as true (which they are not)—that, "upon information and belief," Plaintiffs "contacted" Defendants' customers, "recommended" that these customers discontinue their technical support contracts with Defendants and "recommended" that these customers demand a partial refund from Defendants (Am. Countercl. ¶ 129)—Defendants' tortious interference claim still must fail because Defendants have not alleged that these third party customers did, in fact, terminate their contracts with Defendants as a direct result of Plaintiffs' intentional interference.  Rather, Defendants allege, conjecturally, that Defendants' purported communications and/or recommendation(s) to third parties might or would "thereby" cause the latter to breach their contracts with Defendants—not that these contracts *actually were breached*.  (Id.)  Confirming that the term "thereby" in the Tenth Counterclaim is subjunctive (*i.e.*, "would thereby cause")  rather than declarative (*i.e.*, "thereby caused") on the issue of whether Plaintiffs' purported conduct induced the breach of any third-party contract(s) with Defendants, Defendants plead almost verbatim at paragraph 41 in the

---

[15]  As demonstrated above, Defendants' tortious interference claims are contract claims disguised as tort claims and, in any event, the Agreements expressly provide for the application of Maryland law to claims arising under these Agreements.  See, e.g., Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999).  However, as

(continued)

section denominated "Facts Common to All Counterclaims" the allegations contained at paragraph 129 of their Tenth Amended Counterclaim, *i.e.*, that Plaintiffs "contacted" Defendants' customers and "recommended" the discontinuance of technical support contracts with Defendants—but in paragraph 41, Defendants unambiguously omit the phrase "thereby breaching said contracts" as follows:

> . . . **Upon information and belief**, [Plaintiffs] have **contacted** customers of [Defendants] knowing that they were under contract with [Defendants] and **recommended** that said customers cease using [Defendants'] technical support and service under the terms of the existing contracts, demand a full or partial refund of the contract price for said technical support and service, *[omitted phrase contained in paragraph 129—thereby breaching said contracts]* and enter into contracts with [Plaintiffs] for technical support and service.

(Am. Counterclaim ¶ 41) (emphasis added).  Thus, through sleight of hand, Defendants inserted the clause "thereby breaching said contracts" into paragraph 129 in an unsuccessful attempt to allude to contractual breaches, albeit ones that have not occurred.   Clearly, if Plaintiffs actually had induced Defendants' customers to breach their contracts with Defendants, Defendants would have alleged as such in the Facts Common section.   In addition to the foregoing, Defendants would be hard pressed to demonstrate how a customer's decision to change technical support providers rises to the level of a breach of contract.   "A requisite element . . . of a tortious interference with contract claim is that 'the [counter-]defendant . . . shall have intentionally . . .induced one of the contracting parties to *refuse to perform* his contract to the injury of the other contracting party.'"   Suburban Mortgage Assocs., Inc. v. Springhill Health Services, Inc., No. 92-2025, 1993 WL 142063 at * 5 (4th Cir. May 5, 1993) (*quoting* 86 C.J.S. *Torts* § 44 (1954) (emphasis in original)).[16]   At best, Defendants have alleged that Plaintiffs recommended that third parties breach contracts

---

(continued from previous page . . .)

demonstrated herein, even if Maryland law did not apply—which it does—Defendants' Tenth Counterclaim fails under Illinois and Ohio law as well.

[16]    See also McIntyre v. Guild, Inc., 105 Md. App. 332, 358, 659 A.2d 398, 410 (1995) (holding that by definition, a claim for tortious interference with contract requires both a contract between plaintiff and third party and breach of that contract) and Kramer v. Mayor & City Council of Baltimore, 124 Md.App. 616, 637, 723 A.2d 529, 539 (1999) (holding that claim for intentional interference with contract requires proof that a valid existing contract was interfered with).   Defendants' Tenth Counterclaim fails under Illinois and Ohio law as well because, like Maryland, those jurisdictions require as an essential element of a tortious interference with contract claim an allegation that the defendant's willful conduct actually caused contractual breach(es).   See, e.g., Exchange National Bank v. Farm Bureau Life Ins. Co. of Michigan,108 Ill.App.3d 212, 214, 438 N.E.2d 1247, 1249 (3d Distr. 1982); Illinois Bell Telephone Co. v. Plote, Inc., 334 Ill.App.3d 796, 806, 778 N.E.2d 1203, 1211 (Ill. App. Ct. 2002); Gibson v. City Yellow Cab Co., No. 20167, 2001 WL 123467 at * 3 (Ohio App. Ct. Feb. 14, 2001); *cf.* Khoury v. Trumbull Physician Hospital Org., No. 99-T-0138, 2000 WL 1804356 at * 3 (Ohio App. Ct. Dec. 8, 2000).

with Defendants, not that such a breach actually occurred. Defendants' allegations, even if true, therefore, do not support a claim for tortious interference with contract.

