Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
**(Cite as: 2001 WL 58950 (N.D.Ill.))**

United States District Court, N.D. Illinois, Eastern Division.

MICROSOFT CORPORATION, a Washington corporation, Plaintiff,
v.
LOGICAL CHOICE COMPUTERS, INC., an Illinois corporation and Dennis Dayson, an individual, Defendants.

**No. 99 C 1300.**

Jan. 22, 2001.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.

**\*1** In recent years, Plaintiff Microsoft Corporation has filed dozens of lawsuits in federal court challenging the illegal distribution of its software. This case is one of them. Microsoft has brought suit against Logical Choice Computers, Inc. ("LCC") and its founder, Dennis Dayson (collectively, "Defendants"), alleging that Defendants illegally distributed counterfeit Microsoft software in violation of (1) the Copyright Act of 1976, 17 U.S.C. § 502, *et seq.;* (2) the Lanham Act, 15 U.S.C. § 1114 *et seq.;* (3) the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et. seq.;* (4) the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.;* and (5) the Illinois common law of unfair competition. After Microsoft included a reference to the lawsuit in its monthly newsletter, LLC filed a counterclaim alleging defamation and tortious interference with business relations.

In February 2000, Microsoft filed a motion for summary judgment on its complaint as well as on Defendants' counterclaim. Microsoft's motion rested on its assertion that the software at issue was indeed counterfeit. Because the original motion and supporting materials were not adequate in this court's view to establish the absence of a dispute on the issue of whether the software involved was counterfeit, the court denied Microsoft's motion without prejudice. The court nevertheless directed Microsoft to supplement its motion with additional proof, and Microsoft has since done so. Defendants have not presented evidence that there remains a dispute on this central issue. The court therefore grants Microsoft's motion and enters judgment in favor of Plaintiff.

*FACTUAL BACKGROUND*

A. Parties

Microsoft is a Washington corporation that has its principal place of business in Redmond, Washington and does substantial business in the Northern District of Illinois. Microsoft develops, promotes, distributes, and licenses computer software. (Plaintiff Microsoft Corporation's LR 56.1(a)(3) Statement of Material Facts as to Which It Contends There is no Issue and That Entitles It to a Judgment as a Matter of Law Against Defendants Logical Choice Computers, Inc. and Dennis Dayson ("Microsoft's 56.1 Statement"), at ¶ 1.) Its software, including Microsoft Windows 95 and Microsoft Office 97 (Professional Edition), [FN1] is distributed in all fifty states and throughout the world. (*Id.* at ¶ 12.)

> FN1. Microsoft Windows 95 performs a number of computer-related operations including allocating computer memory, scheduling the execution of applications software, and managing the flow of information and communication among the various components of the personal computer. (Compl., at ¶ 12.) Microsoft Office 97 (Professional Edition) is a suite of popular Microsoft programs including: Microsoft Access 97, which allows users to create and manipulate databases and to store data; Microsoft Excel 97, which allows users to create spreadsheets, perform calculations, and store numerical data; Microsoft Outlook 97, which allows users and networked teams to create and manage calendars, tasks and contacts; Microsoft PowerPoint 97, which allows users to create, organize, and present overhead and slide presentations; and Microsoft Word 97, which allows users to create and edit reports and documents. (*Id.,* at ¶ 13.)

Defendant LCC is an Illinois corporation that, during the time relevant to Microsoft's complaint, was doing business at 6163 North Northwest Highway, Chicago, Illinois, 60631. (*Id.* at ¶ 2.) It stopped doing business on or about March 30, 1999 (*Id.* at ¶ 5), but remains a corporation in good standing in Illinois. (*Id.* at ¶ 6.) Up until such time, LCC designed and assembled computer systems for its customers (Logical Choice Computer Inc. and Dennis Dayson's Reply to Microsoft Corporation's Motion for Summary Judgment, at 2), and purchased all of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

necessary computer components, including Microsoft Windows 95 and Microsoft Office 97, from wholesale sellers. (*Id.*) Defendant Dayson founded LCC, controlled LCC's daily operations, and had primary responsibility for its software acquisitions and distributions. (Microsoft's 56.1 Statement, at ¶ ¶ 3, 37, 38.)

B. The Copyrights and Trademarks at Issue

 **\*2** Microsoft owns copyrights in and to "Microsoft Windows 95" (TXu 649-511 issued on August 18, 1995), "Microsoft Office 97 (Professional Edition)" (TX 4- 395-984 issued on March 7, 1997), "Microsoft Access 97" (TX 4-395-639 issued on February 14, 1997), "Microsoft Excel 97" (TX 4-395-640 issued on February 14, 1997), "Microsoft Outlook 97" (TX 4-395-686 issued on February 14, 1997), "Microsoft PowerPoint 97" (TX 4-395-685 issued on February 14, 1997), and "Microsoft Word 97" (TX 4-395-687 issued on February 14, 1997) software. These copyrights were registered with the United States Copyright Office in compliance with the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.,* and Copyright Office regulations. (*Id.* at ¶ 10.) Microsoft has been, and still is, the sole owner of all right, title and interest in, and to, these copyrights and Certificates of Registration. (*Id.* at ¶ 11.)

 Microsoft is also the owner of the following valid, federally-registered trademarks and/or service marks: (a) Trademark Registration No. 1,256,083, issued on November 1, 1983 ("MICROSOFT") for computer hardware and software manuals, newsletters and computer documentation; (b) Trademark Registration No. 1,872,264, issued on January 10, 1995 ("WINDOWS") for computer programs and manuals sold as a unit; (c) Trademark and Service Mark Registration No. 1,200,236, issued July 6, 1982 ("MICROSOFT") for computer programs and computer programming services; (d) Trademark Registration No. 1,816,354, issued on January 11, 1994 (Windows Flag Logo) for computers, computer peripherals, and computer programs and manuals sold as a unit; (e) Trademark Registration No. 1,815,350, issued on January 4, 1994 (Colored Windows Flag Logo) for computers, computer peripherals, and computer programs and manuals sold as a unit; (f) Trademark Registration No. 1,475,795, issued on February 9, 1988 ("POWERPOINT") for pre-recorded computer programs recorded on magnetic disks; (g) Trademark Registration No. 1,741,086, issued on December 22, 1992 ("MICROSOFT ACCESS") for computer programs for use with databases and manuals sold as

a unit; and (h) Trademark Registration No. 1,592,783, issued on April 24, 1990 ("BOOKSHELF") for computers, computer programs and manuals sold therewith. (*Id.* at ¶ 8.) Microsoft has been, and still is, the sole owner of all right, title and interest in, and to, these trademarks, service marks, and registrations. (*Id.* at ¶ 9.)

