Not Reported in F.Supp.2d                                                   Page 1
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

United States District Court, S.D. New York.

PENGUIN BOOKS U.S.A., INC., Foundation for "A
Course in Miracles, Inc.", and
Foundation for Inner Peace, Inc., Plaintiffs,
v.
NEW CHRISTIAN CHURCH OF FULL
ENDEAVOR, LTD., and Endeavor Academy,
Defendants.

**No. 96 CIV. 4126(RWS).**

July 25, 2000.

Frankfurt, Garbus, Klein & Selz, New York, By
Arthur J. Ginsburg, Esq., Of Counsel, for Plaintiff
Penguin Books U.S.A., Inc.

Epstein, Becker & Green, New York, Boston, MA,
By Frances M. Maloney, Esq., John J. Rosenberg,
Esq., Sanford J. Hodes, Esq., Carrie J. Fletcher, Esq.,
Of Counsel, for Plaintiff Foundation for Inner Peace
and Foundation for" A Course in Miracles," Inc.

Lawrence E. Fabian, Esq., New York, Monty C.
Barber, Esq., Wisconsin Dells, WI, By Monty C.
Barber, Esq., Carol J. Forbes, Esq., Of Counsel, for
Defendants.

OPINION

SWEET, D.J.

**\*1** Plaintiffs Penguin Books U.S.A., Inc.
("Penguin"), Foundation for "A Course in Miracles,"
Inc. ("FACIM"), and Foundation for Inner Peace, Inc.
("FIP") (collectively, "Plaintiffs") have moved,
pursuant to Rule 56, Fed.R.Civ.P., for partial
summary judgment on their claim for copyright
infringement, and for a preliminary injunction.
Defendants New Christian Church of Full Endeavor,
Ltd. ("Church") and Endeavor Academy
("Endeavor") (collectively, "Defendants") have cross-
moved for summary judgment to dismiss all of
Plaintiffs' claims. For the reasons set forth below, the
summary judgment motions will be denied but a
limited preliminary injunction will be granted.

*The Parties*

Penguin is a New York corporation with its principal
place of business in Manhattan.

FACIM is a New York corporation with its principal

place of business in Roscoe, New York.

FIP is a New York corporation with its principal
place of business in Tiburon, California.

Church is a Wisconsin corporation with its principal
place of business in Wisconsin Dells, Wisconsin.

Endeavor is a teaching facility established by Church
with its principal place of business in Reedsburg,
Wisconsin.

*Prior Proceedings*

Penguin filed the original complaint in this action on
June 3, 1996. Defendants initially proceeded *pro se,*
but were ordered on January 24, 1997 to retain
counsel. FIP and FACIM joined as plaintiffs and
discovery proceeded. On September 27, 1999, the
parties stipulated to the filing of a third amended
complaint, to which Defendants filed an answer on
October 5, 1999. Notice of Plaintiffs' instant
summary judgment motion was filed on December
15, 1999, and of Defendants' instant cross-motion for
summary judgment on February 3, 2000. The bulk of
the papers pertaining to the summary judgment
motions were received by April 19, 2000, when oral
argument was heard. However, additional materials
arising in the course of discovery were permitted by
order dated June 7, 2000, to be submitted. These
materials were received on June 14, 2000.

Plaintiffs' motion for a preliminary injunction was
brought by order to show cause dated June 13, 2000.
Oral argument was heard on June 21, 2000.

*Facts*

The following facts are drawn from the parties' Rule
56.1 Statements and other submissions and, as
required, are construed in the light most favorable to
the non-movant. They do not constitute findings of
fact by the Court. [FN1]

> FN1. Plaintiffs assert that they are entitled to
> summary judgment on procedural grounds
> alone because Defendants' Rule 56.1
> Statement in support of its cross-motion for
> summary judgment, and its Rule 56.1
> Counter- Statement in opposition to
> Plaintiffs' motion for summary judgment,
> are of "outrageous length," because
> Defendants' evidentiary materials submitted
> in support of its Rule 56.1 Statements are

Not Reported in F.Supp.2d                                                                                    Page 2
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

excessive, and because the Statements cite to inadmissible evidence. In fact, Defendants' Rule 56.1 Statements are not much longer than Plaintiffs' Rule 56.1 Statements, although Defendants' Statements are not properly formatted and do contain legal arguments, which limit their utility and make them burdensome to read. Moreover, although Defendants have submitted enormous quantities of supporting evidentiary material, much of which is duplicative and wasteful, Local Rule 56.1 only requires that the Statement be concise, and does not place limits on the amount of supporting material. Of course, to the extent that Defendants' supporting evidentiary submissions are inadmissible, they will, of course, not be considered. But the procedural defects in Defendants' submissions do not rise to a level which would merit granting Plaintiffs' requests for relief on these grounds alone.

The centerpiece of this litigation is a lengthy written work entitled "A Course in Miracles" (the "Course"). The Course, currently published by Penguin in a single volume over a thousand pages in length, is divided into three sections: the text ("Text"), a workbook for students ("Workbook"), and a manual for teachers ("Manual"). The Course can loosely be categorized as belonging to that genre of "New Age" spiritual texts which seem to pop out of the post-industrial cultures of the northern hemisphere like the quarks which particle physicists tell us materialize spontaneously in the fabric of space-time. Nevertheless, despite its New Age trappings, the Course is explicitly grounded in Christian theology. Its somewhat bewildered, bewildering, yet not terribly novel message appears to be that the world humans perceive with their senses is merely an illusion projected by our minds outside of ourselves, and that the true world is "God," who is love, which is "all there is." This is an admittedly subjective summation, but perhaps more informative than the cryptic summation provided in the Course itself: "Nothing real can be threatened. Nothing unreal exists. Herein lies the peace of God."

**\*2** Perhaps not surprisingly in this day and age, the Course has developed a substantial following. Well over a million copies have been printed, and multiple foreign-language editions exist, with more planned for the near future. Teachers, lecturers, and study groups flourish, and a steady stream of books,

pamphlets, brochures, newsletters and magazine articles continue to appear in which the Course is discussed, analyzed, and explained.

Due to the nature of the defenses raised in this action, it is necessary to set forth the origins of the Course and its publication history at some length. In 1965, Dr. Helen Schucman ("Schucman"), an associate professor of medical psychology at Columbia University's College of Physicians and Surgeons, experienced some tension at work. The head of her department had expressed his irritation at the "angry and aggressive feelings" reflected by the attitudes of the staff, and had concluded that "there must be another way." Schucman agreed to help him find this "other way." For the following three months, she experienced a series of particularly vivid dreams. Soon thereafter, she began to hear a "Voice" which would speak to her whenever she was prepared to listen. In October, 1965, the Voice told her: "This is a course in miracles. Please take notes." Schucman then began to write down what the Voice said, a process she later described as a kind of soundless "rapid inner dictation." Over the next seven years, until 1972, she filled nearly thirty stenographic notebooks with words she believed were dictated to her by the Voice.

At some point, Schucman identified the Voice as "Jesus," and she thereafter apparently thought of herself as a scribe taking down the words of Jesus. [FN2] The words in Schucman's notebooks (the "Notes") would eventually evolve into the three sections of the Course: the Text, Workbook, and Manual.

> FN2. The parties devote considerable resources disputing whether Schucman's Jesus is identical to "Jesus Christ of Nazareth," i.e., the "historical Jesus" of the New Testament. Although the evidence suggests that for Schucman, Jesus was a symbol of God's love, and that she did not necessarily mean that she was speaking of "Jesus of Nazareth" when she spoke of "Jesus," the question is irrelevant for the purposes of these motions.

At the beginning of this process, Schucman confided in a colleague, Dr. William Thetford ("Thetford"), who was also a faculty member at Columbia. Thetford encouraged her, and in their spare time at work, Schucman would dictate aloud from her notes,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                              Page 3
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

making occasional revisions, while Thetford would type out the words. The revisions included omitting, for example, various references to Schucman's personal life. The process was apparently guided by the Voice, although at least some of the editing and shaping of the manuscript was initiated by Schucman and subsequently "confirmed" by the Voice.

