IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PRACTICEWORKS, INC., et al., | ) | Civil No.: JFM 02 CV 1205 |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| PROFESSIONAL SOFTWARE SOLUTIONS | ) | |
| OF ILLINOIS, INC., | ) | |
| Defendant. | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| PRACTICEWORKS, INC., et al., | ) | Civil No.: JFM 02 CV 1206 |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| DENTAL MEDICAL AUTOMATION, INC., | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT GRANTING THEIR AMENDED THIRD, FOURTH, FIFTH AND SIXTH COUNTS AND FOR PARTIAL SUMMARY JUDGMENT, TO DISMISS, OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS AS TO DEFENDANTS' FIFTH, SEVENTH, EIGHTH, NINTH, TENTH, ELEVENTH, TWELFTH, THIRTEENTH AND PSSI'S FOURTEENTH AMENDED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES**

LAW OFFICES OF MARK E. WIEMELT, P.C.
10 S. LaSalle St., Ste. 3500
Chicago, Illinois 60603

OBER, KALER, GRIMES & SHRIVER
120 E. Baltimore Street
Baltimore, MD 21202-1643

Counsel for Defendants/Counter-Plaintiffs
Dental Medical Automation, Inc. and Professional Software Solutions, of Illinois, Inc.

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1
DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS AS TO
WHICH THERE IS NO GENUINE DISPUTE ...................................................5
ARGUMENT....................................................................................................9
  Plaintiffs' Amended Claims ........................................................................9
  I. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT GRANTING
  THEIR FOURTH AMENDED COUNT BECAUSE DEFENDANTS HAVE NOT
  BREACHED THE  AGREEMENTS ...............................................................10
    A. Plaintiffs Have Not Fully Complied With Their Contractual Obligations..........10
    B. Defendants Have Returned Relevant Materials to Plaintiffs .............................11
    C. Defendants Have Not Disclosed Confidential or Proprietary Information Regarding
    the Software............................................................................................13
    D. Defendants Do Not Need to Copy Plaintiffs' Software to Provide Support and
    Service and Have Not Done So ...................................................................14
    E. Genuine Issues of Material Facts Exist and Plaintiffs Are Not, Therefore, Entitled to
    Summary Judgment on Their Fourth Amended Count for Breach of Contract.............15
  II. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT
  GRANTING THEIR FIFTH AMENDED COUNT BECAUSE DEFENDANTS' HAVE
  NOT INFRINGED PLAINTIFFS' COPYRIGHT .............................................19
    A. Defendants Do Not Copy Plaintiffs' Software to Provide Support and Service. ........19
    B. Defendants Lawfully Possess Copies of Plaintiffs' Software...........................20
      1. Defendants Can Also be End-Users During the Term of the Agreements ...............20
      2. Plaintiffs Sold Software Outright Without a License..................................21
      3. Defendants Acquired Software From Plaintiffs Without Restrictions on Use or Re-
      Sale ....................................................................................................21
    C. Use of the Software by Defendants to Provide Technical Support to Third Parties is
    ...........................................................................................................22
    within the Scope of Permissible Copying Under Section 117 of the Copyright Act .........22
    D. Plaintiffs Offer No Credible Evidence That Defendants Reproduce, Prepare
    Derivatives of or Distribute the Software ......................................................23
  III. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT
  GRANTING THEIR SIXTH AMENDED COUNT AND DISMISSAL OF DEFENDANTS'
  SEVENTH COUNTERCLAIM BECAUSE DEFENDANTS MAY USE THEIR LAWFUL
  COPIES OF THE SOFTWARE TO PROVIDE TECHNICAL SUPPORT AND SERVICE
  ...........................................................................................................23
  IV. PLAINTIFFS CANNOT PREVAIL ON THEIR MOTION, EITHER IN WHOLE OR
  IN PART, AND ARE NOT, THEREFORE ENTITLED TO JUDGMENT IN THEIR
  FAVOR ON THEIR THIRD CLAIM FOR AN AWARD OF ATTORNEYS' FEES
  UNDER THE AGREEMENTS AND DISMISSING DEFENDANTS' NINTH AMENDED
  COUNTERCLAIM FOR THE RECIPROCAL RELIEF ..................................26
  Defendants' Counterclaims.......................................................................26

V. BECAUSE PSSI'S USE OF THE SOFTWARE TO PROVIDE TECHNICAL
SUPPORT AND SERVICE NEITHER CONSTITUTES A BREACH OF THE
AGREEMENT NOR INFRINGES SOFTDENT'S COPYRIGHT, PLAINTIFFS ARE
NOT ENTITLED TO SUMMARY JUDGMENT DISMISSING PSSI'S AMENDED
FOURTEENTH COUNTERCLAIM FOR BREACH OF CONTRACT............................26
VII. DEFENDANTS' HAVE STATED VALID CLAIMS UNDER BOTH STATE AND
FEDERAL LAW, AND PLAINTIFFS' MOTION FOR DISMISSAL AND/OR
JUDGMENT ON DEFENDANTS FIFTH, EIGHTH, TENTH, AND ELEVENTH
AMENDED COUNTERCLAIMS SHOULD BE DENIED ............................................29
  A. Maryland Law Does Not Govern Because the Narrow Choice of Law Provision
  Contained in the Agreement Cannot be Read Sufficiently Broad to Encompass
  Contract-Related Tort Claims.................................................................................29
  B. The Court's Liberal Pleading Standard Demands that the Counterclaims Not Be
  Dismissed ................................................................................................................30
  C. Defendants State a Valid Claim Under the Illinois Deceptive Trade Practices Act ....31
  D. Defendants State a Valid Illinois Common Law Claim for Unfair Competition and
  Trade Disparagement .............................................................................................32
  E. Defendant State a Valid Unfair Competition Claim .............................................32
  F. Defendants State a Valid Illinois Consumer Fraud and Deceptive Business Practices
  Act (815 ILCS 505) Claims.....................................................................................33
  G. Defendants Have Alleged Valid Tortious Interference With Contract Claim............34
  H. Defendants State a Valid Tortious Interference With Prospective Economic
  Advantage Claim....................................................................................................35
  I. DMA States a Valid Claim for Deceptive Trade Practices, Unfair Competition, and
  Defamation Under Ohio Law..................................................................................36
  K. Defendants State a Valid Maryland Common Law Unfair Competition Claim ........38
  L. Defendants State a Valid Tortious Interference with Contract Claim .........................39
VIII. DEFENDANTS STATE A CLAIM UNDER SECTION 43(A) OF THE LANHAM
ACT AND, THEREFORE PLAINTIFFS' MOTION TO DISMISS THE EIGHTH
AMENDED COUNTERCLAIM MUST BE DENIED..............................................40
IX. DEFENDANTS HAVE PLEAD A TYING ARRANGEMENT UNDER THE
SHERMAN ACT AND PLAINTIFFS MOTION FOR DISMISSAL AND/OR
JUDGMENT OF THE THIRTEENTH AMENDED COUNTERCLAIM MUST BE MUST
BE DENIED...................................................................................................................43
  A. Defendants Have Plead the Requisite Elements of a Tying Arrangement .................43
  B. Defendants Have Alleged an Antitrust Injury.........................................................47
X. DEFENDANTS ARE ENTITLED TO AN ACCOUNTING AND, THEREFORE,
PLAINTIFFS' MOTION SEEKKING DISMISSAL AND/OR JUDGMENT OF
DEFENDANTS TWELFTH COUNTERCLAIM MUST BE MUST BE DENIED .............48
Affirmative Defenses................................................................................................48
XI. AFFIRMATIVE DEFENSES PROVIDE AN EXCUSABLE REASON FOR AN
AJUDGED INFRINGEMENT, WHICH JUDGMENT HAS NOT BEEN MADE IN THIS
CASE, AND THERE HAVING BEEN NO MEANINGFUL DISCOVERY, CANNOT BE
MADE AND, THEREFORE PLAINTIFFS MOTION TO DISMISS DEFENDANTS

TWELFTH THROUGH TWENTY-SECOND AFFIRMATIVE DEFENSES MUST BE DENIED ............................................................................................................48

XII. PLAINTIFFS ARE NOT ENTITLED TO A PERMANENT INJUNCTION, STATUTORY DAMAGES AND ATTORNEYS' FEES BECAUSE DEFENDANTS HAVE NOT INFRINGED SOFTDENT'S COPYRIGHTS ............................................49

CONCLUSION ...................................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc., 61 F.Supp.2d 426 (D. Md. 1999)....38

Automatic Retailers of Am., Inc. v. Evans Cigarette Service Co., 304 A.2d 581 (Md.1973)..............15

Bennett v. Schmidt, 153 F.3d 516 (7th Cir. 1998)........................................................................39

Berry & Gould, P.A. v. Berry, 360 Md. 142 (2000)......................................................................35

Bickley v. FMC Tech., Inc., 282 F.Supp.2d 631 (N.D. Ohio 2003)..................................................47

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977).................................................47

Brunswick Corp. v. Bowl-O-Matic, 428 U.S. 104 (1986).................................................................47

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue, 284 F.2d 302,

cert. denied, 537 U.S. 1001 (2002)...........................................................................................40

Central Hudson Gas & Elec. v. Public Serv. Comm'n, 447 U.S. 557 (1980)........................................42

Conley v. Gibson, 355 U.S. 41 (1957).......................................................................................30

Cromeens, Holloman, Sibert, Inc v. AB Volvo, 349 F.3d 376 (7th Cir. 2003)......................................35

Davis v. Jacobs, 710 N.E.2d 1185 (Ohio App. 1998)....................................................................37

DSC Comm. Corp. v. Pulse Comm., Inc., 170 F.3d 1354 (Fed. Cir. 1999). ................................24, 25

Duncavage v. Allen, 497 N.E.2d 433 (Ill. App. 1986) ...................................................................31

Eastman Kodak v. Image Tech. Serv., Inc., 112 S. Ct. 2072 (1992)............................................43, 44

Edelman, Combs and Latturner v. Hinshaw and Culbertson, 788 N.E.2d 740 (Ill. App. 2003) ....35, 36

Electronics Store, Inc. v. Cellco Partnership, 732 A.2d 980 (Md. App. 1999) ......................................38

Faulkner Adv. Assoc., Inc. v. Nissan Motor Corp. in U.S.A., 905 F.2d 769 (4th Cir. 1990) ..............35

Fedders Corp. v. Elite Classics, 279 F.Supp.2d 965 (S.D. Ill. 2003) ..............................................36

Friedman v. Rogers, 440 U.S. 1, 11 (1979)..............................................................................42

Glazewski v. Coronet Ins. Co., 483 N.E.2d 1263 (Ill. 1985)...........................................................31

Gordon & Breach Sci. Publishers, S.A. v. Am. Inst. of Physics,

859 F. Supp. 1521 (S.D.N.Y. 1994)..........................................................................................42

Gosden v. Louis, 687 N.E.2d 481 (Ohio App. 1996)....................................................................37

havePOWER, LLC v. General Electric Co., 183 F.Supp.2d 779 (D.Md. 2002) ......................34, 35, 39

Hishon v. King & Spaulding, 467 U.S. 69 (1984)........................................................................30

ILC Peripherals Leasing Corp. v. IBM, 488 F. Supp. 228 (N.D. Cal. 1978) ......................................44

In re Microsoft Corporation Antitrust Litigation, 237 F.Supp.2d 639 (D. Md. 2002) ......................47

Innovative Digital Equip., Inc. v. Quantum Tech., Inc., 597 F. Supp. 983 (N.D. Ohio 1984).............37

International Salt Co. v. United States, 332 U.S. 392 (1947).............................................................45

Jefferson Parish Hosp. Dist. 2 v. Hyde, 466 U.S. 2 (1984) ...........................................................44

Krock v. Lipsay, 97 F.3d 640, (2nd Cir. 1996)............................................................................29

Leatherman v. Tarrent County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993).....30

Logan Graphic Prods., Inc. v. Textus USA, Inc., 2002 WL 31507174 ........................................30, 41

Madison v. Purdy, 410 F.2d 99 (5th Cir. 1969)..........................................................................38

MAI Sys. Corp. v. Peak Computer, Corp., 991 F.2d 511 (9th Cir. 1993).....................................22, 46

Matikas v. Univ. of Dayton, 788 N.E.2d 1108 (Ohio App. Ct. 2003)..............................................39

Measurement Specialties, Inc. v. Taylor Precision Prods., L.P., 131 F.Supp.2d 982 (N.D. Ill. 2001).34

Mitchell, Best & Visnic, Inc. v. Travelers Prop. Cas. Corp., 121 F.Supp.2d 848 (D.Md. 2000),

aff'd, No. 01-1911, 2002 WL 1018562 (4th Cir. May 16, 2002) ....................................................39

Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488 (1942)...................................................................44
Natural Design, Inc. v. Rouse Co., 302 Md. 47 ...................................................................................36
Neurotron, Inc. v. American Assoc. of Electrodiagnostic Medicine, 189 F.Supp.2d 271
(D. Md. 2001), aff'd No. 01-2115, 2002 WL 31207199 (4th Cir. 2002).............................................42
Northern Pac. Ry. v. United States, 356 U.S. 1 (1958) ........................................................................45
Osborn v. Sinclair Ref. Co., 286 F.2d 832 (4th Cir. 1960), cert. denied, 366 U.S. 963 (1961)...........46
Parker v. Davis, 900 F. Supp. 788 (D. Md.1995) ...................................................................................9
Parker v. The Columbia Bank, 91 Md. App. 346 (1992)......................................................................28
Penn-Plax, Inc. v. L. Schultz, Inc., 988 F. Supp. 906 (D. Md. 1997)...................................................38
Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994)....................................................49
Randazzo v. Harris Bank Palatine, 104 F.Supp.2d 949 (N.D. Ill. 2000), aff'd 262 F.3d 663 ..............33
Republic Tobacco, L.P. v. North Atl. Trading Co., 1999 WL 261712 (N.D. Ill, 1999)......................30
Scotts Co. v. United Industries Corp., 315 F.3d 264 (4th Cir. 2002) ..................................................40
See, Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F.Supp.2d 589 (E.D. Penn. 1999)..30
Service & Training, Inc. v. Data Gen. Corp., 963 F.2d 680 (4th Cir. 1992) .......................................44
Shell Oil Co. v. FTC, 360 F.2d 470 (5th Cir. 1966) .......................................................................45, 46
Slife v. Kundtz Properties, 40 Ohio App.2d 179 (Ohio Ct. App. 1974)...............................................38
Sutter Ins. Co. v. Applied Systems, Inc., 2004 WL 161508 (N.D. Ill.)................................................33
Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc.,
190 F. Supp. 2d 785 (D. Md. 2002)....................................................................................................28
Systemcare, Inc. v. Wang Labs. Corp., 117 F.3d 1137 (10th Cir. 1997)..............................................45
Turner v. Fletcher, 706 N.E.2d 514 (Ill. App. Ct. 1999) .....................................................................39
Unique Concepts, Inc. v. Manuel, 669 F.Supp. 185 (N.D. Ill. 1987)....................................................32
Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425 U.S. 748 (1976)...................42
Ways v. Means, Inc. v. IVAC Corp., 506 F. Supp. 697 (N.D. Cal. 1979)
aff'd, 638 F.2d 143 (9th Cir.), cert. den. 454 U.S. 895 (1981) ...........................................................45
We Deliver America, Inc. v. General Growth Properties, Inc., 2003 WL 22836449 (N.D.Ill.)...........33
Wells v. Chevy Chase Bank, F.S.B., 768 A.2d 620 (Md. 2001) ..........................................................15
Wilson v. Electro Marine Sys., Inc., 915 F.2d 1110 (7th Cir. 1990).....................................................32
Zenith Electronics Corp. v. Exzec, 182 F.3d 1340 (Fed. Cir. 1999) ...................................................40

