IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PRACTICEWORKS, INC., et al., | ) Civil No.: JFM 02 CV 1205 |
| Plaintiffs | ) |
| V. | ) |
| PROFESSIONAL SOFTWARE SOLUTIONS OF ILLINOIS, INC., | ) |
| Defendant. | ) |
| AND | ) |
| PRACTICEWORKS, INC., et al., | ) Civil No.: JFM 02 CV 1206 |
| Plaintiffs | ) |
| V. | ) |
| DENTAL MEDICAL AUTOMATION, INC., | ) |
| Defendant. | ) |

### AFFIDAVIT OF LAWRENCE E. EYER

County of Cook )
              ) ss:
State of Illinois )

**Lawrence E. Eyer**, being duly sworn, deposes and says:

1) I am the president of Defendant Professional Software Solutions of Illinois, Inc. (hereinafter referred to as "PSSI"). As such, I am fully familiar with the facts set forth in this affidavit.

2) I respectfully submit this affidavit in support of PSSI's response to Plaintiffs' currently pending Motion for Partial Summary Judgment of their amended third, fourth, fifth and sixth counts and for Partial Summary Judgment,


EXHIBIT A

to Dismiss, or, in the alternative, and for Judgment on the Pleadings as to Defendants' fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth and PSSI's fourteenth amended counterclaims and affirmative defense.

3) PSSI is a party to the Agreement in question. The Agreement defines End-user as "a customer or purchaser of Product(s)." (A copy of the Agreement is attached hereto as Exhibit A.) No document ever presented to me or agreement executed by me defined end-user as being only a dentist, orthodontist, or oral surgeon, or a dental or orthodontic practice. Further, I was never advised by Plaintiffs or their predecessors-in-interest that end-users were limited to dentists, orthodontist, or oral surgeons, or dental or orthodontic practices.

4) Plaintiffs and their predecessors-in-interest would routinely and knowingly sell software to non-dentist, orthodontist, or oral surgeon end users. During the term of the Agreement, I am aware of such sales to at least a school, a prison, and an eye care facility. In fact, I sold both Medassist and Softdent software to non-dentists.

5) At no time was I ever informed by Plaintiffs that PSSI, as a dealer, could not be an end-user of the product. As stated above, Plaintiffs routinely and knowingly sold Softdent to non-dentists, orthodontist, and oral surgeons. In fact, PSSI has for many years used the Softdent program for its own accounting purposes, a situation about which Plaintiffs were aware.

6) In my dealings with Plaintiffs and their predecessors-in-interest, tight control of the dissemination of copies of the software did not occur. According to the Agreement, software orders would only be filled when the completed Purchase Registration Form had been executed by an end-user and received by

Plaintiffs. However, it was my experience that the Purchase Registration Form was routinely disregarded or not completed by an end-user. Yet, orders were filled by Plaintiffs and their predecessors in interest. Moreover, in or about January of 1999 at a Dealers' meeting in Las Vegas, I was informed by Jeff Lyon, Plaintiffs' predecessors' General Manager that it was no longer necessary to complete and submit a Purchase Registration Form.

7) Also, during the term of the Agreement, there was an extended period of time during at least portions of 2001 and 2002 in which software was sold without a license associated with it.

8) PSSI purchased a copy of the software from Plaintiffs in November 2002. This Software was freely sold to PSSI by Plaintiffs and included a subscription agreement that provided for updates for one year. This Software was sent without a license agreement and included permission for up to ten individuals to use the software. During the term of the Agreement, I also received Software directly from Plaintiffs as consideration for attendance at and work on behalf of Plaintiffs at trade shows. This software was given to me without restriction as to use or re-sale. In particular, Plaintiffs indicated that I could use or sell it as I pleased without any payment to Plaintiffs.

9) PSSI served as much more than a conduit of Plaintiffs' software. The Agreement acknowledged that PSSI was a value added reseller of Plaintiffs' Products. As a value added reseller, PSSI was also responsible for the installation and setup of the software as well as training as to its use. Moreover, Plaintiffs and their predecessors-in-interest sometimes drop shipped product to an end-user. As this became routine, PSSI stopped stocking an inventory of Software. PSSI

generally did not see or touch the software in these circumstances until such time as a PSSI representative would assist an end-user in the installation and setup of the software on the end-users' computers.

