IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PRACTICEWORKS, INC., et al., | ) Civil No.: JFM 02 CV 1205 |
| Plaintiffs | ) |
| v. | ) |
| PROFESSIONAL SOFTWARE SOLUTIONS OF ILLINOIS, INC., | ) |
| Defendant. | ) |
| AND | ) |
| PRACTICEWORKS, INC., et al., | ) Civil No.: JFM 02 CV 1206 |
| Plaintiffs | ) |
| v. | ) |
| DENTAL MEDICAL AUTOMATION, INC., | ) |
| Defendant. | ) |

**AFFIDAVIT OF JEFFREY SUGLIO**

County of Summit  )
                  ) ss:
State of Ohio     )

**Jeffrey Suglio**, being duly sworn, deposes and says:

1) I am the president of Defendant Dental Medical Automation, Inc. (hereinafter referred to as "DMA"). As such, I am fully familiar with the facts set forth in this affidavit.

2) I respectfully submit this affidavit in support of DMA's response to Plaintiffs' currently pending Motion for Partial Summary Judgment of their amended third, fourth, fifth and sixth counts and for Partial Summary Judgment,


EXHIBIT B

to Dismiss, or, in the alternative, and for Judgment on the Pleadings as to Defendants' fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth Counterclaims and Affirmative Defenses.

3) I am a signatory to the Agreement in question. The Agreement defines End-user as "a customer or purchaser of Product(s)." (A copy of the Agreement is attached hereto as Exhibit A.) No document ever presented to me or agreement executed by me defined end-user as being only a dentist, orthodontist, or oral surgeon, or a dental or orthodontic practice. Further, I was never advised by Plaintiffs or their predecessors-in-interest that end-users were to limited to dentists, orthodontist, or oral surgeons, or dental or orthodontic practices.

4) Plaintiffs and their predecessors-in-interest would routinely and knowingly sell software to non-dentist, orthodontist, or oral surgeon end users. During the term of the Agreement, I am aware of such sales to at least a school, a prison, and an eye care facility. Moreover, I sold both Medassist and Softdent software to non-dentists.

5) At no time was I ever informed by Plaintiffs that DMA, as a dealer, could not be an end-user of the product. As stated above, Plaintiffs routinely and knowingly sold Softdent to non-dentists, orthodontist, and oral surgeons. I am also aware of that co-defendant Professional Software Solutions of Illinois, Inc. has for many years used the Softdent program for its own accounting purposes.

6) In my dealings with Plaintiffs and their predecessors in interest, tight control of the dissemination of copies of the software did not occur. According to the Agreement, software orders would only be filled when the completed Purchase Registration Form had been executed by an end-user and received by

Plaintiffs. However, it was my experience that the Purchase Registration Form was routinely disregarded or not completed by an end-user. Yet, orders were filled by Plaintiffs and their predecessors in interest. Moreover, in or about January of 1999 at a Dealers' meeting in Las Vegas, I was informed by Jeff Lyon, Plaintiffs' predecessors' General Manager that it was no longer necessary to complete and submit a Purchase Registration Form.

7) Also, during the term of the Agreement, there was an extended period of time during at least portions of 2001 and 2002 in which software was sold without a license associated with it.

8) During the term of the Agreement, I received Software directly from Plaintiffs as consideration for attendance at and work on behalf of Plaintiffs at trade shows. This software was given to me without restriction as to use or re-sale. In particular, Plaintiffs indicated that I could use or sell it as I pleased without any payment to Plaintiffs.

9) DMA served as much more than a conduit of Plaintiffs' software. The Agreement acknowledged that DMA was a value added reseller of Plaintiffs' Products. As a value added reseller, DMA was also responsible for the installation and setup of the software as well as training as to its use. Moreover, Plaintiffs and their predecessors-in-interest sometimes drop shipped product to an end-user. As this became routine, DMA stopped stocking an inventory of Software. DMA generally did not see or touch the software in these circumstances until such time as a DMA representative would assist an end-user in the installation and setup of the software on the end-users' computers.

