**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```
                                              )
PRACTICEWORKS, INC., et al.,                  )
                                              )
                          Plaintiffs          )    Civil No.: JFM 02 CV 1205
                                              )
              - against -                     )
                                              )
PROFESSIONAL SOFTWARE SOLUTIONS               )
OF ILLINOIS, INC.,                            )
                                              )
                          Defendant.          )
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```
                                              )
PRACTICEWORKS, INC., et al.,                  )
                                              )
                          Plaintiffs          )    Civil No.: JFM 02 CV 1206
                                              )
              - against -                     )
                                              )
DENTAL MEDICAL AUTOMATION, INC.,              )
                                              )
                          Defendant.          )
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'  MOTION
FOR PARTIAL SUMMARY JUDGMENT GRANTING THEIR AMENDED
THIRD, FOURTH, FIFTH AND SIXTH COUNTS AND FOR PARTIAL SUMMARY
JUDGMENT, TO DISMISS, OR,  IN THE ALTERNATIVE, FOR PARTIAL JUDGMENT
ON THE PLEADINGS AS TO DEFENDANTS' FIFTH, SEVENTH, EIGHTH, NINTH,
TENTH, ELEVENTH, TWELFTH, THIRTEENTH AND PSSI'S FOURTEENTH
AMENDED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES**

**KATTEN MUCHIN ZAVIS ROSENMAN**
575 Madison Avenue
New York, New York 10022

Counsel for Plaintiffs
PracticeWorks, Inc. and SoftDent LLC

# TABLE OF CONTENTS

PRELIMINARY STATEMENT......................................................................................................1

ARGUMENT ............................................................................................................................3

I.     DEFENDANTS HAVE FAILED TO DEMONSTRATE WHY PLAINTIFFS
SHOULD NOT BE AFFORDED PARTIAL SUMMARY JUDGMENT ON
THEIR FOURTH, FIFTH AND SIXTH AMENDED COUNTS AS WELL AS
DISMISSING DEFENDANTS' SEVENTH AMENDED COUNTERCLAIM
AND PSSI'S FOURTEENTH AMENDED COUNTERCLAIM.........................................3

    A.     Defendants' Acquisition of the Software is Governed by the Terms of
the Agreements Which Confirms Their Singular Role as Value-Added Resellers............3

    B.     The Unrelated Allegations Underlying Defendants' Sixth Amended
Counterclaim for Breach of Contract Do Not Preclude Judgment in
Plaintiffs' Favor on their Fourth Amended Count for Breach of Contract ........................4

    C.     Because Defendants Do Not Dispute That They are Using the
Software to Provide Technical Support and Service to Third Parties,
SoftDent is Entitled to Summary Judgment on its Fifth Amended
Count for Copyright Infringement ...................................................................................6

        1 .     "Viewing" SoftDent's Software for the Commercial Purpose of
Providing Technical Support for Third Parties Without Plaintiffs'
Authorization Constitutes Unlawful "Copying" Under the Copyright Act ...........7

        2.     Defendants' Attempts to Undermine Peak and its Progeny are Unavailing ..........7

        3 .     Defendants' Affirmative Defenses Should be Dismissed.....................................9

        4 .     Plaintiffs are Entitled to an Injunction, Damages and Attorneys' Fees.................9

    D.     Because Defendants' Use of the Software Infringes SoftDent's Copyrights
Plaintiffs Are Entitled to Summary Judgment on their Amended Sixth Count
and Dismissing Defendants' Seventh Amended Counterclaim ..........................................9

    E.     Because PSSI's Use of the Software to Provide Technical Support
and Service is in Breach of the Agreement and Infringes SoftDent's
Copyright, Plaintiffs are Entitled to Summary Judgment Dismissing
PSSI's Amended Fourteenth Counterclaim for Breach of Contract ................................10

II.     DEFENDANTS ERR IN ASSERTING THAT THEY HAVE STATED
VALID UNFAIR COMPETITION AND BUSINESS TORT CLAIMS AND
THUS THEIR FIFTH, EIGHTH, TENTH AND ELEVENTH AMENDED
COUNTERCLAIMS SHOULD BE DISMISSED .............................................................11

    A.     Defendants' Choice-of-Law Analysis is Flawed and
Maryland Law Does, In Fact, Apply to Defendants Fifth,
Eighth, Tenth and EleventhAmended Counterclaims.....................................................11

B.     Defendants Have Not Stated Claims for Unfair Competition Under Maryland, Illinois and/or Ohio Law and Thus Their Fifth Amended Counterclaim Must Fail ................................................................................ 12

       1.     Defendants Err in Asserting that They Have Stated a Claim for Deceptive Trade Practices, Trade Disparagement and/or Unfair Competition Under Maryland Law ...................................................................... 12

       2.     PSSI Errs in Asserting That it Has Stated a Claim for Deceptive Trade Practices, Trade Disparagement and/or Unfair Competition Under Illinois Law ............................................................................ 13

       3.     PSSI Errs in Arguing that it Has Stated a Valid Claim Under the Illinois Consumer Fraud and Deceptive Business Practices Act .......................... 15

       4.     DMA Errs in Asserting that it Has Stated a Valid Claim for Deceptive Trade Practices, Unfair Competition and Defamation Under Ohio Law ....................... 16

C.     Defendants Err in Contending That They Have Stated a Viable Claim Under Section 43(a) of the Lanham Act and Thus Their Eighth Amended Counterclaim Must Be Dismissed ...................................................... 17

D.     Defendants Have Not Stated Valid Tortious Interference Claims and Thus Their Tenth and Eleventh Amended Counterclaims Must Be Dismissed................ 19

       1.     Defendants Err in Contending that they Have Stated a Valid Claim for Tortious Interference With Contract........................................... 19

       2.     Defendants Err in Contending that they Have Stated a Viable Claim For Tortious Interference With Prospective Economic Advantage .................... 20

III.     DEFENDANTS ERR IN CONTENDING THAT THEY HAVE PLEADED A TYING ARRANGEMENT UNDER THE SHERMAN ACT AND THUS THEIR THIRTEENTH AMENDED COUNTERCLAIM MUST BE DISMISSED ...................... 21

   A.     Defendants Err in Arguing They Have Alleged Antitrust Injury...................................... 24

IV.     THE TWELFTH AMENDED COUNTERCLAIM FOR AN ACCOUNTING MUST BE DISMISSED AND/OR JUDGMENT MUST BE GRANTED IN FAVOR OF PLAINTIFFS........................................................ 24

V.     PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES ........................................................... 25

CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AC Legg Packing Co. v. Olde Plantation Spice Co., Inc.*,
  61 F. Supp. 2d 426, 433 (D. Md. 1999) .................................................................................. 13

*Advanced Computer Services of Michigan, Inc. v. MAI System Corp.*,
  845 F. Supp. 356 (E.D. Va. 1994) ............................................................................. 7, 8, 9, 10

*Allen v. Zurich Insurance Co.*,
  667 F.2d 1162 (4th Cir. 1982) ................................................................................................. 4

*Bollech v. Charles County, Maryland*,
  166 F. Supp. 2d 443 (D. Md. 2001), *affd*,
  No. 01-2385, 2003 WL 21546001 (4th Cir. July 10, 2003) ................................................... 11

*Cannon Group, Inc. v. Better Bags, Inc.*,
  250 F.Supp.2d 893 (S.D. Ohio 2003) .................................................................................... 17

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
  447 U.S. 557 (1980) ............................................................................................................... 18

*Costar Group Inc. v. Loopnet, Inc.*,
  164 F. Supp.2d 688 (D.Md. 2001) ........................................................................................... 8

*DSC Communications Corp. v. Pulse Committee, Inc.*,
  170 F.3d 1354 (Fed. Cir. 1999) ........................................................................................ 9, 10

*Eastman Kodak v. Image Technical Services, Inc.*,
  504 U.S. 451, 112 S. Ct. 2072 (1992) ................................................................................... 22

*Expediters International of Washington, Inc. v. Direct Line Cargo
  Mgmt. Services, Inc.*, 995 F. Supp. 468 (D.N.J. 1998) ...................................................... 4, 8

*Fare Deals Ltd. v. World Choice Travel.Com. Inc.*,
  180 F. Supp. 2d 678 (D. Md. 2001) ....................................................................................... 20

*Farmers Loan & Trust Co. v. Southern Engineering Co.*,
  284 F. 557 (4th Cir. 1922) ....................................................................................................... 5

*Faulkner Advertising Associates, Inc. v. Nissan Motor Corp.*,
  905 F.2d 769 (4th Cir. 1990) ........................................................................... 20, 21, 22, 23

*havePOWER, LLC v. General Electric Co.*,
  183 F. Supp. 2d 779 (D. Md. 2002) ................................................................................. 19, 21

*Hitachi Credit America Corp. v. Signet Bank*,
  166 F.3d 614 (4th Cir. 1999) ................................................................................................. 11

*HQM, Ltd. v. Hatfield*,
  71 F. Supp. 2d 500 (D. Md. 1999) ......................................................................................... 13

*ILC Peripherals Leasing Corp v. IBM*,
  458 F. Supp. 423 (N.D. Cal. 1978) ........................................................................................ 22

*In re Microsoft Corporation Antitrust Litigation*,
237 F. Supp. 2d 639, 658 (D. Md. 2002)................................................................24

*Industrial Specialty Chemicals, Inc. v. Cummins Engine Co.*,
902 F. Supp. 805 (N.D. Ill. 1995) ........................................................................15

*Innovative Digital Equipment, Inc. v. Quantum Technology, Inc.*,
597 F. Supp. 983 (N.D. Ohio 1984) ....................................................................16

*Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.*,
75 F. Supp. 2d 1290 (D. Utah 1999) ....................................................................7

*Jefferson Parish Hosp. Dist. 2 v. Hyde*,
466 U.S. 2 (1984) ....................................................................................21, 22, 23

*Logan Graphic Products, Inc. v. Textus USA, Inc.*,
No. 02 C 1823, 2002 WL 31507174 (N.D. Ill. Nov. 8, 2002) ............................18

*Lowrys Reports, Inc. v. Legg Mason, Inc.*,
271 F. Supp. 2d 737 (D.Md. 2003) ......................................................................8

*MAI Sys. Corp. v. Peak Computer Corp.*,
991 F.2d 511 (9th Cir. 1993) ....................................................................7, 8, 10

*Measurement Specialties, Inc. v. Taylor Precision Products, L.P.*,
131 F. Supp. 2d 982 (N.D. Ill. 2001) ..................................................................16

*Micro-Sparc, Inc. v. Amtype Corp.*,
592 F. Supp. 33 (D. Mass. 1984) ..........................................................................8

*Microsoft Corp. v. Maryland Micro.com, Inc.*,
No. Civ. JFM-01-3797, 2003 WL 21805213 (D. Md. Jul. 15, 2003) ..........6, 12, 13

*Montogomery County Association of Realtors, Inc. v. Realty Photo Master Corp.*,
783 F. Supp. 952 (D. Md. 1992) ..........................................................................22

