IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---------------------------------------------x
                                              )
PRACTICEWORKS, INC., et al.,                  )
                                              )
                              Plaintiffs      )   Civil No.: JFM 02 CV 1205
                                              )
          - against -                         )
                                              )
PROFESSIONAL SOFTWARE SOLUTIONS               )
OF ILLINOIS, INC.,                            )
                                              )
                              Defendant.      )
---------------------------------------------x
---------------------------------------------x
                                              )
PRACTICEWORKS, INC., et al.,                  )
                                              )
                              Plaintiffs      )   Civil No.: JFM 02 CV 1206
                                              )
          - against -                         )
                                              )
DENTAL MEDICAL AUTOMATION, INC.,              )
                                              )
                              Defendant.      )
---------------------------------------------x

### REPLY AFFIDAVIT OF AL FIORE

COUNTY OF COBB      )
                    ) ss.:
STATE OF GEORGIA    )

**AL FIORE**, being duly sworn, deposes and says:

1. I am Vice President of Marketing and Corporate Development of Plaintiffs PracticeWorks, Inc. and SoftDent LLC (collectively "Plaintiffs"). As such, I am fully familiar with the facts set forth herein. I respectfully submit this reply affidavit in further support of Plaintiffs' motion (i) for partial summary judgment granting their Third, Fourth, Fifth and Sixth Amended Counts and dismissing Defendants Professional Software Solutions of Illinois, Inc.'s ("PSSI") and Dental Medical Automation, Inc.'s ("DMA") (collectively "Defendants") Seventh, Ninth and PSSI's Fourteenth Amended Counterclaims; (ii) dismissing Defendants' Fifth, Eighth, Tenth, Eleventh, Twelfth and Thirteenth Amended Counterclaims; and (iii) dismissing Defendants' Twelfth through Twenty-Second

Affirmative Defenses to the Fifth Amended Count, SoftDent's copyright infringement claim ("Plaintiffs' Motion").

2. I have reviewed the affidavits of Lawrence Eyer, Jeffrey Suglio and Robert Chaisson, submitted by Defendants in opposition to Plaintiffs' Motion.

<u>The Agreements Confirm Defendants' Singular Role as Value-Added Resellers</u>

3. The Agreements clearly identify Defendants as "Dealer[s]" (Exs. D and E, Agreements, intro. para) and SoftDent (as successor-in-interest to InfoSoft) as the "copyright holder" of the Software (id. § 1.2). In exchange for exclusive distribution rights in their respective geographic territories, Defendants agreed that they would offer "value-added services. . . such as hardware, training installation and support" with respect to the Software (id. §§ 3.1 and 10.2), which role Defendants readily admit (see Eyer and Suglio Affs. ¶ 9).

4. In an attempt to justify their breach of contract and infringement of SoftDent's copyrights, Defendants say that they occupied a "dual role as both Dealers and End-Users," even though the Agreements nowhere support that assertion. In fact, the Agreements repeatedly and unambiguously identify Defendants *solely* as re-sellers of the dental management software known as the "SoftDent Dental Management System" (the "Software"). (Exs. D and E, Agreements §§ 1.3; 3.1; 5.1; 5.2; 7.1; 9.2; 10.3; 10.5, 12.1 and 12.2). Consistent with the Agreements, Plaintiffs always viewed Defendants as value-added re-sellers and *never* viewed them as End-Users of the Software. All copies of the Software that Plaintiffs sold to Defendants were sold pursuant to the terms and conditions of the Agreements and intended solely for re-sale to genuine third-party end-users in Defendants' respective geographic territories.

5. In arguing that, in addition to being "value-added resellers," they also were "End-Users" of the Software, Defendants attempt to nullify, or at least distance themselves from, the Agreements, which inextricably link their *acquisition* and *use* of the Software to their now-concluded role as value-added resellers.

