IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PRACTICEWORKS, INC., ET AL. | * | |
| | * | |
| v. | * | Civil No. JFM-02-1205 |
| | * | |
| PROFESSIONAL SOFTWARE | * | |
| SOLUTIONS OF ILLINOIS, INC. | * | |
| | ***** | |
| PRACTICEWORKS, INC., ET AL. | * | |
| | * | |
| v. | * | Civil No. JFM-02-1206 |
| | * | |
| DENTAL MEDICAL | * | |
| AUTOMATION, INC. | * | |
| | ***** | |

**OPINION**

Plaintiffs PracticeWorks, Inc. and SoftDent LLC ("Plaintiffs") filed suit against Defendants Professional Software Solutions of Illinois, Inc. ("PSSI") and Dental Medical Automation, Inc. ("DMA") (collectively "Defendants") in April 2002. The suit centers around contracts between Plaintiffs and Defendants under which Plaintiffs sold to Defendants at a discounted price a dental management software program, and Defendants re-sold the software to End-Users ("the Agreements"). Presently pending before me is Plaintiffs' motion for partial summary judgment and for dismissal or, in the alternative, for judgment on the pleadings. The critical issue presented by the motion is whether Defendants may continue to utilize Plaintiffs' software to provide technical support and services to third-party customers. I find Defendants are prohibited from doing so, both by the terms of the Agreements entered into between the parties and by the Copyright Act.

I.

A.

Plaintiffs are information management technology providers for dentists, oral surgeons, and orthodontists throughout the United States. PracticeWorks is a Delaware corporation with its principal place of business in Georgia. SoftDent is a wholly owned subsidiary of PracticeWorks. It is also a Delaware corporation but has its principal place of business in Maryland. PSSI and DMA are dealers of dental management products throughout Illinois and Ohio, respectively.

The Agreements were entered in January 1993 by Plaintiffs' predecessor-in-interest, Professional Software Solutions, Inc., a Maryland corporation ("PSSM"). They granted Defendants an exclusive right to re-sell a dental management software program known as the SoftDent® Dental Management System (the "Software") within specified zip codes throughout Illinois and Ohio. PracticeWorks was built by acquiring different companies, including PSSM and SoftDent, and it was eventually assigned the rights to the Agreements. There are seven copyrights associated with the Software issued by the U.S. Copyright Office. Currently, SoftDent is the sole owner of all of these copyrights.

The Agreements refer to Defendants as "Dealers," and define customers or purchasers of the Software as "End-Users." (Pls.' Mot. Exs. D, E ("Agreements") § 2.5.) The Software and related materials are referred to in the Agreements as the "Products," and are defined as "SoftDent® computer software and related products now or hereafter, during the term of this Agreement, developed, manufactured, or distributed by [Plaintiffs]." (*Id.* § 2.1.) In addition to giving the Dealer the exclusive right to re-sell the Software, the Agreements allow the Dealer to offer local support and service to the End-Users. (*Id.* § 10.5.) However, the Agreements require the Dealers to offer both national support

services (provided by Plaintiffs) and local support services (provided by Dealers) and allow the customers to decide based on the merits and prices of the support options. (*Id.*) In addition, under the Agreements the Dealers must not impede, block, obstruct, inhibit, or restrict Plaintiffs' access to the End-Users. (*Id.*)

The Agreements also require the Dealer to acknowledge that SoftDent® is a registered trademark, and they provide that any violation of the copyright of the Software or documentation by the making of unauthorized copies is grounds for immediate termination of the contracts. (*Id.* §§ 11.1, 11.5.) Furthermore, the Dealer must acknowledge the proprietary rights of Plaintiffs to the Software and agree not to disclose or cause to be disclosed any confidential or proprietary information relating to the Products throughout the term of the contracts and at all times thereafter. (*Id.* § 13.1.) Finally, the Agreements provide that upon their termination for any reason, the Dealer must immediately return "any and all materials regarding the Products in any form whatsoever...provided [Plaintiffs] will pay Dealer for the price Dealer paid for any unopened Products and shall pay fair value for other items of value which were purchased from [Plaintiffs]." (*Id.* § 13.3.)

B.