### a. Defendants Fail to Allege Plaintiffs' Intentional Interference with Defendants' Third-Party Contracts

The third element of Defendants' tortious interference claim rests precipitously on the self-serving, conclusory allegation that Plaintiffs "purposely, intentionally, maliciously and without legal justification" interfered with Defendants' contracts (Am. Countercl. ¶ 130). Where, as here, a party baldly alleges wrongful and unjustified conduct, without more, such allegations are insufficient to establish tortious interference with contract and warrant dismissal. See, e.g., havePOWER, 183 F.Supp.2d at 784 (dismissing tortious interference claim for failure to allege adequately intentional, interference). Indeed, "'even though a third party may for his own benefit intentionally induce one party to terminate a contract with another, this alone will not render him liable in an action for tortious interference if he had a right to cause the breach since, in such circumstances, the conduct would not be wrongful or improper.'" Greenway Investments General Partnership v. Signet Bank/ Maryland, Nos. 92-1332, 92-1497, 1993 WL 104668 at *3 (4th Cir. Apr. 9, 1993) (quoting Sharrow v. State Farm Mut. Automobile Ins. Co., 306 Md. 754, 765, 511 A.2d 493, 498 (1986)).

Further extinguishing the possibility of wrongful or improper conduct on Plaintiffs' part, it is important to recall that in the 1/7/03 Decision and Judgment, the Court expressly held that Defendants "are not entitled to continue technical support and services anticipated in the Agreements" (Ex. A, 1/7/03 Decision at 9), clarified this ruling to the limited extent of holding that Defendants could provide technical support and service pertaining to the Software "provided, of course, . . . that relevant materials were returned [to Plaintiffs] and not used" (Ex B, Feb. 21, 2003 Trans. at p. 11) which Defendants have failed to do. Given the Court's holding and Plaintiffs' admitted use of copying Defendants' software to provide technical support and service, even if Defendants' allegations were true, they have failed to allege that Plaintiffs actions were wrongful or without justification.

Even absent the Court's 1/7/03 Decision and Judgment, had Plaintiffs recommended that Defendants' customers enter into service contracts with them, this alone does not amount to wrongful or malicious conduct. Indeed, the Agreements themselves expressly afford Plaintiffs the right to offer customers service and support, and, in fact, expressly preclude Defendants from "imped[ing], block[ing], obstruct[ing], inhibit[ing] or restrict[ing] [Plaintiffs'] access to the End-User with regard to these services" (Am. Compl., Exs. A and B, Agreements, § 10.5). In light of the foregoing, even if Plaintiffs did

communicate with Defendants' customers, these communications, without more, were contemplated by the parties in the Agreements and certainly do not fulfill the element of wrongful, malicious or unjustified interference attendant to Defendants' business tort counterclaims.  See, e.g., Fare Deals Ltd. v. World Choice Travel.Com. Inc., 180 F. Supp.2d 678, 691 (D. Md. 2001) (dismissing claims for tortious interference with economic relationships where defendant merely entered into contracts for its own [product] because "acting to pursue one's own business interests at the expense of others is not, in itself tortious").[17]

> ### 2.    Plaintiffs' Eleventh Amended Counterclaim for Tortious Interference With Prospective Economic Advantage Must Fail Because Defendants Have Failed to Plead the Requisite Element of Malice, i.e., Violation of Federal Antitrust Law

Defendants also have failed to state a claim for tortious interference with prospective economic advantage, under Maryland, Illinois or Ohio law, the elements of which are: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."  Natural Design, Inc. v. Rouse Co., 302 Md. 47, 71, 485 A.2d 663, 675 (1984); see also Edelman, Combs & Latturner v. Hishaw & Culbertson, 788 N.E.2d 740, 752 (Ill. App. Ct. 2003).

In Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp., 905 F.2d 769, 775 (4th Cir. 1990), the Fourth Circuit confirmed that the third element of malice in Natural Design "'necessarily hinges on whether defendants' actions constitute a violation of federal or state antitrust laws'" and held that a claim for tortious interference with prospective business advantage "under Maryland law stands or falls along with  . . . federal antitrust claims."  See also Purity Products, Inc. v. Tropicana Products, Inc.,  702 F. Supp. 564, 575 (D. Md. 1988), aff'd, 887 F.2d 1081 (4th Cir. 1989) (holding that tortious interference with prospective business advantage claim rises and falls with federal antitrust claim) and Microbix Biosystems, Inc. v. Biowhittaker, Inc., 172 F. Supp. 2d 680, 701-02 (D. Md. 2000) (same), aff'd No. 00-2262, 2001 WL 603416 (4th Cir. June 4, 2001).  Here, because Defendants have failed to state a cognizable antitrust claim, their business tort claim must fall with their fatally deficient Thirteenth Amended Counterclaim.

---

[17]    Defendants' unspecified allegations of tortious interference fail under Illinois and Ohio law as well.  See, e.g.,  HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E. 2d 672, 678 (Ill. 1989) ; and Sammarco v. Anthem Ins. Cos., Inc, 723 N.E.2d 128, 136-37 (Ohio App. Ct. 1998).