C. Defendants' Allegedly Infringing Activities

 Microsoft has alleged that Defendants infringed these copyrights and trademarks by distributing counterfeit Microsoft software. (Compl.¶ ¶ 23-27.) According to Plaintiff, Defendants acquired the allegedly infringing software from unauthorized suppliers. (Microsoft's 56.1 Statement, at ¶ 15.) Microsoft maintains a Delivery Service Partner program (now known as its "System Builder" program) which identifies authorized suppliers known as Delivery Service Partners or DSPs (now known as "OEM Authorized Distributors") for entities, like LCC, that assemble personal computers ("computer system builders" or "CSBs"). (*Id.* at ¶ 14.) Once registered, CSBs receive communications from Microsoft concerning Microsoft's distribution programs and methods to help assure against dealing in counterfeit Microsoft software. (*Id.* at ¶ 16.)

 **\*3** According to a Microsoft database, LCC has been registered in Microsoft's Delivery Service Partner program since April 19, 1998. (*Id.* at ¶ 17.) Defendants are therefore on notice that only certain companies are authorized to supply Microsoft software. (*Id* . at ¶ 27.) Defendants do not deny their awareness of and involvement in the Delivery Service Partner program. (Dayson Dep. at 120-21.) In fact, Defendants' business records from April 1995 to March 1999 show that they obtained some Microsoft software from authorized suppliers. (*Id.* at ¶ 15.) For example, two of their suppliers, SED International, Inc. and Synnex Information Technologies, Inc., were DSPs. (*Id.*) During that same time period, however, Defendants also acquired at least 740 units of purported Microsoft Windows 95 software and 44 units of purported Microsoft Office 97 software from non-DSPs such as Acecom, Inc., of Elmhurst, Illinois; Leadman, of Mt. Prospect, Illinois; Micro Distribution Center, of Elk Grove Village, Illinois; and Software & More, of Buffalo Grove, Illinois. (*Id.* at ¶ 13, 18, 19.) The prices that the non-DSPs charged LCC during this period for the purported Microsoft software were often well below the prices charged by DSPs. For example, while the lowest price at which Defendants obtained Microsoft Windows 95 software from DSPs was $86 per unit,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
**(Cite as: 2001 WL 58950 (N.D.Ill.))**

Defendants routinely obtained Windows 95 from non-DSPs for about $60 per unit. (*Id.* at ¶ 28, 29, 30.) In addition to these low prices, non-DSPs also used odd codes to identify purported Microsoft software. (*Id.* at ¶ ¶ 33-36.) For example, on its printed invoices, Acecom, Inc. used the codes "Software," "Software 9," "5," "55," and "55555555," to describe purported Microsoft Windows 95. (*Id.* at ¶ 33.) To identify the same purported software, Micro Distribution Center used the code "System 95." (*Id.* at 35.) Defendants then redistributed all of this software, except for two units of purported Microsoft Office Professional 97 which were obtained from Software & More. The record does not indicate why LCC failed to redistribute these two units.

On or about April 17, 1997, Gilbert Egbert, an investigator hired by Plaintiff, purchased three units of purported Microsoft Windows 95 software from Defendants. (Declaration of Gilbert Egbert in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson.) On May 20, 1997, Microsoft drafted an internal investigation report documenting its analysis of the software, and the determination that the software was counterfeit. (Plaintiff Microsoft Corporation's Reply Pursuant to LR 56.1(a)(3) in Support of its Statement of Material Facts, at 6.) This investigation report was rather conclusory, *see infra* Factual Background, Section D.3, but Sarah Joyce Corley, a Microsoft employee specializing in the detection of software piracy, has now analyzed the purchased software and set forth reasons for her conclusion that it was infringing. She noted, among other factors, that the manuals were not the same as genuine Microsoft Windows 95 manuals and that some of the lettering on the CD-ROMs differed from that on genuine Microsoft Windows 95 CD-ROMs. (Declaration of Sara Joyce Corley in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson.)

**\*4** Consequently, on June 20, 1997, Microsoft, through its law firm of Preston, Gates & Ellis LLP sent a cease and desist letter which LCC received on or about June 23, 1997. (*Id.* at ¶ 22.) The letter was addressed to LCC's "Owner" (Exhibit 1 ("Cease and Desist Letter") to Declaration of Laurie Stein in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson) and Dayson admits to having received it. (Dayson Dep. at

213.) The Cease and Desist Letter informed Defendants that the software they were distributing was counterfeit and directed them to instead use assured sources of genuine software. (Cease and Desist Letter) ("One of the easiest ways to safeguard yourself and your company from the liability of dealing in counterfeit product is to obtain Microsoft product from licensed OEM distributors [DSPs] through the Delivery Service Partner (DSP) program."). Dayson immediately contacted his attorney, Joseph B. Platt, and directed him to respond to the letter. (Dayson Dep. at 212.) Platt, who represents both LCC and Dayson in this case, responded on July 3, 1997, stating: "Please be advised that Logical Choice purchased microsoft [sic] products from an authorized dealer: Synnex Information Technology...." (Defendants Logical Choice Computers and Dennis Dayson's Reply to Microsoft's Statement of Material Facts: With Their Statement of Facts ("Defendants' Statement of Facts"), ¶ 23; Exhibit 1 to Reply Memorandum in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson).