The manuscript went through two additional drafts, one (the second draft) edited by Schucman alone and the subsequent one (the third draft) edited by Schucman and Thetford. In the third draft, the manuscript was split into chapters and sections, to which titles and headings were added. Sections where personal information had been deleted were rewritten so that the text would flow smoothly and communicate clearly its intended message. Again, throughout this process, Schucman and Thetford felt they were guided by the Voice, and that their personal preferences and concerns played no important role in the editing decisions. When they were unsure about whether to make a change, Schucman would ask the Voice for guidance. A copy of the third draft was given to Hugh Lynn Cayce ("Cayce") in 1970 at his Association for Research and Enlightenment in Virginia Beach, Virginia. Schucman and Thetford permitted Cayce to pass this draft on to his son and to a certain Dr. Puryear. Schucman and Thetford hoped to receive feedback from them on the material.

**\*3** While the material that eventually became the Text went through these three drafts, Schucman continued to hear the Voice and take down by hand the material that would become the Workbook and the Manual, and Thetford continued to type out this material as Schucman read it to him during the day. The Workbook and the Manual were not edited and revised nearly as heavily as the Text. However, much of a draft of the Workbook was included in the material sent to Cayce, and the correspondence between Cayce and Thetford suggests that at least some editing of the Workbook was expected to take place.

In 1973, Schucman and Thetford presented the third draft of the complete manuscript to Dr. Kenneth Wapnick ("Wapnick"), a psychologist to whom they had been introduced in 1972 and who subsequently became a teacher of the Course, co-founder and president of FACIM, and a director and executive committee member of FIP. Wapnick reviewed the draft and discussed with Schucman further revisions that were needed to place the book in final form. Over the next thirteen months, Wapnick and

Schucman edited the manuscript again, altering chapter and section headings to make them more consistent with the sections to which they referred, and correcting various inconsistencies in paragraph structure, punctuation, and capitalization. When they were unsure about whether to make a particular change, Schucman would ask for guidance from the Voice. Wapnick has stated that "[Schucman] did feel Jesus allowed her the license to make minor changes in the form as long as the content was not affected."

The Course contains numerous psychological terms and ideas, such as denial, projection, dissociation, and hallucination. Wapnick has stated that Jesus made use of Schucman's educational background, interests, and experience in dictating the Notes, while Thetford has stated that the Notes were alien to Schucman's background, interests, and mode of conceptualizing ideas. Nevertheless, the Course includes many ideas similar to those which are found in the philosophy of Plato, in whom Schucman had a personal interest. In addition, Schucman had a lifelong passion for the works of the major English poets, including Shakespeare, much of whose work is written in iambic pentameter. A significant portion of the Course is written in iambic pentameter, and there is a reference to *Hamlet,* which was Schucman's favorite play. Finally, the Course contains more than 800 references to the King James version of the Bible, a version which Schucman loved.

Schucman completed the final version of the manuscript in 1975. This version became the first published edition of the Course, and contained the three component sections: the Text, the Workbook, and the Manual. The Course, while described by Plaintiffs as a non-sectarian, non-denominational spiritual teaching, is unquestionably grounded in Christian theology and has been described as a "restatement of Christianity."

On May 29, 1975, Schucman, Thetford, and Wapnick met Judith Skutch (now Skutch-Whitson) ("Skutch Whitson"). Soon thereafter, they introduced her to the Course and the four of them met regularly to study, discuss, and share their common enthusiasm for it. A number of additional copies of the Course had been made by this time and distributed to certain select individuals for commentary. Wapnick recalls that ten copies of the second typed revision were made, of which a few were given out. Wapnick did not duplicate his copy, nor is he aware of anyone else having done so.

**\*4** Schucman and Thetford, in particular, were

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                          Page 4
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

reluctant to show the manuscript to too many people, partially because they were concerned about their professional reputations as serious academics. Skutch-Whitson, on the other hand, who was heavily involved in the exploration of paranormal activity, appears to have been eager to share the manuscript with friends. During the summer of 1975, she obtained permission from Schucman and Thetford to make and distribute several copies of the Course to friends in the San Francisco Bay area. Through Skutch-Whitson and her friends, up to a hundred copies of the manuscript may have been distributed in this manner in the San Francisco area. These copies were distributed without any copyright notice affixed, and the recipients may not have been told that the work was protected by copyright and was not to be copied or distributed. In like manner, copies may also have been distributed in North Carolina around the same time. Some copies were handed out for review and analysis; others, allegedly, simply to share with friends.

 Although Plaintiffs have denied that any distribution of copies took place beyond the circulation of a handful of copies to select individuals for commentary, with express warning that such copies were not to be copied or passed on to others, these denials are undermined by writings of Robert Skutch ("Skutch"), the former husband of Skutch-Whitson and current Vice-President and Treasurer of FIP. Skutch authored a book entitled "Journey Without Distance," which was first published in 1984. In all editions of the book published prior to 1996, Skutch described a meeting in the San Francisco area in the summer of 1975 attended by people who had "xerox copies of the Course." In 1996, the reference to "xerox copies" was deleted. In addition, the following excerpt was contained in the pre-1996 editions: "Judy [Skutch] couldn't keep lending her copy out for twenty-four hours to everyone who wanted it. Despite this, expedients did develop. Jim's copy started to be reproduced. And those copies were then copied. And before long there were over a hundred people in the San Francisco area in possession of A Course in Miracles." This was replaced in the 1996 edition by the following: "Judy [Skutch] didn't want to lend her copy to anyone else. Yet she was absolutely certain that her professional friends who were involved in teaching and exploring the subject of metaphysics would want to study the material carefully. It was then that a creative solution to the problem began to develop." Skutch made these changes after he was aware that Plaintiffs might pursue litigation against Defendants. Given that the Court is faced with cross-motions for summary

judgment, all that can be concluded from the evidence is that the scope of the San Francisco distribution is unclear.

 At some point during the summer of 1975, after it became apparent that an interest for the Course was developing, Schucman heard from the Voice that copyright registration should be sought for the Course, ostensibly in order to preserve the form of the Course against the possibility of incomplete or corrupted editions. Schucman asked that the registration be in the name of the nonprofit organization, the Foundation for Para-Sensory Investigation ("FPSI"), founded by Skutch-Whitson and her then-husband Skutch. FPSI was later renamed FIP, allegedly because Schucman did not want to be associated with anything that was parasensory. [FN3] Skutch-Whitson has been and is currently president of FIP.

> FN3. For simplicity, the opinion henceforth will refer to FPSI as FIP.

 **\*5** Schucman orally assigned her copyright interests in the book to FIP and requested anonymity with respect to authorship. No written assignment was ever made, nor does written evidence exist of the oral assignment. Skutch, who was handling the paperwork and business aspects of FIP, did the work of obtaining the copyright.

 On or about October 6, 1975, Freeperson Press published the Course in a four- volume softcover set with proper copyright notice affixed. Freeperson completed three printings, each of 100 copies.

 According to an article (the "December 1992 Article") in the December 1992 issue of "The Lighthouse," the newsletter of FACIM, allegedly authored by Wapnick, his wife Gloria Wapnick, Skutch-Whitson, and Skutch:

  When *A Course in Miracles* was originally published in June of 1976, we made a firm commitment to seek out and listen to the Voice of the Holy Spirit before making any decisions related to the Course. None of us was prepared, however, for one particular instruction from Jesus to Helen Schucman, scribe of the Course. He wanted *A Course in Miracles* copyrighted and, she stated emphatically, he was quite adamant about this. Although Helen and William Thetford, her partner in scribing the Course, had known from the beginning that the Course was not intended for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                          Page 5
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

them alone, they could not imagine that it would ever become popular enough to require copyright protection. Also, the idea of a copyright struck all of us as somewhat out of character when applied to a spiritual teaching such as *A Course in Miracles.* Nevertheless, even though we could not envision a need for the Course to be copyrighted, we of course listened to Jesus and proceeded to contact the [U.S.] Copyright Office....