## Statutes

17 U.S.C. § 117.....................................................................................................................................26
17 U.S.C. § 117(c) ...............................................................................................................................22
17 U.S.C. § 505.....................................................................................................................................50
815 ILCS 505/1(c) ...............................................................................................................................33
815 ILCS 505/1(e) ...............................................................................................................................33
Computer Maintenance Competition Assurance Act ("CMCA"), section 301. ...............................22, 23
Consumer Fraud Act (815 ILCS § 505)...........................................................................................31, 48
Digital Millinium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998).22
Illinois UDTPA ........................................................................................................................31, 32, 48
Lanham Trademark Act, § 1et seq, 15 U.S.C.A. § 1051 et seq ............................................................41
Maryland Consumer Protection Act. Md. Code Ann., Com. Law § 13-101 et seq.............................38

Ohio Uniform Deceptive Trade Practices Act..............................................................................................37
Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)..........................................................................48

## Rules

Fed. R.Civ. P. 12 (c) .............................................................................................................................30
Fed. R.Civ. P. 12(b)(6)...........................................................................................................................30
Fed. R.Civ. P. 8.......................................................................................................................................30
Fed. R.Civ. P. 8(c) ..................................................................................................................................49
Fed. R.Civ. P. 8(c) ..................................................................................................................................30
Fed. R.Civ. P. 8(f)...................................................................................................................................30
Fed. R.Civ. P. 9(b) ..................................................................................................................................33
Fed. R.Civ. P. 56(c) ..................................................................................................................................9

## Treatises

NIMMER ON COPYRIGHT, § 8.08, p. 6 (2003).....................................................................................22

Defendants/Counter-Plaintiffs Dental Medical Automation, Inc. (hereinafter "DMA") and Professional Software Solutions of Illinois, Inc. (hereinafter "PSSI") (collectively DMA/PSSI or Defendants)[1] respectfully submit this Memorandum of Law in Response to Plaintiffs' Motion for Partial Summary Judgment, Motion to Dismiss, or, in the Alternative, and Judgment on the Pleadings.

This response is based on the following discussions, the Affidavit of Lawrence E. Eyer and Exhibits thereto, the Affidavit of Jeffrey Suglio and Exhibits thereto, the Affidavit of Mark E. Wiemelt and Exhibits thereto, the Affidavit of Robert J. Chaisson, all pleadings and papers in the Court's file, including the Complaint, Answer, Affirmative Defenses and Counterclaims, Reply to Counterclaims, and Plaintiffs' Motion for Partial Summary Judgment and For Partial Judgment on the Pleadings and related papers, and such other matters as may be considered by the Court at the time of the hearing.

## PRELIMINARY STATEMENT

Defendants submit that Plaintiffs' motions are, at best, premature. In reading Plaintiffs' Memorandum of law in support of their motions one becomes baffled at their timing. No meaningful discovery has taken place in this matter. Thus, there is little evidence to provide the Court. Plaintiffs are left, therefore having to repeatedly throughout the Memorandum, recite portions of the Agreement and sections of previous court decisions, toss in a statement from the affidavit of Mr. Fiori or an out of context portion of a transcript to somehow arrive at the conclusion that Defendants are unquestionably guilty of some heinous act.

The truth is that many unanswered questions exist in this case, genuine questions as to what documents mean, what activities the parties have undertaken, whether those activities are permissible, and how the parties must relate to one another in the future. It is only through ignoring these questions, the gaps in their arguments, and the use of circuitous reasoning and leaps of logic, that Plaintiffs can present any argument at all.

---

[1] Since Plaintiffs submitted one brief directed to both actions, DMA and PSSI are submitting one brief in response. Unless otherwise indicated, the use of DMA/PSSI shall apply to DMA, PSSI, or both, and the use of the singular Agreement shall apply to the Agreement of DMA, PSSI, or both, where applicable.

1

It is telling that Plaintiffs bring their motions before any meaningful discovery has begun. Throughout this case, Plaintiffs have repeatedly insisted that discovery not begin. One suspects the reason for resisting discovery is that it will not be kind to Plaintiffs and it is their "house of cards" that will quickly fall.

It is also telling that while Plaintiffs repeatedly refer to and rely heavily on the alleged Purchase Registration Form and alleged Software licenses used by Plaintiffs in support of their position, no forms or licenses are attached to their motion or their Memorandum. For that matter, these elusive forms and licenses have *never* been made of record. Moreover, despite repeated requests by Defendants for copies of the licenses so that Defendants can understand with what they are accused of infringing, no licenses have ever been produced by Plaintiffs. Only attorney argument as to their existence and meaning has been offered by Plaintiffs, without even a recitation of their alleged content.

The reality is that the terms of the Agreement and Plaintiffs' actions, procedures, and documents are either in genuine dispute or favor Defendants. Plaintiffs' motions and Memorandum highlight this fact. This response, with its supporting affidavits, one of which is from Plaintiffs' Director of Sales and Marketing during the relevant time frames, confirm this fact.

While taking issue with Plaintiffs' linguistic approach and the characterizations employed by them in their Memorandum, Defendants generally agree with Plaintiffs' preliminary statement insofar as it addresses the past procedures in this matter and summary of the pleadings. So as not to burden the Court with yet another detailed description of events to date and the state of the pleadings, Defendants take time here only to offer a counter response to selected portions of the Plaintiffs' preliminary statement[2].

Plaintiffs present several items that are irrelevant to the issues presently before the Court. Some items, however, merit response. First is Plaintiffs' oft repeated statement that after the Court's January 7, 2003

---

[2] Defendants' selective response should not be viewed as an acceptance of or acquiescence to Plaintiffs' version of the facts or accuracy of procedure. Defendants' approach is taken only to serve judicial economy in the belief that the Court has a good understanding of the history of the case and the current state of the pleadings.

Decision, the action "appeared to be on the cusp of resolution."[3]  From Defendants' viewpoint, and as supported by the affidavits of Mr. Lawrence E. Eyer and Mr. Jeffrey Suglio[4], nothing could be further from the truth.  Settlement proposals were exchanged, but the parties have always been far apart on major issues, including the significant issue of Defendants' ability to use Plaintiffs' Software to provide support and service, an issue that remains unresolved today. (Eyer Aff., ¶ 21; Suglio Aff., ¶ 21).

Second, Plaintiffs will have this Court believe that Defendants disobeyed a Court Order and not returned relevant material to Plaintiffs.  This is not the case.  During the February 21, 2003 Hearing it was made clear that "relevant materials" included only the advertising collateral used to sell the Product. (Wiemelt Affidavit, ¶ 3[5]; Feb. 21, 2003 Trans., at p.10) By agreement with Plaintiffs, Defendants returned relevant material by depositing it with their attorney, Mr. Mark Wiemelt (Eyer Aff., ¶ 14; Suglio Aff., ¶ 14). Defendants have only retained irrelevant materials which they lawfully own and/or for which they have a license.  While Plaintiffs maintain that Defendants do not lawfully own or possess any Software, this fact is part and parcel of Plaintiffs' present motion.  But again, these motions being premature at best, this fact also only offers another example of a genuine issue of material fact.

Third, Plaintiffs inexplicably accuse Defendants of some form of wrongdoing by adding Counterclaims which broaden the scope of this litigation.  However, it is Plaintiff's conduct since the Court's January 7, 2003 Memorandum and Opinion which has broadened the scope of the litigation and necessitated the adding of additional Counterclaims by Defendants.  Furthermore, Plaintiffs ignore the fact that they have also broadened the scope of this litigation by adding counts alleging breach of contract and copyright infringement.

Fourth, Plaintiffs also take statements with which Defendants in principle agree and twist them to reach the desired conclusion.  For example, Plaintiffs rightfully admit that Defendants maintain that they

---

[3] *See, e.g.,* Plaintiffs Memorandum, p. 1
[4] Attached as Exhibits A and B, respectively.
[5] Attached as Exhibit C

3

lawfully own Softdent Software and that title has passed to them. Plaintiffs go on to emphasize that Defendants have admitted that "copying of the Software from a disk or other media into RAM, and that copying, when done without Softdent's authorization, is a direct infringement of Softdent's Copyrights"[6]. Plaintiffs expect this Court to follow their non-sensical leap in logic that since Defendants acquired Software that they maintain they own and/or for which they have a license, and further admit that they know that making unauthorized copies is a copyright violation, that Defendants are guilty of the offense of making unauthorized copies. However, Plaintiffs offer no competent proof that Defendants copy the Software.

In addition, throughout their motion, Plaintiffs expect this Court to ignore Defendants' ownership claims and the impact they have on alleged unauthorized copying. Plaintiffs also expect this Court to ignore the fact that, regardless of ownership rights, Defendants have a license (permission/authorization) to use the Software, express and/or implied. Additionally, Plaintiffs expect this Court to ignore (actually dismiss) Defendants' affirmative defenses, including but not limited to the doctrines of waiver, estopple, acquiescence, laches, and/or fair use, the first sale doctrine, copyright misuse, the doctrine of unclean hands, and/or copyright unenforceability at this early stage of litigation.

Perhaps most importantly, because no meaningful discovery related to most of the remaining issues in this case has been completed, Plaintiffs must rely primarily on the conclusory affidavit of Mr. Fiori to present their case. Needing to ultimately rely on an affidavit for these particular motions is sufficient reason alone to defeat them as being premature at best and unfounded at worst.

Furthermore, the affidavits and evidence introduced by Defendants contradict the relevant portions of Fiore's affidavit and preclude the entry of summary judgment in Plaintiffs' favor. For example, the affidavits and evidence introduced by Defendants, including the Agreements[7], reveal that Plaintiffs' lack strict control of the dissemination of their Software, Defendants may be both Dealers and/or End-Users, and Plaintiffs and Defendants have sold the Software to non-dentists, oral surgeons and orthodontists.

---

[6] Plaintiffs Memorandum, p, 2, quoting Am. Compl. ¶ 100 and Am. Ans ¶ 100
[7] Agreements attached as Exhibit A to Eyer and Suglio Affidavits (Memorandum Exhibits A and B, respectively)

4

Because the Agreement's choice of law provision is narrow and applies only to "[t]his Agreement and construction thereof"(Agreement, ¶19), and because Counterclaims V (violation of the Illinois Uniform Deceptive Trade Practices Act, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, unfair competition and trade disparagement under the common law of Illinois), Counterclaim VIII (violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)), Counterclaim X (tortious interference with contract) and Count XI (tortious interference with prospective economic advantage) all arise out of conduct which occurred after the Agreements were declared terminated on January 7, 2003 and also occurred in Illinois and Ohio, Illinois and Ohio law (and corresponding federal circuit court law) applies to Defendants' Counterclaims. Counterclaim IX (attorneys' fees) and Counterclaim XII (accounting) should also be construed under the laws of Illinois and Ohio for the corresponding state law violations which give rise to attorneys' fees and an accounting.

Accordingly, Defendants PSSI/DMA respectfully ask this Court to deny Plaintiffs' motion for partial summary judgment granting their amended third, fourth, fifth and sixth counts and for partial summary judgment, to dismiss, or, in the alternative, for judgment on the pleadings as to defendants' fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth and PSSI's fourteenth amended counterclaims and affirmative defenses.

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Plaintiffs submit a plethora of "facts" to which they claim there are no genuine disputes. Defendants disagree. As they did with the preliminary statement, Plaintiffs have, through the conclusory affidavit of Mr. Al Fiori and a distortion of prior statements made by Defendants' counsel, made a liberal and unsupportable interpretation of material facts to suit their purposes.

Defendants dispute Plaintiffs' implication that plaintiffs are only in the business of selling dental management software. The Agreements themselves prove otherwise. The Agreements require the Dealer to acknowledge Plaintiffs' ownership of the marks "Infosoft®", "MedAssist®", and "SoftVet®", indicating that

5

Plaintiffs and Defendants sold Software to third parties who were not dentists, oral surgeons or orthodontists (collectively "non-dentists"). (Agreements ¶ 8.1). Indeed, Plaintiffs' United States Trademark registrations[8] indicate that, during the term of the Agreements, Plaintiffs sold software to "veterinary offices" and "medical offices," in addition to dental offices. In addition, Addendum A[9] to the Agreement expressly stated that MedAssist® software was to be re-sold by Defendants under the Agreement. In fact, Defendants sold Plaintiffs' MedAssist® and SoftDent® software to non-dentists. ( Eyer Aff., ¶ 4 and Suglio Aff., ¶ 4). Therefore, contrary to Plaintiffs' contention, the sale of the Software was not restricted only to dentists, orthodontists and oral surgeons, either under or outside the Agreement.

Defendants do not dispute that exclusive Dealership rights were granted by the Agreements. For purposes of this motion only, Defendants also do not dispute that Plaintiffs are the owners of seven copyright certificates for Software, but submit the entire issue of copyright validity and unenforceability is premature without the benefit of discovery.

Defendants further agree that the purpose of the Agreement was to facilitate the sale of copies of the Software to end-users. Defendants adamantly deny, however, Plaintiffs' repeated assertion that End-User was defined by the Agreement as dental or orthodontic practices in Defendants' territory. A simple reading of the Agreement demonstrates otherwise. Paragraph 2.5 of the Agreement states that " [t]he term "End-User" shall mean a customer or purchaser of the Product(s). (Agreement, §2.5; Eyer affidavit, ¶ 3; Suglio affidavit, ¶ 3). Nowhere in the Agreement is the word dentist, orthodontist, oral surgeon, or phrase dental practice or orthodontic practice used.