10) During the term of the Agreement, Plaintiffs did not comply with their contractual obligations as set forth in the Agreement. For example, the Agreement required Plaintiffs and their predecessors-in-interest to supply regular reports of improvements in business methods developed by PSS and other dealers in the form of newsletters, pamphlets, brochures, annual business meetings, and other methods deemed appropriate by PSS (Exhibit A, Paragraph 4.1). Further, the Agreement required that Plaintiffs supply PSSI with, among other items, mailing lists (Exhibit A, Paragraph 4.2). During the last eighteen months approximately of the Agreement, Plaintiffs would not supply PSSI with mailing lists or other materials.

11) No one associated with PSSI has ever disclosed, or caused to be disclosed, any confidential or proprietary information relating to the software or Softdent outside of the terms of the Agreement.

12) At no time has any person associated with PSSI impeded, blocked, obstructed, or restricted Plaintiffs' ability to promote and sell its own maintenance and service programs.

13) PSSI owns an unrestricted copy of the software. Accordingly, PSSI can use its software to service a customer's need. However, PSSI does not need to make copies of Plaintiffs' software or download it onto customer (or other third party) computers to provide support and service to its customers. More particularly, PSSI does not copy or load Software which it owns or to which it has

a license on customer or third parties computers when PSSI provides support and service to its customers.

14) PSSI has returned all material as contemplated under the Agreement to Plaintiffs. The materials were given to PSSI's attorney, Mark E. Wiemelt, as agreed to by Plaintiffs, for safekeeping pending the outcome of this lawsuit. The material, to my knowledge, remains in the possession of Mr. Wiemelt. PSSI returned all SELF RUNNING DEMO or LIVE DEMO software it received during the term of the Agreement.

15) Plaintiffs have made disparaging and inaccurate statements regarding PSSI's business. Plaintiffs' employees and agents have on several occasions informed current customers of PSSI and prospective customers of PSSI that PSSI is not able to supply the customer or potential customer with support and service of Plaintiffs' software. Moreover, Plaintiffs have encouraged the PSSI customers to seek refunds from PSSI for prepaid support and service. I have personally spoken to and received correspondence from many of these individuals which support this statement.

16) PSSI has not alleged that Plaintiffs have made "disparaging, false, untrue and/or misleading representations" to third parties regarding PSSI's inability to use the software to provide technical support and service. Instead, PSSI alleges that Plaintiffs have made such remarks in connection with PSSI's inability to provide support and service in any manner. I have personally spoken to and received correspondence from many of these individuals which support this statement.

17) To effectuate the terms of the Agreement and obtain sales necessary to retain its exclusive dealer status, PSSI expended significant funds and forewent other opportunities to fully develop and maximize the economic viability of the defined territory for the benefit of Plaintiffs.

18) Throughout the term of the Agreement, PSSI sold in excess of an average of 50 Products per year.

19) As a result of Plaintiffs' unfair and illegal activities, PSSI has suffered losses in excess of $1 million.

20) Through industry contacts and relationships built up throughout the years, I have learned that Plaintiffs' sales personnel have informed existing Softdent customers and prospective Softdent customers that they must, in order to purchase Softdent software, enter into a maintenance and support agreement with Plaintiffs.

21) At no time has this matter been "on the cusp of a settlement." The parties have had preliminary settlement discussions and have exchanged proposed settlement terms but they have always disagreed on many issues, not the least of which are the attorneys' fees issue and the "lingering" issue of support and service.

22) Attached hereto as Exhibit B is a true and accurate copy of Addendum A of the Agreement.

23) Plaintiffs transmitted a letter to software customers in PSSI's Territory approximately two weeks after the January 7 Decision and Order. (A copy of the letter is attached to the Amended Answer as Exhibit A).

24) Defendant PSSI states that it responded to the April 14, 2003 letter by letter dated May 8, 2003, a copy of which is attached to the Amended Answer as

Exhibit C. Further answering, Defendant PSSI has complied with the parties agreement on page 14 of the transcript of the February 21, 2003 hearing that Defendant would "drop all the materials that have ever been given them by the plaintiffs, with the exception of the software that they've purchased, drop all that material off to [their attorneys] office pending this litigation."

25) Defendant PSSI has complied with the parties agreement on page 14 of the transcript of the February 21, 2003 hearing that Defendant would "drop all the materials that have ever been given them by the plaintiffs, with the exception of the software that they've purchased, drop all that material off to [their attorneys] office pending this litigation." Defendant has further notified Plaintiffs that it has done so.

26) The Agreement provided that Counter-Plaintiff's exclusive rights as a distributor and value added reseller of the Software and related products shall continue during the term of the Agreement and all renewals thereof for so long as Counter-Plaintiff purchases from PSS an average of fifty Products per year.