10)  During the term of the Agreement, Plaintiffs did not comply with their contractual obligations as set forth in the Agreement. For example, the Agreement required Plaintiffs and their predecessors-in-interest to supply regular reports of improvements in business methods developed by PSS and other dealers in the form of newsletters, pamphlets, brochures, annual business meetings, and other methods deemed appropriate by PSS (Exhibit A, Paragraph 4.1). Further, the Agreement required that Plaintiffs supply DMA with, among other items, mailing lists (Exhibit A, Paragraph 4.2). During the last eighteen months approximately of the Agreement, Plaintiffs would not supply DMA with mailing lists or other materials.

11)  No one associated with DMA has ever disclosed, or cause to be disclosed, any confidential or proprietary information relating to the software or Softdent outside of the terms of the Agreement.

12)  At no time has any person associated with DMA impeded, blocked, obstructed, or restricted Plaintiffs' ability to promote and sell its own maintenance and service programs.

13)  DMA does not need to make copies of Plaintiffs' software or download it onto customer (or other third party) computers to provide support and service to its customers. More particularly, DMA does not copy or load Software which it owns or to which it has a license on customer or third parties computers when DMA provides support and service to its customers.

14)  DMA has returned all material as contemplated under the Agreement to Plaintiffs. The materials were given to DMA's attorney, Mark E. Wiemelt, as agreed to by Plaintiffs, for safekeeping pending the outcome of this lawsuit. The

material, to my knowledge, remains in the possession of Mr. Wiemelt. DMA returned all SELF RUNNING DEMO or LIVE DEMO software it received during the term of the Agreement.

15) Plaintiffs have made disparaging and inaccurate statements regarding DMA's business. Plaintiffs' employees and agents have on several occasions informed current customers of DMA and prospective customers of DMA that DMA is not able to supply the customer or potential customer with support and service of Plaintiffs' software. Further, other DMA customers have informed DMA that Plaintiffs have informed them that DMA is going out of business or is bankrupt. Moreover, Plaintiffs have encouraged the DMA customers to seek refunds from DMA for prepaid support and service.

16) DMA has not alleged that Plaintiffs have made "disparaging, false, untrue and/or misleading representations" to third parties regarding DMA's inability to use the software to provide technical support and service. Instead, DMA alleges that Plaintiffs have made such remarks in connection with DMA's inability to provide support and service in any manner.

17) To effectuate the terms of the Agreement and obtain sales necessary to retain its exclusive dealer status, DMA expended significant funds and forewent other opportunities to fully develop and maximize the economic viability of the defined territory for the benefit of Plaintiffs.

18) Throughout the term of the Agreement, DMA sold in excess of an average of 50 Products per year.

19) As a result of Plaintiffs' unfair and illegal activities, DMA has suffered losses in excess of $1 million.

20) Through industry contacts and relationships built up throughout the years, I have learned that Plaintiffs' sales personnel have informed existing Softdent customers and prospective Softdent customers that they must, in order to purchase Softdent software, enter into a maintenance and support agreement with Plaintiffs.

21) At no time has this matter been "on the cusp of a settlement." The parties have had preliminary settlement discussions and have exchanged proposed settlement terms but they have always disagreed on many issues, not the least of which are the attorneys' fees issue and the not so "lingering" issue of support and service.

22) Attached hereto as Exhibit B is a true and accurate copy of Addendum A of the Agreement.

23) Plaintiffs transmitted a letter to software customers in DMA's Territory approximately two weeks after the January 7 Decision and Order. (A copy of the letter is attached to the Amended Answer as Exhibit A).

24) Defendant DMA states that it responded to the April 14, 2003 letter by letter dated May 8, 2003, a copy of which is attached to the Amended Answer as Exhibit C. Further answering, Defendant DMA has complied with the parties agreement on page 14 of the transcript of the February 21, 2003 hearing that Defendant would "drop all the materials that have ever been given them by the plaintiffs, with the exception of the software that they've purchased, drop all that material off to [their attorneys] office pending this litigation."

25) Defendant DMA has complied with the parties agreement on page 14 of the transcript of the February 21, 2003 hearing that Defendant would "drop all the materials that have ever been given them by the plaintiffs, with the exception of

the software that they've purchased, drop all that material off to [their attorneys] office pending this litigation." Defendant has further notified Plaintiffs that it has done so.