*Morton Salt Co. v. G.S. Suppiger Co.*,
314 U.S. 488 (1942) ..............................................................................................22

*Neurotron, Inc. v. American Ass'n of Electrodiagnostic Medicine*,
189 F. Supp. 2d 271 (D. Md. 2001), *affd*, No. 01-2115,
2002 WL 31207199 (4th Cir. Oct. 4, 2002) ..................................................17, 18

*Oksanen v. Page Memorial Hospital*,
945 F.2d 696 (4th Cir. 1991), *cert. denied*, 502 U.S. 1074 (1992) ....................24

*Olympic Chevrolet, Inc. v. General Motors Corp.*,
959 F. Supp. 918 (N.D. Ill. 1997) ..................................................................15, 16

*Scotts Co. v. United Industries Corp.*,
315 F.3d 264 (4th Cir. 2002) ..........................................................................17, 18, 19

*Service & Training, Inc. v. Data General Corp.*,
963 F.2d 680 (4th Cir. 1992) ..........................................................................21, 23

*7-Eleven, Inc. v. McEvoy*,
  300 F. Supp. 2d 352, 359-63 (D. Md. 2004) .......................................................... 5

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ............................................................................................ 9

*Systemcare, Inc. v. Wang Labs. Corp.*,
  117 F.3d 1137 (10th Cir. 1997) ........................................................................ 23

*3Com Corp. v. Electronics Recovery Specialists, Inc.*,
  104 F. Supp. 2d 932 (N.D. Ill. 2000).................................................................. 25

*Unique Concepts, Inc. v. Manuel*,
  669 F. Supp. 185 (N.D. Ill. 1987) ...................................................................... 14

*Wilson v. Electro Marine System, Inc.*,
  915 F.2d 1110 (7th Cir. 1990) ...................................................................... 14, 15

*Words, Inc. v. Xerox Corp.*,
  No. 99-1182, 2000 WL 234502 (4th Cir. Mar. 2, 2000) ...................................... 12

### STATE CASES

*Allied Investment Corp. v. Jasen*,
  123 Md. App. 88, 716 A.2d 1085 (Md. Ct. Spec. App. 1998) .............................. 24

*Crinkley v. Dow Jones & Co.*,
  385 N.E.2d 714 (Ill. App. Ct. 1978) .................................................................. 14

*Duncavage v. Allen*,
  497 N.E.2d 433 (Ill. App. Ct. 1986) .............................................................. 13, 14

*Glazewski v. Coronet Insurance Co.*,
  483 N.E.2d 1263 (Ill. 1985) .......................................................................... 13, 14

*Hahn v. Kotten*,
  331 N.E.2d 713 (Ohio 1975) ............................................................................ 17

*Havens-Tobias v. Eagle*,
  No. 19562, 2003 WL 1601461 (Ohio App. Ct. Mar. 28, 2003) ............................ 17

*Miller Medical Sales, Inc. v. Worstell*,
  No. 91AP-610, 1992 WL 31988 (Ohio Ct. App. Feb. 18, 1992) .......................... 25

*P.V. Properties, Inc. v. Rock Creek Village Associates Ltd. Partnership*,
  77 Md. App. 77, 549 A.2d 403 (Md. Ct. Spec. App. 1988) .................................. 24

*State Farm Fire & Casualty Co. v. Trousdale*,
  673 N.E.2d 1132  (Ill. App. Ct. 1996) .............................................................. 15

*Stern v. Norwest Mortgage, Inc.*,
  672 N.E.2d 296 (Ill. App. Ct. 1996), *affd*, 668 N.E.2d 99 (Ill. 1997) .................... 14

## FEDERAL STATUTES

15 U.S.C. § 1 ................................................................................................................ 12, 21

15 U.S.C. § 1125(a) ............................................................................................ 12, 17, 18, 19

17 U.S.C. § 117.............................................................................................................. 7, 8, 9

## STATE STATUTES

Illinois Consumer Fraud and Deceptive Business Practices Act,
    815 ILCS 505/1 ...................................................................................................... 13, 15

Illinois Uniform Deceptive Trade Practices Act,
    815 ILCS 510/3 ...................................................................................................... 13, 14

Maryland Consumer Protection Act,
    Md. Code Ann., Com. Law § 13-101 *et seq.* ............................................................. 12

Ohio Deceptive Trade Practices Act,
    Ohio Rev. Code § 4165.02(10) ................................................................................ 16, 17

## MISCELLANEOUS

2 Melville B. Nimmer and David Nimmer,
    NIMMER ON COPYRIGHT, § 8.08[D] (2004)................................................................. 7, 8

<u>**PRELIMINARY STATEMENT**</u>

In the wake of this Court's conclusion that Plaintiffs could lawfully terminate Defendants' dealership agreements (the "Agreements"), the central remaining issue became whether Defendants were entitled to continue using SoftDent's dental management software (the "Software"), as they readily admit they are doing, for the commercial purpose of providing technical support and service to third-parties. As set forth more fully herein, and in Plaintiffs' moving brief ("Pl. Br."), the answer to that question is a resounding No.[1]

To further their cause, Defendants advance the novel proposition that, in addition to being "value-added resellers" they also were "End-Users" of the Software. Clearly, Defendants purport to assume this new identity in an attempt to avoid application of the Agreements, which inextricably link their ***acquisition*** and ***use*** of the Software to their now-concluded role as value-added resellers. In fact, until now, Defendants never have claimed to be "End-Users." Rather, they repeatedly have distinguished themselves from their "end-user customers" (<u>see</u>, <u>e.g.</u>, Am. Countercl. ¶¶ 48 and 63). More importantly, Defendants previously *admitted* that their right to provide technical support and service with respect to the Software "***derived from*** [their] exclusive rights as . . . ***distributor[s]*** and ***value-added reseller[s]*** as granted by [Plaintiffs] in the Agreement[s]" (<u>See</u> Defs. Answer, Affirmative Defenses and Counterclaims, dated May 15, 2002 ("Defs. Orig. Countercl.") at ¶¶ 12 and 105) (emphasis added). Hence, Defendants should be judicially estopped from arguing now that their use of the Software to provide technical support to third parties is "outside the terms of the Agreements" (Def. Br. at 14).

Defendants also attempt to distract the Court with anecdotal testimony of alleged Software sales to "non-dentists," *e.g.*, schools and prisons (Eyer and Suglio Affs. ¶ 4) and the alleged discontinued use of a software registration form (<u>id.</u> ¶ 6). However, even if true, these allegations do not justify Defendants' continuing contractual breach and copyright infringement. The overwhelming majority of educational institutions that have purchased the Software did so for use in a dental hygiene or dental assistants' program (Fiore Reply Aff ¶ 12). Similarly, the few correctional institutions that have purchased the Software did so for their dental clinics (<u>id.</u>). But even if, as Defendants contend, Plaintiffs "knowingly and routinely sold SoftDent products to virtually anyone who wanted to buy the product" (Chaisson Aff. ¶ 3), this would not transform Defendants from value-added resellers into "End-Users." Defendants also argue that there came a

---

[1]    Defendants oppose Plaintiffs' Motion on the ground that "no meaningful discovery has taken place" (Defendants Memorandum of Law in Response to Plaintiffs' Motion, dated April 5, 2004 ("Def. Br.") at p. 1). Their reference to the need for discovery should be disregarded because Defendants repeatedly have recognized the wisdom of staying discovery, pending the outcome of the instant and prior motions, as borne out by the numerous Stipulations, So Ordered by the Court, reflecting Defendants' consent to a stay of discovery.

point when third-party end-users no longer were required to complete a Registration or Order Form when purchasing the Software (Eyer and Suglio Affs. ¶ 6). However, Defendants fail to explain the connection between this practice and Defendants' rights and obligations under the Agreements. Quite simply, Defendants' rights to use the Software are governed by the Agreements. The fact that others may have had different agreements, or different rights, is wholly irrelevant.

Nor does Defendants' claim that they are "viewing the Software when properly loaded on Defendants' computers only" (Def. Br. at 19) place them within any safe harbor. Defendants' rights to use the Software were extinguished when the Agreements were terminated. As a result, each time Defendants load the Software onto their computer's Random Access Memory ("RAM"), they are making an unauthorized copy. This violates SoftDent's copyright under the Copyright Act.

Defendants' final strategy is to file yet another array of unsupportable counterclaims. Just as Defendants' first arsenal of counterclaims was an unsuccessful attempt to obfuscate Plaintiffs' lawful right to terminate the Agreements, Defendants' current crop of consumer fraud, unfair competition and antitrust counterclaims should not deflect attention from the core issue—whether the Agreements permit the continued use of the Software after their termination. Because those counterclaims fail to state a claim upon which relief may be granted under federal, Maryland, Illinois or Ohio law, they cannot prevent the conclusion that Defendants' right to use the Software to offer commercial support services ended when the Agreements did.

For all these reasons and those amplified below, it is respectfully submitted that Plaintiffs' motion (i) for partial summary judgment granting their  Third, Fourth, Fifth and Sixth Amended Counts; and dismissing Seventh, Ninth and PSSI's Fourteenth Amended Counterclaims; (ii) dismissing or for judgment on the pleadings with respect to Defendants' Fifth, Eighth, Tenth, Eleventh, Twelfth and Thirteenth Amended Counterclaims; and (iii) dismissing Defendants' Twelfth through Twenty-Second Affirmative Defenses to the Fifth Amended Count, SoftDent's copyright infringement claim be granted in its entirety.

**ARGUMENT**

**I.**

**DEFENDANTS HAVE FAILED TO DEMONSTRATE WHY PLAINTIFFS SHOULD
NOT BE AFFORDED PARTIAL SUMMARY JUDGMENT ON THEIR FOURTH, FIFTH
AND SIXTH AMENDED COUNTS AS WELL AS DISMISSING DEFENDANTS' SEVENTH
AMENDED COUNTERCLAIM AND PSSI'S FOURTEENTH AMENDED COUNTERCLAIM**

    **A.**    **Defendants' Acquisition of the Software is Governed by the Terms of the
Agreements Which Confirms Their Singular Role as Value-Added Resellers**

One need look no further than the plain language of the Agreements to resolve in Plaintiffs' favor the issue that lies at the heart of their Fourth, Fifth and Sixth Amended Counts:  whether Defendants may continue to use SoftDent's Software to provide technical support to third parties.  The Agreements confirm unequivocally that Defendants may not continue such use.  Indeed, the Agreements clearly identify Defendants as "Dealer[s]" (Exs. D and E, Agreements, intro. para) and SoftDent (as successor-in-interest to InfoSoft) as the "copyright holder" of the Software (id. § 1.2).  In exchange for exclusive distribution rights in their respective geographic territories, Defendants agreed that they would offer "value-added services. . . such as hardware, training installation and support" with respect to the Software (id. §§ 3.1 and 10.2), which role Defendants readily admit (see Eyer and Suglio Affs. ¶ 9).  Now, in a post-facto attempt to justify their breach of contract and infringement of SoftDent's copyrights, Defendants purport to occupy a "dual role as both Dealers and End-Users" (Def. Br. at 11), even though the Agreements nowhere support such duality, and in fact, repeatedly and unambiguously identify Defendants *solely* as re-sellers of the Software. (Exs. D and E, Agreements §§ 1.3; 3.1; 5.1; 5.2; 7.1; 9.2; 10.3; 10.5, 12.1 and 12.2).  Indeed, the Court found in its 1/7/03 Decision and Judgment that "[t]he agreements in issue provide for the sale of software to the defendants and *the resale of the same software* by the defendants to the public."  (1/7/03 Dec. at p. 2) (emphasis added).  As resellers, Defendants purchased copies of the Software for approximately 40% off the suggested retail price and re-sold the Software to end-users, pocketing any margin as profit (id. § 24.1).  Notably, the invoice for the Software purchased by PSSI in November 2002 *clearly reflects a Dealer's discount and squarely places PSSI's purchase within the terms of the Agreement* (see Eyer Aff., Ex. E).