6. As resellers, Defendants purchased copies of the Software for approximately 40% off the suggested retail price and re-sold the same to end-users, pocketing any margin as profit (Exs. D and E, Agreements § 24.1). Notably, the invoice for the Software purchased by Defendant PSSI in November 2002 *clearly reflects a Dealer's discount and squarely places PSSI's purchase within the terms of the Agreement* (see Eyer Aff., Ex. E).

2

7.  In addition to selling the Software to Defendants at a discount, Plaintiffs also gave them complimentary copies of the Software during the term of the Agreements. This Software, whether sold or given free of charge to Defendants, was furnished pursuant to the terms of the Agreements, *i.e.*, that it either would be re-sold by Defendants to genuine end-users or "used" by Defendants as value-added resellers.

8.  Indeed, during the term of the Agreements, Defendants were required to "personally learn and sell the Products" (see Exs. D and E, Agreements § 5.1), and had the option of providing "local support to their customers" (id. § 10.5), both of which "uses" fell squarely within their roles as value-added resellers. However, Defendants' rights to use the Software in this manner ended when the Agreements were terminated as of December 31, 2002. Indeed, the Agreements confirm that upon termination thereof, "for any reason whatsoever," Defendants must "immediately return [to Plaintiffs] any and all materials regarding the Products in any form whatsoever" (Exs. D and E, Agreements § 13.3.)

9.  To the extent that Defendants retained copies of the Software that they purchased during the term of the Agreements, such as the copy purchased by PSSI in November 2002, the Agreements provide that Defendants shall be reimbursed either the price paid for unopened Software or "fair value" for opened software (Exs. D and E, Agreements § 13.3). Nowhere do the Agreements support Defendants' interpretation that they too were End-Users and/or could continue using the Software to provide technical support once their role as value-added resellers came to an end. In any event, an "End-User" uses the Software for its intended purpose, to facilitate office management (most commonly for dentists), and not for the commercial purpose of providing technical support to third parties.

10. Moreover, Defendants misleadingly allude to "non-dentist, non-dealer independent service providers" who provide SoftDent technical support and service to end-users (Chaisson Aff. ¶ 4). In fact, Plaintiffs have entered into agreements, for full and valuable consideration, with authorized computer network integrators, also known as "Network Solution Providers" (NSP's), who assist SoftDent end-users with the loading, configuration and integration of the Software into multi-computer networks. Defendants furnish these NSP's with authorized copies of the Software for the sole purpose of their performing systems integration work. However, these NSP's are not authorized either to sell the Software or to provide technical support thereof to end-users.

22197198.01

### Sale of the Software to "Non-Dentists" Does Not Give Defendants the Right to Breach the Agreements or Infringe SoftDent's Copyrights

11. Even though the Software at issue is an office management tool for dentists, orthodontists and oral surgeons, Defendants raise the issue of SoftDent's sale of its Software to "non-dentists," *e.g.*, schools and prisons (Eyer and Suglio Affs. ¶ 4).

12. I have reviewed the customer database for the Software sold by Defendants from approximately 1993 through December 31, 2002 in their formerly exclusive geographic territories in and around Illinois and Ohio, respectively. The overwhelming majority of educational institutions that have purchased the Software did so for use in a dental hygiene or dental assistants' program. Similarly, the few correctional institutions that have purchased the Software did so for their dental clinics.

13. The fact that in addition to the 15,000 dentists, orthodontists, oral surgeons and educational institutions to whom Plaintiffs sold the SoftDent Software, Defendants may have sold the Software, for example, to an eyecare facility, or otherwise, does not refute Plaintiffs' tightly controlled dissemination of the Software, as alleged by Defendants. However, it is my understanding that even if Plaintiffs did not tightly control the dissemination of the Software, this fact does not allow Defendants to breach the Agreements and/or infringe SoftDent's copyrights by using copies of the Software to provide technical support and service to third parties.