On April 8, 2002, SoftDent sent a letter to both Defendants informing them that Plaintiffs were terminating the Agreements in nine months, effective as of December 31, 2002, and that the Agreements would not be renewed for the term commencing on January 1, 2003. On April 10, 2002, Plaintiffs initiated this suit seeking a declaration that the letter to Defendants constituted reasonable notice of termination and non-renewal. Defendants filed numerous counterclaims, essentially seeking a declaration that the April 8 letter was insufficient to terminate the Agreements. On January 7, 2003, I issued an opinion Plaintiffs' motion for partial summary judgment, finding that Plaintiffs had lawfully

terminated the Agreements. I also held that Defendants did not have a continuing right to provide technical support and service to their former and existing customers under the Agreements. Accordingly, I ordered Defendants to comply with the provision of the Agreements requiring the immediate return of all materials regarding the Products.

Defendants filed a motion for reconsideration. In a hearing held by telephone, I granted this motion in part. In a brief oral opinion, I clarified that Defendants were still permitted to provide technical support and service so long as the relevant materials were returned to Plaintiffs. The parties agreed that the materials would be returned to Defendants' counsel while the case was pending. During the hearing, Defendants' counsel stated that all that needed to be returned was "advertising collateral used to sell the product," which was not needed to provide technical support and service. (Pls.' Mot. Ex. B, at 10.) He also stated that Defendants "will use software but they're using only software that they have, that they have lawfully purchased and for which title has passed to them." (*Id.*) After making my ruling, I noted that, "if the plaintiffs want to move for an injunction, if their position is, well, materials are being used improperly, that they should be returned or that software is being used improperly, that is a whole different legal issue. And I am perfectly willing to entertain that in the proper context." (*Id.* at 12.)

In accordance with the parties' agreement, Defendants returned some materials to their attorney. However, they did not return all the copies of the Software they possessed. The parties then agreed to file amended complaints and amended answers/counterclaims.

II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits

demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The materiality requirement means that only those factual disputes that might affect the outcome of the suit preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order for there to be a "genuine" issue of material fact, the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Id.* If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249-50.[1]

III.

A.

While Plaintiffs admit that Defendants returned some materials to their attorney, they allege, and Defendants do not dispute, that Defendants have retained copies of the actual Software and are using them to provide technical support and service for their customers. Plaintiffs claim that this use of the Software breaches the provisions of the Agreement requiring the return of all materials related to the "Products" and prohibiting the unauthorized copying of the Software.[2]

In response, Defendants assert that they obtained some copies of the Software as End-Users

---

[1]Defendants argue throughout their opposition to Plaintiffs' motion that summary judgment is premature because no meaningful discovery has taken place. This argument is somewhat disingenuous because Defendants have repeatedly agreed in stipulations that discovery should be stayed pending the outcome of these motions. In any event, I am fully satisfied that no further factual development is necessary to decide the central question addressed in this opinion of whether Defendants may continue to utilize Plaintiffs' software to provide technical support and service to third-party customers.

[2]Plaintiffs also contend that Defendants' use of the software violates a third contractual provision prohibiting the disclosure of Plaintiffs' confidential or proprietary information. As to that contention, the present record does not establish that Defendants make any disclosures of confidential information to third parties when they provide technical support and service.

and that their use of this software is unrestricted. Specifically, Defendants point to (1) complimentary Software they were given as consideration for attending and working on behalf of Plaintiffs at trade shows, and (2) one copy of the Software PSSI purchased in November 2002. According to Defendants, nothing in the Agreements prevents them from acting as both Dealers and End-Users of the Software, and they have the right to use the Software they obtained as End-Users to provide technical support by viewing Software which is properly loaded on their own computers.

Whether the Agreements contemplate that Defendants may be End-Users as well as Dealers is a question of contract interpretation. The Agreements contain a choice of law clause stating, "This Agreement and the construction thereof shall be governed by the laws of the State of Maryland." (Agreements § 19.) Under Maryland law, where the contract is unambiguous, the court must give effect to its plain meaning and there is no need for further construction by the court. *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001). To determine if a contract is ambiguous, the court may only consider the contract itself. *Fed. Leasing, Inc. v. Amperif Corp.*, 840 F. Supp. 1068, 1073 (D. Md. 1993). Only if an ambiguity exists - i.e., if reasonably prudent persons could disagree about the contract's meaning - may the court consider extrinsic evidence to construe the contract. *Id.*

In my view the Agreements are unambiguous. While they do not specifically state that Dealers may not be End-Users, the provisions as a whole necessarily imply that Defendants only had a single role - as Dealers. Section 1.3 states that the Dealer "wishes to renew its agreement to sell the software products." Section 3.1 grants the Dealer the exclusive right to *sell* the Products. Sections 5.1 and 5.2 require the Dealer to personally learn and *sell* the Products and use its best efforts to exploit the sales potential of the Products. Finally, section 10.3 specifically refers to the Dealer and End-User as

separate entities, describing the situation where "a Product is sold to the End-User by any person or entity other than the Dealer."