In sum, for all of the foregoing reasons Defendants' Tenth and Eleventh Amended Counterclaims for tortious interference must fail.

<div align="center">V.</div>

### THE TWELFTH COUNTERCLAIM FOR AN ACCOUNTING MUST BE DISMISSED AND/OR JUDGMENT MUST BE GRANTED IN FAVOR OF PLAINTIFFS

In their Twelfth Counterclaim, Defendants purport to seek a "complete accounting of the gross revenues and profits of the business of [Plaintiffs], including all gross revenue and profits arising from, related to, diverted from, or otherwise attributable to" software and technical support sales in Defendants' former territories (Am. Countercl. ¶ 143). Remarkably, Defendants have failed to allege any factual basis that would entitle them to the equitable remedy of an accounting.

Indeed, a suit for an accounting is an equitable remedy that may be maintained when remedies at law are inadequate. P.V. Properties, Inc. v. Rock Creek Village Assocs. Ltd. Partnership, 77 Md. App. 77, 89, 549 A.2d 403 (Md. Ct. Spec. App. 1988). Nowhere have Defendants alleged the inadequacy of their legal remedies; in fact, with one exception, Defendants have alleged that their counterclaims are compensable at law in money damages (See, e.g., Am. Countercl. ¶¶ 97, 108, 121, 133 and 141).

Additionally, an accounting is only an appropriate remedy when one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed, or where there is a confidential or fiduciary relationship between the parties, and a duty rests upon the defendant to render an account. See Allied Investment Corp. v. Jasen, 123 Md. App. 88, 110, 716 A.2d 1085, 1095 (Md. Ct. Spec. App. 1998). Here, Defendants have not alleged that facts and records pertaining to their sales and support revenue are in their exclusive possession nor have they alleged the existence of any fiduciary or confidential relationship between them and Plaintiffs. Accordingly, due to the foregoing fatal defects, Defendants' Twelfth Counterclaim for an accounting must fail.

<div align="center">VI.</div>

### AS WITH THEIR PRIOR DISPOSITIVE MOTION, PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT GRANTING THEIR THIRD AMENDED COUNT FOR AN AWARD OF ATTORNEYS' FEES UNDER THE AGREEMENTS AND DISMISSING DEFENDANTS' NINTH AMENDED COUNTERCLAIM FOR THE RECIPROCAL RELIEF

As the Court has noted, the Agreements provide for recoupment of attorneys' fees by the successful party for any action filed in relation to the Agreements. (Ex. A, 1/7/03 Decision at 9, *citing* B & T Enter. v. Overland Equipment Co., 758 A.2d 1026, 1046 (Md. Ct. Spec. App. 2000)). Thus, to the extent that the

Court grants judgment in favor of Plaintiffs on their Amended Third, Fourth, Fifth and Sixth Counts and to dismiss Defendants' Seventh, Ninth and PSSI's Fourteenth Counterclaims, and to dismiss under Rule 12(b)(6) or grant partial judgment on the pleadings with respect to Defendants' Eighth, Tenth, Eleventh, Twelfth and Thirteenth Counterclaims, and dismiss Defendants' Twelfth through Twenty-Second Affirmative Defenses, Plaintiffs thus would be entitled to recover the costs they have incurred in connection with the foregoing, including, without limitation, attorneys' fees, disbursements and other costs incurred by Plaintiffs in commencing this action, defending against Defendants' Amended Counterclaims, and enforcing their rights under the Agreements.

As a result, Plaintiffs are entitled to summary judgment granting their Third Count for attorneys' fees and dismissing Defendants' Ninth Counterclaim seeking the reciprocal relief.

## CONCLUSION

For all of the foregoing reasons and those set forth in the accompanying Fiore Affidavit, it is respectfully requested that the Court grant Plaintiffs' motion for partial summary judgment on Plaintiffs' Amended Third, Fourth, Fifth and Sixth Counts and to dismiss Defendants' Seventh, Ninth and PSSI's Fourteenth Counterclaims, and to dismiss under Rule 12(b)(6) or grant partial judgment on the pleadings with respect to Defendants' Eighth, Tenth, Eleventh, Twelfth and Thirteenth Counterclaims, and to dismiss Defendants' Twelfth through Twenty-Second Affirmative Defenses.

Dated:  February 13, 2004

<div style="margin-left:40%">

Respectfully submitted,

KATTEN MUCHIN ZAVIS ROSENMAN


By:  _____/s/ Howard E. Cotton_____
     Howard E. Cotton (admitted *pro hac vice*)
     Michael S. Gordon (admitted *pro hac vice*)
     575 Madison Avenue
     New York, New York 10022
     Telephone: (212) 940-8855
     Facsimile: (212) 894-5966

     Counsel for Plaintiffs
     PracticeWorks, Inc. and SoftDent LLC

</div>