Regardless of the veracity of this response, and despite Microsoft's advice, Defendants continued to acquire purported Microsoft Windows 95 and Microsoft Office 97 software from Acecom, Inc., Micro Distribution Center, and other non- DSPs after receiving the cease and desist letter. (*Id.* at ¶ 36.) Then, on February 17, 1999, Scott Thorsen, another Microsoft investigator acquired from Defendants an allegedly counterfeit and infringing copy of Microsoft Office 97. (*Id.* at ¶ 24; Declaration of Scott A. Thorsen in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson.) As it had done in 1997, Microsoft drafted an internal investigation report documenting its analysis of the software, and determination that the software is infringing. (Plaintiff Microsoft Corporation's Reply Pursuant to LR 56.1(a)(3) in Support of its Statement of Material Facts, at 6.)

D. Procedural History

1. The Complaint

On March 1, 1999, two weeks after Thorsen purchased the allegedly infringing copy of Microsoft Office 97, Microsoft filed the instant complaint against Defendants alleging: (1) copyright infringement; (2) violations of the Lanham Act; (3)

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
**(Cite as: 2001 WL 58950 (N.D.Ill.))**

violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"); (4) violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFDTPA"); and (5) unfair competition under Illinois law.

2. Defendants' Counterclaim

**\*5** Soon after filing its complaint (the precise date is not identified in the record), Microsoft included a reference to the lawsuit in its monthly newsletter, the *Direct Mailer.* The *Direct Mailer* is an informational publication mailed directly by Microsoft to CSBs and other users of large quantities of Microsoft software. (*Id.* at ¶ 41.) As is often the case, this particular issue of the *Direct Mailer* included a list of case names and numbers of recent copyright/trademark infringement prosecutions commenced by Microsoft. (*Id.* at ¶ 42.) First among the list of the recent cases filed in the United States District Court for the Northern District of Illinois was: "Microsoft Corporation v. Logical Choice Computers, Inc. [Chicago], Civil Action No. 99C1300." (Exhibit A-1 to First Amended Counterclaim.) The newsletter makes no other direct reference to LCC but sets forth the following statements: (1) "Software piracy is against the law;" (2) "Microsoft has initiated the following legal actions alleging copyright and trademark infringement in the United States District Court for the Northern District of Illinois;" (3) "The lawsuits were filed based on the companies' alleged distribution of counterfeit or infringing copies of Microsoft software to undercover investigators;" and (4) "Beware of dishonest suppliers who offer so-called 'gray-matter' or 'OEM overage' products." Defendant Dayson was not mentioned in the newsletter. (*Id.*) Microsoft maintains that, prior to causing the *Direct Mailer* to be distributed, it analyzed the software obtained by its investigators, verified it to be counterfeit, and thus had no doubts as to the truth of the statements in the *Direct Mailer.* (Microsoft's 56.1 Statement at ¶ ¶ 48, 51.)

In response to the reference in the *Direct Mailer,* on August 17, 1999, Defendants filed a counterclaim against Microsoft, which it then amended on November 23, 1999 ("First Amended Counterclaim"). The First Amended Counterclaim asserts the following three counts: (1) defamation of Defendant LCC; (2) defamation of Defendant Dayson; and (3) tortious interference with Defendants' business relations.

3. The Court's July 17, 2000 Order

On February 28, 2000 Microsoft moved for summary judgment against Defendants both on the complaint and Defendants' First Amended Counterclaim. In support of its central allegation that Defendants' products were counterfeit, Microsoft produced (1) the aforementioned internal investigation reports of May 20, 1997 and February 22, 1999, and (2) the declaration of Sara Joyce Corley, a Microsoft investigator responsible for analysis of counterfeit and/or infringing units of Microsoft software and hardware, who analyzed three units of the software at issue on November 3, 1999 and January 20, 2000.

On July 17, 2000, the court provisionally denied Microsoft's motion. (Doc. No. 87-1.) The court found the investigative reports "wholly conclusory," because, for example, they stated that the "adjacent letters in title 'Microsoft' are not spaced correctly," without attaching sample copies of the artwork on the packaging of either the alleged counterfeit product or authentic product. (*Id.*) The court found Corley's declaration to be similarly conclusory and insufficient to support summary judgment. (*Id.*) The court nevertheless invited Microsoft to "provide some bases for its conclusions by providing comparisons between samples or copies of the alleged counterfeit and authentic products including but not limited to diskettes, packaging, manuals, certificates of authenticity and the software to which these certificates allegedly trace." The court noted its expectation that Microsoft would be able to meet this burden, and further observed that "assuming Microsoft can meet its burden, ... Defendants' defamation claim is unlikely to survive, given that truth is an absolute bar to defamation suits." (*Id.*)

4. The Supplemental Declaration of Microsoft's Sarah Joyce Corley

**\*6** On August 17, 2000, Microsoft responded to the court's July 17, 2000 Order by filing the Supplemental Declaration of Sarah Joyce Corley. Microsoft attached to this Supplemental Declaration exhibits which illustrate the following variances between the allegedly counterfeit software that Microsoft investigators obtained from LCC and genuine Microsoft components: (1) certain text is displayed in a different font on the respective CD-ROMs, for example, the letter "g" in the word "Designed;" (2) the Microsoft logo on the counterfeit Microsoft Windows 95 CD-ROMs obtained from LCC has a different wedge-shaped cut-out than that found on genuine Microsoft Windows 95 CD-ROMs; (3) the Microsoft logo on the counterfeit Microsoft

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
(Cite as: 2001 WL 58950 (N.D.Ill.))