We were informed that a copyright could not be granted to a non-physical author such as Jesus, nor to "Anonymous." On the other hand, Helen's name could not appear on the Course's copyright page because Jesus had cautioned her against publicly associating her name with it, lest people confuse her role with his and the Holy Spirit's. Therefore, our guidance was that the copyright registration should be filed with the author listed as "Anonymous," followed by Helen's name in parentheses, while the copyright itself was officially assigned by Helen to [FIP].

Skutch has denied that he ever asked the Copyright Office whether a copyright application could be made in the name of Jesus. Skutch has also denied that he co-authored the December 1992 Article, although he has conceded that he had read it prior to its publication and had indicated to Skutch-Whitson his discomfort with its use of the word "Jesus." Skutch-Whitson, for her part, has also denied that she co-authored the December 1992 Article, though she has admitted she saw it prior to publication and agreed with its premise. Wapnick does not deny writing the Article, but claims that he lacked personal knowledge of the circumstances surrounding Skutch's application for copyright registration.

**\*6** It is not disputed, however, that the first application for copyright registration of the Course was made on behalf of FPSI/FIP by Skutch, and listed as author "[Anonymous] (Helen Schucman)." The application was notarized on November 24, 1975, stamped as received by the Copyright Office on December 4, 1975, and assigned registration number A 693944.

Starting in or about June 1976, FIP itself began to publish the Course in a hardcover three-volume set. In 1992, FIP began publishing the second edition of the Course. All editions published by FIP contained a copyright designation affixed.

FIP registered a copyright (Reg. No. A 805255) for the Course on August 2, 1976, listing the author as "Anonymous" with unknown words following whited

out ("Manual for Teachers" only). On July 17, 1992, FIP obtained copyright registration (No. TX 32 377 899) for the second edition of the Course, listing as author "Anonymous (Helen Schucman)."

FIP was not always diligent in its enforcement of its copyright, as the following excerpt from the December 1992 Article states:

The promulgation of "A Course in Miracles" was left to the Holy Spirit and obviously did not need our help, nor anyone else's.

Our trusting attitude carried over to our enforcement of the Course's copyright, and so for approximately six years we maintained a very liberal stance regarding permission to quote from the Course. Our lenience also reflected in part our feeling that very few people would be interested in "A Course in Miracles" because of the profound nature of its teachings. There seemed little reason to carefully scrutinize all published Course references when for so many years the material remained relatively unknown, without widespread acceptance.

One result of our lax policy was the appearance of a number of abridgements and poetic compilations of passages excerpted from the Course. In fact, these directly contravened Jesus' very specific instructions to Helen that the three books should never be separated from each other, nor should any of the material appear out of context in abridged form. The Course's curriculum is by its very nature an integrated and self-contained one. Therefore, any attempts to abridge or "short cut" the process of teaching and learning forgiveness could only prove detrimental, and would alter the very essence of the Course both as a theoretical thought system and a process of spiritual development. Yet we did not recognize the need to intervene at that point.

It was not until the early 1980s that we began to appreciate the wisdom behind Jesus' insistence on obtaining a copyright. At that time a number of unauthorized translations of "A Course in Miracles" were beginning to appear worldwide. Many of these were, to say the very least, inaccurate, leading to unacceptable distortions of the Course's central teachings. Because [FIP] held the copyright to the Course, we could closely supervise the process of translation to ensure that the Course's message was preserved intact for foreign readers....

**\*7** ... [W]e were gradually led to reconsider our policy regarding enforcement of the copyright... Should we continue our lenient policy with regard to excerpts and quotes, and risk a continuing and serious dilution and distortion of the Course's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

message? ...

After several years of conferring with each other, and much prayer, we received very clear guidance from the Holy Spirit to adhere to the prevailing practice of the publishing industry regarding permission to quote. This meant a significant tightening of our policy.

The Article goes on to discuss in greater detail the nature of the new, more restrictive policy. It also indicates that FIP had received permission from the United States Patent and Trademark Office ("PTO") to use the title "A Course in Miracles" as a service mark, and that FIP would thereby limit public use of the title. The Article goes on to state:

If [FIP] erred in the past, it was in relying on our own reasonableness, disregarding Jesus' guidance. It seemed less reasonable to us somehow, certainly less "spiritual," to strictly enforce the copyright. And so we mistakenly allowed our judgment to preempt his. However, as the Course repeatedly makes clear, we are not to rely upon our own judgment in any decision, no matter how seemingly obvious it may appear at first glance....

As if to underscore this point, we have since learned that, according to copyright law, if the holder of a copyright consistently fails to enforce it, then the copyright may be judged null and void.

Thereafter, FIP indeed stepped up its enforcement efforts.

In or about December 1995, FIP entered into a five-year licensing agreement with Penguin, granting Penguin a license to publish and distribute the Course in English in all territories except the United Kingdom. The Penguin edition of the Course is a single hardcover volume. FIP and its licensees also publish and distribute eight foreign-language editions of the Course.

On or about September 22, 1998, FIP assigned and transferred to FACIM FIP's right, title and interest in and to the Course and its foreign translations, subject to FIP's previously-existing agreement with Penguin. FACIM granted to FIP a royalty-free and worldwide license to publish and distribute the Course and all translations thereof, and to use, copy, and prepare derivative works based on the Course, including all electronic publishing rights thereto. The Transfer Agreement was filed in the Copyright Office on April 1, 1999.

Wapnick obtained a Certificate of Registration for the "Unpublished Writings of Helen Schucman--

Volumes 1-22" in 1990. On March 1, 2000, he transferred his rights to this material to FACIM.

FIP registered the mark "A Course in Miracles" with the PTO on November 30, 1993. FIP registered the acronym "ACIM" with the PTO on December 2, 1997. Both "A Course in Miracles" and "ACIM" were widely used throughout the United States and elsewhere for many years by individuals and groups promoting the Course, publishing interpretations or guides to it, or teaching its message or variants thereon. This use appears to have begun as soon as the Course was first published and the frequency of the use appears to have grown steadily as the Course has gained a wider and wider following. Until at least 1992, FIP made no effort to restrict use of the Course title or the acronym.

**\*8** The Church is one of the many organizations dedicated to spreading the message of the Course. It has purchased hundreds, perhaps thousands, of copies of the Course directly from FIP over the years, which it gives to its members and students.

Commencing in or before January of 1995, Defendants began to copy and print materials containing substantial verbatim quotations from the Course, which Defendants have distributed without charge, including the entire 488-page Workbook and a series of pamphlets containing significant portions of the Text arranged without commentary in a different order than appears in the Text. Defendants have also translated the Course into foreign languages. None of these activities were done with the authorization or consent of Plaintiffs.

FIP and FACIM were aware of Defendants' existence since 1985, and of Defendants' activities involving the Course since 1989. Plaintiffs did not become aware of Defendants' allegedly *infringing* activities, however, until early in 1995, at which point Plaintiffs requested that Defendants stop, and eventually sent Defendants a cease-and-desist letter. Defendants continued to copy and distribute substantial portions of the Course, however.

Defendants--or members or students of the Church or Endeavor--have posted, or have permitted the posting of, substantial portions of the Course and of the unpublished "Cayce" version on the internet, usually without any commentary or copyright legend.

Defendants have indicated in sworn deposition testimony that they intend to continue to copy and distribute materials copied directly from the Course

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                    Page 7
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

even in the face of an order from this Court prohibiting such conduct. One of Defendants' goals is to achieve as widespread a distribution of the Course and its message as possible.