Defendants also dispute that Plaintiffs tightly controlled dissemination of the Software. Plaintiffs routinely and knowingly shipped Software without receiving a completed Purchase Registration Form from Defendants or End-Users. As attested to by both Lawrence Eyer and Jeffrey Suglio:

---

[8] See Wiemelt Affidavit, ¶¶ 4-8.
[9] Attached as Exhibit B to Eyer and Suglio Affidavits (Memorandum Exhibits A and B, respectively)

6

> Plaintiffs and their predecessors-in-interest would routinely and knowingly sell Software to non-dentist, orthodontist, or oral surgeon end-users. During the term of the Agreement, I am aware of such sales to at least a school, a prison, and an eye care facility. In fact, I sold both Medassist and Softdent software to non-dentists.

(Eyer affidavit, ¶ 4 and Suglio affidavit ¶ 4)

Moreover, Mr. Robert J. Chaisson, a former Director of Sales and Marketing for Plaintiffs, attested to the same fact:

> Plaintiffs did not tightly control the dissemination of copies of Softdent. For example, I am familiar with the contracts entered into between Plaintiffs and Defendants. Those contracts included a provision that provided that Softdent products would only be shipped upon receipt by Plaintiffs of a completed Product Registration Form. Contrary to this contract provision, Plaintiffs routinely shipped Softdent products without a product registration form first being completed by dealers or end-users, End-users needed only to place an order and pay for Softdent products to complete the purchase and be shipped Softdent products.

(Chaisson affidavit[10], ¶ 2)

Defendants further dispute the proposition that the Agreements "clearly" do not contemplate Defendants being End-Users. Nowhere in the Agreement is Dealer defined. Moreover, the Agreement neither excludes Dealers from being a customer or purchaser of the Product(s) nor prohibits Dealers from purchasing Products. Again, Plaintiffs ask this Court to follow their non-sensical leap in logic to reach their desired conclusion. In addition, Mr. Eyer attests:

> No document ever presented to me or agreement executed by me defined end-user as being only a dentist, orthodontist, or oral surgeon, or a dental or orthodontic practice. Further, I was never advised by Plaintiffs or their predecessors-in-interest that end-users were to limited to dentists, orthodontist, or oral surgeons, or dental or orthodontic practices.
>
> Plaintiffs and their predecessors-in-interest would routinely and knowingly sell Software to non-dentist, orthodontist, or oral surgeon end users. During the term of the Agreement, I am aware of such sales to at least a school, a prison, and an eye care facility.
>
> At no time was I ever informed by Plaintiffs that PSSI , as a Dealer, could not be an end-user of the product. As stated above, Plaintiffs routinely and knowingly sold Softdent to non-dentists, orthodontist, and oral surgeons. **In fact, PSSI has for many years used**

---

[10] Attached hereto as Exhibit D

7

the Softdent program for its own accounting purposes, a situation
about which Plaintiffs were aware.

(Eyer affidavit, ¶¶ 3-5)(emphasis added).

Mr. Suglio echoes that statement:

No document ever presented to me or agreement executed by me
defined end-user as being only a dentist, orthodontist, or oral surgeon, or a
dental or orthodontic practice. Further, I was never advised by Plaintiffs or
their predecessors-in-interest that end-users were to limited to dentists,
orthodontist, or oral surgeons, or dental or orthodontic practices.

Plaintiffs and their predecessors-in-interest would routinely and
knowingly sell Software to non-dentist, orthodontist, or oral surgeon end
users. During the term of the Agreement, I am aware of such sales to at
least a school, a prison, and an eye care facility.

At no time was I ever in formed by Plaintiffs that DMA, as a
Dealer, could not be an end-user of the product. As stated above, Plaintiffs
routinely and knowingly sold Softdent to non-dentists, orthodontist, and
oral surgeons. I am also aware of that co-defendant Professional
Software Solutions of Illinois, Inc. has for many years used the
Softdent program for its own accounting purposes.

(Suglio affidavit, ¶¶ 3-5)(emphasis added).

And Mr. Chaisson supports these statements:

Plaintiffs did not distinguish between potential end-users of the
Softdent product and, in fact, knowingly and routinely sold Softdent
Products to virtually anyone who wanted to buy the product. While the
main thrust of Plaintiffs business was to sell Softdent Products to dentists,
oral surgeons or orthodontists, there was no requirement that the ultimate
end-user be a dentist, oral surgeon or orthodontist, or work for a dental or
orthodontic practice. As only one of numerous examples, in April of 1999,
Plaintiffs knowingly sold a multi-user Softdent product package to
Permanent Eyeliners Plus, Inc. of Indianapolis, IN. To my knowledge, no
one who owned or worked at Permanent Eyeliners Plus, Inc. was a dentist,
oral surgeon or orthodontist. In addition, Plaintiffs knowingly sold products
to schools, hospitals and prisons.

Plaintiffs knew of and did not prohibit non-dentist, non-dealer
independent service providers from providing Softdent technical support and
service to Softdent owners and/or licensees.

As Director of Sales and Marketing, I was intimately involved in the
promotion of Softdent Products. Again, while the main thrust of Plaintiffs
business was to sell Softdent Products to dentists, oral surgeons or
orthodontists, I never received a directive from my superiors nor did I ever
issue one that sale and distribution of Softdent Products was to be only to
dentists, oral surgeons or orthodontists.

Moreover, I never received a directive from my superiors nor did I
ever issue one that the sale and distribution of Softdent products could not

8

be made to Softdent dealers. In fact, there were numerous known instances
when such sales were made.

(Chaisson affidavit, ¶¶ 3-6)

Contrary to Plaintiffs' assertions, Defendants also served as much more than conduits for the shipment
of the Software to End-Users. The Agreement acknowledged that Defendants were value-added resellers of
Plaintiffs' Products. (Agreement, § 10.2). As value-added resellers, Defendants were also responsible for the
installation and setup of the Software as well as training as to its use. (Eyer affidavit, ¶ 9 and Suglio affidavit ¶
9). Moreover, Plaintiffs and their predecessors-in-interest sometimes drop shipped product to an end-user.
(Eyer affidavit, ¶ 9 and Suglio affidavit ¶ 9). Defendants generally did not see or touch the software in these
circumstances until such time as a DMA representative would assist an end-user in the installation and setup of
the software on the end-users' computers (Eyer affidavit, ¶ 9; Suglio affidavit, ¶ 9).

As detailed infra, Defendants also dispute that Plaintiffs have submitted any competent evidence that
Defendants have used or copied the Software after the declaration of termination of the Agreements on
January 7, 2003, with or without authority. (See, Arguments I.D. and II., generally, infra).

## ARGUMENT
## Plaintiffs' Amended Claims

It is axiomatic law that when deciding a motion for Summary Judgment, the court must draw all
reasonable factual inferences in favor of the non-moving party. *Parker v. Davis*, 900 F. Supp. 788, 791 (D.
Md. 1995). Summary judgment is appropriate only where "there is no genuine issue as to any material fact
and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In the motion presently before the Court, Plaintiffs have not come close to presenting a case worthy of
summary judgment. Plaintiffs present no coherent argument or conclusive evidence that they are entitled to
summary judgment for any of their counts, and fail to demonstrate that there are no genuine issues as to
material facts. Accordingly, Plaintiffs' motion fail and must be denied.

9

**I.**

## PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT GRANTING THEIR FOURTH AMENDED COUNT BECAUSE DEFENDANTS HAVE NOT BREACHED THE AGREEMENTS

In their Fourth Amended Count for breach of contract, Plaintiffs essentially allege that (1) they have fully complied with their contractual obligations and (2) Defendants have not. Plaintiffs contend that it is undisputed that Defendants have:

(i) failed to return to Plaintiffs all materials regarding the Products as required under the Agreement;

(ii) disclosed confidential or proprietary information relating to the Software; and,

(iii) continue to use, copy, or otherwise exploit the Software to provide technical support and service to third parties.

Plaintiffs' argument consists solely of a litany of incomplete, unsupported, or erroneous "factual" representations and misstatements of Defendants' positions posing as a purported chronological and logical order of events that lead to the inevitable conclusion that Defendants' breached their Agreements.

Actually, Plaintiffs offer no proof whatsoever that they have complied with their contractual obligations, that Defendants have disclosed confidential or proprietary information, and only an erroneous interpretation based upon a wishful reading of Defendants' Answer to their Amended Complaint that Defendants impermissibly use or copy Plaintiffs' Software to provide support and maintenance to third parties.

### A. Plaintiffs Have Not Fully Complied With Their Contractual Obligations

Paragraph 4.4 of the Agreement provides that during its term, Plaintiffs will, *inter alia*, provide mailing lists, demographic studies, brochures, demonstration disks, and other sales materials to Deal at cost . . .. This Plaintiffs have failed to do. As only one example, and as attested to by Mr. Eyer and Mr. Suglio, during the last eighteen months approximately of the Agreement, none of the listed materials were provided to them. (Eyer affidavit, ¶ 10 and Suglio affidavit, ¶ 10). Defendants have alleged additional breaches in their Amended Counterclaims. (See, Am. Counterclms., ¶¶ 103-105).

10

## B. Defendants Have Returned Relevant Materials to Plaintiffs

Plaintiffs consistently and unfairly maintain that Defendants will not return "relevant materials." This is untrue. It is also a misstatement of the Court's Decision and Order. The Court, as is admitted by Plaintiffs in their Memorandum at p. 14, found that Defendants could provide technical support and service of the Software "provided, of course, . . . that relevant materials were returned to [Plaintiffs] and not used" as required under Paragraph 13.3 of the Agreements (Feb. 21, 2003 Trans., p. 10)[11]. During that Hearing Defendants' counsel made clear that "relevant materials" included only the advertising collateral used to sell the Product. (Feb. 21, 2003 Trans., at p.10).

During that same Hearing it was agreed by the parties that Defendants could return the relevant materials by forwarding them to their attorney, Mr. Wiemelt (Feb. 21, 2003 Trans., at p.14). Both PSSI and DMA have abided by this agreement and returned all relevant materials to Mr. Wiemelt (Eyer affidavit, ¶ 14; Suglio affidavit, ¶ 14).

Defendants have retained non-relevant materials, i.e., Software that they lawfully own and/or to which they have a license. Plaintiffs maintain that the "relevant materials" of Paragraph 13.3 of the Agreements includes all Software acquired by Defendants, regardless of how, when and why the Software was acquired. In doing so, Plaintiffs ignore Defendants' dual role as both Dealers and End-Users. Plaintiffs further ignore the distinction between Defendants' acquisition of Software as Dealers and their acquisition of Software as End-Users.

Plaintiffs' also ignore the intent and meaning of the language of paragraph 13.3 of the Agreements. Paragraph 13.3 of the Agreements is found within Section 13 entitled "Protection of Trade Secrets" and Plaintiffs have not alleged and cannot prove that ownership, use or possession of the Software by Defendants

---

[11] Also notable is the fact that Plaintiffs have judicially admitted that they "do not dispute Defendants may continue to provide 'technical support' and 'service' to their former and existing customers even after the Agreements have been terminated." (Plaintiffs' First Motion for Summary Judgment p. 30; 2/21/03 Transcript, p. 10)

11

violates any trade secrets rights of Plaintiffs. Plaintiffs' bad-faith and conduct now forces the Court to decide whether Defendants lawfully own and/or have a license to use this Software.

Furthermore, when read in the context of the entire Agreement, it is apparent that the "relevant materials" of paragraph 13.3 of the Agreements includes only the advertising and marketing collateral used to sell the Products, i.e. sales supplies, sales tools and sales materials. The Agreements expressly define "Products" as "computer software and related products now or hereafter, during the term of this Agreement, manufactured by InfoSoft® and distributed by PSS." (Agreements ¶ 2.1). The Agreements provide that "[t]he restrictions and controls on the Dealer's operation and acquisition of **sales supplies** established herein are intended **solely** to protect PSS' rights to its trademark and to discharge **[Plaintiffs'] obligation** to the Dealer to maintain a high level of quality products and services." (Agreements ¶ 1.5)(emphasis added). Accordingly, the restrictions and controls on sales supplies, including the requirement that "relevant materials" be returned to Plaintiffs, were "intended **solely** to protect PSS' rights to its trademark and to discharge **[Plaintiffs'] obligation** to the Dealer." The restrictions and controls on sales supplies found in the Agreements were not intended to prevent Defendants from owning, using or possessing Software which they obtained outside of the Agreements as End-Users.

Numerous other provisions of the Agreements leading up to paragraph 13.3 referenced the sales supplies, sales tools and sales materials which were to be returned. Sections 4 of the Agreements address Plaintiffs' obligations to provide sales supplies or sales materials to Dealers in order to facilitate sales of the Products by Dealers. The Agreements expressly provide that Plaintiffs shall provide "mailing lists, demographic studies, brochures, demonstration disks and other **sales materials** to licensed Dealers at cost." (Agreements ¶ 4.4)(emphasis added). Sections 7.4 of the Agreements address Plaintiffs' provision of promotional items and promotional materials (sales materials) to Dealers. In addition, Addendum A to the Agreements lists specific advertising collateral, sales supplies or sales materials under the heading SALES TOOLS, including SELF RUNNING DEMO and LIVE DEMO (which Defendants have returned). (Eyer

12

affidavit, ¶¶ 14 & 22, Exhibit B; Suglio affidavit, ¶¶ 14 & 22, Exhibit B). Consequently, when the Agreements are read as a whole and in the proper context, they clearly provide only that "sales supplies", "sales materials", and the like, which are related to the sale of Products, are to be returned to Plaintiffs after termination of the Agreements.

Furthermore, during the term of the Agreements, Defendants received SoftDent® Software directly from Plaintiffs as consideration for Defendants' attendance at and work on behalf of Plaintiffs at trade shows. (Eyer affidavit ¶ 8; Suglio affidavit, ¶ 8). This Software was given to Defendants without restriction as to use or re-sale. (Eyer affidavit ¶ 8; Suglio affidavit, ¶ 8). Since Defendants were free to re-sell the Software, without restrictions, they certainly are not required to now recall and return the Software, regardless of whether the Software was re-sold.

With respect to the return of Software upon termination of the Agreement, the Agreement was intended to provide for the return of excess inventory of the Software which Defendants held for sale to third parties. (Agreement, ¶ 13.3 ). However, as time passed under the Agreement, the Plaintiffs sometimes drop shipped the Software to the End-Users, and Defendants ceased stocking an inventory of the Software for sale to End-Users. (Eyer Aff., ¶ 9; Suglio Aff.,¶ 9 ).

## C. Defendants Have Not Disclosed Confidential or Proprietary Information Regarding the Software

Even assuming that Plaintiffs have met their contractual obligations, they offer no proof that Defendants have not also met their contractual obligations. Without an iota of evidence, Plaintiffs allege that Defendants have disclosed confidential or proprietary information regarding the Software to third parties, without even attempting to identify the information or explain why it should be considered protectable. Plaintiffs forge ahead, as they do in many of their arguments, by simply restating a section of the Agreement. Here, Plaintiffs restate § 13.1 wherein Defendants' agree to not disclose unspecified information, even after termination of the Agreement. Defendants' willingly admit that this is what the Agreement states. Defendants

13

are mystified, however, by how this restatement of an Agreement section is undisputed evidence that Defendants have committed the offense.