27) The Agreement further acknowledged that Counter-Plaintiff, in executing the Agreement, is relying on the exclusive right as a distributor and value added reseller of the Software and related products in the specified zip code ranges, and is expending significant funds (and foregoing other opportunities) to fully develop and maximize the economic viability of the defined territory for the benefit of Counter-Plaintiff and PSS.

28) The Agreement provided that title to the products shall pass from PSS to PSSI after delivery of such Products.

29) Counter-Defendants have directed one or more communications offering the SoftDent software and related products for direct sale to various SoftDent customers and/or prospective customers in PSSI's exclusive geographical region.

30) Counter-Plaintiff purchased SoftDent software from Counter-Defendants and their predecessors-in-interest.

31) The sales of SoftDent software by Counter-Defendants and their predecessors-in-interest to Counter-Defendant constituted sales.

32) The sales of SoftDent software by Counter-Defendants and their predecessors-in-interest to End-Users constituted and continues to constitute sales.

33) The sales of SoftDent software by Counter-Plaintiff to End-Users constituted sales.

34) Counter-Defendants have contacted customers of Counter-Plaintiff knowing that they were under contract with Counter-Plaintiff and recommended that said customers cease using Counter-Plaintiff's technical support and service under the terms of the existing contracts, demand a full or partial refund of the contract price for said technical support and service, and enter into contracts with Counter-Defendants for technical support and service.

35) Counter-Defendants have until recently sold its software without requiring that end-user's purchase technical support and services from it. Counter-Plaintiff has also sold Counter-Defendants' software without providing technical support and services.

36) Counter-Plaintiffs have also provided technical support and services for Counter-Defendants' software separate from any software sales.

37) Using the Counter-Defendants' software without technical support and service renders the software useless to most end-users.

38) Counter-Defendants have recently begun to sell their software to end-users only if they agree to accept technical support and services from Counter-Defendants. Upon information and belief, Counter-Defendants' contract for sales of software assumes the purchase of technical support and services from Counter-Defendants.

39) Counter-Defendants further expressly allege to end-user customers and potential end-user customers that Counter-Plaintiff is no longer able to provide technical support and services for Plaintiff's software.

40) A number of Counter-Plaintiff's customers have inquired of Counter-Plaintiff whether they could purchase software from Counter-Defendants and technical support and services from Counter-Plaintiff.

41) Counter-Plaintiff has been and continues to be ready, willing, and able to provide technical support and services for Counter-Defendants' software.

42) Counter-Defendants' disparaging, false, inaccurate and/or misleading representations are in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1-7(1965), namely § 2(8), a deceptive act or practice in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1-12 (1961) and constitute unfair competition and trade disparagement under the common law of Illinois.

43) By their actions, as described above, Counter-Defendants willfully engaged in an unfair method of competition and a deceptive act or practice.

44) As a direct and proximate result of the unfair competition, deceptive trade practices and defamatory acts of Counter-Defendants, Counter-Plaintiff has suffered and will continue to suffer damages in amounts not yet fully determined, including lost profits and the expenditure of attorneys' fees and court costs.

45) Counter-Plaintiff and Counter-Defendants entered into a valid and enforceable contract dated January 15, 1993, a copy of which is attached to the First Amended Complaint in this matter as Exhibit A.

46) Counter-Plaintiff has fully complied with its contractual obligations set forth in the Agreement.

47) SoftDent's "Platinum", "Advantage", and "Subscription" products and services contain Counter-Defendants' SoftDent Software and related products, which, by definition, are subject to the terms of the Agreement.

48) Counter-Defendants, in violation of Sections 3.1, 4.1, 4.4, 10.1 and 10.7 of the Agreement, have: i) offered to sell Software and related products to customers within Counter-Plaintiff's exclusive geographical territory; ii) sold Software and related products to customers within Counter-Plaintiff's exclusive geographical territory; iii) directly advertised its SoftDent Software and related products and services to customers and potential customers within Counter-Plaintiff's exclusive geographical territory; iv) failed to provide mailing lists, demographic studies, brochures, demonstration disks and other sales materials to Counter-Plaintiff, as provided in paragraph 4.4; v) failed to compensate Counter-Plaintiff as provided in the Agreement; vi) failed to provide regular reports as required in paragraph 4.1; and vii) otherwise interfered with the Fair Trade Practices of Counter-Plaintiff.

49) Every contract includes an implied covenant of good faith and fair dealing.