26) The Agreement provided that Counter-Plaintiff's exclusive rights as a distributor and value added reseller of the Software and related products shall continue during the term of the Agreement and all renewals thereof for so long as Counter-Plaintiff purchases from PSS an average of fifty Products per year.

27) The Agreement further acknowledged that Counter-Plaintiff, in executing the Agreement, is relying on the exclusive right as a distributor and value added reseller of the Software and related products in the specified zip code ranges, and is expending significant funds (and foregoing other opportunities) to fully develop and maximize the economic viability of the defined territory for the benefit of Counter-Plaintiff and PSS.

28) The Agreement provided that title to the products shall pass from PSS to DMA after delivery of such Products.

29) Counter-Defendants have directed one or more communications offering the SoftDent software and related products for direct sale to various SoftDent customers and/or prospective customers in DMA's exclusive geographical region.

30) Counter-Plaintiff purchased SoftDent software from Counter-Defendants and their predecessors-in-interest.

31) The sales of SoftDent software by Counter-Defendants and their predecessors-in-interest to Counter-Defendant constituted sales.

32) The sales of SoftDent software by Counter-Defendants and their predecessors-in-interest to End-Users constituted and continues to constitute sales.

33) The sales of SoftDent software by Counter-Plaintiff to End-Users constituted sales.

34) Counter-Defendants have contacted customers of Counter-Plaintiff knowing that they were under contract with Counter-Plaintiff and recommended that said customers cease using Counter-Plaintiff's technical support and service under the terms of the existing contracts, demand a full or partial refund of the contract price for said technical support and service, and enter into contracts with Counter-Defendants for technical support and service.

35) Counter-Defendants have expressly asserted to third parties, including customers of Counter-Plaintiff, that a Judgment was entered against Counter-Plaintiff and in favor of Counter-Defendant in this action, requiring Counter-Plaintiff to pay Counter-Defendant at least $500,000.00.

36) Counter-Defendants have expressly asserted to third parties, including customers of Counter-Plaintiff, that Counter-Plaintiff is going out of business and/or bankrupt.

37) Counter-Defendants have until recently sold its software without requiring that end-user's purchase technical support and services from it. Counter-Plaintiff has also sold Counter-Defendants' software without providing technical support and services.

38) Counter-Plaintiffs have also provided technical support and services for Counter-Defendants' software separate from any software sales.

39) Using the Counter-Defendants' software without technical support and service renders the software useless to most end-users.

40) Counter-Defendants have recently begun to sell their software to end-users only if they agree to accept technical support and services from Counter-Defendants. Upon information and belief, Counter-Defendants' contract for sales of software assumes the purchase of technical support and services from Counter-Defendants.

41) Counter-Defendants further expressly allege to end-user customers and potential end-user customers that Counter-Plaintiff is no longer able to provide technical support and services for Plaintiff's software.

42) A number of Counter-Plaintiff's customers have inquired of Counter-Plaintiff whether they could purchase software from Counter-Defendants and technical support and services from Counter-Plaintiff.

43) Counter-Plaintiff has been and continues to be ready, willing, and able to provide technical support and services for Counter-Defendants' software.

44) Counter-Defendants' disparaging, false, inaccurate and/or misleading representations are in violation of Section 4165.02(A)(10) of the Ohio Deceptive Trade Practices Act and constitute unfair competition and trade disparagement under the common law of Ohio.

45) By their actions, as described above, Counter-Defendants willfully engaged in an unfair method of competition and a deceptive act or practice.

46) As a direct and proximate result of the unfair competition, deceptive trade practices and defamatory acts of Counter-Defendants, Counter-Plaintiff has

suffered and will continue to suffer damages in amounts not yet fully determined, including lost profits and the expenditure of attorneys' fees and court costs.

47)     Counter-Plaintiff and Counter-Defendants entered into a valid and enforceable contract dated January 15, 1993, a copy of which is attached to the First Amended Complaint in this matter as Exhibit A.