In addition to selling the Software to Defendants at a discount, Plaintiffs also gave them complimentary copies of the Software during the term of the Agreements (Fiore Reply Aff. ¶ 7; see also Eyer and Suglio Affs. ¶ 8).  This Software, whether sold or given free of charge to Defendants, was furnished pursuant to the terms of the Agreements, *i.e.*, that it either would be re-sold by Defendants to genuine end-users or "used" by Defendants as value-added resellers (Fiore Reply Aff. ¶ 7).  In fact, during the term of the Agreements, Defendants were required to "personally learn and sell the Products" (see Exs. D and E,

Agreements § 5.1), and had the option of providing "local support to their customers" (id. § 10.5), both of which "uses" fell squarely within their roles as value-added resellers.[2]  However, Defendants' rights to use the Software in this manner ***ended*** when the Agreements were terminated as of December 31, 2002.  The Agreements, on their face, confirm that upon termination thereof, "for any reason whatsoever," Defendants were required to "immediately return [to Plaintiffs] any and all materials regarding the Products in any form whatsoever" (Exs. D and E, Agreements § 13.3.)  To the extent that Defendants retained copies of the Software that they purchased during the term of the Agreements, such as the copy purchased by PSSI in November 2002, the Agreements provided that Defendants would be reimbursed either the price paid for unopened Software or "fair value" for opened software (id.).  Nowhere do the Agreements support Defendants' argument that they could continue using the Software to provide technical support once their role as value-added resellers came to an end.[3]  In any event, an "End-User" uses the Software for its intended purpose, to facilitate office management (most commonly for dentists), and not for the commercial purpose of providing technical support to third parties  (Fiore Reply Aff. ¶ 9).

Given Defendants' prior judicial admission that their right to provide technical support is "derived from" their rights as value-added resellers under the Agreements  (Defs. Orig. Countercl. ¶¶ 12 and 105), Defendants should be judicially estopped on the instant motion from arguing that their acquisition and use of the Software to provide technical support to third parties is "outside the terms of the Agreements" (Def. Br. at 14).  See, e.g. Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982) (applying judicial estoppel, precluding a party from taking a position in conflict with one earlier taken in the same litigation).

**B.    The Unrelated Allegations Underlying Defendants' Sixth Amended Counterclaim for Breach of Contract Do Not Preclude Judgment in Plaintiffs' Favor on their Fourth Amended Count for Breach of Contract**

Without citing a single case, Defendants argue that the very existence of their counterclaim for breach of contract somehow precludes disposition of Plaintiffs' Fourth Amended Count for breach of

---

[2]    Turning a blind eye to the obvious, Defendants inquire as to why Plaintiffs did not earlier assert copyright infringement as a basis for automatic termination of the Agreements under Section 11.5 and are first doing so now (Defs. Br. at 19, 21 n. 14).  As stated above, Defendants' use of the Software was authorized under the plain language of the Agreements (see, e.g., Exs. D and E, Agreements §§ 5.1 and 10.5) in furtherance of their role as value-added resellers.  It was only after the Agreement properly was terminated and Defendants improperly continued using the Software to provide technical support that those same actions constituted copyright infringement.  See, e.g., Expediters Int'l of Washington, Inc. v. Direct Line Cargo Mgmt. Servs., Inc., 995 F. Supp. 468, 478 (D.N.J. 1998) (legitimate use of software became infringing conduct when done after the termination of the license agreement).

[3]    The Agreements do not support the notion that the parties ever contemplated Defendants wearing both "Dealer" and "End-User" hats.  For example, Section 10 alone, repeatedly distinguishes between Defendants, on the one hand, as Dealers, and purchasers of the Software as End-Users, on the other hand.  (Exs. D and E, Agreements § 10.2, 10.3, 10.5).

contract. (Def. Br. at 10). Preliminarily, it should be noted that the very same breach of contract counterclaim was in place when Plaintiffs previously moved for summary judgment as to the terminability of the Agreements on reasonable notice. Significantly, Defendants did not then invoke their breach of contract counterclaim as an impediment to judgment on Plaintiffs' contract-based declaratory claims. Then, as now, Plaintiffs' contract-based claims were ripe for adjudication and turned on allegations *completely unrelated* to those of Defendants. Indeed, on the instant motion, Plaintiffs' breach of contract claim arises under Sections 11 and 13 of the Agreements, *i.e.*, that Defendants have failed to return the Software (Exs. D and E, Agreements § 13.3); (ii) are disclosing confidential or proprietary information relating to the Software (id. § 13.1); and (iii) are continuing to copy the Software to provide technical support and service to third parties (id. § 11.5) (Am. Compl. ¶ 89). In contrast, Defendants' breach of contract counterclaim arises under the unrelated Sections 3, 4 and 10 of the Agreements—regarding exclusivity, continuing supervision and alleged interference with free trade practices (see Exs. D and E, Agreements §§ 3.1, 4.1, 4.4, 10.1 and 10.7; see also Eyer and Suglio Affs. ¶ 10).

Where, like here, parties have asserted unrelated breach of contract claims against one another and one party's claim was ripe for adjudication while the other's was not, the District of Maryland has seen no impediment to granting summary judgment with respect to the ripe breach of contract claim. See, e.g., 7-Eleven, Inc. v. McEvoy, 300 F. Supp. 2d 352, 359-63 (D. Md. 2004) (granting summary judgment on plaintiff franchiser's breach of contract claim but denying summary judgment as to defendant franchisee's breach of contract counterclaim arising under the same agreement predicated on bases, like here, unrelated to plaintiff's breach claim); see also Farmers' Loan & Trust Co. v. Southern Engineering Co., 284 F. 557, 559 (4th Cir. 1922) (holding that where, like here, the facts are not in dispute, the issue of whether a contract has been breached is a question of law). The same result applies here.

In any event, Defendants have failed to proffer *any* material issues of fact supporting their breach of contract counterclaim, other than their own self-serving affidavit testimony (see Eyer and Suglio Affs. ¶ 10). Defendants also fail to demonstrate how these "fact issues" preclude disposition of Plaintiffs' Fourth Amended Count. As the Court previously found, "the bald assertions of the two shareholders of the [D]efendants" are insufficient to defeat summary judgment. (1/7/03 Dec. at 8).

Mindful that their contract counterclaim is unrelated to Plaintiffs' contract claim, Defendants concoct issues of fact which, they erroneously contend, preclude summary adjudication of Plaintiffs' claim. Yet, review of the "disputed" facts referenced by Defendants on pages 15 to 21 of their opposition brief reveals that there are no *material* issues of fact precluding summary judgment on Plaintiffs' Fourth Amended Count. Illustratively, Defendants do not dispute the sections of the Agreement quoted by Plaintiffs (see Item Nos. 2

through 4, Def. Br. at 16-17), the Court's holding in its 1/7/03 Decision and Judgment (Item Nos. 5 and 6, id. at 17), nor that Plaintiffs demanded the return of all Software in a letter to Defendants dated April 14, 2003 (Item No. 8, id. at 18).   The only "disputed" issues of fact raised by Defendants in their affidavits, as well as the affidavit of Robert Chaisson, are that:  (i)  Plaintiffs did not tightly control the dissemination of copies of the Software (Chaisson Aff. ¶ 2; Eyer and Suglio Affs. ¶ 6); (ii) Plaintiffs routinely shipped the Software without previously receiving a Purchase Registration or Order Form from the prospective end-user (Chaisson Aff. ¶2, Eyer and Suglio Affs. ¶ 6); (iii) the Software may have been sold to third parties who were not dentists, oral surgeons or orthodontists, such as schools and prisons (Chaisson Aff. ¶3, Eyer and Suglio Affs. ¶ 4); and (iv) Plaintiffs sold "at least some of their Software" without a license (Eyer and Suglio Affs. ¶ 7). As set forth in the Fiore Reply Affidavit, Plaintiffs do not dispute the third and fourth issues and, in part, do not dispute the second issue (Fiore Reply Aff. ¶¶ 11-17).  However, even if *all* of these statements are true, they would not render any less ripe Plaintiffs' Fourth Amended Count for breach of contract, nor preclude summary adjudication thereof.  Simply put, Defendants have not returned the Software as they are required to do under the Agreements and are engaging in unauthorized copying of the Software (Exs. D and E, §§ 1.2 ,11.5 and 13.3).  In doing so, Defendants are  "disclos[ing] or caus[ing] to be disclosed . . . confidential or proprietary information relating to the Products"  (id. § 13.2.)   As such, Defendants are in breach of the Agreements, and judgment should be granted in Plaintiffs' favor on their Fourth Amended Count.

>    **C.     Because Defendants Do Not Dispute That They are Using
>            the Software to Provide Technical Support and Service to
>            Third Parties, SoftDent is Entitled to Summary Judgment
>            on its Fifth Amended Count for Copyright Infringement**

There is no dispute that Plaintiffs have satisfied the first requirement of a copyright infringement claim, proffering copyright certificates, which constitute *prima facie* evidence of copyright ownership. Microsoft Corp. v. Maryland Micro.com, Inc., No. Civ. JFM-01-3797, 2003 WL 21805213, at *2 (D. Md. Jul. 15, 2003)(Motz, J.).  In fact, despite numerous affirmative defenses interposed by Defendants purporting to question SoftDent's copyright ownership, Defendants have asserted **no** facts to challenge SoftDent's copyright certificates and, in fact, **have conceded** that SoftDent owns the copyrights at issue (Def. Br. at 6). As such, Defendants' request for discovery is nothing more than an unwarranted fishing expedition, particularly in the face of Defendants' repeated agreement that it was in the interests of litigation efficiency to stay discovery pending dispositive motion practice, see *supra* p.1, n.1.