14. In the same vein, it is my understanding, based on my review of SoftDent's and its predecessors' records, that during the term of the Agreements, SoftDent did require all dealers, including Defendants, to complete and forward to it a "Purchase Registration Form," also known as an "Order Form." This Form identified the name and address of the End-User and the SoftDent product(s) being purchased by that End-User. Indeed, it was the Purchase Registration or Order Form that would trigger SoftDent's shipment of the Software to Defendants for re-sale to third-party end-users, thus making it unlikely that the Form would be disregarded by Plaintiffs and/or End-Users. However, even if, as Defendants argue, the "Purchase Registration Form was routinely disregarded or not completed by an end-user" (Eyer and Suglio Affs. ¶ 6), it is my understanding that the failure to complete this Form does not allow Defendants to breach the Agreements and/or to infringe SoftDent's copyrights by using copies of the Software to provide technical support and service to third parties.

15. In the ordinary course, upon receipt of a Purchase Registration or Order Form, SoftDent would ship the Software to Defendants who, in turn, would furnish the Software to the end-user. However, it is my understanding that there were some instances, as alleged by Defendants, where

4

SoftDent "drop-shipped" the Software directly to an end-user (Eyer and Suglio Affs. ¶ 9). While both Defendants wanted all Software ordered by new customers to be shipped directly to them for delivery by them to the third-party end-user, Mr. Eyer asked that SoftDent directly send Software updates to established customers in his territory, rather than first shipping these updates to him. Mr. Suglio, however, requested that as with new sales, all Software updates be shipped to him for delivery to third-party end-users. It is my understanding that this "drop-shipping" is irrelevant to the issue of whether Defendants can continue to use the Software to provide technical support to third parties.

16. Finally, Defendants allege—and Plaintiffs do not dispute—that there was a time in 2001 and 2002 when the Software was sold without a license agreement. However, it is my understanding that the sale or re-sale of the Software to an end-user without a license does not divest SoftDent of copyright protection under the Copyright Act, which precludes unauthorized copying of the Software for commercial purposes, such as Defendants are engaging in here.

17. In any event, even absent a license, Defendants' rights with respect to the Software fall squarely within the Agreements. Indeed, Defendants acknowledged Plaintiffs' copyright ownership, precluding "unauthorized duplication" of the Software (Exs. D and E, Agreements § 1.2 and 11.5) and further "agree[d] not to disclose or cause to be disclosed, any confidential or proprietary information relating to the Products" (id. § 13.2). Defendants argue that the non-disclosure provisions and other restrictions in the Agreements are to protect trade secrets rather than to restrict use of the Software. However, the Agreements expressly state otherwise.

18. Indeed, Section 13 contains Defendants' "acknowledgment [of] the proprietary rights of [Plaintiffs] to the Products," as well as Defendants' agreement not to reveal "confidential information" relating to the "operation" of the Software during or *after* the term of the Agreements (id. § 13.3). Finally, and perhaps most importantly, the Agreements require upon termination thereof, the "immediate[] return" of "any and all materials regarding the Products in any form whatsoever," offering to reimburse Defendants the price they paid for unopened Software and offering "fair value" for opened items like the Software at issue here (id.). While trade secrets are certainly included within the bundle of rights Plaintiffs seek to shield from disclosure, the use and operation of the Software also is included therein. As such, Defendants' copies of the Software are subject to the terms of the Agreements, which most certainly does not permit the continued use thereof for commercial purposes once the Agreements have been terminated.

22197198.01

WHEREFORE, for the foregoing reasons, and those set forth in the accompanying Memorandum of Law, it is respectfully requested that the Court grant Plaintiffs' motion for partial summary judgment, to dismiss and/or for judgment on the pleadings.

*AL FIORE*

Sworn to before me this
28th day of May, 2004

*Andrea R. Scott*
Notary Public

[Notary seal: ANDREA R. SCOTT, MY COMMISSION EXPIRES DEC 23 2004, COBB COUNTY, GEORGIA, NOTARY PUBLIC]