The Software that Defendants received free of charge from Plaintiffs self-evidently was provided to Defendants in their capacity as dealers for Plaintiffs and during the course of the relationship established by the Agreements. As Defendants themselves state, this Software was provided as consideration for Defendants' attendance and work at trade shows on Plaintiffs' behalf. Likewise, the fact that Plaintiffs permitted PSSI to purchase and use for its own internal purposes one copy of Software does not negate the fundamental relationship between the parties. It simply makes no sense to infer that Plaintiffs intended to undermine the carefully crafted terms of the Agreements by providing Defendants with unrestricted copies of the Software. Moreover, even if Defendants were End-Users as to this copy of the Software, the intended use was, as Defendants themselves state, internal. Plaintiffs did not give or sell it for the purpose of enabling Defendants to provide technical support and services to third-party customers. Any transactions made for that purpose were conducted in the context of the Agreements.[3]

B.

Defendants further argue that even if they are to be considered only as Dealers (not in the dual capacity of Dealer/End-User), they have not breached the Agreements. The first breach asserted by Plaintiffs is that Defendants have not complied with the contractual requirement that they return "any

[3]Defendants also contend that (1) not all End-Users of the Software were dentists, orthodontists, oral surgeons, or dental/orthodontic practices; (2) Plaintiffs did not tightly control the dissemination of copies of the Software; and (3) Plaintiffs shipped the Software without receiving a Purchase Registration or Order Form from the End-User. Assuming those contentions to be true, they simply are not material to the question of whether Defendants were entitled to use the Software they received without restriction.

and all materials regarding the Products in any form whatsoever received from [Plaintiffs]." (Agreements § 13.3.) Defendants contend that the Software itself is not part of the materials that must be returned. The "Products" are defined to include the Software and any related items. (*Id.* § 2.1.) Defendants suggest that because Section 13.3 says "materials *regarding* the Products" and not simply "the Products," the Software itself is not included. This argument falls by its own weight because it would be senseless for Plaintiffs to require materials related to the copyrighted Software to be returned and yet not the actual Software. Moreover, the Agreements clearly contemplate that the Software itself will be returned upon their termination because they state that upon the return, the Dealer will be paid by Plaintiffs the price it paid "for any unopened Products," and "Products" includes the Software itself.[4]

The second contractual breach alleged by Plaintiffs is the unauthorized copying of the Software. Defendants claim that they do not copy the Software in order to provide technical support and service to their customers. They admit, however, that they view the Software that is properly loaded on their computers in order to provide support and service. Plaintiffs argue that this viewing of the Software constitutes copying. This issue overlaps with Plaintiffs' claim that Defendants, in addition to breaching the Agreements, have violated the Copyright Act. I will now discuss that claim.

IV.

[4]Defendants also argue that the materials at issue in Section 13.3 include only the advertising and marketing collateral used to sell the Products. In support of this argument, they rely on Section 1.5 of the Agreements, which states that the controls on the Dealer's operation and acquisition of "sales supplies" are intended to protect Plaintiffs' rights to its trademark and to discharge Plaintiffs' obligation to maintain a high level of quality products and services. The mere fact that Section 1.5 might refer only to sales supplies and not to the Software itself does not mean that Section 13.3 only refers to "sales supplies." Indeed, as stated *supra*, Section 13.3. requires the return of "any and all materials regarding the Products," not simply the return of sales supplies.

In order to establish copyright infringement, a plaintiff must demonstrate that it owned a valid copyright and that the defendant violated any of the exclusive rights conferred by copyright ownership. 17 U.S.C. § 501(a). One of these exclusive rights is the right to reproduce the copyrighted work. 17 U.S.C. §106(1). Defendants do not dispute that Plaintiffs own seven copyright certificates for the Software. They contend, however, that they do not reproduce it.