Windows 95 CD-ROMs obtained from LCC has more space between the "s" and the second "o" than is found on genuine Microsoft Windows 95 CD-ROMs; (4) the Microsoft logo on the counterfeit Microsoft Office Professional 97 CD-ROM obtained from LCC has the letters "i," "c," and "r," bleeding into each other, whereas on genuine Microsoft Office Professional 97 CD-ROMs, there are small spaces between those letters; and (5) the printed shadow under the stylized Windows Flag trademark logo on the cover of the counterfeit Windows 95 manuals obtained from LCC does not extend below that registered trademark symbol as it does on genuine Microsoft Windows 95 manuals. Defendants argue that these are merely "minuscule imperfections in the printing." (Logical Choice Computers, Inc. and Dennis Dayson's Second Reply to Plaintiff Microsoft Corporation's Motion for Summary Judgment, at 2.) The court disagrees. Plaintiff has offered evidence sufficient to meet the burden of proving that the software Defendants distributed is counterfeit, and Defendants have not presented evidence that creates a dispute of fact on the issue.

*DISCUSSION*
A. Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *O'Connor v. DePaul University,* 123 F.3d 665, 669 (7th Cir.1997). Once a motion for summary judgment has been properly supported, the opposing party has the burden of setting forth specific facts which present a genuine issue of fact for trial. *Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir.1986). Thus, the opposing party must produce affirmative evidence raising a genuine issue for trial and may not merely rest upon allegations in the pleadings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986). The court will grant summary judgment against a party who does not produce evidence that would reasonably permit the finder of fact to find in its favor on a material question. *McGrath v. Gillis,* 44 F.3d 567, 569 (7th Cir.1995).

B. *Microsoft Corporation v. Compusource Distributors, Inc.*

*7 On August 28, 2000, Judge Borman of the United States District Court for the Eastern District of Michigan granted summary judgment to Microsoft in a case remarkably similar to the one at bar. *See Microsoft Corp. v. Compusource Distributors, Inc.,* 115 F.Supp.2d 800 (E.D.Mich.2000).* Compusource Distributors, Inc. ("Compusource"), like LCC, is a distributor of Microsoft software. As did LCC, Compusource sold to Microsoft investigators purported Microsoft software that Microsoft, and later Judge Borman, determined to be counterfeit. *Id. at 803.* As in this case, after learning of this counterfeit software, Microsoft requested that Compusource "cease and desist distributing counterfeit Microsoft products, and offered suggestions on how to ensure compliance, such as by obtaining products from DSPs." *Id.* Notwithstanding the cease and desist letter, Compusource continued to purchase counterfeit Microsoft software from non-DSPs and redistribute this counterfeit software. *Id.* at 804. The non-DSP suppliers offered Compusource this purported Microsoft software at prices far below those of authorized DSPs and made use of "mysterious codes" to "disguise the true nature of the distribution." *Id.* at 808.

Consequently, Microsoft brought suit against Compusource alleging claims of (1) copyright infringement, (2) trademark infringement, (3) false designation of origin in violation of the Lanham Act, 15 U .S.C. § 1125, (4) violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.903, and (5) unfair competition under Michigan common law. In his August 28 order, Judge Borman found that Compusource's activity of distributing counterfeit Microsoft software, without Microsoft's consent, rendered it liable on all five claims. Moreover, Judge Borman found that Microsoft was eligible to receive the maximum amount of damages for willful infringement under both the federal copyright and trademark statutes because "Compusource's business dealings ... [constituted] reckless disregard for Microsoft's intellectual property rights." [FN2] *Id.* at 807. Although this court is not bound by the *Compusource* decision, the structure and rationale of that decision are helpful in analyzing Microsoft's claims against Defendants LCC and Dayson.

FN2. The court notes, however, that, in *Compusource,* Microsoft only sought "the maximum amount of statutory damages available for non- willful copyright

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
(Cite as: 2001 WL 58950 (N.D.Ill.))

infringement, and less than the full amount of available statutory trademark damages." 115 F.Supp. at 812.

## C. Copyright Infringement

In Count I of its Complaint against Defendants LCC and Dayson, Microsoft alleges that Defendants infringed the copyrights in Microsoft's software products by distributing copies of these products without authorization in violation of 17 U.S.C. § 502. To establish a claim of copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright, and (2) the copying of constituent elements of the work that are original. *See LZT/Filliung Partnership, LLP v. Cody/Braun & Assoc.,* 117 F.Supp.2d 745, 750 (N.D.Ill.2000) (citing *Harris Custom Builders, Inc. v. Hoffmeyer,* 92 F.3d 517, 519 (7th Cir.1996)). Microsoft registered its copyrights for Windows 95, Office 97, and other products with the United States Copyright Office. Registration alone is prima facie evidence that Microsoft owns valid copyrights for this software. *See Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 507 (7th Cir.1994) (citing 17 U.S.C. § 410(c)). Defendants have not rebutted this presumption, and there is no dispute concerning Microsoft's ownership of valid copyrights in the software at issue.

**\*8** Microsoft must still, however, establish that Defendants "copied" this software by "encroach[ing] upon one of the exclusive rights of the copyright owner as provided by sections 106 through 121." 17 U.S.C. § 501(a). The primary "exclusive right" at issue in this case is Microsoft's right "to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Defendants do not deny that they distributed the software at issue. Instead, Defendants argue that the software was not "counterfeit" and that, even if it was, they were not aware of that fact upon distributing it. Both of these arguments fail. First, as noted earlier, Defendants have offered no evidence that creates a dispute of fact concerning Microsoft's claim that the software at issue was indeed counterfeit. Second, any argument as to intent is inapposite to a finding of copyright liability because infringement does not require any particular state of mind, *see Marobie-FL, Inc. v. National Assoc. of Fire Equip. Distributors,* 983 F.Supp. 1167, 1172 (N.D.Ill.1997); intent only becomes relevant when considering damages, *see id.* Hence, Microsoft is entitled to summary judgment on

Count I.