*Discussion*

Plaintiffs have moved for summary judgment on their claim for federal copyright infringement, and for preliminary injunctive relief to prevent members of Church or students of Endeavor from posting on web sites materials that infringe on Plaintiffs' alleged copyright in the Course. Defendants have cross-moved for summary judgment on all claims. [FN4] Because resolution of a motion for a preliminary injunction requires inquiry into the likelihood of ultimate success on the merits of the action, the summary judgment motions will be addressed first.

> FN4. In addition to a claim for federal copyright infringement, the third amended complaint alleges causes of action sounding in federal trademark infringement, false designation of origin and false description, and trademark dilution.

I. *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir.1988)* (*citing Celotex Corp. v. Catrett, 477 U.S. 317, 330 n. 2 (1986)* (Brennan, J., dissenting)); *see Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir.1995)*; *Burrell v. City Univ., 894 F.Supp. 750, 757 (S.D.N.Y.1995)*. If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell, 894 F.Supp. at 758* (*citing Binder v. Long Island Lighting Co., 933 F.2d 187, 191 (2d Cir.1991)*).

**\*9** Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)*. "[T]he mere existence of factual issues--where those issues are not material to the claims before the court--will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985)*.

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)*. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (citations omitted).

II. *Copyright Infringement*

There are two elements to a copyright infringement claim: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)*; *accord Fonar Corp. v. Domenick, 105 F.3d 99, 103 (2d Cir.1997)*. Defendants challenge both elements of Plaintiffs' copyright infringement claim.

A. *Ownership of a Valid Copyright*

A certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the ownership of a valid copyright. *See 17 U.S.C. § 410(c)*; former 17 U.S.C. § 209 (1909 Copyright Act). [FN5] FIP originally obtained a certificate of registration for the Course in 1975. The burden thus falls upon Defendants to rebut the *prima facie* validity of such certificate.

> FN5. The primary difference between current 17 U.S.C. § 410(c) and former 17 U.S.C. § 209 is that under the current statute, prima facie validity only applies to works registered within five years of initial publication, a time limit inapplicable under the former statute. *See Sem-Torg, Inc. v. K Mart Corp., 936 F.2d 851, 854 (6th Cir.1991)*. Here, the distinction is doubly irrelevant, since FIP obtained a registration certificate within a few months of initial publication of the Course.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                      Page 8
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

Defendants assert three defenses to rebut the presumption of validity: (1) lack of originality; [FN6] (2) fraud on the Copyright Office; and (3) chain of title. Other affirmative defenses are addressed in Section III below.

> FN6. Originality could also be seen as a defense to the second prong of an infringement claim, i.e., "copying of constituent elements of the work that are original." *Feist, 499 U.S. at 361.* As a practical matter, it makes no difference whether the defense is considered under *Feist's* "valid copyright" prong or under its "copying of constituent elements" prong.

### 1. *Originality*

Defendants maintain that Plaintiffs do not possess a valid copyright because the Course is not an original work of Schucman but of Jesus.

Originality is an essential element of copyright law. *See Feist, 499 U.S. at 345* ("The sine qua non of copyright is originality."). Copyright protection only extends to those aspects of a registrant's works that are original to the "author" of the work. *See* 17 U.S.C. § 102(a) ("Copyright protection subsists ... in original works of authorship ...."). However, the Copyright Act does not require a high degree of originality. As *Feist* explains:

  To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble, or obvious" it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.
 **\*10** *Feist, 499 U.S. at 345-46, 111 S.Ct. 1282* (citations omitted).

In a case similar to this one, the Ninth Circuit recently held that, notwithstanding a spiritual book's "celestial" or "divine" origins, the originality requirement necessary for a valid copyright was satisfied because the human beings who "compiled, selected, coordinated, and arranged" the book did so " 'in such a way that the resulting work as a whole constitutes an original work of authorship." ' *Urantia Found. v. Maaherra,* 114 F.3d 955, 958 (9th Cir.1997) ("*Urantia* ") (*quoting* 17 U.S.C. § 101). The parties in *Urantia* agreed that the words in "The Urantia Book" were authored by divine spiritual beings, who initially communicated with a psychiatric patient who wrote the words down by hand. *See Urantia,* 114 F.3d at 957; *Urantia Found. v. Burton,* 210 U.S.P.Q. 217, 1980 WL 1176, at *1 (W.D.Mich.1980) ( "*Urantia II* "). The handwritten manuscript was then typed out by the patient's psychiatrist. Although it is not entirely clear from the opinions of the courts, at some point in the process it appears that a group of people, the "Contact Commission," came to know the manuscript, discussed it, and, at the prompting of the divine beings, posed questions to the divine beings. The answers to those questions became the series of teachings that formed the Urantia Book. *See id.; Urantia,* 114 F.3d at 957. The Ninth Circuit held that the choice of questions by the Contact Commission, notwithstanding guidance from the divine beings, "materially contributed to the structure of the Papers, to the arrangement of the revelations in each Paper, and to the organization and order in which the Papers followed one another." *Urantia,* 114 F.3d at 958. This was held to constitute sufficient creative input to satisfy the originality requirement of the Copyright Act. *See id.; cf. Garman v. Sterling Publ'g Co.,* No. C-91-0882, 1992 U.S. Dist. LEXIS 21932, at *7 (N.D.Cal. Nov. 4, 1992) ("assertions by both parties that the information [in copyrighted text] was provided by spiritual guides" "channeled" through a person in a "psychic trance" held not to be a defense to originality). In particular, "[t]hose who were responsible for the creation of the tangible literary form that could be read by others, could have claimed copyright for themselves as 'authors,' because they were responsible for the revelations appearing 'in such a way as to render the work as a whole original." ' *Urantia,* 114 F.3d at 958 (*quoting Feist,* 499 U.S. at 358).

In the instant case, FIP, FACIM, their principals Wapnick, Skutch-Whitson, and Skutch, and Schucman and Thetford have repeatedly asserted that Jesus dictated the Course to Schucman. Nevertheless, it is not disputed that the arrangement of the materials in the Course was initiated by Schucman, with assistance from Thetford, Wapnick, and others. Perhaps of even greater significance, there is no evidence to suggest that the Course would have come

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                      Page 9
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

into existence had Schucman not had the conversation with the head of her department at Columbia and had she not agreed that "there must be another way." In other words, if indeed it was Jesus who spoke to Schucman, it was only because she had opened herself up to the possibility of receiving this vision. Nor is there any doubt that the form of the Course reflects many of Schucman's personal interests and tastes. Again, even if the Course came from Jesus, significant aspects of it are the direct result of it having come *through* Schucman. In this way, Schucman is as much an author as the members of the Contact Commission in *Urantia,* since even Defendants in this action have essentially conceded that had the Course been channeled through any other individual, its form would have been different. Indeed, that is apparently one of the messages of the Course.

**\*11** In addition, even if Schucman had not made herself available to receive this revelation, and even if the original material did not reflect her personal tastes, it is undisputed that the dictated material was subsequently edited: personal references were removed, punctuation was added, chapter and section headings were created, and other work was done to shape the material into the final form it took in the published Course. Even if all of these editorial changes and additions were "approved of" by Jesus, it is undisputed that many of them were *initiated* by Schucman, Thetford, or Wapnick--i.e., many changes were not simply dictated, but were initially the impulse of Schucman and those others, with Schucman then "checking" to see if the changes would pass muster with Jesus, a process quite similar to that used by the Contact Commission. Significantly, the initial creative spark for these changes came from Schucman and the others, not from Jesus, and, as in *Urantia,* materially contributed to the structure of the Course. These editorial changes thus satisfy the "minimal degree of creativity," *Feist, 499 U.S. at 346,* required by copyright law.