Contrary to Plaintiffs' unsupported conclusion, Mr. Eyer and Mr. Suglio attest that neither they nor anyone involved with the Defendant companies have impermissibly disclosed any confidential or proprietary information regarding the Software to third parties (Eyer affidavit, ¶ 11; Suglio affidavit, ¶ 10).

## D. Defendants Do Not Need to Copy Plaintiffs' Software to Provide Support and Service and Have Not Done So

As noted above, the Court's February 21, 2003 clarification provided that Defendants can provide support and service so long as relevant materials were not used. Defendants thereafter returned relevant materials to Plaintiff by depositing them, as agreed, with their attorney. Defendants kept materials which they lawfully acquired outside the terms of the Agreement.

Consistent with this position, Defendants answered Plaintiffs' First Amended Complaint by responding that they are entitled to use copies of all Software which it lawfully owns and/or for which it has a license to provide technical support and service to third parties (Ans. Am. Compl., ¶ 58).

Plaintiffs now take this answer, asserted as their sole piece of evidence, and ask this Court to accept that because Defendants assert the right to use Software they own and/or to which they have a license, that they are necessarily copying the Software. This is a mistaken interpretation of Defendants' answer and of their conduct. As attested to by Mr. Eyer and Mr. Suglio, they and their companies do not need to copy Plaintiffs' Software to provide support and service. (Eyer affidavit, ¶ 13; Suglio affidavit, ¶ 13).

Further to this point, Mr. Eyer and Mr. Suglio have attested to the fact that Defendants do not copy Plaintiffs' Software in providing support and service to third parties. (Eyer affidavit, ¶ 13; Suglio affidavit, ¶ 13). They do continue, however, to maintain the position that they have the right to provide support and service using Software that they lawfully own and/or to which they have a license if they so choose, i.e. by viewing the Software when properly loaded on Defendants' computers only.

14

### E. Genuine Issues of Material Facts Exist and Plaintiffs Are Not, Therefore, Entitled to Summary Judgment on Their Fourth Amended Count for Breach of Contract

As noted above, Plaintiffs' sole support of their motion for summary judgment of their Fourth Amended Count is a litany of incomplete, inadmissible, or erroneous "factual" representations and misstatements of Defendants' positions posing as a purported chronological and logical order of events that lead to the inevitable conclusion that Defendants' breach their Agreements. Specifically, Plaintiffs contend that the following facts are undisputed:

> 1. Defendants agreed to re-sell copies of the Software to end-users, which are dental or orthodontic practices in Defendants' territory ("End-Users").

Where, as is the case here, the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court. *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620 (Md. 2001). Courts may not supply an additional term for a contract which is plain as to its meaning and leaves no room for construction. *Automatic Retailers of America, Inc. v. Evans Cigarette Service Co.*, 304 A.2d 581(Md.1973).

Again, Defendants agree that they agreed to sell copies of the Software to End-Users. However, Defendants take issue with Plaintiffs contention that End-Users are dental or orthodontic practices only. Nowhere in the Agreement is the term "End-User" defined as such. The Agreement defines " [t]he term "End-User" as meaning "a customer or purchaser of the Product(s)." (Agreement, ¶ 2.5; Eyer affidavit, ¶ 3; Suglio affidavit ¶ 3). Nowhere in the Agreement is the word dentist, orthodontist, oral surgeon, dental practice, or orthodontic practice used. The Agreements do, however, require the Dealer to acknowledge Plaintiffs' ownership of the marks "Infosoft®", "MedAssist®", and "SoftVet®", indicating that Plaintiffs and Defendants were to sell Software to third parties who were not dentists, oral surgeons or orthodontists. (Agreements ¶ 8.1). Indeed, Plaintiffs' United States Trademark registrations[12] indicate that, during the term

---

[12] See Wiemelt Affidavit, ¶¶ 4-8.

of the Agreements, Plaintiffs sold software to "veterinary offices" and "medical offices," in addition to dental

offices. In addition, Addendum A to the Agreement expressly stated that MedAssist® software was to be re-

sold by Defendants under the Agreement. ( Addendum A, Eyer and Suglio Affidavits, Exhibit A). In fact,

Defendants sold Plaintiffs' MedAssist® and SoftDent® software to non-dentists. (Eyer affidavit, ¶ 4; Suglio

affidavit ¶ 4). Therefore, contrary to Plaintiffs' contention, End-Users was not restricted only to dental or

orthodontic practices by the terms of the Agreement or in practice.

> 2. In the Agreements, Defendants "acknowledge[d] the proprietary rights
> of [SoftDent]" to the Software and agreed "[t]hroughout the term of this
> Agreement *and at all times thereafter* . . . not to disclose, or cause to
> be disclosed, any confidential or proprietary information relating to the
> [Software] or [SoftDent], other than in the faithful performance of the
> duties hereunder." (Agreement ¶ 13.1) (emphasis added by Plaintiffs).

As discussed above, Defendants are willing to admit that this is what the Agreements say. In light of

the dearth of evidence that Defendants have disclosed any such disclosed information or that said information

is protectable, Defendants fail to see the relevance of the statement. Moreover, Defendants deny that they have

disclosed, or caused to be disclosed, any protectable confidential or proprietary information relating to the

Software to any third parties (Eyer affidavit, ¶ 11;Suglio affidavit, ¶ 11).

> 3. In the Agreements, Defendants acknowledged that the Software was
> copyrighted and that "unauthorized duplicat[ion]" thereof constituted a
> copyright violation that could lead to termination of the Agreements, (Id.
> § 11.5). Further Defendants agreed to "be subject to *any and all
> applicable fines and penalties under the provisions of the Federal
> Copyright Laws*." (Id., emphasis added by Plaintiffs).

Yet again, Defendants will agree that this is what the Agreements state. As demonstrated above, however,

Plaintiffs have offered no evidence that Defendants have committed "unauthorized duplication" of Plaintiffs'

Software. (Supra, p.14)

> 4. The Agreements require that upon termination thereof, Defendants
> must "immediately return" to Plaintiffs "any and all materials regarding the
> Products in any form whatsoever," including any and all Software. (Id. §

16

13.3), "Products" are broadly defined in the Agreement as "SoftDent
computer Software and related products now or hereafter, during the
term of this Agreement, developed, manufactured or distributed by
[Plaintiffs]." (Id. § 2.1).

First, ¶ 13.3 of the Agreement does not provide for the return of any and all Software. Second, ¶ 13.1
of the Agreement provides that what is to be returned are materials regarding the Products, not Software. This
reading is consistent with ¶ 1.5 of the Agreement wherein Plaintiffs' "restrictions and controls on the Dealer's
operation and acquisition of sales supplies established herein are intended solely to protect PSS's rights to it
trademarks and to discharge PSS's obligation to Dealer to maintain a high level of quality product and
services." (Agreement, ¶ 1.5). Third, Plaintiffs admit that the Court found that Defendants could provide
technical support and service of the Software "provided, of course, . . . that relevant materials were returned to
[Plaintiffs] and not used" as required under Paragraph 13.3 of the Agreements (Feb. 21, 2003 Trans., p. 10; Pl.
Memo. at p. 14).

Defendants have abided by this agreement and returned all relevant material to Mr. Wiemelt, as agreed
to by Plaintiffs. (Eyer affidavit, ¶ 14; Suglio affidavit, ¶ 14). Defendants have retained non-relevant materials,
i.e., Software that they lawfully own and/or to which they have a license. Determining whether Defendants
lawfully control and now have continued right to use this Software, is a central issue in this case.

5. The Court determined in its 1/7/03 Decision and Judgment that Plaintiffs'
properly had terminated and non-renewed the Agreements, effective as of
December 31, 2002 (Ex. A).

Defendants admit this is a fair representation of the Court's Decision but further state that they have
reserved the right to appeal the Court's Decision.

6. The Court dismissed Defendants' Eighth Counterclaim for a
declaration that Defendants had the "continuing right" to provide, *inter
alia*, technical support and service of the Software and later clarified this
dismissal to the limited extent of holding that Defendants could provide
technical support and service of the Software "provided, of course, . . . that
relevant materials were returned [to Plaintiffs] and not used" as required
under paragraph 13.3 of the Agreements (Ex. B, 2/21/03 Trans. At p. 11)

17

Defendants admit this restatement of the Court's findings. Please see Argument I.B., *supra*, for a detailed discussion of this factual allegation.

> 7. By letter dated April 14, 2003, Plaintiffs demanded that Defendants immediately return to them any and all materials regarding the Products in any form whatsoever, including the Software, as required in the Agreement.

As discussed above (Argument I.B.), Defendants returned materials to Plaintiffs as provided for by the Court's Order and Agreement of the parties.

> 8. Defendants have judicially admitted that they will *not* return Plaintiffs' Software to Plaintiffs and that Defendants have been using, and will continue to use, the same to provide technical support and service. (emphasis added by Plaintiff)

Defendants deny this asserted "fact." As discussed in detail above, Defendants have returned Plaintiffs' relevant Software pursuant to an agreement between the parties. Defendants have retained Software which they lawfully own and/or for which they possess a license. As attested to by Mr. Eyer and Mr. Suglio, they and their companies do not need to copy Plaintiffs' Software to provide support and service. (Eyer affidavit, ¶ 13; Suglio affidavit, ¶ 13). Moreover, Mr. Eyer and Mr. Suglio both attested to the fact that the Defendants do not copy Plaintiffs' Software in providing support and service to third parties. (Eyer affidavit, ¶ 13; Suglio affidavit, ¶ 13). They do continue, however, to maintain the position that they have the right to provide support and service using Software that they lawfully own and/or to which they have a license if they so choose, i.e. by viewing the Software when properly loaded on Defendants' computers only.

To the extent Plaintiffs argue that Paragraph 13.3 of the Agreements prevent Defendants from owning, possessing or using Software which they lawfully own and/or to which they have a license, post-termination of the Agreements, Plaintiffs note that Paragraph 13.3 of the Agreements is found within Section 13 entitled "Protection of Trade Secrets" and Plaintiffs have not alleged and cannot allege that ownership, use or possession of software violates any trade secrets rights of Plaintiffs.

18

Plaintiffs have failed to meet their burden in seeking summary judgment on their Fourth Amended Count for breach of contract. Plaintiffs have offered no undisputed evidence on any material fact; there is no evidence that Defendants have not lived up to their contractual obligation, disclosed confidential information, created unlawful copies of Plaintiffs' Software, or used Software at all, whether it be authorized or unauthorized. Accordingly, summary judgment should be denied in Plaintiffs' favor on their Fourth Amended Count for breach of contract.

## II.
## PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT GRANTING THEIR FIFTH AMENDED COUNT BECAUSE DEFENDANTS' HAVE NOT INFRINGED PLAINTIFFS' COPYRIGHT

It is interesting to note that despite Plaintiffs' vigorous attempts to terminate Defendants' Agreements, they did not seek to automatically terminate the Agreements for copyright infringement pursuant to § 11.5. Indeed, Plaintiffs have repeatedly stated and continue to maintain that copyright infringement, one of the five enumerated offenses under the Agreements, "[has] not occurred and [is] likely never to occur," (E.g., Plaintiffs' Reply to Defendants' First Amended Counterclaims, ¶ 29.) It is only now that Plaintiffs have no legitimate reasons for their conduct towards Defendants that they attempt to label them copyright infringers.

### A. Defendants Do Not Copy Plaintiffs' Software to Provide Support and Service.

Underscoring the lack of discovery in this matter is the fact that Plaintiffs continually rely on a misinterpretation of Defendants' answer to Plaintiffs' Amended Complaint. Defendants have never asserted that they copy Plaintiffs' Software to provide support and service. The fact is, they have no need to do so. (Eyer affidavit, ¶ 13; Suglio affidavit, ¶ 13). Defendants have consistently maintained, however, that they have the right to provide support and service using Software that they lawfully own and/or to which they have a license if they so choose, i.e. by viewing the Software when properly loaded on Defendants' computers only.

19

## B. Defendants Lawfully Possess Copies of Plaintiffs' Software

### 1. Defendants Can Also be End-Users During the Term of the Agreements

Despite Plaintiffs' contention otherwise, the Agreements do not clearly or expressly define Dealer. In fact, a careful reading of the Agreement reveals that there is no definition of Dealer. Moreover, nowhere in the Agreement is End-User defined as anything other than a purchaser or user of the Products (Agreement, ¶ 2.5). Further, there is nothing in the Agreement that prohibits or excludes Defendants from being End-Users.

Also despite Plaintiffs' contention otherwise, Plaintiffs did not tightly control the dissemination of their Software. Plaintiffs' sole proof of the truth of their assertion is presented once again by restating Agreement language in the Fiori affidavit. Here, Plaintiffs rely on the language that states that Softdent Products would only be shipped upon receipt by Plaintiffs of a completed Product (*sic*) Registration Form. However, Plaintiffs offer no proof that they followed this provision. Plaintiffs have never made Purchase Registration Forms of record. Plaintiffs offer nothing other than the contract language and Mr. Fiori's conclusory restatement of attorney Gordon's restatement of the language.

Defendants maintain that the evidence is to the contrary: Plaintiffs loosely controlled the dissemination of the Software. Plaintiffs and their predecessors-in-interest would routinely and knowingly sell Software to non-dentist, orthodontist, or oral surgeon end-users (Eyer affidavit, ¶ 4; Suglio affidavit ¶ 4).

Moreover, Mr. Robert J. Chaisson, former Director of Sales and Marketing for Plaintiffs attested to the same fact:

> Plaintiffs did not tightly control the dissemination of copies of Softdent. For example, I am familiar with the contracts entered into between Plaintiffs and Defendants. Those contracts included a provision that provided that Softdent Products would only be shipped upon receipt by Plaintiffs of a completed Product Registration Form. Contrary to this contract provision, Plaintiffs routinely shipped Softdent Products without a product registration form first being completed by dealers or end-users. End-users needed only to place an order and pay for Softdent products to complete the purchase and be shipped Softdent products.

(Chaisson affidavit, ¶ 2)

20

Furthermore, Plaintiffs were aware that PSSI was using the Software as an End-User during the term of the Agreement. (Eyer Aff., ¶ 5). Accordingly, Defendants were entitled to wear two hats in dealing with Plaintiffs: Dealer and End-User.

### 2. Plaintiffs Sold Software Outright Without a License

As attested to by Mr. Eyer and Mr. Suglio, Plaintiffs outright sold at least some of their Software; no license was provided or associated with this Software (Eyer affidavit, ¶ 7; Suglio affidavit, ¶ 7)[13]. It was in this environment that Defendant PSSI obtained Software from Plaintiffs (Eyer affidavit, ¶ 8).