50) Counter-Defendants have: i) failed to forward sales "leads" within Counter-Plaintiff's exclusive geographical territory to Counter-Plaintiff; ii) failed to cooperate with Counter-Plaintiff regarding issues pertaining to the distribution of Software upgrades, pricing, and participation in trade shows; and iii) failed to allow Counter-Plaintiff to offer products and services within Counter-Plaintiff's territory when the products and services were offered in other territories.

51) As such, Counter-Defendants have expressly breached the terms of the Agreement and have breached the implied covenant of good faith and fair dealing in its business and contractual relationship with Counter-Plaintiff.

52) As a result of Counter-Defendants' breach of the Agreement, Counter-Plaintiff has suffered damage in excess of $1 million dollars including, without limitation, lost technical support and service opportunities in Counter-Plaintiff's Territory under the Agreement and lost access to customers for others services – which losses Counter-Defendants reasonably foresaw as the probable result of breach at the time it entered into the Agreement.

53) As a result, Counter-Defendants are liable to Counter-Plaintiff for substantial damages in excess of $1 million arising out of Counter-Defendant's breach of the Agreement, the exact amount of which is to be determined at trial.

54) Counter-Plaintiff has a history of providing technical support and service of Counter-Defendants' Products to third parties which precedes the effective date of the Agreement.

55) Counter-Defendants maintain that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to

customers pending this litigation or after termination of the Agreement by Counter-Defendant.

56) Counter-Defendants have expressly asserted to third parties, including customers of Counter-Plaintiff, that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to customers.

57) Such assertions have caused and threaten further to cause injury to Counter-Plaintiff, including litigation costs and attorneys' fees.

58) Counter-Plaintiffs statements constitute false, inaccurate and/or misleading representations and their publication to third parties in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

59) Counter-Defendants' violation of 15 U.S.C. § 1125(a) has been willful and malicious.

60) The Agreement provides for recoupment of attorneys fees by the successful party for any action filed in relation to the Agreement as follows:

> In the event that any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all of the sums that the unsuccessful party may be called on to pay, a reasonable sum for the successful party's reasonable attorneys' fees.
> Ex. A at ¶ 17.

61) By virtue of Counter-Defendants' dispute of and challenge to Counter-Plaintiff's attempted anticipatory wrongful termination, anticipatory breach, and breach of the Agreement, Counter-Plaintiff has been forced to incur expenses, including, without limitation, attorneys' fees, disbursements and other costs

incurred by Counter-Plaintiffs in commencing the instant action and enforcing its rights under the Agreement.

62) As a result, Counter-Defendants are liable to Counter-Plaintiff for Counter-Plaintiff's expenses including, without limitation, attorneys' fees, disbursements and other costs incurred by Plaintiffs in commencing the instant action and enforcing its rights under the Agreement, in an amount to be determined at trial.

63) Counter-Plaintiff has entered into long-term contracts for the provision of technical support and service of Counter-Defendants' Products to numerous customers of Counter-Plaintiff.

64) Counter-Defendants have expressly asserted to third parties, including customers of Counter-Plaintiff, that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to customers.

65) Counter-Defendants have contacted customers of Counter-Plaintiff knowing that they were under contract with Counter-Plaintiff and recommended that said customers cease using Counter-Plaintiff's technical support and service under the terms of the existing contracts, demand a full or partial refund of the contract price for said technical support and service, thereby breaching said contracts, and enter into contracts with Counter-Defendants for technical support and service.

66) As such, Counter-Defendants knew of and have purposely, intentionally, maliciously and without legal justification interfered with Counter-Plaintiff's contracts under Illinois and other state laws.

67) Counter-Plaintiff has suffered and will continue to suffer injury and damages as a result of Counter-Defendants' interference with Counter-Plaintiff's contracts.

68) Counter-Defendants' conduct has caused Counter-Plaintiff damage in an amount not yet determined.

69) Counter-Plaintiff has a history of entering into long-term contracts with third parties for the provision of technical support and service of Counter-Defendants' Products.

70) Counter-Defendants have expressly asserted to third parties, including customers and prospective customers of Counter-Plaintiff, that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to customers or prospective customers.

71) Based on its prior dealings with customers and prospective customers, Counter-Plaintiff had a reasonable expectation of entering into and continuing valid business relationships with said customers and prospective customers.

72) As such, Counter-Defendants knew of and have purposely, intentionally, maliciously and without legal justification interfered with Counter-Plaintiff's legitimate expectancy of business relationships by inducing or causing customers and prospective customers of Counter-Plaintiff to refrain from and delay entering into a business relationship with Counter-Plaintiff under Illinois and other state laws.

73) Counter-Plaintiff has suffered and will continue to suffer injury and damages as a result of Counter-Defendants' interference with Counter-Plaintiff's prospective economic advantage.