48)     Counter-Plaintiff has fully complied with its contractual obligations set forth in the Agreement.

49)     SoftDent's "Platinum", "Advantage", and "Subscription" products and services contain Counter-Defendants' SoftDent Software and related products, which, by definition, are subject to the terms of the Agreement.

50)     Counter-Defendants, in violation of Sections 3.1, 4.1, 4.4, 10.1 and 10.7 of the Agreement, have: i) offered to sell Software and related products to customers within Counter-Plaintiff's exclusive geographical territory; ii) sold Software and related products to customers within Counter-Plaintiff's exclusive geographical territory; iii) directly advertised its SoftDent Software and related products and services to customers and potential customers within Counter-Plaintiff's exclusive geographical territory; iv) failed to provide mailing lists, demographic studies, brochures, demonstration disks and other sales materials to Counter-Plaintiff, as provided in paragraph 4.4; v) failed to compensate Counter-Plaintiff as provided in the Agreement; vi) failed to provide regular reports as required in paragraph 4.1; and vii) otherwise interfered with the Fair Trade Practices of Counter-Plaintiff.

51)     Every contract includes an implied covenant of good faith and fair dealing.

52) Counter-Defendants have: i) failed to forward sales "leads" within Counter-Plaintiff's exclusive geographical territory to Counter-Plaintiff; ii) failed to cooperate with Counter-Plaintiff regarding issues pertaining to the distribution of Software upgrades, pricing, and participation in trade shows; and iii) failed to allow Counter-Plaintiff to offer products and services within Counter-Plaintiff's territory when the products and services were offered in other territories.

53) As such, Counter-Defendants have expressly breached the terms of the Agreement and have breached the implied covenant of good faith and fair dealing in its business and contractual relationship with Counter-Plaintiff.

54) As a result of Counter-Defendants' breach of the Agreement, Counter-Plaintiff has suffered damage in excess of $1 million dollars including, without limitation, lost technical support and service opportunities in Counter-Plaintiff's Territory under the Agreement and lost access to customers for others services – which losses Counter-Defendants reasonably foresaw as the probable result of breach at the time it entered into the Agreement.

55) As a result, Counter-Defendants are liable to Counter-Plaintiff for substantial damages in excess of $1 million arising out of Counter-Defendant's breach of the Agreement, the exact amount of which is to be determined at trial.

56) Counter-Plaintiff has a history of providing technical support and service of Counter-Defendants' Products to third parties which precedes the effective date of the Agreement.

57) Counter-Defendants maintain that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to

customers pending this litigation or after termination of the Agreement by Counter-Defendant.

58) Counter-Defendants have expressly asserted to third parties, including customers of Counter-Plaintiff, that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to customers.

59) Such assertions have caused and threaten further to cause injury to Counter-Plaintiff, including litigation costs and attorneys' fees.

60) Counter-Plaintiffs statements constitute false, inaccurate and/or misleading representations and their publication to third parties in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

61) Counter-Defendants' violation of 15 U.S.C. § 1125(a) has been willful and malicious.

62) The Agreement provides for recoupment of attorneys fees by the successful party for any action filed in relation to the Agreement as follows:

> In the event that any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all of the sums that the unsuccessful party may be called on to pay, a reasonable sum for the successful party's reasonable attorneys' fees.
> Ex. A at ¶ 17.

63) By virtue of Counter-Defendants' dispute of and challenge to Counter-Plaintiff's attempted anticipatory wrongful termination, anticipatory breach, and breach of the Agreement, Counter-Plaintiff has been forced to incur expenses, including, without limitation, attorneys' fees, disbursements and other costs

incurred by Counter-Plaintiffs in commencing the instant action and enforcing its rights under the Agreement.

64) As a result, Counter-Defendants are liable to Counter-Plaintiff for Counter-Plaintiff's expenses including, without limitation, attorneys' fees, disbursements and other costs incurred by Plaintiffs in commencing the instant action and enforcing its rights under the Agreement, in an amount to be determined at trial.

65) Counter-Plaintiff has entered into long-term contracts for the provision of technical support and service of Counter-Defendants' Products to numerous customers of Counter-Plaintiff.