With respect to the second requirement for a copyright infringement claim, unauthorized copying, Microsoft Corp., 2003 WL 21805213, at *2, Defendants admit that they are "viewing the Software when properly loaded on Defendants' computers only."  (Def. Br. at 19).  As Plaintiffs' moving brief makes clear,

and as demonstrated below, this "use" of SoftDent's Software is in direct violation of the Copyright Act, and does not fall within any exception under Section 117 of the Act.

**1.**    **"Viewing" SoftDent's Software for the Commercial Purpose of Providing Technical Support to Third Parties Without Plaintiffs' Authorization Constitutes Unlawful "Copying" Under the Copyright Act**

Defendants' attempted distinction notwithstanding, their "viewing" of SoftDent's Software on their own computers for the purpose of providing technical support to third parties constitutes infringement under the Copyright Act. Indeed, in order to "view" a computer program (as Defendants readily admit to doing), a user must load the Software into a computer's RAM. As Plaintiffs demonstrated on page 16 of their moving brief—and Defendants do not dispute—merely loading software from a computer's hard drive onto RAM constitutes "copying" under the Copyright Act to sustain a claim of copyright infringement. See, e.g., Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp., 845 F. Supp. 356 (E.D. Va. 1994) ("ACS of Michigan"); see also, Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc., 75 F. Supp. 2d 1290, 1294 (D. Utah 1999) (holding that "viewing" a website containing copyrighted material constitutes infringement). Moreover, Defendants' admitted "viewing" the Software does not fall within the statutory safe harbor in Section 117(a)(1) of the Copyright Act because copies are being made for external, commercial purposes, as opposed to internal use. See infra Point I(C)(2).

**2.**    **Defendants' Attempts to Undermine Peak and its Progeny are Unavailing**

Realizing that the weight of case law authority is against them, Defendants advance the red herring argument that the Computer Maintenance Competition Assurances Act ("CMCA"), codified at 17 U.S.C. § 117(c), somehow overruled MAI Sys. Corp. v. Peak Computer Corp., 991 F.2d 511 (9th Cir. 1993)("Peak"). In Peak, the Ninth Circuit held that "it is generally accepted that the loading of software into a computer constitutes the creation of a copy under the Copyright Act" because the software is copied onto a computer's RAM. Id. at 519. Contrary to Defendants' contentions, Peak and its progeny—including ACS of Michigan decided by this Court's sister court in the Eastern District of Virginia—are still valid law. In any event, as amplified below, the CMCA is totally irrelevant to the issue of whether Defendants' "viewing" of the Software to provide technical support constitutes copyright infringement.

Notably, Defendants readily acknowledge that "the general purpose of CMCA was to enable repair of hardware" (Def. Br. at 22) and that the statute does not even address the maintenance of software. Instead, Section 117(c) allows the owner or lessee of a ***machine*** to "make . . . a copy of a computer program . . . for purposes only of maintenance or repair of ***that machine***." 17 U.S.C. § 117(c)(emphasis added). Further, the legislative history of the CMCA provides that the statute "does not in any way alter the law with respect to the scope of the term 'reproduction' as it is used in the Copyright Act." 2 Melville B. Nimmer and David

Nimmer, NIMMER ON COPYRIGHT, § 8.08[D] at 8-135 (*quoting* Conf. Rep. (DMCA) p. 76; S. Rep. (DMCA) p. 57). As such, the CMCA did ***not*** overrule Peak, which—contrary to Defendants' notion of Peak being "outdated" (Def. Br. at 23)—***has been cited by the District of Maryland as good law*** since the CMCA's enactment in 1998.[4] See, e.g. Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 745 (D.Md. 2003); Costar Group Inc. v. Loopnet, Inc., 164 F. Supp.2d 688, 695-96 (D.Md. 2001).

In the same vein, the fact that the defendant in Peak may have loaded software onto ***third-party computers*** and not its own computer (Def. Br. at 22), is entirely beside the point. As argued in Plaintiffs' moving brief, the crucial question for applying a Section 117 exception to copyright infringement is whether or not the use for which the copy was made is internal or external. (Pl. Br. at 18-19). Indeed, in ACS of Michigan, defendants were found to have infringed plaintiffs copyrights by loading the Software onto computers ***both at their own facility and at customers' facilities***. 845 F. Supp. at 367. The crucial distinction was not where the Software was loaded, but for what purpose. Id. Because the defendants in ACS of Michigan were loading the software onto their own computers, at their own facilities (just as Defendants here admit to doing), for the purposes of providing technical support to third parties, the use was external and thus outside Section 117(a)(1)'s safe harbor. Id.; see also Expediters Int'l of Washington, Inc. v. Direct Line Cargo Mgmt. Servs., Inc., 995 F. Supp. 468, 478 (D.N.J. 1998) (use of a copy of copyrighted software on an internal computer to generate information for third party customers not within internal use exception); and Micro-Sparc, Inc. v. Amtype Corp., 592 F. Supp. 33, 35 (D. Mass. 1984) )(typing computer programs transcribed in magazine into internal computer and selling these programs to third parties not within internal use exception).

In sum, by "viewing" the Software on their own computers, Defendants are loading the Software onto RAM and thus making an unauthorized copy in furtherance of an external, commercial use: to provide technical support and maintenance to third parties. As such, summary judgment should be granted to SoftDent on its Fifth Amended Count for copyright infringement.

---

[4]     Moreover, Defendants' reference to Nimmer's statement that "'judicious rejection of the approach in *MAI v. Peak* would allow maintenance of software under ***appropriate circumstances***'" (Def. Br. at 22, *quoting* 2 Nimmer on Copyright, § 8.08[D] at 8-134 (2004)(emphasis added)) overlooks the fact that Defendants' use of the Software is inappropriate. Indeed, while Nimmer believes that loading software onto a hard drive should be "essential" to the software's utilization within the meaning of Section 117(a)(1)'s safe harbor—which Peak still places outside the exception—even Nimmer acknowledges that such copying should be "incidental to the rightful possessor's ***personal use*** of the software, ***not to infringe it***." Id. § 8.08[B][1] at 122.7 n.31.4(emphasis added).

**3.    Defendants' Affirmative Defenses Should be Dismissed**

As argued in Plaintiffs' moving brief, Defendants have asserted every conceivable copyright affirmative defense, hoping, in vain, that one will stick. (Def. Br. at 19-25). Instead of responding to the actual arguments made by Plaintiffs, Defendants are forced to rely, without any case law, on the oft-cited refuge of parties opposing summary judgment—the purported need for discovery. However, as demonstrated above, there are no material issues of fact precluding SoftDent's right to judgment as a matter of law on its copyright infringement claim. Indeed, Defendants have not even attempted to rebut the presumption in favor of the validity of SoftDent's copyrights, **conceding** SoftDent's ownership thereof (Def. Br. at 6). As such, Defendants' affirmative defenses challenging Plaintiffs' copyright ownership (Fifteenth through Nineteenth, Twenty-First and Twenty-Second) must fail. Similarly, as amplified in Plaintiffs' moving brief (Pl. Br. at 20-21), because Defendants' use of the Software is admittedly for commercial gain, their "fair use" defense must fail as well. See, e.g., Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 451 (1984); ACS of Michigan, 845 F. Supp. at 365. Defendants' failure to plead any corroborative facts, their failure to argue any law, and their failure even to attempt to distinguish the case law cited by Plaintiffs shows how bereft of merit Defendants' affirmative defenses truly are. Therefore, dismissal of the affirmative defenses is warranted.

**4.    Plaintiffs are Entitled to an Injunction, Damages and Attorneys' Fees**

As with the affirmative defenses, Defendants have failed to rebut Plaintiffs' legal and factual arguments that they are entitled to an injunction, damages and attorneys fees. Defendants' only response is that, because they do not believe that copyright infringement has occurred, Plaintiffs are not entitled to these remedies. Defendants essentially acknowledge, then, that if they are liable for copyright infringement, Plaintiffs are entitled to the requested remedies. As shown earlier, Defendants have, and continue to, infringe SoftDent's copyrights and thus an injunction, damages and attorneys' fees are appropriate.

**D.    Because Defendants' Use of the Software Infringes SoftDent's Copyrights Plaintiffs Are Entitled to Summary Judgment on their Amended Sixth Count and Dismissing Defendants' Seventh Amended Counterclaim**

Plaintiffs are entitled to judgment on their Sixth Amended Count for a declaration that Defendants do **not** have the "continuing right" to use the Software in providing technical support and service to third parties. (Am. Compl. ¶ 118; Am Countercl. ¶ 116). Similarly, Plaintiffs are entitled to judgment dismissing Defendants' Seventh Amended Counterclaim seeking the inverse declaration that they **do** have this "continuing right," which as demonstrated above and in Plaintiffs' moving papers, they do not.

Defendants' sole argument in support of their Seventh Amended Counterclaim—a misguided attempt to distinguish DSC Communications Corp. v. Pulse Comm., Inc., 170 F.3d 1354 (Fed. Cir. 1999)—

actually supports judgment in Plaintiffs' favor by underscoring the irrelevancy of Defendants' argument that some of SoftDent's Software was sold without a license (Def.. Br. at 25). As the DSC court made clear, even where, as alleged here, software has been purchased without a license, the copyright owner still uses the software subject "to the rights of the copyright holder under the Copyright Act." Id. at 1360 (*citing* Peak and ACS of Michigan). The DSC court further noted that "the fact that the right of possession is perpetual, or that the possessor's rights were obtained through a single payment . . . are not necessarily dispositive if the possessor's right to use the software is heavily encumbered **by other restrictions that are inconsistent with the status of owner**." 170 F.3d at 1362 (emphasis added).

Here, Defendants are not "owners" of the Software because, separate and apart from the protections afforded to SoftDent under the Copyright Act, Defendants' rights with respect to the Software are heavily encumbered under the Agreements. Indeed, Defendants acknowledged Plaintiffs' copyright ownership, precluding "unauthorized duplication" of the Software (Agreements § 1.2 and 11.5) and further "agree[d] not to disclose or cause to be disclosed, any confidential or proprietary information relating to the Products" (id. § 13.2). Defendants purport that the non-disclosure provisions and other restrictions in the Agreements are to protect trade secrets rather than to restrict use of the Software (Defs. Br. at 25). However, a reading of the Agreements does not support this interpretation insofar as Section 13 contains Defendants' "acknowledgment [of] the proprietary rights of [Plaintiffs] to the Products," as well as Defendants' agreement not to reveal "confidential information" relating to the "operation" of the Software during or ***after*** the term of the Agreements (Exs. D and E, Agreements § 13.3). Finally, and perhaps most importantly, the Agreements require upon termination thereof the "immediate[] return" of "any and all materials regarding the Products in any form whatsoever," offering to reimburse Defendants the price they paid for unopened Software and offering "fair value" for opened items like the Software at issue here (id.). While trade secrets are certainly included within the bundle of rights Plaintiffs seek to shield from disclosure, the use and operation of the Software also is included therein (Fiore Reply Aff. ¶ 18). As such, Defendants' copies of the Software are subject to the terms of the Agreements, which most certainly does not permit the continued use thereof for commercial purposes once the Agreements have been terminated.