In their amended complaint, Plaintiffs allege that in order to use the Software or any portion of it, the Software must be loaded into a computer's Random Access Memory ("RAM"), which requires copying of the Software from a disk or other storage media into RAM. They further allege that this copying, when performed without authorization, infringes on SoftDent's copyrights. In their amended answer, Defendants admit that these allegations are true.

Numerous courts have found that loading software onto a computer's RAM constitutes copying of the software. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518-519 (9th Cir. 1993); *Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 362-363 (E.D. Va. 1994). Defendants argue, however, that *Peak* and its progeny are no longer good law subsequent to the passage of 17 U.S.C. § 117(c) in 1998, and that the viewing of the Software on their computers falls within an exception under the Copyright Act found in Section 117(c). This section provides:

> [I]t is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, *for purposes only of maintenance or repair of that machine*.

(emphasis added).

Defendants' argument is flawed in two respects. First, section 117(c) did not, as they claim, overrule *Peak*. The emphasized language of section 117(c) demonstrates that it provides an outlet for

the use of a computer program on a computer in order to repair that computer's hardware. This does not in any way conflict with the holding in *Peak* and *Advanced Computer Servs.* that loading software into RAM constitutes copying of the software. If it were the case that the software was loaded for the purpose of repairing the computer's hardware, then, under Section 117(c), that form of copying would not be an infringement. Thus, *Peak* and Section 117(c) can exist together. Indeed, this court has recently cited *Peak* as good law. *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 745 (D. Md. 2003).

Second, Defendants are incorrect that their viewing of the Software falls within the 117(c) exception. To begin, the loading of the software is only permissible under 117(c) if it is for the purposes of repairing the *machine* into which it is loaded, not the software itself. Defendants' use of the Software is to repair and maintain the *Software* - specifically, the Software purchased by its customers. Moreover, 117(c) applies to the repair and maintenance of the machine *into which the program is loaded*, not the repair and maintenance of a third party's machine. In this case, the Software is loaded onto Defendants' computer in order to repair and maintain the Software loaded on its *customers'* computers. This use is beyond the scope of Section 117(c).

Although they do not explicitly invoke 17 U.S.C. § 117(a), Defendants also appear to argue that their use of the Software might be exempt from liability for infringement under this section. It provides that the owner of a computer program may make or authorize the making of a copy of the program provided that the copy is created as an essential step in utilization of the program in conjunction with the machine, and that it is used in no other manner. As an initial matter, reliance by Defendants on section 117(a) would not be proper because they are not "owners" of the Software within the meaning of that section. For the reasons I have stated in section IIIA in regard to Plaintiffs'

contract claim, I find that Defendants received the Software subject to the restrictions contained in the Agreements between the parties. This holding is dispositive of Defendants' ownership claim under the Copyright Act as well. *See DSC Communications Corp. v. Pulse Communications, Inc.*, 170 F.3d 1354, 1360-62 (Fed. Cir. 1999). Moreover, even if Defendants are deemed to be owners of the Software, courts have interpreted section 117(a) to apply only to those uses that are internal, not external. *See, e.g., Expediters Int'l of Washington, Inc. v. Direct Line Cargo Mgmt. Servs., Inc.*, 995 F. Supp. 468, 478 (D.N.J. 1998); *Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F. Supp. 617 621-622 (C.D. Cal. 1984). In this case, while the copy is made in order to use the program on Defendants' computer, the copy is not for Defendants' internal use. Rather, Defendants copy the Software in order to generate information for third parties - the customers they service. This use does not fall within the 117(a) exception.

V.

For these reasons, I find that Defendants are violating both their contractual obligations and the Copyright Act by continuing to use the Software to provide technical support and services to their customers. In light of this ruling, I will, in accordance with the understanding reached at the conclusion of the hearing held on June 18, 2004, schedule a conference with counsel so that they, after conferring with their clients and with one another, can suggest how next to proceed.[5]

---

[5]Because Defendants have filed affirmative defenses (as well as counterclaims), I will decline for the moment to enter a formal order of judgment in favor of Plaintiffs on their contract and copyright claims. My ruling today, however, substantially affects the defenses and counterclaims as presently drafted. Accordingly, I will grant Plaintiffs' motions to strike the defenses and to dismiss the counterclaims while granting Defendants leave to file amended defenses and counterclaims if they elect to do so. In the latter event, I will rule upon any motions to strike and dismiss filed by Plaintiffs promptly.

Date: June 23, 2004

/s/
J. Frederick Motz
United States District Judge