## D. Trademark Infringement

### 1. Section 32 of the Lanham Act

In Count II, Microsoft alleges that Defendants violated § 32 of the Lanham Act. [FN3] To prevail on such a claim, a plaintiff must establish that (1) it holds a valid trademark, and that the defendants (2) used a reproduction, counterfeit, copy, or colorable imitation of a mark; (3) without the registrant's consent; (4) in commerce; (5) in connection with the sale, offering for sale, distribution or advertising of any goods; (6) where such use is likely to cause confusion, or to cause mistake, or to deceive. *See Fila, U.S.A., Inc. v. Chong,* 94 C 6537, 1995 WL 505492, at \*2 (N.D.Ill. Aug. 21, 1995) (citing 15 U.S.C. § 1114(1)(a)). Notably, as in the copyright realm, intentional infringement may lead to enhanced statutory damages, but is not required to prove a defendant's liability. *See* 15 U.S.C. § 1117(c); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1152 n. 6 (7th Cir.1992) ("We note in passing that the district court did not have to find that [the defendant] was willfully blind to establish its liability. Sellers bear strict liability for violations of the Lanham Act.").

> FN3. Section 32, or 15 U.S.C. § 1114(1), provides, in relevant part:
> Any person who shall, without the consent of the registrant-(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale ... or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant.

Microsoft has met this burden, and again Defendants have not raised a dispute of material fact on the issue. First, as already mentioned, Microsoft has registered the relevant marks. These registrations are "prima facie evidence of the validity of the registered mark and of the registration of the mark." *Ty, Inc. v. Publication Int'l, Ltd.,* No. 99 C 5565, 2000 WL 1499449, at \*9 (N.D.Ill. Oct. 6, 2000) (quoting 15 U.S.C. § 1115(a)). Second, Plaintiff has offered unrebutted evidence that Defendants used and/or distributed a counterfeit mark. Third, Microsoft has demonstrated that Defendants obtained this

Not Reported in F.Supp.2d                                                                                     Page 7
2001 Copr.L.Dec. P 28,211
**(Cite as: 2001 WL 58950 (N.D.Ill.))**

counterfeit software, without Microsoft's consent, from non-DSP distributors. Nor is there any dispute concerning Defendants' use and/or distribution of the counterfeit software in commerce: Microsoft software is distributed in all fifty states and throughout the world, and, here, the uncontroverted evidence shows that Defendants distributed the infringing products to, at a minimum, Microsoft's investigators. Finally, with respect to the likelihood of confusion, the Seventh Circuit generally considers seven factors:

**\*9** (1) the similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of the infringing party to "palm off" its product as that of the other party.

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 436 (7th Cir.1999)* (citing *Rust Env't & Infrastructure v. Teunissen, 131 F.3d 1210, 1216 (7th Cir.1997))*. As most, if not all, of these factors weigh heavily in Microsoft's favor, the court finds there to be no dispute as to the "likelihood of confusion" caused by the counterfeit software. *See Microsoft v. CMOS Tech., Inc., 872 F.Supp. 1329, 1335 (D.N.J.1994)* ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety."). Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear. Because Defendants have not raised a genuine issue of material fact on the six elements of Microsoft's § 32 Lanham Act claim, the court grants Microsoft summary judgment on Count II.

2. Section 43 of the Lanham Act

The analysis under § 43 of the Lanham Act [FN4] is quite similar. In order to establish a prima facie false designation of origin claim under § 43, Plaintiff must establish that: (1) Defendants used a false designation of origin or false description or representation in connection with goods or services, (2) Defendants caused such goods or services to enter into commerce, and (3) Plaintiff believes it will be damaged as a result. *PS Promotions, Inc. v. Stern, No. 97 C 3742, 2000 WL 283092,* at \*5 (N.D.Ill. Mar. 8, 2000) (citing *Web Printing Controls Co., Inc. v. Oxy-Dry Corp., 906 F.2d 1202, 1204 (7th Cir.1990))*. To satisfy the third element, actual

confusion is not necessary. Rather, a plaintiff need only show that there is a likelihood that consumers will be confused by the false representation. *Id. See also Eli Lilly & Co. v. Natural Answers, Inc., No. 00-1375, 2000 WL 1735075,* at \*2 (7th Cir. Nov. 21, 2000) ("[C]ourts have come to a consensus that a Lanham Act plaintiff need only establish that its mark is protectable and that the junior mark is likely to cause confusion among consumers."). Borrowing the logic from its § 32 analysis, the court grants Microsoft summary judgment on its § 43 claim for false designation of origin.

FN4. Section 43, or 15 U.S.C. § 1125(a)(1), provides: Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading representation of fact, which-(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

E. Microsoft's State Law Claims

In Counts IV through VI of the Complaint, Microsoft alleges that Defendants' actions constituted (1) violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.,* (2) violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.,* and (3) unfair competition under Illinois common law. A person will be liable under the IUDTPA if he or she, *inter alia,* "passes off goods or services as those of another [and/or] causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 815 ILCS 510/2. In somewhat of a statutory redundancy, liability under the ICFDTPA may arise upon "the use or employment of any practice described in Section 2

of the 'Uniform Deceptive Trade Practices Act' ... in the conduct of any trade or commerce." 815 ILCS 505/2. Accordingly, under both the IUDTPA and the ICFDTPA, a defendant may be found liable if the plaintiff can establish a likelihood of confusion between the relevant products. See *McGraw-Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1173-74 (7th Cir.1986); *Tarin v. Pellonari,* 253 Ill.App.3d 542, 551, 625 N.E.2d 739, 746-47 (1st Dist.1993) (stating that the standard for trademark liability under the IUDTPA and ICFDTPA is the same as that under the Lanham Act). The liability standard for common law unfair competition in Illinois is no different. See *McGraw-Edison Co.,* 787 F.2d at 1174 ("We need not address [plaintiff's unfair competition claim] separately as the Illinois Deceptive Trade Practices Act ... is merely a codification of the Illinois common law of unfair competition."). The court's discussion and consequent findings in Discussion, Section D, then, support the conclusion that Microsoft is entitled to summary judgment on its IUDTPA, ICFDTPA, and common law unfair competition claims.

F. Defendants' Knowledge and 'Willful Blindness'

**\*10** As noted earlier, intent to infringe becomes relevant upon a consideration of damages. Microsoft has alleged that Defendant's infringement in this case was knowing or, at the very least, that Defendants were "willfully blind" to Microsoft's ownership rights. Based on the evidence presented by the parties, the court agrees and concludes that no rational trier of fact could find in favor of Defendants on this issue.