Defendants, in their memoranda of law, play down the editorial contributions of Schucman, stating that she was only a scribe taking dictation. This is not borne out by the evidence, however, even when viewed in the light most favorable to Defendants. Schucman's interaction with the Voice was similar to the Contact Commission's interaction with the divine beings in *Urantia:* although in each instance the non-human author had the final say, the humans had at least some input into, and effect on, the form and content.

Thus, the Course can be protected as a particular compilation of facts, where the originality lies in the arrangement and selection of the material.

There is, however, an independent basis for affirming the originality of the Course: as a literary work authored by Schucman. As the *Urantia* district court held, "Whether The Urantia Book is a divine revelation dictated by divine beings is irrelevant to the issue of whether the book is a literary work within the meaning of 17 U.S.C. § 102." *Urantia Found. v. Maaherra, 895 F.Supp. 1337, 1338 (W.D.Ariz.1995)* ("*Urantia III* "). While the Ninth Circuit in *Urantia* did not affirm the district court on this basis--relying instead on the "original fact compilation" theory--the Nimmer treatise suggests that the district court's approach was better. *See Urantia, 114 F.3d at 958;* 1 Nimmer on Copyright § 2.11[C] at 2-172.22-23 (hereinafter "Nimmer"). Indeed, Nimmer cites to the English case *Cummins v. Bond,* [1927] 1 Ch. 167, "in which the plaintiff medium produced a contemporary account of the Apostles by engaging in "automatic writing" from a 1900-year-old spirit." *Id.* at § 2.11[D] n. 24.4. The Chancery judge in *Cummins* noted that he lacked jurisdiction in "the sphere in which the [dead spirit] moves" and declined to hold that "authorship and copyright rest with some one already domiciled on the other side of the inevitable river." *Id.* (*quoting Cummins,* 1 Ch. 167, at 173). [FN7]

> FN7. The Court recognizes that *Cummins* is not fully on point here, as the "spirit" in this case--Jesus--has not been represented to be on the "other side of the river." Nevertheless, the similarities are rather apparent.

**\*12** This approach is sensible. As a matter of law, dictation from a non- human source should not be a bar to copyright. However, Defendants have invoked the defense of "factual" estoppel peculiar to the copyright field, maintaining that because Plaintiffs have continually represented that the author of the Course is Jesus, they cannot now claim that it is an original work of Schucman.

The leading case describing this particular type of copyright estoppel in this Circuit is *Arica Institute, Inc. v. Palmer, 970 F.2d 1067 (2d Cir.1992).* The plaintiff in *Arica* had published works which claimed discovery, as "scientifically verifiable facts of human nature," of the "ego fixations" of the human spirit,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                              Page 10
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

which could be demonstrated in a laboratory and in clinical tests, and which centered around seven labeled so-called "enneagrams." *Id.* at 1074-75. The defendant published a work which relied on theories similar to those found in plaintiff's works and expressed those theories in sometimes identical terms, including use of the same seven labeled enneagrams. *See id.* at 1071-75. The Second Circuit held that the plaintiff, having continually represented that the enneagram labels were scientifically verifiable facts, was estopped from claiming in litigation that the labels were "metaphoric claims of philosophical truth." *Id.* at 1075. Hence, because the material had been represented as being factual, it was deemed not copyrightable. *See id.*

*Arica* differs from the instant case in two significant respects. First, Plaintiffs have never claimed it to be a scientifically verifiable fact that the Voice who spoke to Schucman was the voice of Jesus. Indeed, the evidence, viewed in the light most favorable to Defendants, only demonstrates that Plaintiffs have stated on many occasions their belief that it was Jesus who dictated the Course to Schucman. Admittedly, in the murky depths of epistemology, the distinction between an assertion of fact and an assertion of belief disappears. In a court of law, however, where common sense, aided by the rules of evidence (not analytic philosophy), must be employed in order for judgments to be made at all, the distinction is significant. Plaintiffs' statements of belief that Jesus dictated the Course to Schucman do not make the Course a factual work. A claim based on science is of a different order than a claim based on faith, the rather recent protestations of the historians and philosophers of science notwithstanding.

Moreover, even if it could be established as a "fact" that Jesus dictated the Course to Schucman, it would not make the material in the Course factual. Much of the Course is prescriptive rather than descriptive. Consider, for example, the first lesson in the Workbook. It begins:

Nothing I see in this room [on this street, from this window, in this place] means anything.
1. Now look slowly around you, and practice applying this idea very specifically to whatever you see:
**\*13** *This table does not mean anything.*
*This chair does not mean anything.*
*This hand does not mean anything.*
*This foot does not mean anything.*
*This pen does not mean anything.*

Workbook p. 3 (boldface, square brackets, and italics in original). The boldfaced statement could be

construed as a fact, yet not necessarily; it is also a prescription. The goal of the lesson is to enable the reader to accept the boldfaced statement as a fact. More obviously, the statement "Now look slowly around you, and practice applying this idea very specifically to whatever you see," is a prescriptive command. It is not a statement of fact at all. The Workbook, in particular, is composed mostly of prescriptive statements. In this respect, the Course is fundamentally different from the work which was the subject of *Arica.*

Additionally, the alleged infringements in *Arica* involved the use of single words and phrases and conceptual titles. *See Arica, 970 F.2d at 1072-77.* Here, the alleged infringements are a verbatim reproduction of the entire 488- page Workbook and verbatim reproductions of complete sections of the Course in a series of pamphlets. The scope of the infringement here is thus far greater.

*Oliver v. Saint Germain Foundation,* 41 F.Supp. 296 (S.D.Cal.1941), cited by Defendants for support, is also easily distinguished. In *Oliver,* the plaintiff, who claimed that his book, "A Dweller on Two Planets," was a factual account dictated by a spirit from another planet, was estopped, because of the claim of fact, from asserting an infringement claim on defendant, who wrote a text involving the same subject matter. *See id.* at 299. There was "no plagiarism or copying of words and phrases as such, but only slight similarity of experiences [between the two works]." *Id.* Here, again, by contrast, Defendants are not alleged to have appropriated merely the ideas contained in the Course, but to have reproduced substantial sections of it verbatim. Moreover, "A Dweller on Two Planets" appears to have been written as a historical account, and presumably its style would have been descriptive, not prescriptive. *See id.* at 297 (preface of book refers to it as a "history"). In addition, and perhaps more significantly, the *Oliver* decision is criticized and even mocked in the Nimmer treatise, which "wonders whether the *Oliver* court would have invoked the same defense against Sir Arthur Conan Doyle on the grounds his 'Sherlock Holmes' stories are presented as factual accounts by Dr. Watson." 1 Nimmer § 2.11[C] at 2-172.22; *see also* Robert C. Denicola, *Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works,* 81 Colum. L.Rev. 516, 526 n. 52 (1981) ("The *Oliver* case is particularly bizarre, even under California's expansive view of the normal. The defendant was permitted to appropriate material appearing in plaintiff's work because it had been represented as the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                           Page 11
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

actual revelations of a deceased entity from another world. It would appear, however, that the interests of society would not suffer greatly if this position were tempered by the adoption of an objective measure of the reasonable expectations of the copier.")

**\*14** These significant distinctions mitigate against a finding of estoppel based on Plaintiffs' representations that the Course was authored by Jesus. As a matter of law, it is irrelevant for copyright purposes whether Jesus wrote the Course. There is no question, of course, that if Schucman had been a "scribe" for Thetford (for example), she would lack the requisite originality for copyright protection. But she was not a scribe for any human creator. She was a scribe for a voice she heard in her own mind. While she identified this voice as "Jesus," and Plaintiffs, Defendants, and countless other people have apparently chosen to believe this, beliefs are not substitutes for facts. They cannot be verified in a court of law according to the rules of evidence. *See Garman,* 1992 U.S. Dist. LEXIS 21932, at \*7 (with regard to issue of originality, held that there was "no legal relevance to the assertions by both parties that the information was provided by spiritual guides") (*citing Urantia II,* 210 U.S.P.Q. 217 ("legally ... the source of the [author's] inspiration is irrelevant.")).