### 3. Defendants Acquired Software From Plaintiffs Without Restrictions on Use or Re-Sale

During the term of the Agreements, Defendants received SoftDent® Software directly from Plaintiffs as consideration for Defendants' attendance at and work on behalf of Plaintiffs at trade shows. (Eyer affidavit ¶ 8; Suglio affidavit, ¶ 8). This Software was given to Defendants without restriction as to use or re-sale. (Eyer affidavit ¶ 8; Suglio affidavit, ¶ 8). Since Defendants were free to use or re-sell the Software, without restrictions, they certainly are not required to now recall and return the Software, regardless of whether the Software was re-sold.

Accordingly, and contrary to Plaintiffs' allegations, Defendants legitimately acquired Software without restriction and outside of the Agreement[14].

---

[13] Plaintiffs contend that their Software was sold subject to license agreements. Yet, Plaintiffs have offered no license agreements into evidence. None were attached to their original complaint, to their amended complaint, or to this motion. In fact, Defendants have repeatedly asked Plaintiffs for copies of the licenses; to date, no licenses have been offered.

[14] It is interesting to note that despite Plaintiffs' vigorous attempts to terminate Defendants' Agreements, they did not seek to automatically terminate the Agreements for copyright infringement pursuant to § 11.5. It is only now that Plaintiffs want to rid themselves of Defendants do they consider Defendants to be infringers. Indeed, Plaintiffs have repeatedly stated and continue to maintain that copyright infringement, one of the five enumerated offenses under the Agreements, "[has]not occurred and [is] likely never to occur." (E.g., Plaintiffs' Reply to Defendants' First Amended Counterclaims, ¶ 29.)

21

## C. Use of the Software by Defendants to Provide Technical Support to Third Parties is within the Scope of Permissible Copying Under Section 117 of the Copyright Act

Defendants do not need to use Plaintiffs' Software in providing technical support and maintenance to third parties. However, they do possess lawful copies of the Software and are entitled to use those lawful copies for technical support and maintenance if they so choose, i.e. by viewing the Software when properly loaded on Defendants' computers only.

Plaintiffs mistakenly rely on *MAI Sys. Corp. v. Peak Compter, Corp.*, 991 F.2d 511 (9th Cir. 1993) (hereinafter "MAI") to support their contention that Defendants have no 17 U.S.C. § 117 rights. *MAI* is no longer the state of the law. In 1998, Congress passed the *Digital Millinium Copyright Act* ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998). Realizing that servicing computers was a socially beneficial activity, Congress included as part of the DMCA the *Computer Maintenance Competition Assurance Act ("CMCA")*, section 301. The CMCA specifically provides that it is not copyright infringement to make or authorize the making of a copy of a computer program, so long as "such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the program." 17 U.S.C. § 117(c). One purpose of the provision was to specifically overrule *MAI*. *See*, NIMMER ON COPYRIGHT, § 8.08, p. 6 (2003). While the general purpose of the CMCA was to enable repair of hardware, commentators have stated that "judicious rejection of the approach in *MAI v. Peak* would allow maintenance of Software under appropriate circumstances." *Id.*

In the present case, Defendants lawfully obtained copies of the Software. The CMCA provides them with the framework in which to use that Software for the technical support and maintenance for third parties. Following the logic of the CMCA and the comment by Nimmer, it is within the scope of the Act to permit Software maintenance using authorized Software and receive the exemption protection of 17 U.S.C. § 117(c).

Moreover, even if the Court determines that *MAI* is not overruled by the CMCA, it is still misapplied in this case. In *MAI*, the Defendant copied Software onto **third party computers**. *MAI*, supra, at 512

22

(emphasis added). Here, when Defendants have used the Software in the past, it has been only on their own computers, in their own facilities. (Eyer affidavit, ¶ 13; Suglio affidavit ¶ 13).

Furthermore, Plaintiffs have failed to present credible evidence that no dispute exists as to the issue of copying and copyright infringement. Defendants' affidavits provide evidence that they do not need to copy Plaintiffs' Software to provide support and maintenance service and, additionally, they do not make or load copies onto third parties' computers. (Eyer affidavit, ¶ 13; Suglio affidavit ¶ 13). Defendants do possess lawful copies of the Software which they can use if they so choose, i.e. by viewing the Software when properly loaded on Defendants' computers only.

## D. Plaintiffs Offer No Credible Evidence That Defendants Reproduce, Prepare Derivatives of or Distribute the Software

Plaintiffs' suggest that it is undisputed that Defendants have "(1) reproduce[d] the copyrighted works, (2) prepare derivative works based on the copyrighted work, and (3) distribute copies of the copyrighted work," (Plaintiffs' Memorandum p. 15). However, Plaintiffs offer no competent evidence in support thereof. Instead, Plaintiffs merely cite to outdated cases[15] in which the loading of software onto **third parties computers**, without authorization, permission or a license, was considered the making of an unauthorized copy of the Software. Plaintiffs have not even alleged that Defendants have loaded Software onto third parties computers, and Defendants have denied doing so.

### III.

## PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT GRANTING THEIR SIXTH AMENDED COUNT AND DISMISSAL OF DEFENDANTS' SEVENTH COUNTERCLAIM BECAUSE DEFENDANTS MAY USE THEIR LAWFUL COPIES OF THE SOFTWARE TO PROVIDE TECHNICAL SUPPORT AND SERVICE

Plaintiffs seek a declaration "that following termination of the Agreements, Defendants do not have the continuing right to use the Software in providing technical support and service to third parties." (Am. Compl, ¶118). There is no dispute regarding the fact that Defendants can provide technical support and service to third parties. In fact, Plaintiffs have judicially admitted this fact. (2/21/03 Trans., p. 10). The Court

---

[15] i.e., pre-CMCA cases.

addressed this issue, as is admitted by Plaintiffs in their Memorandum at p. 14, when it found that Defendants could provide technical support and service "provided, of course, . . . that relevant materials were returned to [Plaintiffs] and not used" as required under Paragraph 13.3 of the Agreements (Feb. 21, 2003 Trans., p. 10).

Defendants returned relevant materials pursuant to an agreement between the parties. Defendants retained only their lawfully obtained Software for which they have unrestricted control (Byer affidavit, ¶¶ 13-14; Suglio affidavit, ¶¶13-14)[16].

As noted by Plaintiffs, ownership of a copy of a Software product for purposes of the Section 117 exception depends on whether restrictions are placed on the use of the Software. *See DSC Comm. Corp. v. Pulse Comm., Inc.*, 170 F.3d 1354 (Fed. Cir. 1999). Plaintiffs' reliance on *DSC Comm.* actually benefits Defendants. In *DSC Comm.*, the plaintiff owned copyrights on Software used to operate microprocessors and interface circuitry used in telecommunications digital switching systems. *Id.* at 1358. The defendant entered into an agreement with the plaintiff to use the Software, but the agreement put several restrictions on use. *Id.* at 1361. Specifically, the agreement provided that the Software was not to be disclosed to anyone except defendant's employees, and only then on a need-to-know basis, and also provided that the Software was only to be used on specific hardware. *Id.* In finding the licensees not to be owners, the court said "the licensing agreements severely limit the rights of the [licensee] ... in ways that are inconsistent with the rights normally enjoyed by owners of copies of Software." *Id.* In making this ruling, the court also pointed to clauses of the contract that provided for the passage of title to all the material transferred from plaintiff to the licensee, except for the Software. *Id.* The language and context of those clauses made it clear that the clauses referred to the plaintiff's rights to the copies of the Software in the licensee's possession, not the plaintiff's copyright interest in the Software. *Id.*

---

[16] Plaintiffs contend that their Software was sold subject to license agreements. Yet, Plaintiffs have offered no license agreements into evidence. None were attached to their original complaint, to their amended complaint, or to this motion. In fact, Defendants have repeatedly asked Plaintiffs for copies of the licenses; to date, no licenses have been offered.

In sharp contrast, some of the Software acquired by Defendants contained no license restrictions. (Eyer affidavit, ¶ 7; Suglio affidavit ¶7). For the remaining Software acquired by Defendants during the term of the Agreements, it is again noted that Plaintiffs have not even attempted to offer any such alleged license restrictions into evidence.

Even assuming that the Dealer/Resellers Agreements apply to the acquisition of the Software by Defendants, the terms of the Agreements were much less restrictive than the license restrictions of *DSC Comm.* For example, there were no provisions limiting the type of hardware on which the Software could be run. Lacking this type of restriction weighs heavily toward a finding of ownership because it is consistent with a right normally enjoyed by owners of a copy of Software. The Agreements included non-disclosure provisions (Dealer / Reseller's Agreement, ¶13. Protection of Trade Secrets), but the rationale underlying such a provision is for the purpose of protecting trade secrets rather than restricting the licensee's use of the Software per se. Furthermore, by their own terms, the Agreements provide that "[t]he restrictions and controls on the Dealer's operation and acquisition of **sales supplies** established herein are intended **solely** to protect PSS' rights to its trademark and to discharge **[Plaintiffs'] obligation** to the Dealer to maintain a high level of quality products and services." (Agreements ¶ 1.5)(emphasis added). Finally, and perhaps most importantly, unlike the contract in *DSC Comm.*, there were no provisions restricting ownership of copies of the Software. Therefore, even if the Agreements apply to the acquisition of the Software by Defendants, the degree and type of restrictions in the present case do not rise to the level of "substantial" or "severe restrictions on use" that the *DSC Comm.* court requires for a finding of non-ownership.

Again, there is no question but that some of the Software acquired by Defendants has no restrictions placed on it. PSSI bought the Software outright; there was no license involved at all (Eyer affidavit, ¶ 7-8) Furthermore, during the term of the Agreements, Defendants received SoftDent® Software directly from Plaintiffs as consideration for Defendants' attendance at and work on behalf of Plaintiffs at trade shows. (Eyer affidavit ¶ 8; Suglio affidavit, ¶ 8). This Software was given to Defendants without restriction as to use

25

or re-sale. (Eyer affidavit ¶ 8; Suglio affidavit, ¶ 8). Since Defendants were free to use or re-sell the

Software, without restrictions, they certainly are not required to now recall and return the Software,

regardless of whether the Software was re-sold.

Additionally, Defendants, under the protections afforded them by their ownership rights in the copies

of the Software and 17 U.S.C. § 117 can use their lawful copies to provide technical support and maintenance

to third parties, i.e. by viewing the Software when properly loaded on Defendants' computers only.

Accordingly, Plaintiffs motion for must be denied.

IV.

### PLAINTIFFS CANNOT PREVAIL ON THEIR MOTION, EITHER IN WHOLE OR IN PART, AND ARE NOT, THEREFORE ENTITLED TO JUDGMENT IN THEIR FAVOR ON THEIR THIRD CLAIM FOR AN AWARD OF ATTORNEYS' FEES UNDER THE AGREEMENTS AND DISMISSING DEFENDANTS' NINTH AMENDED COUNTERCLAIM FOR THE RECIPROCAL RELIEF

In order for Plaintiffs to be entitled to an award of Attorneys' fees, they must prevail on some action

that relates to the Agreement. Here, Plaintiffs have brought a plethora of motions, some of which do not relate

to the Agreement and none of which have merit. Accordingly, Plaintiffs will not be entitled to such an award

and this portion of Plaintiffs' motion must fail.

Defendants further request that Plaintiffs' motion to dismiss Defendants Counterclaim for attorneys'

fees be denied. To the extent that Defendants prevail on their own breach of contract claim, Lanham act claim,

and any state law claim, they would be entitled to attorney's fees.

### Defendants' Counterclaims
V.

### BECAUSE PSSI'S USE OF THE SOFTWARE TO PROVIDE TECHNICAL SUPPORT AND SERVICE NEITHER CONSTITUTES A BREACH OF THE AGREEMENT NOR INFRINGES SOFTDENT'S COPYRIGHT, PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT DISMISSING PSSI'S AMENDED FOURTEENTH COUNTERCLAIM FOR BREACH OF CONTRACT

Incredibly, Plaintiffs take the position that it is undisputed that Defendant PSSI breached the contract

for sale of software to PSSI. Offering no evidence but once again relying on attorney argument, Plaintiffs

26

expect this Court to follow their non-sensical logic. Contrary to Plaintiffs' version of the "facts", and as
attested to by Mr. Eyer, the true facts surrounding this Counterclaim are:

1.    Counter-Plaintiff and Counter-Defendants entered into a valid and enforceable contract for the
sale of SoftDent software by Counter-Defendants to Counter-Plaintiff ("Sale Contract"), the terms of which
are included in an Invoice dated November 15, 2002.

2.    Counter-Plaintiff has fully complied with its contractual obligations set forth in the Sale
Contract, including payment of the purchase price.

3.    Per the terms of the Sale Contract, Counter-Defendants provided Counter-Plaintiff with
version 9.7 of the software.

4.    Under to the terms of the Sale Contract, Counter-Plaintiff purchased a one year Update
Subscription.

5.    Under an Update Subscription, a purchaser pre-purchases all updated versions of the SoftDent
software which are released and distributed by Counter-Defendants for one year following the purchase date of
the Update Subscription.

6.    During the one year following the date of the Sale Contract, Counter-Defendants released and
distributed multiple updated versions of the SoftDent software, including versions 9.8, 10.0.1 and 10.0.2, to
their customers, including those who purchased an Update Subscription covering the release and distribution
period.

7.    Under the terms of the Sale Contract, Counter-Plaintiff was and is entitled to receive all
updated versions of the SoftDent software, for one year following the date of the Sale Contract, including
versions 9.8, 10.0.1 and 10.0.2.

8.    Despite repeated demands by Counter-Plaintiff that Counter-Defendants comply with their
contractual obligations to provide Counter-Plaintiff with versions 9.8, 10.0.1 and 10.0.2 of the software,
Counter-Defendants fail and refuse to do so.

27

9.    As such, Counter-Defendants have expressly breached the terms of the Sale Contract and have breached the Sale Contract.

10.    As a result of Counter-Defendants' breach of the Sale Contract, Counter-Plaintiff has suffered damage in excess of $1 million dollars including, without limitation, lost technical support and service opportunities in Counter-Plaintiff's Territory – which losses Counter-Defendants reasonably foresaw as the probable result of breach at the time it entered into the Sale Contract.

11.    As a result, Counter-Defendants are liable to Counter-Plaintiff for substantial damages in excess of $1 million arising out of Counter-Defendant's breach of the Sale Contract, the exact amount of which is to be determined at trial. (Eyer Aff., §§86-96; Exhibit E)

Plaintiffs do not deny that they did not send PSSI the updates. In fact, they seem to revel in it. This, despite the fact that they have taken Counter-plaintiffs money, kept it, and have not fully performed or responded under the contract. Instead, Plaintiffs assert they should be excused from performance by claiming that it was PSSI that breached the contract by infringing the Software. Plaintiffs present no evidence of any such breach by PSSI but merely claim it as fact.