74) Counter-Defendants' conduct has caused Counter-Plaintiff damage in an amount not yet determined.

75) Counter-Defendants sell on a national scale a software program designed for dental practices ("end-users") and enabled for use for billing and other purposes. Counter-Defendants' software is superior to other software on the market designed for the same purpose and is, therefore, highly desirable by end-users.

76) Counter-Defendants have until recently sold its software separately from and without requiring that end-user's purchase technical support and services from it. Counter-Plaintiff has also sold Counter-Defendants' software separately from and without providing technical support and services.

77) Counter-Plaintiffs have also provided technical support and services for Counter-Defendants' software separate from any software sales.

78) Using the Counter-Defendants' software without technical support and service renders the software useless to most end-users.

79) Counter-Defendants have recently begun to sell their software to end-users only if they agree to accept technical support and services from Counter-Defendants. Upon information and belief, Counter-Defendants' contract for sales of software assumes the purchase of technical support and services from Counter-Defendants.

80) Counter-Defendants further expressly allege to end-user customers and potential end-user customers that Counter-Plaintiff is no longer able to provide technical support and services for Counter-Defendants' software.

81) A number of Counter-Plaintiff's customers have inquired of Counter-Plaintiff whether they could purchase software from Counter-Defendants and technical support and services from Counter-Plaintiff.

82) Counter-Plaintiff has been and continues to be ready, willing, and able to provide technical support and services for Counter-Defendants' software.

83) Coercing an end-user to purchase technical support and services from Counter-Defendants in order to receive the software unlawfully restricts an end-user's ability to purchase the software from Counter-Defendants and technical support and service from a provider of end-user's choosing.

84) Informing end-users and potential end-users that Counter-Plaintiff is unable to provide technical support and services for Counter-Defendants' software infers that the only viable economic option for the end-user is to buy technical support and services from Counter-Defendants.

85) As a result of Counter-Defendants' unlawful tying of its software and support and maintenance services, Counter-Plaintiff has suffered injury.

86) Counter-Plaintiff and Counter-Defendants entered into a valid and enforceable contract for the sale of SoftDent software by Counter-Defendants to Counter-Plaintiff ("Sale Contract"), the terms of which are included in an Invoice dated November 15, 2002, a copy of which is attached to the Amended Answer as Exhibit D.

87) Counter-Plaintiff has fully complied with its contractual obligations set forth in the Sale Contract, including payment of the purchase price.

88) Per the terms of the Sale Contract, Counter-Defendants provided Counter-Plaintiff with version 9.7 of the software.

89) Under the terms of the Sale Contract, Counter-Plaintiff purchased a one year Update Subscription.

90) Under an Update Subscription, a purchaser pre-purchases all updated versions of the SoftDent software which are released and distributed by Counter-Defendants for one year following the purchase date of the Update Subscription.

91) During the one year following the date of the Sale Contract, Counter-Defendants released and distributed multiple updated versions of the SoftDent software, including versions 9.8, 10.0.1 and 10.0.2, to their customers, including those who purchased an Update Subscription covering the release and distribution period.

92) Under the terms of the Sale Contract, Counter-Plaintiff was and is entitled to receive all updated versions of the SoftDent software, for one year following the date of the Sale Contract, including versions 9.8, 10.0.1 and 10.0.2.

93) Despite repeated demands by Counter-Plaintiff that Counter-Defendants comply with their contractual obligations to provide Counter-Plaintiff with versions 9.8, 10.0.1 and 10.0.2 of the software, Counter-Defendants fail and refuse to do so.

94) As such, Counter-Defendants have expressly breached the terms of the Sale Contract and have breached the Sale Contract.

95) As a result of Counter-Defendants' breach of the Sale Contract, Counter-Plaintiff has suffered damage in excess of $1 million dollars including, without limitation, lost technical support and service opportunities in Counter-Plaintiff's Territory – which losses Counter-Defendants reasonably foresaw as the probable result of breach at the time it entered into the Sale Contract.

96) As a result, Counter-Defendants are liable to Counter-Plaintiff for substantial damages in excess of $1 million arising out of Counter-Defendant's breach of the Sale Contract, the exact amount of which is to be determined at trial.

Date: April 5, 2004

Respectfully submitted,

_____
Lawrence E. Eyer

Subscribed and sworn to before me this 5th day of April, 2004.

_____
Notary Public

My commission expires on _____

"OFFICIAL SEAL"
Dimple Renee Carnes
Notary Public, State of Illinois
My Commission Expires 06/18/07