66) Counter-Defendants have expressly asserted to third parties, including customers of Counter-Plaintiff, that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to customers.

67) Counter-Defendants have contacted customers of Counter-Plaintiff knowing that they were under contract with Counter-Plaintiff and recommended that said customers cease using Counter-Plaintiff's technical support and service under the terms of the existing contracts, demand a full or partial refund of the contract price for said technical support and service, thereby breaching said contracts, and enter into contracts with Counter-Defendants for technical support and service.

68) As such, Counter-Defendants knew of and have purposely, intentionally, maliciously and without legal justification interfered with Counter-Plaintiff's contracts under Ohio and other state laws.

69) Counter-Plaintiff has suffered and will continue to suffer injury and damages as a result of Counter-Defendants' interference with Counter-Plaintiff's contracts.

70) Counter-Defendants' conduct has caused Counter-Plaintiff damage in an amount not yet determined.

71) Counter-Plaintiff has a history of entering into long-term contracts with third parties for the provision of technical support and service of Counter-Defendants' Products.

72) Counter-Defendants have expressly asserted to third parties, including customers and prospective customers of Counter-Plaintiff, that Counter-Plaintiff cannot continue to provide technical support and service of Counter-Defendants Products to customers or prospective customers.

73) Based on its prior dealings with customers and prospective customers, Counter-Plaintiff had a reasonable expectation of entering into and continuing valid business relationships with said customers and prospective customers.

74) As such, Counter-Defendants knew of and have purposely, intentionally, maliciously and without legal justification interfered with Counter-Plaintiff's legitimate expectancy of business relationships by inducing or causing customers and prospective customers of Counter-Plaintiff to refrain from and delay entering into a business relationship with Counter-Plaintiff under Ohio and other state laws.

75) Counter-Plaintiff has suffered and will continue to suffer injury and damages as a result of Counter-Defendants' interference with Counter-Plaintiff's prospective economic advantage.

76) Counter-Defendants' conduct has caused Counter-Plaintiff damage in an amount not yet determined.

77) Counter-Defendants sell on a national scale a software program designed for dental practices ("end-users") and enabled for use for billing and other purposes. Counter-Defendants' software is superior to other software on the market designed for the same purpose and is, therefore, highly desirable by end-users.

78) Counter-Defendants have until recently sold its software separately from and without requiring that end-user's purchase technical support and services from it. Counter-Plaintiff has also sold Counter-Defendants' software separately from and without providing technical support and services.

79) Counter-Plaintiffs have also provided technical support and services for Counter-Defendants' software separate from any software sales.

80) Using the Counter-Defendants' software without technical support and service renders the software useless to most end-users.

81) Counter-Defendants have recently begun to sell their software to end-users only if they agree to accept technical support and services from Counter-Defendants. Upon information and belief, Counter-Defendants' contract for sales of software assumes the purchase of technical support and services from Counter-Defendants.

82) Counter-Defendants further expressly allege to end-user customers and potential end-user customers that Counter-Plaintiff is no longer able to provide technical support and services for Counter-Defendants' software.

83) A number of Counter-Plaintiff's customers have inquired of Counter-Plaintiff whether they could purchase software from Counter-Defendants and technical support and services from Counter-Plaintiff.

84) Counter-Plaintiff has been and continues to be ready, willing, and able to provide technical support and services for Counter-Defendants' software.

85) Coercing an end-user to purchase technical support and services from Counter-Defendants in order to receive the software unlawfully restricts an end-user's ability to purchase the software from Counter-Defendants and technical support and service from a provider of end-user's choosing.

86) Informing end-users and potential end-users that Counter-Plaintiff is unable to provide technical support and services for Counter-Defendants' software infers that the only viable economic option for the end-user is to buy technical support and services from Counter-Defendants.

87) As a result of Counter-Defendants' unlawful tying of its software and support and maintenance services, Counter-Plaintiff has suffered injury.

Date: 4/3/2004

Respectfully submitted,

Jeffrey Suglio

Subscribed and sworn to before me this 3 day of April, 2004.

Mary Leuca
Notary Public
Mary E. Leuca
My commission expires on 5-7-07.