### E. Because PSSI's Use of the Software to Provide Technical Support and Service is in Breach of the Agreement and Infringes SoftDent's Copyright, Plaintiffs are Entitled to Summary Judgment Dismissing PSSI's Amended Fourteenth Counterclaim for Breach of Contract

As stated above, there is no dispute that PSSI's November 2002 purchase of SoftDent Software took place during the term of the Agreement. PSSI also purchased this Software in accord with the Agreement's terms and conditions, including the discount which PSSI received as a "Dealer" under the Agreement (Eyer

Aff., Ex. E; see also Agr. § 24.1).  PSSI has not disputed Plaintiffs' case law that, as a result of PSSI's material breach of its sales agreement with SoftDent, i.e., its infringement of the Software, SoftDent was relieved of any further duty to perform thereunder.  To find otherwise would charge SoftDent with the illogical obligation to continue to enable PSSI's copyright infringement by furnishing PSSI with updates of the Software.  See, e.g., Bollech v. Charles County, Maryland, 166 F. Supp. 2d 443, 458-59 (D. Md. 2001), aff'd, No. 01-2385, 2003 WL 21546001 (4th Cir. July 10, 2003).  As such, for all the reasons set forth above, summary judgment should be granted in Plaintiffs' favor dismissing PSSI's Fourteenth Amended Counterclaim.

## II.

### DEFENDANTS ERR IN ASSERTING THAT THEY HAVE STATED VALID UNFAIR COMPETITION AND BUSINESS TORT CLAIMS AND THUS THEIR FIFTH, EIGHTH, TENTH AND ELEVENTH AMENDED COUNTERCLAIMS SHOULD BE DISMISSED

Bereft of supporting facts and/or any supporting case law, Defendants fail to demonstrate their compliance with federal, Maryland, Illinois and/or Ohio pleading requirements for unfair competition. Nor can Defendants refute Plaintiffs' argument that these claims turn on the vague, unspecified allegations of Plaintiffs' statements to third parties regarding Defendants' inability to use the Software to provide technical support and service. (See, e.g., Pl. Br. at 29-37; see also Am Countercl. ¶¶ 9, 12, 41-43, 95, 119, 129-30, 138 and 150).

### A.    Defendants' Choice-of-Law Analysis is Flawed and Maryland Law Does, in Fact, Apply to Defendants Fifth, Eighth, Tenth and Eleventh Amended Counterclaims

Initially, Defendants seek to evade the application of Maryland law to their unfair competition and business tort counterclaims on the purported ground that these counterclaims are based on Plaintiffs' alleged conduct "since the Agreement was terminated" (Def. Br. at 29) (emphasis in original).  Yet, Defendants' own prior admissions in this action confirm that these counterclaims are closely related to the Agreements. Therefore, they fall within the Fourth Circuit's "sufficiently broad" standard for determining whether a contractual choice-of-law provision applies to contract-related tort claims.  See, e.g., Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999).  As stated above, Defendants previously have taken the position in these actions that their right to provide technical support and service is "derived from" their exclusive rights as value-added resellers under the Agreements (Defs. Orig. Countercl. ¶¶ 12 and 105).  The underlying bases for Defendants' unfair competition and business tort counterclaims are Plaintiffs' alleged statements to third parties interpreting the Agreements as barring Defendants from providing post-termination technical support and service of SoftDent's software (See Defs. Br. at 31; see also Am. Countercl. ¶¶ 42, 43, 48, 128, 136).   Because Defendants' breach of contract and tort-based counterclaims

admittedly are "derived from" the Agreements, there can be no doubt that Maryland law applies to all of these counterclaims.  See, e.g., Words, Inc. v. Xerox Corp., No. 99-1182, 2000 WL 234502, at * 2 (4th Cir. Mar. 2, 2000) (holding that "when alleged torts are not distinct from any pre-existing contract between the parties, any choice of law provisions within the contracts shall determine the applicable law").

Consistent with the foregoing analysis, Defendants do not dispute that the gravamen of their Tenth and Eleventh Amended Counterclaims for tortious interference—as well as their Fifth and Eighth Amended Counterclaims sounding in unfair competition—is Plaintiffs' alleged statements to third parties that Defendants cannot continue to provide technical support of the Software  (Am. Countercl. ¶¶ 128, 136; see also Pl. Br. at 44).  Defendants clearly admit in their opposition brief that the basis for their contractual damages, i.e., for "lost technical support and service opportunities" (Sixth Am. Countercl. ¶ 107) *is identical to the basis for their damages in tort under the Lanham Act*.  (See Def. Br. at  41-42, repeatedly citing Sixth Am. Countercl. ¶ 107 as basis for Lanham Act claim).  As such, Maryland law should be applied to Defendants' Fifth, Eighth, Tenth and Eleventh Amended Counterclaims—all contract claims dressed up as tort claims.  In any event, as demonstrated below, whether evaluated under Maryland, Illinois or Ohio law, Defendants have failed to state claims for unfair competition or tortious interference as a matter of law.

B.    **Defendants Have Not Stated Claims for Unfair Competition Under Maryland, Illinois and/or Ohio Law and Thus Their Fifth Amended Counterclaim Must Fail**

1.    **Defendants Err in Asserting that They Have Stated a Claim for Deceptive Trade Practices, Trade Disparagement and/or Unfair Competition Under Maryland Law**

Defendants have failed to state a claim under the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 et seq. ("Md. CPA") because, as amplified in Plaintiffs' moving brief, corporate competitors are not "consumers" within the meaning of the Md. CPA. (See Pl. Br. at 30, citing, inter alia, Microsoft Corp. v. Maryland Micro.com, Inc., No. Civ. JFM-01-3797, 2003 WL 21805213, at *3 n. 7 (D. Md. Jul. 15, 2003)).  Defendants do not even attempt to distinguish Plaintiffs' cases nor do they cite any case law refuting Plaintiffs' argument.  Rather, Defendants purport that they are not "competitors" of Plaintiffs because Defendants "offer no software of their own for sale," and instead "provide computer system installation, support and maintenance" (Def. Br. at 38). If, indeed, Defendants are not "competitors" of Plaintiffs, then why have Defendants asserted numerous counterclaims sounding in *unfair competition* under Illinois and Ohio consumer fraud statutes; Section 43(a) of the Lanham Act, 15 U.S.C.  § 1125(a); and Section 1 of the Sherman Act, 15 U.S.C. § 1 et seq.?  As is abundantly clear from the pleadings and the parties' submissions, the central issue before the Court on this motion is whether Defendants may "use" Plaintiffs' software *to compete with Plaintiffs*—thus divesting Defendants of standing under the Md. CPA.

Because Defendants lack standing to assert claims under the Md. CPA, their remaining claims for unfair competition and trade disparagement must be evaluated under Maryland common law. See Microsoft, 2003 WL 21805213, at *3 n. 7. Defendants' case AC Legg Packing Co. v. Olde Plantation Spice Co., Inc., 61 F. Supp. 2d 426, 433 (D. Md. 1999) confirms that the Maryland common law claims of unfair competition and trade disparagement nearly always track the Lanham Act, 15 U.S.C. § 1125(a). As demonstrated in Plaintiffs' moving brief at pp. 37-39 and Point II(C) herein, because Defendants have failed to state a claim under the Lanham Act, their common law claims for unfair competition and trade disparagement under Maryland law must fail as well. See, e.g., HQM, Ltd. v. Hatfield, 71 F. Supp. 2d 500, 504-05 and n. 17 (D. Md. 1999) (dismissing Lanham Act and Maryland common law claims together and finding that the same analysis applies to both).

> **2.** **PSSI Errs in Asserting That it Has Stated a Claim for Deceptive Trade Practices, Trade Disparagement and/or Unfair Competition Under Illinois Law**

Even if Maryland law does not apply, PSSI's attempt to cram four alternative theories of liability under Illinois statutory and common law into its Fifth Amended Counterclaim fails on all accounts as well.

**IL UDTPA**: As Plaintiffs argued in their moving brief, PSSI's claim under the Illinois Uniform Deceptive Trade Practices Act ("IL UDTPA") is barred because the IL UDTPA does not permit a private cause of action for damages (as sought by PSSI here). Rather, the IL UDTPA only permits suits for injunctive relief (not sought by PSSI here). See Illinois UDTPA § 3, 815 ILCS 510/3; see also Glazewski v. Coronet Insurance Co., 483 N.E.2d 1263, 1267 (Ill. 1985). Relying on Glazewski as well as Duncavage v. Allen, 497 N.E.2d 433 (Ill. App. Ct. 1986), PSSI maintains that "damages are available" on the purported ground that it has alleged a "separate count" under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 (the "IL CFA") and a "separate count" of common law trade disparagement (Def. Br. at 31). However, PSSI merely has exercised the expedient of nominally listing the UDTPA, the IL CFA and trade disparagement in the heading for the Fifth Amended Counterclaim and asserting the vague allegation that Plaintiffs' "disparaging, false, inaccurate and/or misleading representations" are in violation of these statutes (Am. Countercl. ¶ 95). In doing so, PSSI has *not* met its burden under Glazewski "*to clearly state in separate counts* [its] grounds for recovery and not [place the burden] on the court[] to ascertain all the different theories that a particular count can support." 483 N.E.2d at 1267 (emphasis added). Illustratively, in Defendants' own case, Duncavage, the court found that such burden had been met because, unlike here, the plaintiff specifically had alleged: (i) that the IL CFA incorporated section 2 of the UDTPA, (ii) that he was a "consumer" (a term not used in the UDTPA and nowhere pleaded in PSSI's Am. Countercl.) and (iii) separate allegations of CFA violations, 497 N.E.2d at 440-41, none of which are alleged

here.  Thus, as in <u>Glazewski</u>, PSSI's allegations do not support an action for damages and its claim under the IL UDTPA must fail.

Separate and apart from the unavailability of damages, PSSI cannot sustain a claim under the IL UDTPA because it has not pleaded, as it must, that Plaintiffs disparaged the ***quality*** of its products or services. (Pl. Br. at 31, *citing* cases).  By merely restating the same three conclusory allegations underlying its Illinois-based claims, *i.e.*, regarding Plaintiffs' statements as to the entry of a $500,000 judgment against PSSI (Am. Countercl. ¶ 42), PSSI's going out of business (<u>id.</u> ¶ 43) and PSSI's inability to provide technical support and service (<u>id.</u> ¶ 48) (the "Three Alleged Statements") (Defs. Br. at 31), PSSI demonstrates that these Statements do not implicate the ***quality*** of the technical support services PSSI seeks to provide, but rather address the separate issue of whether PSSI has the legal right to do so.  Indeed, PSSI utterly ignores Plaintiffs' argument that to the extent any statements were made, they arose out of Plaintiffs' good faith interpretation of the Court's ruling.  As such, the Three Alleged Statements do not fall within the IL UDTPA, which requires "deceptive acts rather than a reasonable difference of opinion as to the meaning of [the law]." <u>Stern v. Norwest Mortgage, Inc.</u>, 672 N.E.2d 296, 302 (Ill. App. Ct. 1996), *aff'd*, 668 N.E.2d 99 (Ill. 1997).