Defendants were admittedly aware of the Delivery Service Partner program which authorized certain companies to distribute Microsoft software. See Dayson Deposition at 120-21. In fact, two of Defendants' suppliers, SED International, Inc. and Synnex Information Technologies, Inc., were DSPs. Notwithstanding this knowledge, Defendants' records demonstrate that they consistently obtained software from unauthorized suppliers. Moreover, Defendants ignored unmistakable signals that their non-DSP suppliers were distributing counterfeit software. As noted, these suppliers charged far lower prices for purported Microsoft software than did authorized DSPs, and used mysterious codes to identify such software on their printed invoices. See *Compusource,* 115 F.Supp.2d at 809 (finding that "the constant availability of units at inordinately low prices" and certain suppliers' uses of "mysterious codes" should have put Compusource on notice that "its suppliers were not distributing genuine Microsoft software and

hardware."). Most importantly, though, the court considers Defendants' behavior knowing or "willfully blind" because, despite receiving Microsoft's June 20, 1997 cease-and-desist letter which confirmed that certain software Defendants had acquired from unauthorized suppliers was counterfeit, Defendants continued to obtain software from unauthorized suppliers. Defendants argue that one cease and desist letter, as opposed to repeated notices, does not provide a sufficient basis for a court to infer Defendants' knowledge of the infringement. The court, again finding support in Judge Borman's recent *Compusource* decision, disagrees. See *id.* (finding "willful blindness" even though Microsoft sent only one cease and desist letter to Compusource before filing suit).

G. Individual Liability

Microsoft asserts that Defendant Dayson is personally liable for infringing Microsoft's registered copyrights and trademarks. It claims that Dayson (1) was the President and an owner of LCC, (2) controlled LCC's daily operations and had primary responsibility for its software acquisitions, and (3) received a salary from LCC as his sole source of income during the relevant time period which was directly related to the success of the business. Dayson does not deny these facts, but merely echoes LCC's arguments that the software was not counterfeit and that, even if it was, he was unaware of that fact when distributing the software.

Courts have found that an individual may incur liability for the infringement of a corporation under two theories: (1) vicarious liability; and (2) contributory liability. See *Burdick v. Koerner,* 988 F.Supp. 1206, 1209 (E.D.Wis.1998). An individual may be held vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities. *Id.* See also *Microsoft Corp. v. Grey Computer,* 910 F.Supp. 1077 (D.Md.1995) (same). As for contributory liability, a party may be held liable if he has knowledge of the infringing activity and directly participates in the infringing activity or induces, causes, or materially contributes to the infringing conduct of another. See *Grey Computer,* 910 F.Supp. at 1090. See also *Dynamic Force, LLC v. Dynamic Force, Ltd.,* 98 C 5922, 1999 WL 342407, at \*4 (N.D.Ill. May 14, 1999) ("A corporate officer will be held personally liable for trademark infringement and unfair competition if the officer is a moving, active force behind the corporation's infringement."). A contributory infringer is jointly and severally liable

for the infringement. *Grey Computer,* 910 F.Supp. at 1090 (citing *Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 64 (2d Cir.1992)).

**\*11** Under these standards, Dayson is both vicariously and contributorily liable. He had the right and ability to supervise the acquisition and distribution of the counterfeit software, and, because his source of income was solely derived from his LCC salary, he had a direct financial interest in any and all profits resulting from the infringing activity. Moreover, as the court has already discussed, LCC's, and thus Dayson's, actions amounted to willful infringement and ignorance of Microsoft's legal rights.

H. Damages

1. Statutory Damages

Under the statutory damages provision of the Lanham Act, a trademark owner may elect, at any time before final judgment is rendered, to recover an award of statutory damages, rather than actual damages, for any use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services. *See* 15 U.S.C. § 1117(c). Similarly, under the Copyright Act, a "copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action." 17 U.S.C. § 504(c)(1). In its complaint, Microsoft elected an award of statutory damages under each Act. Where, as here, defendants violate both the Lanham Act and the Copyright Act, the plaintiff is entitled to recover under both statutes. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l,* 40 F.3d 1007 (9th Cir.1994).

Courts have wide discretion in awarding statutory damages. *See Chi-Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1229 (7th Cir.1991). Under the Lanham Act, the present statutory minimum and maximum are $500 and $100,000 for non-willful infringement. *See* 15 U.S.C. § 1117(c)(1). [FN5] A court may nevertheless award up to $1,000,000 if the plaintiff proves that the infringement was willful. *See* 15 U.S.C. § 1117(c)(2). Under the Copyright Act, the current statutory minimum and maximum for non-willful infringement are $750 and $30,000. *See* 17 U.S.C. § 504(c)(1). [FN6] A court may nevertheless award up to $150,000 if the plaintiff proves that the infringement was willful. *See* 17 U.S.C. § 504(c)(2). In assessing damages under

either statute, then, courts can and should consider the infringer's intentions. Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights. *See Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 511 (7th Cir.1994). Thus, knowledge need not be proved directly, but can be inferred from a defendant's conduct. *Id.*

FN5. Section 1117(c) provides:
(c) In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--
(1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or (2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

FN6. Section 504(c) provides, in relevant part:
(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.
(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed

willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

In the present case, the court has already determined that Defendants willfully infringed Microsoft's copyrights and trademarks. *See supra* Discussion, Sections F & G. Microsoft, nevertheless, only seeks statutory damages of $200,000 (as opposed to the statutory maximum for willful infringement of $1,000,000) for each of seven trademarks [FN7] and $20,000 (as opposed to the statutory maximum for willful infringement of $150,000) for each of seven copyrights, for a total of $1,540,000. Defendants have steadfastly denied that their actions were willful, but have not, in the alternative, challenged Plaintiff's request as too high on the statutory scale. Without any such argument, this court finds that Microsoft is entitled to the amount requested. [FN8]

FN7. Although the court has found that eight trademarks have been infringed, Microsoft has asked in its briefs for damages on only seven of those eight. *See* Memorandum of Law in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson, at 16 ("Specifically, Microsoft seeks statutory damages of $200,000 for each of its seven copyrights at issue, for a total of $1,540,000--$1,400,000 for trademark infringement, $140,000 for copyright infringement.").