Thus, the defense of lack of originality fails on two independent grounds: the Course is an original literary work of Schucman, and even if it were not, it would still be an original compilation of facts.

2. *Fraud on the Copyright Office*

Defendants next assert that Plaintiffs, by deliberately withholding the name of Jesus as the author of the Course after hearing from the Copyright Office that it would reject an application with Jesus listed as author, perpetrated a fraud upon the Copyright Office which would have resulted in rejection of the application for registration.

"A party seeking to establish a fraud on the Copyright Office ... bears a heavy burden. The party asserting fraud must establish that the application for copyright registration is factually inaccurate, that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations." *Lennon v. Seaman,* 84 F.Supp.2d 522, 525 (S.D.N.Y.2000) (citations omitted); *see also Eckes v. Card Prices Update,* 736 F.2d 859, 861-62 (2d Cir.1984) ("Only the knowing failure to advise the copyright office of facts which might have occasioned a rejection of the application constitute[s]

reason for holding the registration invalid and thus incapable of supporting an infringement action.") (internal quotations omitted); *Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 456 (2d Cir.1989). To prevail on this defense, Defendants must establish that FIP's efforts to register the copyright were "motivated by scienter rising to the level of deliberate misrepresentation." *Gibson Tex, Inc. v. Sears Roebuck & Co.,* 11 F.Supp.2d 439 (S.D.N.Y.1998).

Plaintiffs contend that Skutch never had a conversation with the Copyright Office regarding the effect of listing Jesus as an author, and that, in any event, the countervailing evidence of a fraudulent motive is inadmissible, because it comes from the December 1992 Article written by Wapnick and/or Gloria Wapnick without personal knowledge of the facts surrounding Skutch's conversations with the Copyright Office in 1975. With regard to these factual contentions, however, there is, as set forth in the "Facts" section above, a genuine issue of material fact regarding what took place in 1975 between Skutch and the Copyright Office. Although Skutch denied in his deposition testimony that he ever had a conversation about Jesus with the Copyright Office, this statement is contradicted by the statements in the December 1992 Article--an article which purported to be co-authored by Skutch. That several clearly interested parties--Skutch, Skutch-Whitson, Wapnick, and Gloria Wapnick--now collectively deny that Skutch co-authored the Article and that Wapnick was not writing from personal knowledge does not make the Article inadmissible, but, rather, raises questions which cannot be resolved properly on summary judgment regarding the credibility of these witnesses and the truth of what took place in 1975.

**\*15** Nevertheless, this defense fails for two reasons. First, as set forth in the preceding discussion of the originality defense, for purposes of federal copyright law Jesus is not the author of the Course. Regardless of Plaintiffs' beliefs, therefore, Defendants cannot establish the first element of the fraud claim: that the application was factually inaccurate. On this ground alone, the defense cannot be sustained.

Second, a copy of the Course was submitted with the initial application. Although the copy submitted did not contain the introduction in which Schucman discusses the process by which she wrote down the material, i.e. by hearing the Voice, it is clear from the context that the purported source of the material is some divine being. In fact, Defendants repeatedly

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                    Page 12
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

assert that the Course clearly indicates that its author is Jesus. Given Defendants' burden of proof on this defense, there has been a failure to show that the Copyright Office would not have had notice of the divine authorship of the Course notwithstanding the failure to name Jesus as an author in the application. *See* *Urantia,* 114 F.3d at 963 (rejection of fraud on the Copyright Office defense because even though plaintiffs did not reveal divine authorship of Urantia Book, they submitted copies with their application and the "Book clearly describes its own origin").

3. *Chain of Title*

FIP's certificate of registration of the Course constitutes *prima facie* evidence that it possesses a proper chain of title, in this instance, that the copyright passed from Schucman to FIP by oral assignment prior to registration. Under the 1909 Copyright Act, in contrast to the current statute, an assignment of a copyright "did not have to be in writing to be enforceable." *Self- Realization Fellowship Church v. Ananda Church of Self-Realization,* 206 F.3d 1322, 1325 (9th Cir.2000); *see also* *Magnuson v. Video Yesteryear,* 85 F.3d 1424, 1428 (9th Cir.1996) (*citing* 3 Nimmer § 10.03[A] at 10-39; *Valente- Kritzer Video v. Pinckney,* 881 F.2d 772, 775 (9th Cir.1989); *Eden Toys, Inc. v. Florelee Undergarment Co.,* 697 F.2d 27, 36 (2d Cir.1982)). Moreover, under the 1909 Act, where an author did not register the copyright and instead gave the manuscript to someone else to publish (here, FIP), a written assignment was unnecessary. *See Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 104 F.2d 306, 311 (2d Cir.1939). FIP subsequently licensed the Course to Penguin for publishing. FIP later assigned the copyright to FACIM, in writing, subject to the Penguin license. The chain of title is valid and Defendants have not met their burden of proof to demonstrate otherwise.

Because the facts sustain neither the originality defense, nor the fraud on the Copyright Office defense, nor the chain of title defense, Plaintiffs have a valid copyright in the Course.

B. *Infringement*

"To prove infringement, a plaintiff with a valid copyright must demonstrate that: '(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." ' *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir.1995)

(*quoting* *Fisher- Price, Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 122-23 (2d Cir.1994)).

**\*16** There is no genuine dispute here that Defendants have copied verbatim large sections of the Course, including the entire Workbook and unadulterated sections of the Text. They have also made foreign translations, and placed portions of the Course on internet web sites. None of these activities was done with the authorization and consent of Plaintiffs. Thus, absent any colorable affirmative defense, summary judgment for Plaintiffs would be proper.

III. *Affirmative Defenses*

Defendants have asserted the following affirmative defenses to Plaintiffs' claims: (a) public domain; (b) estoppel; (c) fair use; (d) copyright misuse/unclean hands; (e) freedom of religion; (f) merger; and (g) the related defenses of abandonment, acquiescence, waiver, and laches. These will be considered in turn.

A. *Public Domain*

Under the 1909 Act, general publication of a work without notice of copyright injected the work into the public domain and stripped it of copyright protection. *See* *Sanga Music, Inc. v. EMI Blackwood Music, Inc.,* 55 F.3d 756, 759 (2d Cir.1995). Limited publication did not place the work in the public domain. *See* *Paramount Pictures Corp. v. Rubinowitz,* 217 U.S.P.Q. 48, 1981 WL 1396, at \*3-\*4 (E.D.N.Y.1981). The distinction between a general and a limited publication has been set forth in a recent decision from this District:

A general publication "occurs when by the consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur." 1 Nimmer § 4.04, at 4-18 (3d ed.1997) (footnotes omitted); *see also* *American Visuals Corp. v. Holland,* 239 F.2d 740, 744 (2d Cir.1956) (where plaintiff disseminated over 200 copies of his book by placing them in hotel rooms, and distributed them in an effort to get business, such dissemination constituted a general publication, because even though the purpose of the distribution was limited, the "persons" to whom it might be given were unlimited). A "limited publication," in contrast, "communicates the contents of a [work] to a definitely selected group and for a limited purpose, and without the right of diffusion,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

reproduction, distribution or sale ... [and therefore] does not result in the loss of the author's common law copyright to his [work]." *White v. Kimmell, 193 F.2d 744, 746-47 (9th Cir.1952).*
*Proctor & Gamble Co. v. Colgate-Palmolive Co., No. 96 Civ. 9123, 1998 WL 788802, at *38, (S.D.N.Y. Nov. 9, 1998).*

There is a genuine issue of material fact whether a general distribution of the Course occurred during the summer of 1975. As Skutch's rewriting of potentially damaging material from his book, "Journey Without Distance," suggests, the circumstances of the pre-publication distribution of copies of the Course in the San Francisco area are unclear. There is an issue as to exactly how many copies were distributed, to whom, and under what conditions. The same questions apply with regard to the possibility of a distribution in North Carolina. In that instance, however, there are complex evidentiary issues: much of the testimony in the affidavits supplied by Defendants contains potentially inadmissible hearsay, and Defendants did not properly notify Plaintiffs of the existence of many of these potential witnesses, who were not deposed by Plaintiffs. Still, even discounting this evidence for these reasons, a genuine factual question still exists regarding the extent and the nature of a North Carolina distribution. The evidence does not unambiguously support a finding of either a limited or a general publication. At most, Skutch-Whitson may have encouraged the distribution of a couple hundred copies of the manuscript. It can be inferred from the testimony and the documentary evidence, however, that her enthusiasm for spreading the word about the Course may have encouraged others to make copies from copies. On the other hand, the distribution may have been quite small. The question, however, is best left for a trial on the merits. Summary judgment on this issue is not appropriate at this stage. This alone, however, suffices to defeat Plaintiffs' motion.