Borrowing from Plaintiffs own brief, "implicit in the sales agreement between PSSI and SoftDent was a duty of good faith and fair dealing, which duty "simply prohibits one party . . . from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc.*, 190 F. Supp. 2d 785, 794 (D. Md. 2002) (*quoting Parker v. The Columbia Bank*, 91 Md. App. 346, 366, 604 A.2d 521 (1992)). (Plaintiff Memo. at p. 28). Here, Plaintiffs have not dealt in good faith or fair dealing. They simply did not want to supply PSSI with the updates and chose instead to breach the contract; breach it to their peril.

Accordingly, summary judgment should be denied in Plaintiffs' favor dismissing PSSI's Fourteenth Amended Counterclaim.

## VII.

## DEFENDANTS' HAVE STATED VALID CLAIMS UNDER BOTH STATE AND FEDERAL LAW, AND PLAINTIFFS' MOTION FOR DISMISSAL AND/OR JUDGMENT ON DEFENDANTS FIFTH, EIGHTH, TENTH, AND ELEVENTH AMENDED COUNTERCLAIMS SHOULD BE DENIED

### A. Maryland Law Does Not Govern Because the Narrow Choice of Law Provision Contained in the Agreement Cannot be Read Sufficiently Broad to Encompass Contract-Related Tort Claims

Not surprisingly, Plaintiffs attempt to pull the Fifth and Eight Amended Counterclaims under the Agreement when in fact it is wrong to do so. The basis of these Counterclaims is Plaintiffs' action *since* the Agreement was terminated. Accordingly, the language of the Agreement has no applicability in this instance.

Even if the Court finds that the conduct arose during the terms of the Agreement, Plaintiffs attempt to avoid application of Illinois and Ohio law by hiding behind a choice of law provision in the Agreement fails. Plaintiffs correctly cite the Fourth Circuit's "sufficiently broad" standard for determining whether a choice of law provision in a contract encompasses contract-related tort claims. (Plaintiffs' Memorandum, p. 30). However, Plaintiffs fail to apply the standard to the present case and incorrectly make a blanket statement that the choice of law provision in the agreement is sufficiently broad to encompass the Fifth Counterclaim.

Application of the standard to this case demonstrates that Maryland law does not govern because the narrow choice of law provision agreed to by the parties cannot be read sufficiently broad enough to encompass contract-related tort claims. Also not surprisingly, Plaintiffs fail to include the language of the Agreement's narrow choice of law provision in their Memorandum. The narrow choice of law provision contained in the Agreement states: "[t]his Agreement and construction thereof shall be governed by the laws of the State of Maryland." (Agreement ¶19). This narrow choice of law provision is nearly identical to the equally narrow choice of law provision the Second Circuit faced in *Krock v. Lipsay*, 97 F.3d 640, 645 (2nd Cir. 1996).[17]  In *Krock*, the Court held that the agreed choice of law provision could not be read broadly enough to apply to a contract-related tort claim. *Id. See, Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F.Supp.2d

---

[17] The choice of law language agreed to in *Krock* read as follows: "'[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.'" Krock v. Lipsay, 97 F.3d 640, 645 (2nd Cir. 1996).

29

589, 593 (E.D. Penn. 1999) (holding that a similar choice of law provision "did not provide more broadly that Delaware law would apply to tortuous conduct that led up to the execution of the contract or to other actions arising out of their relationship"). Accordingly, this Court should not read the narrow choice of law provision broadly enough to apply to Counterclaims 5, 8, 10, and 11.

## B. The Court's Liberal Pleading Standard Demands that the Counterclaims Not Be Dismissed

Plaintiffs further choose to ignore the liberal notice pleading standards applied by the Court. The essence of Plaintiffs' motion seems to be an assertion that Defendants failed to include sufficient specificity in their Counterclaims. Plaintiffs' motion, however, is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6) or, alternatively Fed. R. Civ. P. 12 (c), not a motion for a more definite statement. Thus, as this motion fails to demonstrate that there is no set of facts by which Defendants could prove the counterclaims, the motion should be denied.

Fed. R. Civ. P. 8 requires only that pleadings be simple, concise and direct. It further provides that all pleadings shall be construed to do substantial justice. Fed. R. Civ. P. 8(e), (f). The Supreme Court has stated that Rule 8 means what it says it means. *Leatherman v. Tarrent County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). It does "not require a claimant to set out in detail the facts upon which he bases his claim." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rather, it need only give the opponent fair notice of what the "claim is and the grounds upon which it rests." *Id.* A complaining party need not put all of the essential facts in his pleadings, nor plead law or match facts to every element of a legal theory. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998). It then receives the "benefit of imagination, so long as the hypotheses are consistent with the complaint." *Logan Graphic Products, Inc. v. Textus USA, Inc.*, 2002 WL 31507174 (quoting *Republic Tobacco, L.P. v. North Atl. Trading Co.*, 1999 WL 261712 at 4 (N.D. Ill, 1999). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could prove consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229 (1984).

Defendants meet their burden by all measure. Defendants have set forth the factual elements of the Counterclaims and have further supplied the legal authority under which they seek redress for each Counterclaim as well as damages suffered. Plaintiffs have received fair notice of what the claims are and the grounds upon which they rest.

## C. Defendants State a Valid Claim Under the Illinois Deceptive Trade Practices Act

Plaintiffs' allegation that Defendants claim is barred under the Illinois UDTPA because the statute does not permit a private cause of action for damages, but only permits suits for injunctive relief, is incorrect. Citing *Glazewski v. Coronet Insurance Co.*, 483 N.E.2d 1263, 1267 (Ill. 1985) to support their proposition, Plaintiffs present an incomplete analysis of the case and the law. Damages are available if a claimant has also alleged a separate count under the Consumer Fraud Act (815 ILCS § 505) or a separate count of common law trade disparagement. *Id.; Duncavage v. Allen*, 497 N.E.2d 433, 440 (Ill. App. 1986). That is, a UDTPA claim survives dismissal even when no injunctive relief is requested provided that the claimant also alleges one of the two other causes of action listed above. *Id.* Here, Defendants have alleged claims under not just one but both of those causes of action (Amended Answer, Count V, ¶ 94 - 97). Accordingly, Plaintiffs' motion must be denied.

Plaintiffs' assertion that Defendants UDTPA claim is insufficient in that they did not allege statements that disparage the quality of the defendants' products or services is also incorrect. In ¶ 42 of their Amended Counterclaims, Defendants allege that Plaintiffs' have told third parties that they have a $500,000.00 judgment against Defendants, in ¶ 43 that Plaintiffs have told third parties that Defendants were going out of business or bankrupt and in ¶ 48 that Plaintiffs have told third parties that Defendants were no longer able to provide support and service for Plaintiffs' software. These allegations go to the heart of the quality of Defendants' services and, therefore, present a valid deceptive trade practices counterclaim.

31

## D. Defendants State a Valid Illinois Common Law Claim for Unfair Competition and Trade Disparagement

To support a common law claim for trade disparagement, a claimant must allege that: (1) the goods or services of the plaintiff have been disparaged, or (2) a statement accuses a businessman of outright dishonesty or reprehensible business methods. *Unique Concepts, Inc. v. Manuel*, 669 F.Supp. 185, 190 (N.D. Ill. 1987).

As with the UDTPA Claim, Defendants have met their burden in alleging disparagement of the quality of their services. *See*, Supra, p.31.

## E. Defendant State a Valid Unfair Competition Claim

Once again ignoring the true state of affairs in this case, Plaintiffs, apparently with a straight face, want this Court to believe that they have not engaged in conduct rising to the level of unfair competition. Plaintiffs cite *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1118 (7th Cir. 1990) for the proposition that an unfair competition claim must "so shock judicial sensibilities" and "violate standards of commercial morality" that it cannot be tolerated. Plaintiffs further cite *Wilson* for the proposition that "the essence of an unfair competition claim ... is that the defendant has misappropriated the labors and expenditures of another.... Central to this notion is some element of bad faith." *Id.* at 1118.

If there ever was a case that met not only the scope of *Wilson* but also its spirit, it is the case before the Court. Plaintiffs have taken a situation in which Defendants have given over ten years of their lives to promote Plaintiffs' products and services and once finished with Defendants, Plaintiffs not only terminate their Agreements but take the further steps of encouraging third parties to cancel service contracts with Defendants. This not being enough, Plaintiffs further, and *wrongly*, tell third parties that Defendants are going out of business or are bankrupt and that Plaintiffs have a $500,000.00 judgment against Defendants. If this is not unfair competition, then the claim must not exist.

Plaintiffs may attempt to argue that the statements are mere "puffing" and fall short of disparaging the quality of the services offered by Defendants. This argument fails. While a single statement *may* constitute puffing in some circumstances, here it is the additive, destructive combination of statements that solidify the

32

Counterclaim: $500,000.00 judgment statement **plus** going out of business or bankrupt statement **plus** cancel your contract with them and sign-up with us statement **equals** unfair competition.

### F. Defendants State a Valid Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505) Claims

Again dismissing Defendants' arguments that they were not only Dealers but also End-Users, Plaintiffs make faulty arguments. Defendants were entitled to be End-Users (*See,* Supra). As such, Defendants were "consumers" within the meaning of the statute provision that provides "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household," 815 ILCS 505/1(e). The term "person" includes any business entity or association. 815 ILCS 505/1(c). In addition to being Dealers of the products, Defendants were also end-users of the Software, and, as such, were "consumers" within the meaning of the statute. Further, Illinois courts liberally construe the Illinois Consumer Fraud and Deceptive Practices Act and give a broad definition to "consumer." *Randazzo v. Harris Bank Palatine,* 104 F.Supp.2d 949 (N.D. Ill. 2000), aff'd 262 F.3d 663. Accordingly, Plaintiffs' entire argument falls apart at this point.

Next, Plaintiffs argue that the claim should be dismissed because Defendants fail to allege the requisite "consumer nexus" stating that the conduct implicates consumer protection concerns in general. However, a "business entity that, like [Defendants], is a 'consumer' of the Plaintiffs' products need not show that the transaction has a 'consumer nexus,' but rather only that it suffered an injury caused by the defendant's fraudulent or deceptive acts." *Sutter Ins. Co. v. Applied Systems, Inc.,* 2004 WL 161508 at 6 (N.D.Ill.); *We Deliver America, Inc. v. General Growth Properties, Inc.,* 2003 WL 22836449 (N.D.Ill.).

Finally, Plaintiffs argue that Defendants fail to plead the claim with the requisite particularity and specificity because, as a fraud claim, the required specificity is the same as that required under Fed. R. Civ. P. 9(b) for common law fraud. However, in many cases, such as the present case, a lesser degree of specificity is required. *Measurement Specialties, Inc. v. Taylor Precision Products, L.P.,* 131 F.Supp.2d 982, 986 (N.D. Ill.

2001) (holding that allegations that the defendants deliberately sold knock-off products with the intent to deceive consumers pleaded fraud with sufficient particularity even where specific consumers not identified).

## G. Defendants Have Alleged Valid Tortious Interference With Contract Claim

Plaintiffs argue that Defendants do not meet the requisite pleading requirements to sustain a claim for tortious interference with contract because they have not alleged that the contracts referred to were actually breached. In support of their argument, they point to the language of ¶ 129 of the Counterclaim which says, "thereby breaching said contracts," and characterize the language as being in the subjunctive rather than the declarative. They characterize the allegations as stating that a breach "would" be caused, rather than stating that a breach actually was caused. However, Plaintiffs mischaracterizes Defendants' allegations. The language cited by Plaintiffs is in the declarative. Defendants state in the declarative that the Plaintiffs induced a breach, and there is nothing hypothetical or supposed about the allegations. The language is sufficient to state a claim for tortious interference with contract.

Plaintiffs also assert that Defendants have not adequately alleged a third party breach because of the fact that two paragraphs in the amended counterclaim are identical except for the phrase, "thereby breaching said contracts." Count X ¶ 129 contains the phrase, while Facts in Common ¶ 41 does not. Plaintiffs argue that if such breaches had actually occurred, Defendants would have surely mentioned them in the Fact in Common section, and that their omission from this section means that such breaches of contract have not occurred. Once again, Plaintiffs are reaching. The mere fact that the two paragraphs do not contain identical wording is no basis for the inference that no breaches have occurred.

Plaintiffs also argue that Defendants have not sufficiently alleged facts to support the third element of tortious interference with contract; namely, that they have plead insufficient facts to show that the interference with the contract was wrongful and improper. In support, they cite *havePOWER, LLC v. General Electric Co.*, 183 F.Supp.2d 779, 784 (D.Md. 2002). However, this case is factually distinct from the one before the Court. In *havePOWER*, defendant GE negotiated with the plaintiff havePOWER for the plaintiff to become a dealer

of GE power generators. The parties were on the verge of formalizing a contract to that effect when GE merged with another company and the deal was called off. The court ruled that the merger constituted "economic justification" for the conduct of the defendant because the interference with third party contracts was only incidental to GE's larger business concerns involving the merger. Any interference with plaintiff's business activities was incidental, not intentional. *Id* at 783. On this basis the claim was dismissed. *Id.* at 785. In the present case, however, such "economic justification" is not plead. Even if the termination of the contract with defendants was justified and proper, Plaintiffs' subsequent conduct was not merely incidental to the termination. The statements made by Plaintiffs to third parties were completely unnecessary for and made no contribution to the furtherance of any legitimate business goals that might be used to justify the termination of the contracts and crossed the line into legally malicious conduct.

## H. Defendants State a Valid Tortious Interference With Prospective Economic Advantage Claim

Plaintiffs lists the elements of a tortious interference with prospective economic advantage claim in MD and IL and then assert that, in MD, one element of the claim necessarily hinges on whether Plaintiffs' actions constitute a violation of federal or state antitrust laws. Plaintiffs then argue that Defendants have failed to state a cognizable claim for antitrust, and that the tortious interference claim must therefore fall, not just in MD, but in MD, IL and OH. There are several problems with this argument.

First, neither Neither IL nor OH requires a relationship between antitrust violations and a tortious interference claim. *See Edelman, Combs and Latturner v. Hinshaw and Culbertson*, 788 N.E.2d 740, 752 (Ill. App. 2003); *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003); *Bickley v. FMC Technologies, Inc.*, 282 F.Supp.2d 631, 643 (N.D. Ohio 2003) (listing elements of claim and making no reference to any link to an antitrust violation). Therefore, Plaintiffs' argument does not hold true in IL or OH.