Since PSSI's allegations do not support a claim for damages, and, in any event, PSSI has failed to allege that Plaintiffs disparaged the quality of its services, its allegations are wholly insufficient to state a claim under the IL UDTPA.

**Trade Disparagement**:  PSSI does not dispute that the IL UDTPA incorporates the common law tort of trade disparagement nor that it applies "to statements which disparage the ***quality*** of one's goods or services." <u>Crinkley v. Dow Jones & Co.</u>, 385 N.E.2d 714, 719 (Ill. App. Ct. 1978) (emphasis added).  Thus, for the same reasons that its IL UDTPA claim must fail, its common law trade disparagement claim must likewise fail.  Indeed, PSSI's sole case, <u>Unique Concepts, Inc. v. Manuel</u>, 669 F. Supp. 185, 190  (N.D. Ill. 1987), actually confirms that in order to assert a claim for common law commercial disparagement, a claimant must allege that the ***quality*** of its goods or services has been falsely disparaged.  As previously demonstrated, statements as to the quality of PSSI's services are not alleged here.

**Unfair Competition**:  As with the IL UDTPA and common law disparagement, PSSI's allegations also are insufficient to sustain a claim for "unfair competition" under Illinois common law. PSSI's sole argument is that <u>Wilson v. Electro Marine Sys., Inc.</u>, 915 F.2d 1110 (7th Cir. 1990) meets the "scope" and "spirit" of the instant case.  PSSI advances this argument in the face of the Seventh Circuit's holding that an unfair competition claim must "so 'shock[] judicial sensibilities'" and "violate[] 'standards of commercial morality' that it cannot be tolerated."  <u>Id.</u> at  1118.  Contrary to PSSI's hyperbole, the <u>Wilson</u> court found that the "essence of an unfair competition claim" is that a defendant has "misappropriated the labors and

expenditures of another." Id. Such misappropriation usually involves the breach of a fiduciary or confidential relationship or "some sort of fraud and deception," thus depriving the plaintiff of the opportunity to reap profits on an idea. Id. at 1118-19. Indisputably, none of these elements exist or have been alleged here. Accordingly, PSSI has failed to state a claim for unfair competition under the common law of Illinois.

### 3. PSSI Errs in Arguing that it Has Stated a Valid Claim Under the Illinois Consumer Fraud and Deceptive Business Practices Act

Clinging to its insistence that it is an "End-User" even though it uses the Software for a commercial, competitive purpose, PSSI unsuccessfully attempts to evade the IL CFA's threshold standing requirement that a claimant be a "consumer" within the meaning of the Act. As PSSI has acknowledged, "consumer" is defined as one "who purchases or contracts for the purchase of merchandise ***not for resale*** in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e) (emphasis added). As previously demonstrated, PSSI was a reseller during the term of the Agreements, is now a "competitor," and never was a "consumer." Not surprisingly, PSSI does not allege in the Amended Counterclaims—as it must—that it is a "consumer," or that *it* "relied" upon any alleged deception articulated by Plaintiffs. See, e.g., State Farm Fire & Cas. Co. v. Trousdale, 673 N.E.2d 1132 (Ill. App. Ct. 1996). In fact, even if PSSI were a "consumer," which it is not, the Amended Counterclaims make clear that PSSI could never plead the key element of reliance since it has alleged that the deceptive statements were made, if at all, to third-party end-users, and not to it. (Am. Countercl. ¶¶ 42, 43, 48, 128, 136 and 150).

Similarly, PSSI does not dispute that it has failed to plead that Plaintiffs' alleged conduct is "addressed to the market generally or otherwise implicates consumer protection concerns," which "consumer nexus" is required of commercial entities like PSSI purporting to assert a fraud claim against a competitor. Industrial Specialty Chemicals, Inc. v. Cummins Engine Co., 902 F. Supp. 805, 812 (N.D. Ill. 1995) (see also cases cited in Pl. Br. at 34). Rather, PSSI continues to press its ill-conceived notion that as an "End-User," it is a "consumer," and thus need not show a "consumer nexus." However, as stated above, the Agreements do not support PSSI's attempt to cast off its commercial identity and transform itself into an "End-User." As such, PSSI "has failed to allege the necessary nexus between the complained of conduct and consumer protection concerns," to state a claim under the IL CFA. Indus. Specialty Chem., 902 F. Supp. at 812.

As with its failure to allege the requisite "consumer nexus," PSSI does not dispute that the Three Alleged Statements are devoid of the requisite specificity attendant to a claim under the IL CFA. Under this requirement, a claimant must allege the identity of the person making the misrepresentation or deceptive statement, the time place and content of such statement, and method by which such statement was communicate. See, e.g., Olympic Chevrolet, Inc. v. General Motors Corp., 959 F. Supp. 918 (N.D. Ill.

1997). Instead, PSSI argues that "in many cases, such as the present case, a lesser degree of specificity is required" (Def. Br. at 33). Rather than distinguishing any of Plaintiffs' cases (Pl. Br. at 35) or explaining why the circumstances of this case exempt it from particularizing its allegations under the IL CFA, PSSI merely cites to <u>Measurement Specialties, Inc. v. Taylor Precision Products, L.P.</u>, 131 F. Supp. 2d 982 (N.D. Ill. 2001), which most certainly does not support PSSI's argument. Unlike here, <u>Measurement</u> involved claims of patent and trade dress infringement of a mass-marketed bathroom scale, where it was defendants' alleged "knock off" of plaintiff's product that constituted misappropriation and deception rather than any statements made to third parties, as alleged here. <u>Id.</u> at 986.

In sum because PSSI is not a consumer, has failed to allege a "consumer nexus" and has failed to allege its consumer fraud claims with the requisite specificity, its Fifth Amended Counterclaim must fail.

**4.    DMA Errs in Asserting that it Has Stated a Valid Claim for Deceptive Trade Practices, Unfair Competition and Defamation Under Ohio Law**

Much like PSSI, DMA has shoehorned three alternative theories of liability into its sparsely pleaded Fifth Amended Counterclaim. Given its identical pleadings, DMA similarly fails to demonstrate how the Three Alleged Statements, or any other allegations in its Amended Counterclaims, sustain claims for deceptive trade practices, unfair competition and defamation under Ohio law.

**Ohio DTPA**: As is the case with the IL UDTPA, to sustain a claim under subparagraph 10 of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(10) ("OH DTPA"), the claimant must allege disparagement of the ***quality*** of its goods or services. For the reasons explained above, DMA (like PSSI) has not met this pleading requirement. DMA does not even attempt to address Plaintiffs' cases on this issue, but rather refers over to PSSI's unavailing attempt to eke out quality-related disparagement from the Three Alleged Statements underlying Defendants' unfair competition and tort-based counterclaims. Moreover, DMA does not dispute its failure (like PSSI) to plead its OH DTPA claim with specificity as required under <u>Innovative Digital Equipment, Inc. v. Quantum Technology, Inc.</u>, 597 F. Supp. 983, 988 (N.D. Ohio 1984). Rather, DMA argues that its allegations are sufficient insofar as they are comparable to those at issue in <u>Innovative Digital</u> (Def. Br. at 37.) However, unlike here, <u>Innovative Digital</u> involved allegations that defendant had copied plaintiff's products and catalogue contents (*i.e.*, model numbers, pictures and product descriptions) designed by plaintiff, wherein the plaintiff attached copies of both catalogues manifesting defendant's misappropriation. <u>Id.</u> at 986-88. As such, the court determined that "Plaintiff has sufficiently outlined the time, place and circumstances of Defendants' alleged conduct which could lead to a cause of action," <u>id.</u> at 988, none of which elements have been alleged by DMA in its Amended Counterclaims here.

Accordingly, for the reasons set forth above and in Plaintiffs' moving brief, DMA's claim under the OH DTPA must fail.

**Unfair Competition**:  DMA concedes that under Ohio law, a claim of unfair competition is merely a common law counterpart to a statutory claim under the OH DTPA, and thus must stand or fall with the latter (Def. Br. at 37; see also Pl. Br. at 36).  DMA does not dispute Plaintiffs' argument that under Ohio law, the tort of unfair competition "is grounded on preventing fraud upon the public by preventing deceptive trade practices."  Cannon Group, Inc. v. Better Bags, Inc., 250 F.Supp.2d 893, 904 (S.D. Ohio 2003). Because DMA has failed to allege fraud with specificity, no less a fraud being perpetrated upon the consumer public, its unfair competition claim under the common law of Ohio must fail as well.

**Defamation**:  Finally, other than re-stating the elements of defamation under Ohio law regarding which there is no dispute (Def. Br. at 36-37), DMA does not even attempt to demonstrate that it has met these pleading requirements, clearly because it cannot do so.  Indeed, DMA does not dispute that it has failed to identify who made the alleged defamatory statements, and the time, place and circumstances thereof.  Nor does DMA allege—as it must—the falsity of Plaintiffs' alleged statements and/or that Plaintiffs acted with any degree of fault, no less the requisite degree of fault attendant to stating a defamation claim under Ohio law.  Havens-Tobias v. Eagle, No. 19562, 2003 WL 1601461, at * 6 (Ohio App. Ct. Mar. 28, 2003). Finally, there is no dispute that DMA has failed to allege the third parties' "understanding of the defamatory meaning and . . . actionable character" of the Three Alleged Statements.  Hahn v. Kotten, 331 N.E.2d 713, 718 (Ohio 1975).  As such, DMA's claim for defamation must fail.

### C.    Defendants Err in Contending That They Have Stated a Viable Claim Under Section 43(a) of the Lanham Act and Thus Their Eighth Amended Counterclaim Must Be Dismissed

Defendants do not dispute that Section 43(a) of the Lanham Act applies to alleged "false or misleading" statements made "in commercial advertising or promotion," 15 U.S.C. § 1125(a)(1)(B).  Nor do Defendants dispute the five elements necessary to plead a false advertising claim under the Lanham Act, as articulated by the Fourth Circuit in Scotts Co. v. United Industries Corp., 315 F.3d 264, 272 (4th Cir. 2002) and discussed in Plaintiffs' moving brief at pp. 38-39.  Rather, Defendants merely regurgitate the Three Alleged Statements and then pronounce, as if by magic, that they have satisfied the five Scotts elements, even though it is painfully obvious that the Statements do not even come close to meeting the pleading requirements thereunder.

As required by the first Scotts element, Defendants nowhere allege in their Amended Counterclaims that the Three Alleged Statements constitute "commercial speech" under Section 43(a)(1)(B) of the Lanham Act, see Neurotron, Inc. v. American Ass'n of Electrodiagnostic Medicine, 189 F. Supp. 2d 271, 275 (D. Md.