FN8. In its complaint, Microsoft also requested (1) the imposition of a constructive trust upon the illegal profits of Defendants and (2) an accounting of the number of units of counterfeit and infringing Microsoft software products offered for distribution and distributed by Defendants. *See* Complaint, ¶ ¶ 60-67. Because Microsoft has opted for a statutory award, instead of actual damages, these two

remedies are no longer necessary. *Cf. Respect Inc. v. Committee on the Status of Women,* 821 F.Supp. 531 (N.D.Ill.1993) (finding that an accounting and constructive trust are applicable where a plaintiff opts for actual damages as opposed to a statutory award). Microsoft acknowledged as much by not mentioning either remedy in the damages discussion of its Memorandum of Law in Support of Plaintiff Microsoft Corporation's Motion for Summary Judgment Against Defendants Logical Choice Computers, Inc. and Dennis Dayson.

### 2. Attorneys' Fees

**\*12** In addition to its request for statutory damages, Microsoft also asks the court to award it attorneys' fees and costs. Under the Copyright Act, the court may award reasonable attorney's fees to the prevailing party in addition to costs. *See* 17 U.S.C. § 505. The Lanham Act similarly provides for an award of costs, and in "exceptional" cases, attorneys' fees. *See* 15 U.S.C. § 1117(a). In cases similar to this one, "courts have awarded attorney fees and costs against software distributors who have wilfully infringed copyrights and trademarks." *Compusource,* 115 F.Supp.2d at 812 (citing *Grey Computer,* 910 F.Supp. at 1093; *Microsoft v. CMOS Tech. Inc.,* 872 F.Supp. 1329, 1341 (D.N.J.1994)). Accordingly, the court will award Microsoft attorneys fees and costs and directs Microsoft to submit a petition for such additional amounts as permitted under the court's Local Rules.

### 3. Permanent Injunction

Microsoft seeks a permanent injunction enjoining Defendants from further infringing Microsoft's software products. Where "a copyright plaintiff has established a threat of continuing infringement, he is entitled to an injunction." *Universal City Studios v. Sony Corp. of Am.,* 659 F.2d 963, 976 (9th Cir.1981). The relevant portion of the Lanham Act provides: "The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to principles of equity and upon such terms as the court may deem reasonable to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a). While the evidence demonstrates that LCC is no longer doing business, it is still a corporation in good standing in Illinois. Thus, the court believes that an injunction is

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
(Cite as: 2001 WL 58950 (N.D.Ill.))

Page 11

appropriate to preclude the threat of continued infringement.

I. LCC's Counterclaim

In its counterclaim, LCC asserts three counts stemming from the allegedly defamatory reference to LCC printed in the *Direct Mailer:* (1) defamation of LCC; (2) defamation of Dayson; and (3) tortious interference with Defendants' business relations. The court addresses the defamation claims together and then turns to the claim of tortious interference.

1. Defamation

To prove a claim of defamation, a plaintiff, or in this case, counter- claimants, must show that: (1) the defamer made a false statement concerning the claimant; (2) there was an unprivileged publication of the defamatory statement to a third party by defendant; and (3) the claimant was damaged. *Quiroz v. Hartgrove Hosp.,* No. 97 C 6515, 1999 WL 281343, at *13 (N.D.Ill. Mar. 24, 1999) (citing *Gibson v. Philip Morris, Inc.,* 292 Ill.App.3d 267, 685 N.E.2d 638, 643 (1st Dist.1997)). The court need only discuss the first prong of this standard-which requires a false statement-before rejecting Defendants' claim. In Illinois, substantial truth is a complete defense to any defamation action. *See Sullivan v. Conway,* 959 F.Supp. 877, 881 (N.D.Ill.1997) (applying Illinois law) (citing *Pope v. Chronicle Publishing Co.,* 95 F.3d 607, 613 (7th Cir.1996) (also applying Illinois law)). The statement that "Software piracy is against the law" is true. The statement that "Microsoft has initiated the following legal actions *alleging* copyright and trademark infringement in the United States District Court for the Northern District of Illinois" (emphasis added) is true. The statement that "The lawsuits were filed based on the companies' *alleged* distribution of counterfeit or infringing copies of Microsoft software to undercover investigators" (emphasis added) is true. Moreover, even if, taken as a whole, the statements were to imply that LCC was a "software pirate," then, based on the conclusions set forth in this opinion, such a statement would be true as well. Faced with a similar statement in another Microsoft publication, the Federal District Court for the Central District of California found the statement to be "fair and true." *See Microsoft Corp. v. Yokohama Telecom Corp.,* 993 F.Supp. 782 (C.D.Cal.1998). In that case, Microsoft had brought a copyright and trademark infringement action against Yokohama Telecom, and Yokohama Telecom counterclaimed after Microsoft published a paid announcement concerning the

lawsuit in a newsletter similar to the *Direct Mailer.* In granting Microsoft's motion for summary adjudication of the counterclaim, the court stated:
*13 Microsoft's paid announcement in the World Daily stated: 'The following companies are alleged to have distributed counterfeit Microsoft products to undercover investigators: ... Yokohama Telecom Corporation, Anaheim.' This announcement captures the substance of, and does not deviate from, the allegations in Microsoft's Complaint. The remainder of the anti- piracy announcement discusses Microsoft's efforts to fight counterfeiting and potential counterfeiting penalties. The announcement does not produce a different effect on the reader than would reading the complaint. This Court holds Microsoft's announcement was 'fair and true.'
*Yokohama Telecom Corp.,* 993 F.Supp. at 784. [FN9]

FN9. The *Yokohama Telecom* opinion was limited to the defamation counterclaim, and did not discuss the merits of Microsoft's copyright/trademark infringement claims. Because, according to the legal databases, no further opinions were issued in this case, there is no indication as to whether or not Yokohama Telecom was actually guilty of software piracy.