B. *Equitable Estoppel* [FN8]

> FN8. The separate defense of "factual estoppel" particular to copyright law has been considered above, in the section addressing originality.

**\*17** Equitable estoppel works "to deny a party the right to plead or prove an otherwise important fact-- here, the act of infringement--because of something he has done or omitted to do." *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Svcs., Inc., 746 F.Supp. 320, 329 (S.D.N.Y.1990).* Estoppel requires proof that (1) plaintiffs had knowledge of defendants' infringing conduct; (2) plaintiffs intended that defendants rely on plaintiffs' conduct, or plaintiffs acted in such a manner that defendants had a right to believe they were intended to rely on the conduct; (3) defendants were ignorant of the true facts; and (4) defendants did, in fact, rely to their detriment. *See id.; Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 456 F.Supp. 531, 534 (S.D.N.Y.1977), aff'd 592 F.2d 651 (2d Cir.1978).* Defendants may prevail on their estoppel defense only if they can prove a reasonable and justifiable belief that plaintiffs gave them permission to copy. *See Merchant v. Lymon, 828 F.Supp. 1048, 1064 (S.D.N.Y.1993), rev'd on other grounds, 92 F.3d 51 (2d Cir.1996); Broadcast Music, 746 F.Supp. at 329.*

There are no facts to suggest that Plaintiffs were aware of Defendants' allegedly infringing use of the Course and permitted the infringement. While Plaintiffs were certainly aware of Defendants' existence as a religious group and teaching organization, no evidence has been presented to suggest that Plaintiffs were aware of Defendants' publications in which substantial sections of the Course were quoted verbatim for a significant period of time prior to making the attempts to prevent such use which culminated in the instant litigation. In addition, there is nothing before the Court to indicate that Defendants were not aware of the true facts. Indeed, Defendants admitted that they were fully aware that the Course was protected by a registered copyright. Where, as here, there is no allegation that the Plaintiffs have aided, induced, or caused Defendants' alleged infringement, but merely that Plaintiffs' passivity has encouraged Defendants' use, "[t]he mere affixation of the copyright notice on copies of the work, if seen by the defendant, has been held to constitute a sufficient assertion of the plaintiff's right so as to counter an estoppel based upon a passive holding out." 4 Nimmer § 13.07 at 13-276 (citing cases). For these reasons, the defense of equitable estoppel can be dismissed.

C. *Fair Use*

Defendants maintain that their use of the Course is protected by the "fair use" doctrine. To determine whether a given use is fair, the Court must consider four factors:
  (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                              Page 14
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.
**\*18** 17 U.S.C. § 107.

1. *The Purpose and Character of the Use*

The central focus of an inquiry into purpose and character of the use is whether the allegedly infringing work

merely supersedes the original work or instead adds something new, with a further purpose or different character, altering the first with new meaning or message, in other words, whether and to what extent the new work is transformative. If the secondary use adds value to the original--if copyrightable expression in the original work is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings--this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society. In short, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.

*Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 142 (2d Cir.1998) (citations and internal quotation marks omitted).

Defendants claim their use of the Course is noncommercial and non-profit and for religious educational purposes only. Defendants give away all allegedly infringing materials without charge. Yet this does not mean that Defendants' verbatim use of material from the Course in pamphlets and in the reproduction of the Workbook is in any way "transformative." The Course is not being used by Defendants as "raw material" but as finished product. Almost no commentary or analysis accompanies the copied material, and the mere rearrangement of sections of the Text in Defendants' printed pamphlets is insufficient to transform the material and thereby constitute fair use. Thus, this factor weighs against Defendants.

2. *The Nature of the Copyrighted Work*

This factor distinguishes between factual and fictional works, the latter being regarded as meriting greater protection. *See Castle Rock,* 150 F.3d at 143-44 (citing cases). As set forth above, the Course is not a factual work, and this factor therefore also

weighs against Defendants.

3. *The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole*

This factor also weighs against Defendants. Defendants have copied the entire Workbook, which comprises nearly 40% of the Course. With regard to Defendants' pamphlets, many consist almost entirely of excerpts from the Text. Other pamphlets intersperse substantial verbatim quotations from the text with other material. However, juxtaposing text "wedged between two non-infringing sections" of the secondary work does not constitute fair use. *Paramount Pictures Corp. v. Carol Publ'g Group.,* 11 F.Supp.2d 329, 335 (S.D .N.Y.1998) ( "an illicit copying [cannot] be protected by being placed in the midst of two segments that do not infringe").

4. *Effect of Use on Value or Market*

This factor also clearly weighs against Defendants. Defendants have indicated their desire to distribute the Course freely all over the world, if possible. This would have an obviously negative effect on the value of and market for the published, copyrighted version of the Course.

**\*19** Because all four factors in the fair use analysis weigh against Defendants, this affirmative defense is not a bar to summary judgment for Plaintiffs.

D. *Unclean Hands/Copyright Misuse*

The doctrine of unclean hands "is a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent the defendant's tortious conduct." *Broadcast Music,* 746 F.Supp. at 329. "The defense of unclean hands in copyright actions is recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action." *Id.* (*citing* 3 Nimmer § 13.09[b] at 13-145 (1988)). Defendants contend that Plaintiffs' fraud on the Copyright Office demonstrates their unclean hands. Yet, as set forth above, Plaintiffs have not committed a fraud upon the Copyright Office. Nor have Defendants indicated any serious transgression which Plaintiffs might have committed.

The defense of copyright misuse applies when a plaintiff has allegedly extended the copyright monopoly in a manner that constitutes an

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                Page 15
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

unreasonable restraint of trade. *See Basic Books v. Kinko's Graphics Corp., 758 F.Supp. 1522, 1537-38 (S.D.N.Y.1991)*. It has no applicability in the instant dispute.

E. *First Amendment*

Defendants claim that Plaintiffs' enforcement of its alleged copyright would prevent Defendants' members and students from engaging in the practice of their religion, in violation of the First Amendment.

A valid copyright in a religious work "reflects nothing more than the governmental obligations of neutrality in the face of religious differences," and does not represent government activity that violates the First Amendment. *Sherbert v. Verner, 374 U.S. 398, 409 (1963)*. "[A] grant of copyright on a religious work poses no constitutional difficulty." *United Christian Scientists v. Christian Science Bd. of Directors, First Church of Christ Scientist, 829 F.2d 1152, 1159 (D.C.Cir.1987)*. Consequently, if Plaintiffs otherwise prevail on their copyright claims, enforcement of such claims against Defendants will not violate the First Amendment. *See Religious Technology Center, Church of Scientology, Int'l, Inc. v. Scott, 869 F.2d 1306, 1309-10 (9th Cir.1989)*.

F. *Merger*

Defendants maintain that the "merger doctrine" applies here. "When an idea is so restrictive that it necessarily requires a particular form of expression, that is, when the idea and its expression are functionally inseparable, to permit the copyrighting of the expression would be to grant the copyright owner a monopoly of the idea." *Freedman v. Grolier Enters., Inc., 179 U.S.P.Q. 476, 478 (S.D.N.Y.1973); CCC Information Servs., Inc. v. Maclean Hunter Mkt. Repts., 44 F.3d 61 (2d Cir.1994)*.