Next, Plaintiffs' argument presupposes that Defendants' antitrust claims will be dismissed, which they will not. *Faulkner Advertising Associates, Inc. v. Nissan Motor Corp. in U.S.A.*, 905 F.2d 769, 774-5 (4th Cir. 1990) (allowing plaintiff's antitrust claims and tortious interference claims to go to trial).

35

In any event, whether the elements of a tortious interference with prospective economic advantage claim are met are questions of fact. *Fedders Corporation v. Elite Classics*, 279 F.Supp.2d 965, 971 (S.D, Ill, 2003).

Using Plaintiffs' own cites Defendants' case is made for their Tortious Interference With Prospective Economic Advantage Counterclaim.

Plaintiffs rightly cite that under Maryland, Illinois or Ohio law, the following elements must be alleged:

(1) intentional and willful acts;

(2) calculated to cause damage to the plaintiffs in their lawful business;

(3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and

(4) actual damage and loss resulting." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663, 675 (1984); see also *Edelman, Combs & Latturner v. Hishaw & Culbertson*, 788 N.E.2d 740, 752 (Ill. App. Ct. 2003) (Both cited by Plaintiff).

Here, all four elements have been plead: (1) Counter-Defendants contacted known Counter-Plaintiffs customers (proving they knew of the relationship) and recommended that they cease using Counter-Plaintiffs' technical support and service, and demand a refund of the contract price, and enter contracts with Counter-Defendant ( Am. Counterclaims, ¶129), (2) and (3) Counter-Defendants knowingly, purposely, intentionally, maliciously, and without legal justification interfered with Counter-Plaintiffs' legitimate expectancy of business relationships (Am. Counterclaims, ¶ 138), and (4) Counter-Plaintiffs suffered damages through the lost contract and refunds (Am. Counterclaims, ¶¶ 139-141).

## I. DMA States a Valid Claim for Deceptive Trade Practices, Unfair Competition, and Defamation Under Ohio Law

In Ohio, the elements of defamation are the same irrespective of whether the communication relates to commercial or non-commercial parties. "When the party is a private figure, [a] cause of action for defamation consists of five elements: (1) a false and defamatory statement; (2) about the party; (3) published without

36

privilege to a third party; (4) with fault or at least negligence on the part of the accused party; and (5) that was either defamatory *per se* or caused special harm to the party." *Davis v. Jacobs,* 710 N.E.2d 1185, 1186 (Ohio App. 1998).

Defamation *per se* occurs when statements are defamatory on its face; defamation *per quod* occurs when statements are defamatory through interpretation or innuendo. *Gosden v. Louis,* 687 N.E.2d 481, 488 (Ohio App. 1996).

Plaintiffs make essentially the same argument here they make for the counterclaim under the Illinois Uniform Deceptive Trade Practices Act ; that is, none of the statements on which Defendants' Counterclaim is based specifically disparages the quality of the defendants' goods or services, and that the Counterclaim should therefore be dismissed. Defendants disagree and maintain they have alleged disparagement of the quality of their services. *See,* Supra at pp. 31

Plaintiffs further argue that the claim should be dismissed because Defendants did not plead the disparaging conduct with sufficient specificity. Plaintiffs fail, however, to present any law that requires a heightened pleading requirement. To the contrary, in the very case Plaintiffs use to support their contention, *Innovative Digital Equipment, Inc. v. Quantum Technology, Inc.*, 597 F. Supp. 983, 988 (N.D. Ohio 1984), the Plaintiff did not cite the Ohio Revised Code sections or the common law unfair trade practices action in his original Complaint. *Id.* The pleadings were held to be sufficient to state a cause of action. "Given the inferences that could be fairly drawn from the Plaintiff's complaint," the court declined to dismiss. *Id.* at 988. Similarly in this case, Defendants' allegations are no less informative and allow inferences that prevent dismissal.

Plaintiffs further argue that the common law claim is evaluated under the same framework as a statutory claim under the Ohio Uniform Deceptive Trade Practices Act, and, therefore, the common law claim will fail for the same reasons as the statutory claim. Conversely, Defendant's common law claim stands for the same reasons the statutory claim will stand.

37

Plaintiffs also argue that Defendant's defamation claim should be dismissed because it was not plead with sufficient specificity. Again, Plaintiffs choose to ignore the liberal pleading standards applied by the Courts. "In determining the sufficiency of the complaint, the material facts, but not the unsupported conclusions of the pleader, are considered in the light most favorable to the plaintiff. Civil proceedings in vindication of civil rights are governed by the Federal Rules of Civil Procedure. Under those rules, the theory of the plaintiff in stating his claim is not so important. The complaint should not be dismissed on motion unless, upon any theory, it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts that could be proved in support of his claim." *Madison v. Purdy*, 410 F.2d 99,100-01 (5th Cir. 1969); *Slife v. Kundtz Properties*, 40 Ohio App.2d 179 (Ohio Ct. App. 1974).

### J. Defendants State a Valid Claim Under the Maryland Consumer Protection Act

Plaintiffs argue that Defendants lack standing to bring a claim under the Maryland Consumer Protection Act. Md. Code Ann., Com. Law § 13-101 et seq. Citing, *Penn-Plax, Inc. v. L. Schultz, Inc.*, 988 F. Supp. 906, 911 (D. Md. 1997). In support, Plaintiffs note that the court ruled that a corporate *competitor* alleging a consumer-like injury does not have standing to sue as a consumer, even where the business meets the literal requirements for standing as a consumer under the Md. Code. *Id.* The key here is the word *competitor*. Defendants offer no software of their own for sale. Defendants, instead, provide computer system installation, support, and maintenance. It is through Plaintiffs' actions of proactively seeking out third parties and informing them that Defendant's business is bankrupt or going out of business and that Plaintiffs have a $500,000.00 judgment against Defendants that the claim arises.

### K. Defendants State a Valid Maryland Common Law Unfair Competition Claim

The common law cause of action for unfair competition in Maryland is similar to that of Illinois. Its elements are undefined, but courts invoke general principles of fairness and look for the misappropriation of the work of another in evaluating the cause of action. *Electronics Store, Inc. v. Cellco Partnership*, 732 A.2d 980, 992 (Md. App. 1999). "One man may not reap where another has sown, nor gather where another has

38

strewn." *Id.* Further, the common law tort of trade disparagement is substantially the same in both its federal and state forms. *A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.*, 61 F.Supp.2d 426, 433 (D. Md. 1999).

Plaintiffs make no argument against common law unfair competition or trademark disparagement claims other than the fact that they should fail for the same reasons that Defendants' Lanham Act claims fail. Accordingly, Defendants common law claims stand for the same reasons our Lanham Act claims will stand. (*See*, Argument VIII, infra).

### L. Defendants State a Valid Tortious Interference with Contract Claim

Plaintiffs completely misconstrue Defendants' Tortious Interference with Contract Counterclaim. Plaintiffs would have this court believe that the Agreement controls when, in fact, the Counterclaim alleges Plaintiffs' tortious interference with contract *after* the Agreements were terminated. Thus, neither the Agreement nor Defendants' breach of contract Counterclaims are relevant to this claim. This Counterclaim stands on its own. It follows then that Plaintiffs reliance on *Mitchell, Best & Visnic, Inc. v. Travelers Property Casualty Corp.*, 121 F.Supp.2d 848, 853 (D.Md. 2000), aff'd, No. 01-1911, 2002 WL 1018562 (4th Cir. May 16, 2002) and *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 155, 757 A.2d 108, 115 (2000) is likewise misguided and should be disregarded by this Court.

Plaintiffs, however, once again go on to make Defendants' case for them. Plaintiffs rightly cite the elements for a tortious interference with contract claim:

(1) the existence of a contract between the claimant and a third party;

(2) the other party's knowledge of that contract;

(3) the other party's intentional interference with that contract;

(4) breach of that contract by the third party; and

(5) resulting damages.

See, e.g., *havePOWER, LLC v. General Electric Co.*, 183 F.Supp.2d 779, 784 (D. Md. 2002); *Turner v. Fletcher*, 706 N.E.2d 514, 519 (Ill. App. Ct. 1999) (elements under Illinois law); *Matikas v. Univ. of Dayton*, 788 N.E.2d 1108, 1115 (Ohio App. Ct. 2003) (elements under Ohio law) (all cited by Plaintiffs).

Here, all five elements have been plead: (1) Counter-Plaintiffs have entered into long-term contracts for the provision of technical support and service of Counter-Defendants' Products to numerous customers of Counter-Plaintiff ( Am. Counterclaims, ¶ 127), (2) these were customers of Counter-Plaintiffs for which Counter-Plaintiffs maintain they have tight control over the dissemination of Products (See, e.g., Plaintiffs Memorandum, p. 5), (2) and (3) Counter-Defendants contacted Counter-Plaintiffs customers (evidence they knew of the relationship) and recommended that they cease using Counter-Plaintiffs' technical support and service, and demand a refund of the contract price, and enter contracts with Counter-Defendant ( Am. Counterclaims, ¶ 129), (4) customers breached contracts with Defendants, demanding refunds (Eyer Aff., ¶65; Suglio Aff., ¶ 67), and (5) Counter-Plaintiffs suffered damages through the lost contract and refunds (Am. Counterclaims, ¶ ¶ 131-134).

Accordingly, for the foregoing reasons and arguments, Defendants have stated valid causes of action for which relief can be granted and Plaintiffs' motion seeking dismissal of Defendants' Counterclaims number 5, 8, 10, and 11, therefore, fails and must be denied.

## VIII
## DEFENDANTS STATE A CLAIM UNDER SECTION 43(A) OF THE LANHAM ACT AND, THEREFORE PLAINTIFFS' MOTION TO DISMISS THE EIGHTH AMENDED COUNTERCLAIM MUST BE DENIED

The Lanham Act, § 43, codifies what is generally known as false advertising, trade libel, and product disparagement. *Zenith Electronics Corp. v. Exzec*, 182 F.3d 1340, 1347 (Fed. Cir. 1999). As highlighted by Plaintiffs, to state a cause of action under the Lanham Act, Defendants need only allege five elements. *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (*quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue*, 284 F.2d 302, 310-11(1st Cir.), *cert. denied*, 537 U.S. 1001 (2002).

An element by element analysis of the five elements demonstrates that:

(1) [counter-] defendants made a false or misleading description of fact or representation
of fact in a commercial advertisement about his own or another's product.

RESPONSE: A. Plaintiffs informed third parties that Defendants were going out of business
or were bankrupt when in fact this was not true.

B. Plaintiffs told third parties that they a judgment against Defendants for
$500,000.00 when in fact all Plaintiffs had was a non-liquidated award of attorneys' fees (Am. Counterclms, ¶
43).

(2) the misrepresentation was material, in that it is influenced the purchasing decision;

RESPONSE: Defendants have lost business as a result of the false and misleading
descriptions, (Am. Counterclms, ¶¶ 107, 121).

(3) the misrepresentation actually deceived or had the tendency to deceive a substantial segment of its
audience;

RESPONSE: A. The statements are false and, therefore, do not need to be substantiated. (If a
statement by a [counter] Defendant is actually false, then the [counter]plaintiff does not need to show that the
statement actually deceived, or is likely to deceive, a substantial segment of the audience. Lanham Trademark
Act, § 1et seq, 15 U.S.C.A. § 1051 et seq; *Logan Graphics Products, Inc. v. Textus USA, Inc.*, 2002 WL
31507174 (N.D. Ill.)). Here, neither Defendant is going out of business or is bankrupt or did Plaintiffs have a
judgment for $500,000.00.

B. In any event, the statements did deceive a substantial portion of the audience. Defendants
have lost business as a result of the false and misleading descriptions. (Am. Counterclms, ¶¶ 107, 121).

(4) the [counter-]defendant placed the false or misleading statement in interstate commerce; and

RESPONSE: Plaintiffs informed third parties in at least Illinois and Ohio that Defendants were
going out of business or were bankrupt that Plaintiffs had a judgment for $500,000.00. (Am. Counterclms, ¶
43).

(5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

RESPONSE: Defendants have lost business as a result of the false and misleading descriptions, including but not limited to lost sales opportunities and cancellations of existing contracts. (Am. Counterclms, ¶¶ 41, 107, 121).

Accordingly, despite Plaintiffs' protestations otherwise, Defendants present more than sufficient allegations of a Lanham Act Claim.

Plaintiffs also attempt to argue that Defendants have failed to allege that Plaintiffs' statements were made in the context of a "commercial advertisement." Citing, *Neurotron, Inc. v. American Assoc. of Electrodiagnostic Medicine*, 189 F.Supp.2d 271 (D. Md. 2001), aff'd No. 01-2115, 2002 WL 31207199 (4th Cir. 2002), in support, Plaintiffs actually make Defendants case. In *Neurotron*, this Court found that in order for an alleged "false or misleading" statement to actionable under Section 43(a) of the Lanham Act, as a threshold matter, the statement must be:

> ... (1) commercial speech; (2) by a [counter-]defendant who is in commercial competition with [counter-]plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services ... [and] the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry. *Neurotron* at 275 (*quoting Gordon & Breach Science Publishers, S.A. v. American Institute of Physics*, 859 F, Supp. 1521, 1536 (S.D.N.Y. 1994)).

Once again, Plaintiffs ask this Court to ignore the holes in their reasoning. Not surprisingly, Plaintiffs fail to inform the Court of the definition of *commercial speech*. Doing so not only makes their entire argument moot but supports Defendants' position. In *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980), the Supreme Court reiterated that commercial speech is that speech which is an "expression related solely to the economic interests of the speaker and its audience." *Id*, at 561; *See also, Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976); *Bates v. State Bar of Arizona* 433 U.S. 350, 363 -364 (1977); *Friedman v. Rogers*, 440 U.S. 1, 11 (1979).

42

Plaintiffs' false and misleading statements to third parties regarding the state of Defendants'

businesses (Defendants were going out of business or bankrupt, Plaintiffs had a $500,000.00 judgment,

Defendants could no longer provide support and service, and that the third parties should cancel contracts with

Defendants. (Am. Counterclms. ¶¶ 41, 43, 48; Eyer Aff. 34,66; Suglio Aff. 36, 66-7), are commercial speech

as defined by the Supreme Court signed made by a competitor in the support and service industry designed to

influence the consumer to buy Plaintiffs' services over those of Defendants, those false and misleading

comment being made directly to the consumers of the service.

Moreover, and as discussed in detail above, Plaintiffs ignore the Court's liberal pleading standard. *See*,

Supra p.30. Accordingly, Plaintiffs' motion must fail.

### IX.
### DEFENDANTS HAVE PLEAD A TYING ARRANGEMENT UNDER THE SHERMAN ACT AND PLAINTIFFS MOTION FOR DISMISSAL AND/OR JUDGMENT OF THE THIRTEENTH AMENDED COUNTERCLAIM MUST BE MUST BE DENIED

#### A. Defendants Have Plead the Requisite Elements of a Tying Arrangement

Plaintiffs' again here provide the Court what is at best a tenuous argument. In the arena of Software

licensing, it is common for Software providers to license Software in conjunction with a maintenance contract.