2001), *aff'd*, No. 01-2115, 2002 WL 31207199 (4th Cir. Oct. 4, 2002).  Realizing their glaring omission, Defendants advocate the broadest possible definition of "commercial speech."  In doing so, Defendants rely on Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York, 447 U.S. 557 (1980), a non-Lanham Act case arising in the inapposite First Amendment context, wherein the Supreme Court defined "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." Id. at 561.  Separate and apart from whether the Central Hudson Gas & Elec. Corp. even is applicable to Lanham Act false advertising claims, Defendants fail to allege, nor is there any basis for inferring, that the Three Alleged Statements relate "solely" to the economic interests of Plaintiffs and their audience. As previously stated, the Statements reflect Plaintiffs' interpretation of the Court's disposition of their prior motion for summary judgment, as set forth in the 1/7/03 Decision and Judgment, and thus do not relate "solely" to Plaintiffs' or their audience's economic interests.

However, even if the Three Alleged Statements do constitute "commercial speech," Defendants do not allege, as they must, that the Statements were made for "the purpose of influencing consumers to buy [Plaintiffs'] goods or services" and that the Statements were "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."  Neurotron, 189 F. Supp. 2d at 275 (citations omitted).  Indeed, no underlying purpose or motive with respect to the Statements is alleged in the Amended Counterclaims, and, other than unspecified references to "third party end-users," no allegation is made as to the scope of dissemination.  Nor is a "relevant purchasing public" even identified so as to place the Statements within the Lanham Act definition of "advertising" or "promotion."

With respect to the second Scotts factor, that "the misrepresentation is material, in that it is likely to influence the purchasing decision," Scotts, 315 F.3d at 272, Defendants point to their allegation, that as a "direct and proximate result" of the Three Alleged Statements, they "have suffered and will continue to suffer damages" (Am. Countercl. ¶ 121).  This allegation does not even address the materiality of Plaintiffs' alleged misrepresentations, nor link the damages incurred by Defendants to any impact on the purchasing decisions of third parties.

Nor do Defendants allege the third Scotts factor, that "the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience," Scotts, 315 F.3d at 272.  Defendants seek to circumvent this pleading requirement by relying upon the non-binding Northern District of Illinois case, Logan Graphic Products, Inc. v. Textus USA, Inc., No. 02 C 1823, 2002 WL 31507174 (N.D. Ill. Nov. 8, 2002).  In Logan, the court found with respect to a Lanham Act claim, that if a statement is actually false, "then [Defendants] do[] not need to show that the statement either deceived or is likely to deceive a substantial segment of the audience" 2002 WL 31507174, at * 4 (citations omitted).  Notwithstanding the

absence of any Fourth Circuit precedent relieving Defendants of the requirement of alleging actual or potential deception, the <u>Logan</u> court was swayed by the fact that the claimant had, in fact, alleged a causal nexus between the disparaging statements at issue and the likely deceptive influence that these statements would have on the consumer public. <u>Id.</u> Such a causal link is not alleged here.

The Amended Counterclaims make no reference to Plaintiffs' alleged false or misleading statements being placed "in interstate commerce," as required under the fourth <u>Scotts</u> factor. Nor do Defendants' allegations meet the fifth <u>Scotts</u> factor of demonstrating that Defendants have been, or are likely to be, "injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." 315 F.3d at 272. As previously stated, Defendants' allegation that they "have suffered and will continue to suffer damages" (Am. Countercl. ¶ 121) does not allege a sufficient causal nexus between the Three Alleged Statements and either an alleged "diversion of sales" or "lessening of goodwill" as required under <u>Scotts</u>.

For all of the foregoing reasons, Defendants' Eighth Amended Counterclaim must be dismissed.

**D.    Defendants Have Not Stated Valid Tortious Interference Claims and Thus
Their Tenth and Eleventh Amended Counterclaims Must Be Dismissed**

**1.    Defendants Err in Contending that they Have Stated
a Valid Claim for Tortious Interference With Contract**

Defendants readily concede the elements for stating a claim for tortious interference with contract under Maryland, Illinois or Ohio law (Def. Br at 39; <u>see</u> <u>also</u> Pl. Br. at 45). Yet, they cannot overcome their failure to allege that Plaintiffs' engaged in intentional (*i.e.*, malicious) conduct and that third party customers did, in fact, terminate their contracts with Defendants as a direct result of such alleged intentional conduct.

Defendants do not dispute that their Tenth Amended Counterclaim teeters on the self-serving, conclusory allegation that Plaintiffs "purposely, intentionally, maliciously and without legal justification" interfered with Defendants' contracts (Am. Countercl. ¶ 130). Unable to cite any case law authority to buttress their insufficient allegations, Defendants instead attempt to distinguish Plaintiffs' case <u>havePOWER, LLC v. General Electric Co.</u>, 183 F.Supp.2d 779 (D. Md. 2002). In <u>havePOWER</u>, the court dismissed a tortious interference claim because, like here, other than bald allegations of malice, the claimant had not sufficiently alleged that defendant's actions were wrongful or without justification. <u>Id.</u> at 784. The <u>havePOWER</u> court also determined that the defendant's conduct was "economically justified," which result Defendants contort into ***Plaintiffs'*** pleading deficiency (*i.e.*, that "such 'economic justification' is not plead [here by Plaintiffs]," <u>see</u> Def. Br. at 35). However, the issue of whether Plaintiffs' actions were economically justified would only be relevant where, unlike here, a viable business tort claim already had been stated. Remarkably, moreover, Defendants do not even address, no less dispute, that the Agreements

themselves permit Plaintiffs to compete with Defendants in the area of technical support.  As such, the Three Alleged Statements do not fulfill the element of wrongful, malicious or unjustified interference attendant to Defendants' business tort counterclaims.  See, e.g., Fare Deals Ltd. v. World Choice Travel.Com. Inc., 180 F. Supp. 2d 678, 691 (D. Md. 2001).

Additionally, and perhaps more importantly, Defendants cannot overcome their failure to allege that, even if Plaintiffs did "contact" Defendants' customers and "recommend" that they discontinue their technical support contracts with Defendants, no specific third party customers did, in fact, terminate their contracts with Defendants as a direct result of Plaintiffs' intentional interference (Am. Countercl. ¶ 129).  Indeed, as Plaintiffs argued in their moving brief, Defendants make a single allegation, in the subjunctive voice, that Plaintiffs' alleged actions would "thereby" cause customers to breach their contracts with Defendants (id.)— as opposed to a specific allegation that even one third-party contract *in fact was breached*.  Absent even an analysis of their own pleading, Defendants baldly retort that the word "thereby" in paragraph 129 of their Amended Counterclaims is declarative and that their failure to mention third-party breaches anywhere else in their Amended Counterclaims, including a virtually identical prior paragraph 41, "is no basis for the inference that no breaches have occurred."   (Def. Br. at 34).  Perhaps the best argument that Defendants have failed to allege actual third-party breaches in support of their Tenth Amended Counterclaim is made by Defendants themselves.  On page 40 of their opposition brief, Defendants argue that they have pleaded the five elements of tortious interference with contract, yet for the third-party breach element, Defendants *cite to their own affidavits rather than the Amended Counterclaims*.  Ironically, Defendants' affidavits merely re-state the same deficient allegations in the Amended Counterclaims (see Eyer Aff. ¶ 65; Suglio Aff. ¶ 67).  To the extent that Defendants cite to affidavit testimony to raise the specter of fact issues, such stratagem is unavailing.  As such, Defendants have failed to allege a claim for tortious interference with contract and their Tenth Amended Counterclaim must be dismissed.

### 2.     Defendants Err in Contending that they Have Stated a Viable Claim For Tortious Interference With Prospective Economic Advantage

Defendants do not dispute the Fourth Circuit's holding in Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp., 905 F.2d 769, 775 (4th Cir. 1990) that under Maryland law, the third element of malice attendant to a claim for tortious interference with prospective economic advantage turns on whether a viable antitrust claim has been asserted.  Nor do Defendants dispute the Fourth Circuit's holding that this tortious interference claim "under Maryland law stands or falls along with . . . federal antitrust claims."  Id.  As set forth in Point III herein and in Plaintiffs' moving brief at pp. 39-43, because Defendants have failed to state a

cognizable antitrust claim, their business tort claim must fall with their fatally deficient Thirteenth Amended Counterclaim.

In any event, Defendants' Eleventh Amended Counterclaim is as doomed as their Tenth Amended Counterclaim because of Defendants' failure to allege facts supporting their conclusory allegation that Plaintiffs acted without legal justification or with malice. See, e.g., havePOWER, 183 F. Supp. 2d at 784-85 (dismissing claim of tortious interference with prospective economic advantage due to plaintiff's failure to adequately allege legal malice).

## III.

### DEFENDANTS ERR IN CONTENDING THAT THEY HAVE PLEADED A TYING ARRANGEMENT UNDER THE SHERMAN ACT AND THUS THEIR THIRTEENTH AMENDED COUNTERCLAIM MUST BE DISMISSED

Defendants do not dispute that in order to establish a tying claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, as a threshold matter, they must plead the existence of two separate and distinct product markets which have been linked together. Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp., 905 F.2d 769, 772 (4th Cir. 1990), rev'd on rehearing, 945 F.2d 694 (4th Cir. 1991). Moreover, Defendants do not dispute, and, in fact, assiduously avoid any reference to Faulkner, wherein the Fourth Circuit articulated the stringent requirements for pleading a tying claim, which pleading requirements Defendants fall far short of meeting.[5]

Regarding the separate product requirement, which Defendants have not met here, the Fourth Circuit in Faulkner observed that "[t]he identification of two distinct products or services is often the greatest stumbling block for antitrust plaintiffs who have alleged a tying violation." Id. at 773. Amplifying this point, the Fourth Circuit reasoned in Service & Training, Inc. v. Data General Corp., 963 F.2d 680 (4th Cir. 1992) that "[t]he answer to the question whether one or two products are involved [in a tying analysis] turns on . . . 'the character of the demand for the two items.'" Id. at 684 (emphasis in original) (quoting Jefferson Parish Hosp. Dist. 2 v. Hyde, 466 U.S. 2, 19 (1984)). As borne out by the Amended Counterclaims,

---

[5]    As amplified in Plaintiffs' moving brief at pp. 41-42, after a rehearing en banc, the Fourth Circuit in Faulkner dismissed a tying claim. **Unlike here**, the complaint at issue in Faulkner did, in fact, identify the tying and tied product, expressly alleged an agreement conditioning the purchase of the tying product upon purchase of the tied product (not alleged here) and expressly alleged defendant's possession of sufficient economic power in the tying product market to restrain competition in the tied product market (also not alleged here). 905 F.2d at 774 n.8. Thus, if the "self-serving, inaccurate legal conclusions" alleged in Faulkner were insufficient to state a tying claim, 945 F.2d at 695, there can be no doubt that the Thirteenth Amended Counterclaim, which does not even plead the threshold elements, are similarly insufficient to state a tying claim under the Sherman Act.