This court noted in its July 17, 2000 Order that, "assuming Microsoft can meet its burden [on its infringement claims], [the court would be] inclined to believe that Defendants' defamation claim is unlikely to survive, given that truth is an absolute bar to defamation suits." The court remains true to its word, and grants Microsoft summary judgment on the first two counts of Defendants' counterclaim.

2. Tortious Interference

The third count of Defendants' counterclaim alleges tortious interference with business relations and is equally unavailing. The court first notes that, in *Delloma v. Consolidated Coal Co.,* 996 F.2d 168, 172 (7th Cir.1993), the Seventh Circuit stated that there was "no Illinois case holding that true statements by a defendant with or without a privilege may be the basis for an action for tortious interference...." *Id.* (affirming summary judgment against plaintiff on tortious interference claim because the statement at issue was truthful). Second, even if truth were not a sufficient defense to a claim

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
**(Cite as: 2001 WL 58950 (N.D.Ill.))**

Page 12

of tortious interference, Illinois courts have held that the privileges applicable to defamation actions can serve to justify a defendant's interference with the business relations of another. *See, e.g., Roy v. Coyne, 259 Ill.App.3d 269, 287, 630 N.E.2d 1024, 1036 (1st Dist.1994).* Illinois follows the Restatement (Second) of Torts in determining whether a qualified, or conditional, privilege should be recognized in a given situation. *See Turner v. Fletcher, 302 Ill.App.3d 1051, 1056, 706 N.E.2d 514, 517 (4th Dist.1999)* (citing *Gist v. Macon County Sheriff's Department, 284 Ill.App.3d 367, 671 N.E.2d 1154, 1158 (4th Dist.1996)).* Conditional privileges generally fall into three categories: "(1) situations which involve some interest of the person who publishes the defamatory matter; (2) situations which involve some interest of the person to whom the matter is published or of some third person; and (3) situations which involve a recognized interest of the public." *Id.* Whether a qualified privilege exists is a question of law. *See Kuwik v. Starmark Star Marketing & Administration, Inc., 156 Ill.2d 16, 24, 619 N.E.2d 129, 133 (1993).*

Having found truth a sufficient defense, the court did not need to reach the issue of whether a conditional privilege applied to Microsoft's *Direct Mailer* statements. The court concludes now that a conditional privilege would in fact apply. Microsoft drafted the *Direct Mailer* communication in order to stem the purchase of counterfeit software, thus protecting both itself and legitimate resellers of Microsoft products. The communication also was designed to protect computer system builders and help avoid them becoming the subject of future copyright and trademark litigation initiated by Microsoft. These statements, then, "involve[d] [both] some interest of the person who publishes the defamatory matter" and "some interest of the person to whom the matter is published or of some third person."

**\*14** The defendant in a tortious interference case (here, Microsoft) bears the burden of demonstrating the existence of a conditional privilege. Once the defendant has offered evidence that a privilege exists, the burden shifts to the plaintiff to demonstrate an abuse of the privilege. *See Gist, 284 Ill.App.3d at 373-74, 671 N.E.2d at 1158-59.* Abuse of privilege occurs through any reckless act that demonstrates a disregard for the defamed party's rights. Failure to properly investigate the truth of the allegedly defamatory material, failure to limit the scope of the material and failure to limit receipt thereof are all reckless acts sufficient to destroy the privilege. A plaintiff may also overcome a conditional privilege if

he or she is able to demonstrate "actual malice" on the part of the defendant. *See Philip I. Mappa Interests, Ltd. v. Kendle, 196 Ill.App.3d 703, 708, 554 N.E.2d 1008, 1111-12 (1st Dist.1990).* In order to demonstrate "actual malice," a plaintiff must establish that "defendant had acted with a desire to harm which was unrelated to the interest he was presumably seeking to protect by bringing about the breach." *Id.*

Defendants have not raised a disputed issue of material fact on either "abuse of the privilege" or "actual malice." Microsoft has asserted in its Statement of Material Facts that the *Direct Mailer* newsletter at issue "was prepared with knowledge that Logical Choice twice distributed counterfeit software and that the second distribution was made after [Microsoft warned] Logical Choice to cease and desist from such unlawful conduct." Microsoft further states that, "[n]either the person responsible for preparation of the *Direct Mailer* nor any other Microsoft employee had any knowledge that the statements in the *Direct Mailer* were false, nor did any person have any substantial doubts as to the truth of the statements." Defendants did not adequately refute these statements nor otherwise raise a disputed issue of material fact as to any abuse by Microsoft of its conditional privilege. Moreover, as for actual malice, it is clear that Microsoft's statements regarding LCC in the *Direct Mailer* were directly related to their efforts to protect their legal interests. *Cf. Philip I. Mappa, 196 Ill.App.3d at 710, 554 N.E.2d at 1013* ("The facts indicate that every action taken by defendants was directly related to their efforts to protect their real estate property interests.") (finding no "actual malice," and hence no tortious interference, where defendants distributed a circular seeking to raise money for their pending lawsuit against plaintiff). The court therefore grants Microsoft summary judgment on Defendants' claim of tortious interference with business relations, the third count of Defendants' counterclaim.

*CONCLUSION*

Defendants have offered no evidence that creates a dispute of fact concerning their marketing counterfeit software. Microsoft is entitled to judgment in its favor on each of its claims against Defendants. Because truth is a defense and because Microsoft's statements concerning Defendants' activities were privileged, Microsoft is entitled to judgment in its favor on Defendants' defamation and tortious interference claims, as well.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2001 Copr.L.Dec. P 28,211
**(Cite as: 2001 WL 58950 (N.D.Ill.))**

2001 WL 58950 (N.D.Ill.), 2001 Copr.L.Dec. P 28,211

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works