Defendants maintain that the ideas in the Course could only have been stated in the form in which they are stated in the Course. To conclude thus requires adhering to the belief that because the words of the Course are allegedly the words of Jesus, they could not have been phrased in any other way. In fact, a brief glance through the Course reveals that the same or remarkably similar ideas are restated continually in a myriad of ways. Doubtless these ideas could be further restated in an endless variety of forms.

G. *Abandonment, Acquiescence, Laches, and Waiver*

**\*20** Finally, Defendants assert the defenses of abandonment, acquiescence, laches, and waiver.

To establish abandonment, defendants must demonstrate (1) the copyright holders' intent to surrender its rights in the work; and (2) an overt act evidencing that intent. *See Paramount Pictures Corp. v. Carol Publ'g Group, 11 F.Supp.2d 329, 337 (S.D.N.Y.1998), aff'd 181 F.3d 83 (2d Cir.1999)*. The presence of a copyright notice is evidence of one's intent not to abandon one's copyright. *See id.* No evidence has been presented to indicate an overt act of abandonment. Notwithstanding the evidence that Plaintiffs did not always enforce the copyright as vigorously as they are currently attempting to do, there is no evidence of an overt act by Plaintiffs evidencing an intent to surrender the copyright.

To establish waiver, defendants must show that plaintiffs "relinquished a right with both knowledge of the existence of the right and an intent to relinquish it." *Christian Dior-New York, Inc. v. Koret, Inc., 792 F.2d 34, 40 (2d Cir.1986); see Bingham v. Zolt, 823 F.Supp. 1126, 1132 (S.D.N.Y.1993), aff'd 66 F.3d 553 (2d Cir.1995)*. Again, no evidence of any intent to relinquish Plaintiffs rights has been put forth.

To establish laches or acquiescence, defendants must show (1) plaintiff's unreasonable lack of diligence in initiating an action; and (2) prejudice to the defendant resulting from plaintiff's delay. *See King v. Innovation Books, 976 F.2d 824, 832 (2d Cir.1992)*. The mere passage of time between plaintiff's knowledge of an infringing act and the filing of a suit is insufficient to establish laches as a bar to litigation; rather "[s]ome prejudice to the defendants must be added to the delay for it to ripen into laches." *Peer Int'l Corp.,* 887 F.Supp. at 560. Moreover, "laches is not a defense against injunctive relief when the defendant intended the infringement." *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc., 166 F.3d 65, 75 (2d Cir.1999)*.

Although Plaintiffs were aware of Defendants' existence as a religious organization at least as far back as 1989, there is no evidence that Plaintiffs learned of Defendants' allegedly infringing acts until several years later, at which point Plaintiffs took action.

IV. *Trademark Claims*

Defendants have moved for summary judgment on Plaintiffs' claims for trademark infringement and misuse. Under the Lanham Act, 15 U.S.C. § 43, a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                    Page 16
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

literary title is entitled to protection when the title has obtained secondary meaning. *See, e.g., Twin Peaks Prods. Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1379 n. 4; Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 749 F.Supp. 1243, 1252 (S.D.N.Y.1990)*. Secondary meaning will be found "when the title is sufficiently well known that consumers associate it with a particular author's work." *Id.*

Whether secondary meaning exists is a factual determination, "proof of which entails vigorous evidentiary requirements," *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, 871 F.Supp. 709, 723 (S.D.N.Y.1995)* (*quoting Inwood Labs. v. Ives Labs., 456 U.S. 844, 851 (1982)*), and "[t]here is no question that Lanham Act claims are uniquely fact- intensive and are best decided after the trier of fact is afforded exposure to opposing litigants' arguments in the courtroom." *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 1992-2 Trade Cases P 69,990, 1992 WL 296314 (S.D.N.Y.)*.

**\*21** Defendants contend that Plaintiffs have offered no proof that either the title "A Course in Miracles" or the acronym "ACIM" have acquired secondary meaning. However, both of these marks have been registered by Plaintiffs with the PTO. "A certificate of registration of a mark [is] prima facie evidence of [its] validity ..., of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate...." *15 U.S.C. § 1057(b)*. Moreover, Plaintiffs claim that expert discovery on the trademark issues has been stayed pending resolution of the copyright issues in the case, and that they have retained an expert on the issue of the secondary meaning of the disputed marks. Defendants respond that discovery has closed and Plaintiffs have failed to notify them of this purported expert.

It is not necessary to resolve these questions, however. At the very least, many of the affidavits and much of the documentary evidence submitted by Defendants themselves provide evidence that the marks have acquired secondary meaning. Numerous articles, newsletters, e-mail messages, and other evidence demonstrate that many members of the public identify "A Course in Miracles" and "ACIM" with FIP and FACIM. While this evidence is not sufficient in and of itself to establish secondary meaning, it does establish an issue of material fact. A similar unresolved question is whether Plaintiffs abandoned their marks by failing to police adequately their use.

V. *Preliminary Injunction*

A. *The Standard for a Preliminary Injunction*

The standard for granting a preliminary injunction in this circuit is "(1) a showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant." *Civic Ass'n of the Deaf v. Giuliani, 915 F.Supp. 622, 631 (S.D.N.Y.1996)* (*citing Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir.1994)*); *see also Fun-damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 998-99 (2d Cir.1997)*.

In cases of copyright infringement, irreparable injury is generally presumed if the plaintiff can demonstrate a likelihood of success on the merits. *See, e.g., Richard Feiner & Co. v. Turner Entertainment Co., 98 F.3d 33, 34 (2d Cir.1996); Novelty Textile Mills, Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1094 (2d Cir.1977)*.

Here, although factual questions going to the issue of prior publication preclude any grant of summary judgment to Plaintiffs at this time, and although Defendants may ultimately prevail in this action, a limited preliminary injunction is appropriate. Posting of substantial, verbatim copies of sections of both the Course and of the entire "Text" section of the Cayce Version on a web page, from which anyone with access to a computer could copy the material and redistribute it with a click of a button, satisfies the requirement of "irreparable harm," while it cannot be said that Defendants would suffer any comparable harm were they to be enjoined from posting such material.

**\*22** In addition, while Plaintiffs' likelihood of success on the merits of the action is unclear, the discussion of the summary judgment motions demonstrates beyond doubt that there are sufficiently serious questions going to the merits to make them a fair ground for litigation. In addition, the balance of hardships here certainly tips in favor of Plaintiffs. Indeed, Defendants appear to have recognized as much, as their counsel at oral argument represented that they do not object to shutting down web sites with infringing material to the extent they have control over such sites.

Thus, Defendants will be enjoined from posting

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                        Page 17
2000 Copr.L.Dec. P 28,130, 55 U.S.P.Q.2d 1680
**(Cite as: 2000 WL 1028634 (S.D.N.Y.))**

material which is the subject of this litigation on their
own web sites and on the web sites of persons who
are acting in concert with Defendants. [FN9]

> FN9. While the injunction is granted to this
> limited extent, it is an unresolved question
> whether the individuals who are students at
> Endeavor or members of the Church were
> acting "in concert" with Defendants when
> they posted material from the Course on
> specific web sites, as the affidavits
> submitted in connection with the injunction
> illustrate.

*Conclusion*

For the reasons set forth above, Plaintiffs' and
Defendants' motions for summary judgment are
denied. Plaintiffs' motion for a preliminary injunction
is granted to the extent indicated above. With respect
to the injunction, Plaintiffs shall submit a proposed
order on notice.

It is so ordered.

2000 WL 1028634 (S.D.N.Y.), 2000 Copr.L.Dec. P
28,130, 55 U.S.P.Q.2d 1680

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works