In doing so, the Software provider opens itself up to tying allegations. *Eastman Kodak v. Image Technical

Services, Inc., 112 S. Ct. 2072 (1992).* Applying either a *per se* analysis or a quasi-*per se* analysis, a [counter]

plaintiff alleging tying must prove four elements:

(1) the tying product and tied product/service are distinct from one another;

(2) there must be an express or implied agreement or condition that establishes a tie;

(3) the defendant must have sufficient economic power in the market for the tying product to distort a

consumers choices; and,

(4) the tie must effect a substantial amount of commerce. *Id.*

43

To prove that a tying product and a tied product/service exist, a plaintiff must establish that the tying product (here, Software) and tied service (here, maintenance contract) are, in fact, separate. *Jefferson Parish Hosp. Dist. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984). Factors to be considered are whether: the defendant or its competitors offer the product and service separately or only as a single package, prices are set individually or as a single price, and purchasers perceive the product and service to be separate or a single item. *Eastman Kodak* at 2080; *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 491-92 (1942); *ILC Peripherals Leasing Corp. v. IBM*, 488 F. Supp. 228, 233 (N.D. Cal. 1978).

Here, there is no question but that the software and support and maintenance services are separate from one another: Defendants sold them that way for over ten years. (Eyer affidavit, ¶ 35; Suglio affidavit ¶ 37). Indeed, Plaintiffs admit that Defendants sold Software without providing technical support and service. (Plaintiffs' Reply to Defendants' Amended Counterclaims, ¶ 44). There is also no question but that the two products/services, Software and service, were priced separately; Defendants sold software and also offered both their service and that of Plaintiffs as a separate offering for over ten years. (Eyer affidavit, ¶ 35; Suglio affidavit ¶ 37). There is also no question but that purchasers now believe the two, Software and services to be a single item: Plaintiffs' contracts assume the sale of both in order to receive Software and, as attested to by Mr. Eyer and Mr. Suglio, purchasers are now told by Plaintiffs that they must buy a support contract in order to receive the Software. (Eyer Aff. 38; Suglio Aff. 40). Accordingly, all three elements are met in this case.

The Fourth Circuit has weighed in on the issue of tying as well. It has a history of inferring tying from conduct. In *Service & Training, Inc. v. Data Gen. Corp.*, 342 963 F.2d 680 (4th Cir. 1992), the Court found that computer maintenance/repair and diagnostic Software were not one product --- "computer servicing" leads to the conclusion that we will be able to establish that there is a tying product and a tied service. *Id.* at 684-85.

Moreover, the tying element is satisfied when a [counter]plaintiff establishes that the acquisition of the tying product (here, Software) was conditioned upon the purchaser also buying the tied product (here, support

and maintenance). The condition may be met in an explicit agreement, or it may met by the tying company's policy which results in the purchase of both the Software and the service and support contract as being the "only viable economic option. *Ways v. Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D. Cal. 1979) aff'd, 638 F.2d 143 (9th Cir.), cert. den. 454 U.S. 895 (1981). Here, Counter-Defendants' insistence that customers buy both software and a support and maintenance contract in order to receive software and the fact that their contract assumes the purchase of both, meet both the "inference" standard of the Fourth Circuit and the explicit standard of *Ways v. Means, Inc.*

The Supreme Court has also had its say: a contractual relationship under which the buyer has been expressly required to purchase the tied product, in order to secure the tying product, is sufficient evidence of coercion. *Northern Pac. Ry. v. United States*, 356 U.S. 1, 7-8, 12 (1958). Other courts have held that the mere presence of a contractual provision, even absent actual enforcement, has been held sufficient. *Northern Pac. Ry. v. United States*, 356 U.S. 1, 12 (1958); *International Salt Co. v. United States*, 332 U.S. 392, 397 (1947). In this circumstance, coercion is deemed present simply by virtue of the contractual power to enforce the tie-in. *Shell Oil Co. v. FTC*, 360 F.2d 470, 487 (5th Cir. 1966). For example, in *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997), the Tenth Circuit concluded that "a contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by the seller." *Id.* at 1138. There, as in the present case, an independent computer service organization claimed that the defendant, a computer manufacturer with copyrighted Software for its products, illegally tied the sale of its Software support services to the purchase of its hardware support services. The court of appeals rejected the defendant's argument that it acted "independently to establish a unilateral term of sale." *117 F.3d* at 1143. The court pointed out that, unlike a unilateral refusal to deal, which "preserves a buyer's individual free choice to sell at any price goods already purchased," under an express tying arrangement, "the buyer can no longer make its purchase decision based upon the relative merits of the tied product." *Id.* at 1144.

The Fourth Circuit has found similarly. In *Osborn v. Sinclair Ref. Co., 286 F.2d 832 (4th Cir. 1960)*, cert. denied, *366 U.S. 963 (1961)* the objectionable provision existed in an oral contract only, but was still held to be the product of coercion.

Here, Defendants have alleged an indisputable tying arrangement. During the term of the Agreement, the software (tying product) was sold by Plaintiffs without the requirement that support and maintenance contracts (tied services) also be purchased. (Am. Counterclms. ¶ 44). Defendants, in fact, sold the software (tying product) without Plaintiffs' support and maintenance services and supplied their own support and maintenance services (tied services) (Agreement, in general; Am. Counterclms. ¶ 45; Eyer Aff., 36, 41; Suglio Aff. 36, 41). Plaintiffs admit that Defendants sold Software without providing technical support and service. (Plaintiffs' Reply to Defendants' Amended Counterclaims, ¶ 44). Plaintiffs now coerce customers into purchasing a support and maintenance contract from Plaintiffs before selling software to customers (tying arrangement). (Am. Counterclms. ¶ 47; Eyer Aff., 38; Suglio Aff. 40). That Plaintiffs may have on occasion ultimately sold software without a support and maintenance contract does not save them; they have coerced customers. *Shell Oil Co.* Supra at 487. Accordingly, Plaintiffs' motion fails.

Plaintiffs have difficulty presenting their argument. They focus only on the first element of tying and give up on the remainder of the elements, offering no argument at all. In the argument they do make, Plaintiffs desperately try, but ultimately fail, to convince this Court that there is no tying of software and support and maintenance in this case. Trying not to beat a dead horse, Defendants must once again point out that Plaintiffs completely ignore the pleading standards of the Court. Most importantly, however, Plaintiffs again make Defendants' argument for them. By relying on *MAI Systems Corp.,* 845 F. Supp. at 369, Plaintiffs make the fatal error of agreeing with Defendants. In *MAI*, summary judgment dismissing a tying claim was granted. But unlike the present case, in *MAI*, the Plaintiff failed to proffer any evidence of agreement conditioning the purchase of software to the purchase of technical support. Here, no discovery has been taken. Yet, Plaintiffs want this Court to assume its contention that there is no such evidence. This is an assumption that cannot be

sustained. In fact, what we do have in this case is an Amended Counterclaim alleging that software purchases are tied to support and maintenance contract purchases, including Plaintiffs' contractual assumption that software and support and maintenance are tied (Am. Counterclm. ¶ 47), the Affidavits of Mr. Eyer and Mr. Suglio that both offer evidence that such activity has taken place, and *no* evidence offered by Plaintiffs to the contrary. Accordingly, Plaintiffs fall far short of establishing that Defendants' claim should be dismissed and their motion, therefore, must be denied.

## B. Defendants Have Alleged an Antitrust Injury

Plaintiffs continue in their weak assault on Defendants' antitrust claim by pleading with the Court to, this time around, expressly ignore the liberal pleading standard. Citing this Court in *In re Microsoft Corporation Antitrust Litigation*, 237 F. Supp. 2d 639, 658 (D. Md. 2002) (Motz, J.) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)), Plaintiffs conveniently ignore Defendants' allegations of injury (Am. Counterclm. ¶ 155), i.e, by doing away with independent support and service provider opportunities, Plaintiffs create an atmosphere of no competition. See, *Brunswick v. Bowl-O-Matic*, 428 U.S. 104 (1986) (where antitrust claim was dismissed because Plaintiffs' injury resulted from competition of a merged entity, *not*, as is the case here, a suppression of competition).

Instead, Plaintiffs ask this Court to dismiss Defendants' Claim because (1) Plaintiffs presuppose that their Copyright infringement contract and copyright claims will be granted (the connection here is lost on Defendants) and (2) it might be expensive for Plaintiff if they have to defend their actions.

Defendants submit that have provided Plaintiffs with at least notice of the antitrust claim against them (and, in fact, have provided much more than mere notice). Defendants further submit that they have met their burden by pleading the four required elements of an antitrust claim, and also a compensable injury. Accordingly, Plaintiffs motion fails and must be denied.

47

**X.**
## DEFENDANTS ARE ENTITLED TO AN ACCOUNTING AND, THEREFORE, PLAINTIFFS' MOTION SEEKKING DISMISSAL AND/OR JUDGMENT OF DEFENDANTS TWELFTH COUNTERCLAIM MUST BE MUST BE DENIED

Because the Agreement's choice of law provision is narrow and applies only to "[t]his Agreement and

construction thereof"(Agreement, ¶19), and because Counterclaims V (violation of the Illinois Uniform

Deceptive Trade Practices Act, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,

unfair competition and trade disparagement under the common law of Illinois), Counterclaim VIII (violation of

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)), Counterclaim X (tortious interference with contract)

and Count XI (tortious interference with prospective economic advantage) all arise out of conduct which

occurred after the Agreements were declared terminated on January 7, 2003 and also occurred in Illinois and

Ohio, Illinois and Ohio law (and corresponding federal circuit court law) applies to Defendants'

Counterclaims. Counterclaim IX (attorneys' fees) and Counterclaim XII (accounting) should also be construed

under the laws of Illinois and Ohio for the corresponding state law violations which give rise to attorneys' fees

and an accounting.

### Affirmative Defenses
**XI.**
## AFFIRMATIVE DEFENSES PROVIDE AN EXCUSABLE REASON FOR AN AJUDGED INFRINGEMENT, WHICH JUDGMENT HAS NOT BEEN MADE IN THIS CASE, AND THERE HAVING BEEN NO MEANINGFUL DISCOVERY, CANNOT BE MADE AND, THEREFORE PLAINTIFFS MOTION TO DISMISS DEFENDANTS TWELFTH THROUGH TWENTY-SECOND AFFIRMATIVE DEFENSES MUST BE DENIED

Ignoring the actual facts of the case at hand, Plaintiffs forge ahead with their mistaken belief that they

have proven an indisputable case of copyright infringement against Defendants, which they have not, and

demand that Defendants' affirmative defenses related to copyright infringement be dismissed. Because no

meaningful discovery has taken place, Plaintiffs can present no evidence that if Defendants are liable for

copyright infringement, which they are not, their affirmative defenses do not apply. Once again, Plaintiffs

present only attorney argument, not evidence, that Defendants' affirmative defenses are inapplicable.

It is well settled that an affirmative defense is any matter that serves to excuse the defendant's conduct or otherwise avoid the plaintiff's claim, but which is proven by facts extrinsic to the plaintiff's claim. See, e.g., *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 66 (6th Cir. 1994). Further, F.R.C.P, 8(c) requires that affirmative defenses be affirmatively set forth when responding to a preceding pleading. By pleading as they have, Defendants fulfilled their obligation both the Court and to Plaintiffs by putting each on notice of Defendants response to a finding of infringement. To ask that some of the Affirmative Defenses proffered by Defendants be dismissed at this early stage is contrary to the duty imposed on Defendants by the Court.

Further, each Affirmative Defense stands on its own and those which are applicable depend on the outcome of the underlying copyright claims. Accordingly, Plaintiffs' motion for dismissal of Defendants Affirmative Defenses is, without discovery and in light of the true state of the pleadings and attached affidavits and like the remainder of their motion, premature at best and unfounded at worse.

Moreover, Plaintiffs continue to dismiss Defendants' ownership claims. Plaintiffs have offered no evidence that Defendants are not in possession of lawful copies of the Software yet expect this Court to find otherwise. It is not until pertinent evidence is offered into the record that any analysis of Defendants' Affirmative Defenses can occur. Accordingly, Plaintiffs' motion for dismissal of Defendants twelfth through twenty-second Affirmative Defenses must be denied.

## XII.
## PLAINTIFFS ARE NOT ENTITLED TO A PERMANENT INJUNCTION, STATUTORY DAMAGES AND ATTORNEYS' FEES BECAUSE DEFENDANTS HAVE NOT INFRINGED SOFTDENT'S COPYRIGHTS

Plaintiffs have offered no proof that Defendants are infringing their copyrights. In fact, the only evidence presented to this Court is to the contrary: Defendants have attested to the fact that they do not copy Plaintiffs' software. (Eyer Aff. 13; Suglio Aff13). Defendants do maintain, however, that they are entitled to do so as long as it is done lawfully, i.e., on their computers at their facilities. Moreover, this Court has found that Defendants could provide technical support and service of the Software "provided, of course, . . . that

49

relevant materials were returned to [Plaintiffs] and not used" as required under Paragraph 13.3 of the Agreements (Feb. 21, 2003 Trans., p. 10).

There has been no determination, or will there be, that a copyright infringement has occurred. The evidence before this Court actually points to the opposite finding; Defendants lawfully own and/or possess software and are entitled to use it to provide support and maintenance to third parties. Accordingly, Plaintiffs are not entitled to an injunction, permanent or otherwise, or an award of attorneys' fees under 17 U.S.C. § 505 or for Defendants' non-existent willful infringement

## CONCLUSION

For the foregoing reasons and taking into account the defined terms of the agreement and the affidavits of Lawrence Eyer, Jeffrey Suglio, Mark E. Wiemelt, and Robert Chaisson, it is respectfully requested that the court deny plaintiffs' motion for partial summary judgment granting their amended third, fourth, fifth and sixth counts and for partial summary judgment, to dismiss, or, in the alternative, for judgment on the pleadings as to defendants' fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth and PSSI's fourteenth amended counterclaims and affirmative defenses

Dated: April 5, 2004

Respectfully submitted,

By:

/s/ Mark E. Wiemelt
One of their Attorneys

Lead Counsel (Pro Hac Vice):
Mark E. Wiemelt (06208213)
LAW OFFICES OF MARK E. WIEMELT, P.C.
10 S. LaSalle St., Ste. 3500
Chicago, Illinois 60603
(312) 372-7664

Local Counsel:
John M.G. Murphy
Ober, Kaler, Grimes & Shriver
120 E. Baltimore Street
Baltimore, MD 21202-1643
(410) 347-7334