Defendants have failed to identify a tying and tied product, no less allege any facts from which one could infer the character of consumer demand for each.

A review of paragraphs 44 and 47 of Defendants' Amended Counterclaims—the sole allegations which Defendants point to as alleging a tying arrangement (Def. Br. at 44 and 46)—actually demonstrate how far afield Defendants are of the stringent pleading requirements articulated by the Fourth Circuit. Indeed, in paragraph 44, it is alleged that Plaintiffs "have until recently sold its [sic] software without requiring that end-user's [sic] purchase technical support and service from it" and that Defendants also have "sold [Plaintiffs'] software without providing technical support and services"  (Am. Countercl. ¶ 44). Paragraph 44 neither identifies a tying nor tied product nor references, as it must, the existence of separate and distinct markets for the same.[6]  Moreover, in paragraph 47, it is alleged that Plaintiffs "have recently begun to sell their software to end users only if they agree to accept technical support and services from [Plaintiffs]" and that "[u]pon information and belief, [Plaintiffs'] contract for sales of software assumes the purchase of technical support and services from [Plaintiffs]" (id. ¶ 47).  Paragraph 47 does not state facts from which one could infer the character of consumer demand for software or technical support nor supports Defendants' contention that "purchasers now believe the two, Software and services, to be a single item" (Def. Br. at 44).  By failing even to identify two separate product markets, these allegations do not satisfy the key pleading requirement that these markets actually have been linked.  See, e.g., Faulkner, 905 F.2d at 772.

Curiously, Defendants incorporate the above-cited paragraphs 44 and 47 verbatim into their own affidavits (see Eyer Aff. ¶¶ 35 and 38; Suglio Aff. ¶¶ 37 and 40) and then embellish these allegations in their opposition brief (see, e.g., Def. Br. at 44 and 46).  This subterfuge, however, does not remedy their failure to allege the existence of two separate and distinct product markets which have been linked together.  For example, the mere fact that paragraph 47's vague allegations of software being sold "only if end users accept technical support" are "attested to by Mr. Eyer and Mr. Suglio" (Def. Br. at 44), does not, as Defendants

---

[6]    Nor do these allegations satisfy the three factors which Defendants argue should be considered in determining whether separate products have been identified, i.e., whether the products are offered separately or together, priced separately or as a package, and whether purchasers "perceive" the products to be separate or single.  (Def. Br. at 44). Incidentally, these factors do not even appear in the three cases cited by Defendants on page 44 of their opposition brief: Eastman Kodak v. Image Technical Services, Inc., 504 U.S. 451, 112 S. Ct. 2072, 2080 (1992), Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 491-92 (1942) and ILC Peripherals Leasing Corp v. IBM, 458 F. Supp. 423 (N.D. Cal. 1978).  However, in Montogomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp., 783 F. Supp. 952, 960 (D. Md. 1992) the District of Maryland, drawing from Jefferson Parish, identified separate product factors as:  (i) whether the sales practice is to sell the components separately or together; (ii) whether there are separate charges for the components; and (iii) whether it is more efficient to combine the components) (citing Jefferson Parish, 466 U.S. at 24 n.39), aff'd, 993 F.2d 1538 (4th Cir. 1993); see also Faulkner, 905 F.2d at 774 (noting that "a tie-in arrangement exists if (continued)

appear to believe, automatically translate into "purchasers now believ[ing]" that two products have become one (id.)  Indeed, Defendants have not identified what purchasers believe and/or what the nature of consumer demand is for the software and technical support at issue.

On this latter point, Defendants have alleged that "[u]sing [Plaintiffs'] software without technical support and service renders the software useless to most end-users" (Am. Countercl. ¶ 148).  As Plaintiffs argued in their moving brief, *and Defendants have not disputed*, paragraph 148 bespeaks the unification of—rather than the existence of separate market demands for—software and support services.

Finally, even if Defendants had pleaded the existence of two separate products (which they have not), they have failed to satisfy the remaining three elements for a tying claim.  Defendants' single unspecified allegation "upon information and belief," that Plaintiffs' software contract "*assumes* the purchase of technical support and services for [Plaintiffs] software" (Am. Countercl. ¶ 47) (emphasis added) does not meet the requirement of alleging an agreement *conditioning* or *coercing* the purchase of the tying product upon purchase of the tied product.  Service & Training, Inc., 963 F.2d at 683.  Moreover, the Amended Counterclaims (as well as the fact affidavits submitted therewith) are entirely silent with respect to the third and fourth elements necessary to state a tying claim, *i.e.*, of Plaintiffs' possession of sufficient economic power in the tying product (software) market to restrain competition in the tied (technical support) market, and a concomitant impact of the alleged tying on interstate commerce.  Id.

Remarkably, Defendants' reliance on Systemcare, Inc. v. Wang Labs. Corp., 117 F.3d 1137 (10th Cir. 1997) actually supports Plaintiffs' argument.  Indeed, Defendants have not alleged, as they must, that third-party end-users are "coerced into purchasing the tied product from the producer *because of the producer's market power in the tying product*."  117 F.3d at 1144 (emphasis added).  Thus, even if Defendants' allegation that Plaintiffs' software contract "assumes" the purchase of technical support (Am. Countercl. ¶ 47) were sufficient to allege a tying and tied product (which it is not), Defendants' failure to allege Plaintiffs' economic power in the software market so as to restrain competition in the technical support market is fatal to their claim.  Indeed, Defendants have failed to satisfy what the Tenth Circuit in Systemware referred to as the "concerted action" element of a tying claim, *i.e.*, that a seller has coerced (by virtue of its market power) a buyer's acquiescence in a tying arrangement.  Id. at 1138.

---

(continued from previous page . . .)

a seller links together 'two distinct markets for products that were distinguishable in the eyes of the buyers'")(*quoting* Jefferson Parish, 466 U.S. at 19).

For all of these reasons, Defendants have failed to allege a tying arrangement and thus, their Thirteenth Amended Counterclaim must be dismissed.

**A.      Defendants Err in Arguing They Have Alleged Antitrust Injury**

Defendants do not dispute that in order to state a viable claim under Section 1 of the Sherman Act, they must allege "antitrust injury."  See In re Microsoft Corporation Antitrust Litigation, 237 F. Supp. 2d 639, 658 (D. Md. 2002) (Motz, J.) (citations omitted).  Rather, they contend that their allegation of unspecified "injury" sustained "[a]s a result of [Plaintiffs'] unlawful tying of its software and support and maintenance services" (Am. Countercl. ¶ 155) is an allegation of "antitrust injury."  Preliminarily, because Defendants have not alleged a viable tying claim, they cannot have sustained "antitrust injury." Notwithstanding the foregoing, bald allegations of injury to Defendants alone are insufficient; rather Defendants must demonstrate an impact on competition as a whole within the relevant market.  Oksanen v. Page Memorial Hosp., 945 F.2d 696, 708 (4th Cir. 1991)(en banc), cert. denied, 502 U.S. 1074 (1992).  Here, Defendants make no reference to the relevant market, no less allege an impact upon competition as a whole.

In sum, as Plaintiffs argued in their moving brief, and Defendants do not deny, the Thirteenth Amended Counterclaim rests on the same unstable foundation underlying all of Defendants' tort-based counterclaims, i.e., that Defendants are no longer able to provide technical support and services for Plaintiffs' software (Am. Countercl. ¶ 150).  This allegation does not allege antitrust injury.

Accordingly, for all the reasons set forth herein and in Plaintiffs' moving brief, Defendants' Thirteenth Amended Counterclaim, as well as all of their other unfair competition claims, must fail.

**IV.**

**THE TWELFTH AMENDED COUNTERCLAIM FOR AN ACCOUNTING MUST BE DISMISSED AND/OR JUDGMENT MUST BE GRANTED IN FAVOR OF PLAINTIFFS**

Defendants do not dispute their failure to plead a claim for an accounting under Maryland law, which requires a fiduciary or confidential relationship, see, e.g., Allied Investment Corp. v. Jasen, 123 Md. App. 88, 110, 716 A.2d 1085, 1095 (Md. Ct. Spec. App. 1998), and a showing—not made by Defendants—that remedies at law are inadequate, see, e.g., P.V. Properties, Inc. v. Rock Creek Village Assocs. Ltd. Partnership, 77 Md. App. 77, 89, 549 A.2d 403 (Md. Ct. Spec. App. 1988).  As such, Defendants attempt to evade Maryland law by arguing that their consumer fraud and business tort counterclaims require the application of Illinois and Ohio law.  As amplified at Point II(A) above, because Defendants' own submissions and pleadings demonstrate that their Fifth, Tenth and Eleventh Amended Counterclaims are, in essence, contract claims dressed up as tort claims, Maryland law does indeed apply.  However, even under Illinois and Ohio law, Defendants have failed to satisfy the requirements for an accounting as well. See, e.g.,

3Com Corp. v. Electronics Recovery Specialists, Inc., 104 F. Supp. 2d 932, 941 (N.D. Ill. 2000) (claim for an accounting under Illinois law requires "the absence of an adequate remedy at law," which is not alleged here, "and either a breach of a fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts which are of a complex nature," none of which are alleged here); Miller Medical Sales, Inc. v. Worstell, No. 91AP-610, 1992 WL 31988, * 6 (Ohio Ct. App. Feb. 18, 1992) (elements for accounting claim under Ohio law include "fraud, fiduciary or trust relationship and necessity," none of which are alleged here). As such, under Maryland, Illinois and Ohio law, Defendants' Twelfth Amended Counterclaim for an accounting must fail.

## V.

## PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES

To the extent that Plaintiffs prevail on the instant motion, they are entitled to judgment on their Third Amended Count and dismissing Defendants' Ninth Amended Counterclaim, awarding Plaintiffs, without limitation, attorneys' fees, disbursements and other costs, as provided under the Agreements at Section 17.

## CONCLUSION

For all of the foregoing reasons and those previously set forth in Plaintiffs' moving brief, the Fiore Affidavit and the accompanying Fiore Reply Affidavit, it is respectfully requested that the Court grant Plaintiffs' motion for partial summary judgment on their Amended Third, Fourth, Fifth and Sixth Counts and to dismiss Defendants' Seventh, Ninth and PSSI's Fourteenth Counterclaims, and to dismiss or grant partial judgment on the pleadings with respect to Defendants' Eighth, Tenth, Eleventh, Twelfth and Thirteenth Counterclaims, and to dismiss Defendants' Twelfth through Twenty-Second Affirmative Defenses.

Dated:  May 28, 2004

Respectfully submitted,

KATTEN MUCHIN ZAVIS ROSENMAN


By:    _____/s/ Howard E. Cotton_____
    Howard E. Cotton (admitted *pro hac vice*)
    Michael S. Gordon (admitted *pro hac vice*)
    575 Madison Avenue
    New York, New York 10022
    Telephone: (212) 940-8855
    Facsimile: (212) 894-5966

    Counsel for Plaintiffs
    PracticeWorks, Inc. and SoftDent LLC